#038463

ORIGINAL

FILED
AUG 2 1 2003
U.S. COURT OF FEDERAL CLAIMS

JAMES M. SAKRISON, AZ. BAR NO. 001948
SLUTES, SAKRISON & HILL, P.C.
33 North Stone Avenue, Suite 1000
Tucson, Arizona 85701-1489

Telephone: 520-624-6691

TOM HAMILTON, TX. BAR NO. 08841000
LAFONT, TUNNEL, FORMBY, LAFONT & HAMILTON, LLP
A Limited Liability Partnership
PO Box 1510
Plainview, Texas 79073-1510

Telephone: 806-293-5361

ECF

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| LAN-DALE CO., Plaintiff, vs. UNITED STATES OF AMERICA, Defendant. | Case No. 03-1956C<br>COMPLAINT OF LAN-DALE CO. FOR FAILURE TO PERFORM IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THE SETTLEMENT CONTRACT, RETURN OF SEIZED PROPERTY, DAMAGES, AND ATTORNEY'S FEES |

Plaintiff Lan-Dale Co. alleges as follows:

PRELIMINARY STATEMENT

1. Plaintiff, The Lan-Dale Co. ("Lan-Dale"), is a Nevada corporation. Its primary business has been land development, and its avocation has been acquiring and refurbishing historic aircraft, some of which were then offered for sale or exchange. In the past Lan-Dale completed numerous exchanges with the Marine Corps Air Ground Museum ("MCAGM").

2. On or about September 1990, the Officer in Charge ("OIC") of the MCAGM, asked Lan-Dale to perform the service of flight-delivering the museum's C-117D,

BuNo 50834, from Quantico, VA, to Cherry Point, NC. (Museum-owned aircraft cannot be flown). Since the museum also wished to acquire Lan-Dale's VC-118B, they proposed a two-part exchange. In the first part, Lan-Dale would exchange the VC-118B in return for the C-117D plus several small items. The VC-118B was valued at $500,000, and the small items at $70,000, leaving the value of the C-117D for the purpose of the return exchange at $430,000. In the second part, the return exchange, upon delivery of the C-117D to Cherry Point, Lan-Dale would return title to MCAGM and receive its value in trade stock.

To that end, Lan-Dale submitted a two-page proposal on 21 June 1991. The first page, clearly marked "1 of 2", contained the terms and conditions applicable to both exchanges, and the second page, clearly marked 2 of 2, listed the agreed upon exchange items for the first exchange. The museum did not have sufficient trade stock on hand to list the exchange items for the return exchange. Lan-Dale was assured it had priority over all trade stock the MCAGM acquired and, accordingly, the return exchange was left open ended "*until such time as a mutually agreed upon exchange is consummated.*" To date this exchange has not been consummated.

3. The OIC retired in September 1991 and his replacement arrived in October 1991. Subsequently and unknown to Lan-Dale, the above proposal was modified, approved by the Secretary of the Navy ("SecNav") and used as the basis of the Award/Contract of 13 February 1992. Exchange Award/Contracts do not list values, and Mr. D'Alessandris signed the Contract on 10 February 1992 with representation that Lan-Dale's two-page proposal of 21 June 1991 had been approved as submitted. The flight delivery of the C-117D to MCAS Cherry Point on 27 February 1992 completed Lan-Dale's contractual commitment for both parts of the two-part exchange. What remained was for the Government to perform. The OIC retired in May 1993 and on 23 July 1993, his replacement arrived.

4. The conduct displayed by the replacement OIC regarding this issue resulted in his filing a Hot Line Complaint with the Marine Corps Inspector General ("IG") on 13 June 1995. This was concurred with by Counsel to Marine Corps Combat Development Command ("MCCDC"). The findings of this investigation stated:

OPINIONS:

Page 16, Para. (18). "The sum of the research that I have conducted and the information that I have obtained, lends much credence to the position that the Lan-Dale Company, with regard to the current dispute over the C-117D–VC-118B exchange agreement, may not have been dealt with fairly or equitably, despite protestations to the contrary. Should the dispute become public through litigation, considerable embarrassment may be accrued by the Marine Corps."

RECOMMENDATIONS:

Page 16, Para. (3). "It is recommended that the circumstances and issues surrounding the C-117D–VC-118B exchange between the MCGAM and the Lan-Dale Company be the subject of further review.

Page 17, Para. (4). "If the recommendation contained in par. 3 is not deemed to be warranted, it is recommended that the Marine Corps, to avoid public embarrassment, reach a mutually acceptable accommodation with the Lan-Dale Company regarding that company's current dispute with the MCAGM."

5. These recommendations and opinions were totally ignored by the governmental agencies involved and what Lan-Dale faced was continued illegal conduct on the part of the government's agents and their Counsel. Forced to defend its interests and following the required legal procedures, Lan-Dale filed a Claim with the Contracting Officer on 04 June 1996. The Contracting Officer's denial of the Claim totally ignored the dictates of Lan-Dale's two-part exchange proposal and took the position that the contract has been fully and properly executed with no outstanding actions pending. The *only* part of the contract executed, however, was the *first* part of the two-part exchange listed on page 2 of 2, and it's existence was predicated upon the terms and conditions as stipulated on page 1 of 2: "Based on the agreed value of $500,000.00 for the VC-118B Bu. #128427, the value of the C-117D Bu #50834, after deducting the value of the items listed in the attached proposal, would amount to $430,000.00..." which will be in a loan status at MCAS Cherry Point, North Carolina, "*until such time as a mutually agreed upon exchange is consummated.*"

Lan-Dale's two part exchange proposal of 21 June 1991 is and remains to date the document that is paramount in this ongoing issue. The terms and conditions contained therein were in fact the basis of the Settlement Agreement.

6. On 22 October 1997, Lan-Dale filed a Complaint with the Armed Services Board of Contract Appeals ("ASBCA") which recommended a meeting to resolve this issue. The meeting was conducted in Washington D.C. on 11 May 1998. A settlement of Lan-Dale's two part Exchange Proposal was reached on that date. The "Settlement Agreement" arrived at was the *settlement of the legal issue* generated by the modification of Lan-Dale's two part Exchange Proposal. This settlement was subsequently memorialized in a letter from Lan-Dale's counsel to the government's counsel dated 30 June 1998, a letter to the ASBCA dated 20 August 1998 and a Substitute Award/Contract dated 18 January 2000 (collectively referred to as "Settlement Agreement"). The Settlement Agreement was authorized and approved by the ASBCA and by the office of the Secretary of the Navy.

7. The government's on-going illegal conduct since the unauthorized modification of Lan-Dale's two-page Proposal 21 June 1991 continues in its failure to perform in accordance with the Settlement Agreement, by 1) not allowing Lan-Dale the right to take possession of its property as conveyed by the Bills of Sale; 2) by violating the terms of the Settlement Agreement; and 3) by imposing requirements not included in the Settlement Agreement. This was accomplished through the inappropriate use of the powers governmental agencies possess. In effect, the government has seized the five T-39s stored at Davis-Monthan, with the apparent expectation that Lan-Dale will abandon its property rights given the limited resources available to it to challenge the seizure. In accordance with the terms and conditions of the Settlement Agreement and attached Bills of Sale, there is no legitimate reason why Lan-Dale should not have been possession of its property within the time frame stipulated in the Settlement Agreement.

8. This is an action to recover seized property, lost income, damages and attorney fees by reason of the Government's wrongful retention of Lan-Dale's property under: Contract Disputes Act of 1978, 41 USC, §601-603; the Equal Access to Justice Act,

28 USC §2412; the Federal Acquisition Regulations (FARs), §33; Federal Rule of Criminal Procedure, 41 (e); and this Court's inherent equitable powers to provide Lan-Dale with relief for the violation of its constitutional rights as well as the irreparable harm it is suffering as a result of the Government's wrongful retention of Lan-Dale's property for which it contracted.

## PARTIES, JURISDICTION, AND VENUE

9. Plaintiff Lan-Dale Co. is, and at all times mentioned in this Petition was, a Nevada corporation doing business in Arizona.

10. A. J. D'Alessandris is, and at all times mentioned in this Petition was, the President of Lan-Dale Co.

11. Gary Watson is, and at all times mentioned in this Petition was, Contracting Officer and Head, Purchasing and Contracting Branch, of MCAGM.

12. The Aerospace Maintenance and Regeneration Center (AMARC), located Davis-Monthan AFB, Tucson, Arizona, is and at all times mentioned in this Petition was, the location of the property which is the subject of this suit..

13. The defendant in this action is the United States of America.

14. This action is brought by Lan-Dale Co. pursuant to Federal Rule of Criminal Procedure 41 (e), authorizing motions for return of seized property, damages, and attorney's fees. The Court has subject matter jurisdiction over this action pursuant to this Court's general equitable jurisdiction.

15. Venue is proper in this District pursuant to Federal Rule of Civil Procedure 18, in that the property in question was wrongfully retained at Davis-Monthan Air Force Base, in violation of the Settlement Agreement.

## BACKGROUND

16. Pursuant to 10 U.S.C. § 2572 and 10 U.S.C. § 7572, the Secretary of the Navy has the authority to transfer excess or obsolete material, including aircraft and/or aircraft parts, to non-profit, educational museums, such as the Marine Corps Air Ground Museum at Quantico, VA. The MCAGM has as its principal mission to preserve and enhance

the heritage of the Marine Corps. Department of the Navy aviation-associated museums are tasked with collecting, preserving and displaying artifacts, including vintage aircraft, that are significant and rich in the history, traditions and heritage of Navy and Marine Corps aviation. Under this authorization the Marine Corps has provided the Museum with surplus government owned equipment (GOE), some of which has been exchanged for services or historical items the Museum wished to display.

17. SECNAVINST 5755.2 establishes the policy for the exchange of excess GOE for historical items or specific services. The procedure used by the Museum to exchange GOE with the public contains instructions which require, in part, that

a. an exchange proposal describing the proposed transaction be sent through the appropriate chain of command for approval by the Assistant Secretary of the Navy;

b. the exchange proposal contain the following information and documentation:

1. a proposed exchange agreement between the Museum and the civilian sector;

2. a discussion of the historical value of the material(s) to be exchanged;

3. a determination of the fair market value of the material(s) to be exchanged, including the initial acquisition cost for all GOE;

4. a statement that the exchange is no-cost to the government;

5. a statement that the GOE material exchanged shall be in an "as is, where is" condition as specified in the proposal, and

6. a statement that the proposed exchange is in the best interest of the U. S. Government.

18. Pursuant to the above, the MCAGM has accepted proposals for the exchange of services and artifacts. Lan-Dale has submitted such proposals in the past, all of which were

successfully consummated in accordance with the Terms and Conditions of the Award/Contracts.

## THE TWO-PART EXCHANGE

19. On or about September 1990, Lan-Dale was contacted by LtCol William Beebe II, (OIC) of the MCAGM, who asked if Lan-Dale would be interested in performing a service for the United States Marine Corps ("USMC") by flight-delivering the MCAGM's C-117D BuNo 50834 located at MCAS Quantico, VA, to MCAS Cherry Point, NC. LtCol Beebe, in consultation with his predecessor, LtCol (Ret) Rudy Schwanda, Command Historian at Cherry Point, sent a letter to Lan-Dale dated 23 May 1991 wherein he outlined a proposal for transporting the C-117D. This proposal was typical of the two-part exchange Lan-Dale conducted during LtCol Schwanda's tenure as OIC in 1985. At that time, C-117D BuNo 50835, which had been stricken from the operational inventory in the Philippines, was acquired by the MCAGM and, wings removed, transported to NAS North Island with the hope that an aircraft carrier transiting to the east coast would deliver it to Quantico. This did not occur, so it remained on the ramp at NAS North Island, disassembled and stranded. North Island's Commanding Officer considered it an eyesore and gave LtCol Schwanda six months to move the aircraft. Regulation precluded museum-owned aircraft from being flown. MCAGM contacted Mr. D'Alessandris and requested assistance in solving the problem. It was mutually agreed that a two- part exchange offered a solution. In the first part, Lan-Dale acquired ownership of the C-117D, reassembled it, and as a civilian-owned aircraft, flew it to Tucson where it underwent extensive restoration. Upon completion, at the MCAGM's request, Mr. D'Alessandris flight delivered it to MCAS El Toro, CA. Shortly thereafter, in the second part, Lan-Dale returned title to the aircraft to the museum and received its items of exchange stock. At this time Gary Watson was the Contracting Officer, Head, Purchasing and Contracting Branch, of MCAGM.

20. LtCol Beebe's proposal was typical of the above two-part exchange. Lan-Dale's investment in this would be its VC-118B, which the museum also wished to acquire. Lan-Dale's VC-118B was valued at $500,000 and agreed to by the parties. Encl (16) of the

Inspector General Investigation Report of 07 November 1995 (Exhibit "A" attached hereto and by reference made a part hereof), sets forth LtCol Beebe's statement to the investigating officer relating to this valuation. When asked how he arrived at the $500,000 valuation for the VC-118B, the report states: "He replied that when he first saw the aircraft and the condition it was in, the number that stuck in his mind was $700,000, which was his own personal estimation. When Mr. D'Alessandris mentioned that he would be willing to assign a valuation of $500,000, he thought it was a great deal and jumped at it." This particular aircraft is one-of-a-kind, restored to like-new condition, with a luxurious interior of stainless steel and mahogany, and had been used by several Commandants during the aircraft's military career. (Exhibit "B" photographs of the VC-118B attached hereto and by reference made a part hereof).

21. Lan-Dale submitted a two-page proposal dated 21 June 1991. Based upon the high level of honesty and integrity displayed by Marine Corps personnel in prior exchanges, the terms and conditions stated on page 1 of 2 were concise and specific. (Exhibit "C" attached hereto and by reference made a part hereof). Clearly marked "1 of 2" and "2 of 2", the proposal showed on the first page the mutually agreed upon terms and conditions that applied to both parts of this two-part exchange, in that the contractual commitment for the finalization of the second part of the exchange (the return to the museum of title to the C-117D, valued at $430,000), was predicated upon the availability of trade stock and was open-ended *"until such time as a mutually agreed upon exchange is consummated."* To date, this has not occurred. The second page was the proposal for part one of the exchange, and it's existence was predicated upon the terms and conditions, as stipulated on page 1 of 2, all as suggested by LtCol Beebe.

22. A condition of the exchange was for Lan-Dale to absorb all costs and liability for the flight delivery of the VC-118B from Tucson to MCAS Cherry Point, the restoration to airworthy condition of the C-117D aircraft, and for its flight delivery from MCAS Quantico to MCAS Cherry Point.

23. On 28 June 1991, Lan-Dale received the MCAGM's formal acceptance of the two-page proposal (Exhibit "D" attached hereto and by reference made a part hereof) and on 03 July 1991 the MCAGM submitted the Request for Approval to SECNAV. (Exhibit "E" attached hereto and by reference made a part hereof).

On Page 6 of the Investigating Officer's Investigative Report, 22 September 1995, LtCol Ferrari stated that the *"The proposal had received positive endorsement at each step until arriving at CNO. At this point the paper trail on this proposal stops until November of 1991."* (Exhibit "F" attached hereto and by reference made a part hereof).

24. LtCol Beebe retired in September 1991 and LtCol Carmen Dragotta arrived as OIC of the MCAGM in October 1991. Prior to his departure, LtCol Beebe reviewed the file with LtCol Dragotta and advised him in detail the specifics of the two-part exchange. Lan-Dale awaited either the contract or notice of disapproval by higher authority. Unknown to Lan-Dale, LtCol Dragotta materially changed the values as stipulated in Lan-Dale's two-page proposal and as listed in LtCol Beebe's Request for Approval. LtCol Dragotta without Lan-Dale's knowledge or consent reduced the value of the VC-118B from $500,000 to $350,000, and Lan-Dale's carryover equity represented by the C-117D, from $430,000 to $240,000 and LtCol Dragotta submitted his Request for Approval to SecNav on 15 November 1991. This request listed the altered values and was subsequently approved. (Exhibit "G" attached hereto and by reference made a part hereof). LtCol Dragotta then submitted the altered exchange package to the USMC Contracting Officer, Gary Watson. The package logically would have included, among other things, Lan-Dale's two-page proposal and the altered approved request. A review of the documents readily reveals a discrepancy in values, (the VC-118B, $500,000 vs $350,000 and the C-117D, $430,000 vs $240,000.)

25. Exchange Award/Contracts do not list values, and Mr. D'Alessandris signed the Contract on 10 February 1992 with representation that Lan-Dale's two-page proposal of 21 June 1991 had been approved. (Exhibit "H" the Award/Contract attached hereto and by reference made a part hereof).

Lan-Dale alleges, that the Contracting Officer was guilty of Misfeasance and Nonfeasance in producing a Contract based upon documents which reveal on their face a discrepancy in values, (the VC-118B, $500,000 vs $350,000 and the C-117D, $430,000 vs $240,000.) which should have been readily apparent to any contracting officer.

26. The flight delivery of the C-117D from MCAS Quantico to MCAS Cherry Point was conducted as a USMC operation. A USMC C-130 escorted the C-117D from Quantico to the new museum location at Cherry Point. Among the notables awaiting the arrival at Cherry Point was the Assistant Commandant of the Marine Corps, Gen Richard D. Hearney. Enclosed are copies of official USMC photographs of the C-117D relating to its flight delivery (Exhibit "I" attached hereto and by reference made a part hereof). With this flight delivery Lan-Dale fulfilled its contractual commitment for both Award/Contracts. What remained for closure was performance on the part of the MCAGM in furnishing Lan-Dale trade items totaling $430,000, in exchange for the return of BuNo 50834's title to the MCAGM.

27. Lan-Dale placed numerous phone calls to LtCol Dragotta requesting to be advised immediately of any trade stock that became available to the museum so Lan-Dale could complete the return exchange of the C-117D. During these calls, Lan-Dale reiterated the terms of the exchange, including values, and in the course of conversations perceived an evasiveness on the part of Dragotta.

28. On 26 May 1992, Lan-Dale submitted a letter, with enclosures, to LtCol Dragotta. (Exhibit "J" attached hereto and by reference made a part hereof). This letter documented in detail the terms and conditions of the two-part exchange as agreed to and submitted to SECNAV for approval by LtCol Beebe. LtCol Dragotta never responded to anything in writing, and in the many conversations that followed LtCol Dragotta never refuted the statements made in Lan-Dale's letter of 26 May 1992.

29. Dragotta advised Lan-Dale the MCAGM had received four HH1K helicopters as trade stock. Lan-Dale expressed an interest in these items. Dragotta advised that only three were available since he had committed one to a Pennsylvania helicopter company.

(After he retired, Dragotta was employed by a Pennsylvania helicopter company). Lan-Dale advised that it had the right of first refusal over exchange items the MCAGM acquired, and submitted a letter requesting these items as a part of this exchange. Prior to his retirement, Dragotta denied receiving this letter.

30. About a month later, in a conversation with Joe Payton, MCAGM's Head of Restorations, Mr. D'Alessandris asked the status of the four HH1-Ks and was advised that LtCol Dragotta had committed one of the HH1-Ks in an exchange to a Pennsylvania helicopter company.

Lan-Dale alleges, that LtCol Dragotta, committed fraud by making false statements in a government matter. (SECNAVINST 5370.2H, Section X. para K (see 18 U.S.C. §1001 ). (Exhibit "K" attached hereto and by reference made a part hereof).

31. LtCol Dragotta retired in May 1993 and in July 1993, from the position he held at Headquarters Marine Corps, Washington D.C., Col A. J. Ponnwitz was assigned to the Marine Corps Museum as the OIC. Lan-Dale arranged for a meeting with Col Ponnwitz at MCAS Quantico on 10 September 1993. Mr. D'Alessandris asked LtCol Schwanda to be present because he knew the details of the two-part exchange agreement. During their conversation, Mr. D'Alessandris mentioned that Lan-Dale was to receive $430,000 in trade stock for the return of title of the C-117D to the MCAGM. Col Ponnwitz responded that, in accordance with the approved proposal he had in hand, Lan-Dale was to receive *$240,000* in trade stock and the value of Lan-Dale's VC-118B was $*350,000.* Mr. D'Alessandris advised Col Ponnwitz that the terms and conditions of the proposal Lan-Dale submitted stipulated the retained value of the C-117D at *$430,000* and the value of the VC-118B at *$500,000.* Furthermore, Mr. D'Alessandris advised Col Ponnwitz that Lan-Dale's proposal afforded the USMC only two options: approval or denial. Making changes in Lan-Dale's proposal without Lan-Dale's knowledge or consent constituted an illegal act. Though he was duty bound to address LtCol Dragotta's conduct, he chose to ignore it. Mr. D'Alessandris asked for a copy of the document; Col Ponnwitz refused to tender a copy. At a later date, a copy of the document was acquired by Lan-Dale. This document was dated

15 November 1991 (Ibid Exhibit "G"). In the course of the meeting, Col Ponnwitz made the following statement: "Unlike LtCol Dragotta, I will respond to everything in writing."

32. On 20 September 1993, Lan-Dale submitted a written proposal to Col Ponnwitz for the second part of the exchange. Col Ponnwitz' response to this proposal, was not in writing but in the form of a message left on Lan-Dale's telephone answering machine.

33. During the course of future communications, Col Ponnwitz displayed an irrationality regarding the facts relating to this transaction to the extent that Mr. D'Alessandris could no longer deal with him. Apparently higher authority was never advised of LtCol Dragotta's conduct in violation of: (SECNAVINST 5370.2H. Section X. para B and K (See 18 U.S.C. Section 4 and 1001). (Ibid Exhibit "K")

34. On 15 July 1994 Lan-Dale submitted a proposal to the Director of Marine Corps History and Museums, BrigGen (Ret) E. H. Simmons, USMC, requesting he address this issue.

35. Col (Ret) F. Brooke Nihart, the former Director of the MCAGM, who was knowledgeable of Lan-Dale's past performance, offered to present the truth of this matter to BrigGen Simmons. Nihart consulted with LtCol Schwanda who drafted a letter dated 08 September 1994 to BrigGen Simmons (Exhibit "L" attached hereto and by reference made a part hereof). At Mr. D'Alessandris' request a copy of the above proposal was submitted with this letter. The letter advised BrigGen Simmons of the dishonorable conduct on the part of LtCol Dragotta and Col. Ponnwitz and that "<u>Mr. D'Alessandris would not be opposed to the appointment of a mutually agreeable arbitrator and the use of professional appraisals to determine the current fair market values of Museum trade stock</u>." [Emphasis added]. BriGen Simmons referred this matter back over to Col Ponnwitz and in his letter of 20 September 1994, advised Lan-Dale to contact legal counsel to the MCCDC, Ms Penny Clark.

36. In a Memorandum for the Record dated 20 September 1994, Col Ponnwitz, with Counsel's concurrence, initiated a Hot Line Complaint with the Inspector General of the Marine Corps (IGMC) wherein he made false statements which he labeled allegations (Exhibit "M", attached hereto and by reference made a part hereof).

The above memorandum resulted in the IGMC's investigation dated 13 June 1995, LtCol John Ferrari Investigating Officer. The 10 July 1995 letter of instruction from W.W. Scheffler, Chief of Staff, Marine Corps Air Bases, Eastern Area, Cherry Point, to Lt Col Ferrari, initiating the Hot Line Complaint investigation, clearly states in paragraph 2: "You shall investigate *all* facts and circumstances surrounding the allegations and report findings of facts, *opinions*, and *recommendations* upon completion..." [Emphasis added]. A letter from LtCol Ferrari to Scheffler [ca. 19 July 1995] acknowledged his directive to "...investigate all the facts and circumstances..." Scheffler replied on 03 August 1995 reiterating Ferrari's "...responsibility to investigate and resolve all possible issues." (Exhibit "N" attached hereto and by reference made a part hereof).

37. LtCol Ferrari contacted Lan-Dale Counsel, Tom Hamilton, and advised that he was the Investigating Officer. Hamilton advised LtCol Ferrari that any response he himself would make would be considered hearsay and suggested LtCol Ferrari contact Mr. D'Alessandris directly. Upon receipt of Ferrari's phone number, Mr. D'Alessandris immediately contacted him and advised that he would furnish him Lan-Dale's complete file and would answer any questions he might have. LtCol Ferrari followed up with a letter on 08 August 1995 confirming the details of the conversation (Exhibit "O", attached hereto and by reference made a part hereof). Enclosed with this letter was a copy of the complaint. His letter stated, inter alia, "*Some of these claims are poor works of fiction that are readily transparent.*" [Emphasis added].

38. Col Ponnwitz did not submit data to substantiate the nine allegations which he furnished to the IGMC in the Hotline Complaint.

The Inspector General added two more allegations, listed below, which lacked substance, the proof of which lay within the government's own documents.

The Investigating Officer wrote "*I can only speculate as to why the Inspector General's Office is adding this to the claims made by Col Ponnwitz. It seems rather odd to me.*" These two allegations along with the nine others were easily proven to be false statements. They are:

A. 1. "LtCol Schwanda is alleged to have engaged in questionable practices while serving as the director of the Marine Corps Air Ground Museum (MCAGM) in Quantico VA., by acting as an agent for Lan-Dale Corporation [sic], which permitted him to receive aircraft which were then sent to the museum at Cherry Point, creating a favorable circumstance for his future employment at Cherry Point."

Lan-Dale is fully aware and believes, and on that basis alleges, that the above is a false statement. Any and all exchanges made, and the disposition and location of aircraft involved, would be a matter of record. Had the IGMC requested data to substantiate the above allegation, from both the MCAGM and Cherry Point, he would readily have determined that documentation did not exist and that the only aircraft Lan-Dale delivered to Cherry Point were the two relative to this issue: the C-117D BuNo 50834; and the VC118B BuNo128427.

2. "The IGMC has learned that Counsel at MCCDC [Ms Penny Clark] is presently communicating with attorneys for Lan-Dale Corporation [sic] regarding previous 'deals' that were allegedly made between the MCAGM and Lan-Dale Corporation."

The implication of unsavory conduct in the use of, and emphasis added to, the word "deals" clearly indicates **an** intent **to** defame the credibility, reputation, and character of Mr. D'Alessandris and Lan-Dale.

(Regarding the above allegations, Investigating Officer LtCol John Ferarri's letter to Lan-Dale on 08 August 1995 stated: *"I can only speculate as to why the Inspector General's Office is adding this to the claims made by Col Ponnwitz. It seems rather odd to me. The other 9 allegations are contained in the memorandum from Col. Ponnwitz to the Inspector General."* [Emphasis added]. (Ibid. Exhibit "O").

39. Col Ponnwitz' Allegation #8: "...[LtCol Schwanda] conspired with Col Nihart USMC (Ret) to create a favorable circumstance in which Mr. D'Alessandris could introduce an exchange proposal to the Marine Corps which could result in Lan-Dale Corporation [Sic] earning close to $500,000 in profit."

This allegation is without substance. Lan-Dale was due $430,000 in MCAGM trade stock and as stated in the copy of Col Nihart's letter the IGMC had in hand, "Mr. D'Alessandris would not be opposed to the appointment of a mutually agreeable arbitrator and the use of professional appraisals to determine the current fair market values of Museum trade stock" [Ibid, Exhibit "L").

40. A cursory review of the allegations listed in the Hotline Complaint of 15 June 1995, readily would have revealed that they lacked substance and were in reality false and constituted a defamation of Lan-Dale and A. J. D'Alessandris. Upon initial review, Investigating Officer LtCol John Ferrari determined the allegations lacked substance, and wrote: "*Some of these claims are poor works of fiction that are readily transparent.*"

41. In letters of 19 January 1995, 07 February 1995, and via certified mail return receipt requested on 03 March 1995, Tom Hamilton, Counsel for Lan-Dale, furnished to Counsel, MCCDC, Ms. Penny Clark, a detailed history with documentation of the circumstances relating to the two-part exchange agreement entered into between parties and requested her assistance toward a amicable resolution of this matter. (Exhibit "P" the three letters attached hereto and by reference made a part hereof).

42. Ms. Clark made a response to the above three letters to Tom Hamilton 08 March 1995 wherein she stated, inter alia, "I deemed it appropriate to seek further fact finding and investigation." She refers to an NCIS investigation, and in her letter of 07 April 1995, advised the name of the investigating officers, either Ms. Rizzo and/or Ms. Band, and advised "I would respectfully decline to pursue discussions or resolution of Mr. D'Alessandris' concerns until Ms. Rizzo has completed her fact-finding, recommendations, and case closure."

No one contacted Lan-Dale regarding the facts during the course of the above investigation. Ms. Clark's letter of 16 June 1995 stated "...while Ms. Rizzo has completed a review of the information pertinent to Mr. D'Alessandris' allegations, an investigation is still pending before the IG"..."I would prefer to defer discussions regarding Mr. D'Alessandris' allegations until the investigation has been completed." She then stated, "...the Government's position is and has been that the contract has been fully and properly executed

with no outstanding actions pending." The *only* part of the contract executed, however, was the *first* part of the two-part exchange listed on page 2 of 2, and its existence was predicated upon the terms and conditions as stipulated on page 1 of 2. Ms. Clark was made well aware that the foundation of the Award/Contract was Lan-Dale's two-part exchange proposal of 21 June 1991 which had been modified by LtCol Dragotta and which stipulated, with reference to the second part of the exchange, the return exchange of the C-117D, "*until such time as a mutually agreed upon exchange is consummated.*" Lan-Dale has reason to believe that Ms. Clark's refusal to acknowledge the second part of the two-part exchange, and her decision to defer discussions regarding Mr. D'Alessandris' allegations until the investigation has been completed, was an attempt **to** ignore the findings of the investigations in direct violation of DOD Law SECNAVINST 5370.2H Section X. Para K.). (See 18 U.S.C. Sections 4 and 1001). (Ibid Exhibit "K").

43. IGMC HOTLINE COMPLAINT 950113: By letter dated 07 November 1995, submitted to the Commandant of the Marine Corps (IG) Headquarters, U.S. Marine Corps, Washington DC, MajGen Frederick McCorkle, Commander, Marine Corps Air Bases, Eastern Area, Cherry Point, concurred with the "findings, conclusions and disposition of the Completion Report, which stated as follows:

OPINIONS:

> 18. "The sum of the research that I have conducted and the information that I have obtained, lends much credence to the position that the Lan-Dale Company, with regard to the current dispute over the C-117D – VC-118B exchange agreement, may not have been dealt with fairly or equitably, despite protestations to the contrary. Should the dispute become public through litigation, considerable embarrassment may be accrued by the Marine Corps."

RECOMMENDATIONS:

> 2. "It is recommended, that the circumstances surrounding LtCol Dragotta's relationship with the Keystone Helicopter Company while he was on active

duty, and its influence on his current employment, be the subject of further review.

3. "It is recommended that the circumstances and issues surrounding the C-117D--VC-118B exchange between the MCGAM and the Lan-Dale Company be the subject of further review.

4. "If the recommendation contained in par. 3 is not deemed to be warranted, it is recommended that the Marine Corps, to avoid public embarrassment, reach a mutually acceptable accommodation with the Lan-Dale company regarding that company's current dispute with the MCAGM." (Exhibit "Q" Opinions and Recommendations, attached hereto and by reference made a part hereof).

## CONTRACTOR'S CLAIM

44. In accordance with 41 U.S.C. 601-613, The Contract Disputes Act, Lan-Dale Counsel James Sakrison of the law firm Slutes, Sakrison & Hill, P.C., Tucson, AZ filed a claim with the Contracting Officer on 04 June 1996.

45. On 27 March 1997, the Contracting Officer denied Lan-Dale's claim. The Contracting Officer's denial contained numerous inaccurate statements and contended that Lan-Dale should have contacted him during the course of negotiations with the MCAGM. However, the format for exchange negotiations between Lan-Dale and the MCAGM had been established in at least six other transactions, one of which was a two-part exchange, conducted by Lan-Dale and the MCAGM since 1983. In each case, Lan-Dale was advised that upon completion of the negotiations with the OIC, the MCAGM submitted the documents to CNO for approval. This completed package was then submitted to the Contracting Officer who prepared and signed the contract. Lan-Dale was never instructed to contact, negotiate with, or request any approval from the Contracting Officer. The established format for negotiations of this type is set forth in the following statement made by LtCol Schwanda, former Director of the MCAGM and at that time Command Historian

at MCAS Cherry Point, in his letter dated 05 January 1996 to the Commander of the Marine Corps Air Bases, Eastern Area, Cherry Point, MajGen Frederick McCorkle:

> "The contracting officer at Quantico, and approving authorities at HQMC, NavAirSysCom, CNO, DOD and GAO were fully aware that MCAGM directors served as sole negotiators of proposed exchanges, and never challenged our authority.
> "Every MCAGM director for the past 20 years (Col D'Andrea, LtCol Brown, Myself, LtCol Beebe, LtCol Dragotta and Col Ponnwitz) has routinely and continuously engaged in these negotiations."

The denial stated, furthermore, that the contract had been "fully performed by each Party," referring once again to the contract for the *first* part of the two-part exchange, *totally ignoring the facts presented and the Opinions and Recommendations disclosed in the IGMC investigative report.*

CONTRACTOR'S COMPLAINT

46. On 24 May 1997 Lan-Dale Counsel James Sakrison filed a Complaint with the Armed Services Board of Contract Appeals (ASBCA). John Dietrich, Senior Litigation Trial Attorney, newly appointed Counsel to the Contracting Officer, immediately advised that the IGMC's investigative report would not be admissible. Lan-Dale Counsel advised him that Counsel for the Contracting Officer, Ms Penny Clark, had stated in her letters that she would defer resolution pending the recommendations of the Inspector General's investigation. Dietrich immediately filed a formal Motion to Dismiss, which Motion was denied. The Government then requested a Compromise Settlement Meeting.

47. A Settlement Meeting was conducted in Washington, D.C., on 11 May 1998. Present at the meeting on the part of the Marine Corps were Counsels John Dietrich and Jim Yohn, Contracting Officer Gary Watson, and MCAGM Curator Ken Smith Christmas. Representing Lan-Dale: A. J. D'Alessandris President, and Counsel Tom Hamilton, Esq., of the firm, Lafont, Tunnell, Formby, Lafont & Hamilton, L.L.P., Plainview, Texas. John Dietrich advised that this matter was to be resolved on the basis of the Award/Contract of 13 February 1992, the first part of the two-part exchange, and be memorialized as a substitute

"Award/ Contract". Dietrich then advised that Lan-Dale's position, for the purpose of the meeting, would be considered factual. A Settlement Agreement was arrived at. It was mutually agreed Lan-Dale would receive five Engines (complete and zero-time if available), one T-34 and six T-39s. One of the T-39s and the five engines had not been transferred to the MCAGM account at this time. It was agreed the value of this T-39 would be commensurate with the other four at Davis-Monthan ($50,000 to $55,000). Transfer of T-39D BuNo 150548 and the five engines to the MCAGM was a paper transfer readily accomplished. Five of the T-39s and the five engines were stored at Davis-Monthan AFB, Tucson, and the T-34 and one T-39 were stored at MCAS Cherry Point. Dietrich displayed 8 x10 color photographs of all the aircraft, both exterior and interior, attesting to exactly what Lan-Dale was to receive and subsequently furnished Lan-Dale copies. (Exhibit "R', copies of the photographs attached hereto and by reference made a part hereof). Dietrich advised Mr. D'Alessandris that Lan-Dale would have to accept the items *"as is where is."* Mr. D'Alessandris acknowledged, and stipulated *at no cost to Lan-Dale.* Deitrich agreed: *no cost to Lan-Dale.* Mr. D'Alessandris then advised he had heard AMARC was now imposing a fee for preparation and transport of stored items. Neither Dietrich nor anyone on the Government side of the table made a comment.

The above was the only reference to removal costs at this meeting. AMARC subsequently furnished Mr. D'Alessandris the CO3A List ( items removed and their acquisition cost ) which are attached to the photographs of each of the 5 T-39s located at Davis-Monthan.

<u>THE NAVY AND MARINE CORPS T-39s</u>

48. In January 1955 the USAF ordered 143 T-39s, and in 1961 the USN ordered 42 as Air Crew Trainer, pilot-proficiency/administrative support, and transport aircraft. At least some of the out-of-service T-39s assigned to the Marine Corps were stored at AMARC in Tucson. AMARC stores aircraft for all the military services, including the Marine Corps and, at the direction of the services, reclaims parts from stored aircraft for use in active aircraft. After reclamation, some aircraft are transferred to the MCAGM's account.

49. The organization responsible for directing AMARC with respect to the Marine Corps' stored T-39s is the Navy's Aviation Supply Office ("ASO") in Philadelphia. The ASO is the Navy and Marine Corps organization responsible for Navy and Marine Corps aviation materials. The ASO has a Detachment Field Supply Office ("ASO FSO") at Davis-Monthan, which was under the direction of Herbert Swetman.

50. Based upon the settlement agreement in Washington D.C. it was reasonable to expect that closure of the Award/Contract should have occurred in no more than three months, by 11 August 1998, at which time the T-39s and engines would have fulfilled Lan-Dale's plan for a Mexican cargo operation. Though all these items were readily available, Lan-Dale **did** not have a Contract in hand until a total of *20 months* had passed. This delay proved to be extremely costly to Lan-Dale. (By contrast, LtCol Dragotta submitted his modified proposal to SecNav in November1991, and the Award/Contract and closure occurred in February 1992, fewer than three months).

51. Lan-Dale Counsel Tom Hamilton sent a letter dated 30 June1998 to Dietrich confirming the exchange items Lan-Dale was to receive and the *no cost to Lan-Dale* stipulation. A copy was submitted to the ASBCA thereby memorializing the Settlement Agreement. (Exhibit "S" attached hereto and by reference made a part hereof).

52. In June 1998, one month after the Settlement Meeting and approximately 19 months prior to Lan-Dale's receipt of the Contract, Dietrich was advised in a letter from Anthony A. Mazzone, Navy Inventory Control Point ( NICP), to give consideration to costs involved in removing aircraft from AMARC. Dietrich's receipt of this data was confirmed in a letter from Mazzone on 30 June 1999:

> "About a year ago I wrote to Karen and Mr. Dietrich advising that they should be aware of and give consideration to costs involved in removing aircraft from AMARC."
>
> The letter continued as follows:
>
> "There will be fees for escort, preparation and towing. In order to avoid the untenable situation of AMARC storing aircraft no longer owned by the military services, I

suggest that title be turned over only when the aircraft reach the gate and all fees have been paid.

"Also, 5 of the J-60 engines are still installed on the aircraft. AMARC should have provided an estimate for removal.

"I am just sending this as a reminder of what needs to be considered in modifying the contract." (Exhibit "T" attached hereto and by reference made a part hereof).

Dietrich ignored all of this. The Award/Contract of 18 January 2000 does not reflect any consideration of the above.

53. During this period of time, Lan-Dale's attorneys made many calls and submitted many letters to John Dietrich requesting closure of this issue.

54. On 27 September 1999 Mr. D'Alessandris received a draft copy of the Award/Contract.

55. In his 12 November 1999 letter to Lan-Dale, James Sakrison advised of his telephone conversation with John Dietrich wherein Dietrich made the following statements:

A. "...the fifth T-39, BuNo 150548, which the parties had estimated a value of $50,000, had come in with an appraisal at $70,000.

B. "...the five engines which the parties estimated had a value of $5,000 each, had an appraisal returned of $10,000 each.

C. [He] "...had gotten the appraisals in mid-October and was having a difficult time writing his settlement proposal to the Secretary of the Navy because of the disparity of $20,000 on the aircraft and $25,000 on the five engines. [He said]... theoretically the transactions should have balanced out, but now it looks like the Navy is getting 'short-changed by $45,000.'"

Lan-Dale is fully aware and believes, and on that basis alleges, that the above false statements are the format for Dietrich's scheme in his attempt to alleviate his "no cost to Lan-Dale" commitment.

56. In his 24 November 1999 letter to Tom Hamilton, Dietrich put the above scheme in writing. (Exhibit "U" attached hereto and by reference made a part hereof).

Dietrich stated the fifth T-39 appraised at $70,000 in spite of the fact that the Government had valued three of the other four T-39s at $50,000 and one at $55,000. By comparison, an ocular review of the fifth T-39, BuNo150548, readily revealed its lesser value. This was further attested to in the gross amount of items removed from 150548. Davis-Monthan's CO3A Form listed the items removed and their acquisition cost for each of the T-39s. The *total* cost of the removals from BuNo 150548: $321,880.76. The *average* cost of removals from the other four aircraft: $28,476.14. Subsequently, Lan-Dale requested an independent appraisal of this aircraft which reflected a valuation of $20,000. (Exhibit "V" attached hereto and by reference made a part hereof). To date, John Dietrich has not responded to the $20,000 appraisal.

57. In the above letter Dietrich claims $7,000 was established at the Settlement Meeting as the value of an engine, and that they had subsequently appraised at $10,000. The valuation of $10,000 was established at the Settlement Meeting when Museum Curator Ken Smith Christmas requested Lan-Dale accept T-34B BuNo140908, which the Government valued at $80,000, in lieu of the one agreed upon, BuNo140931, which the Government valued at $90,000. For the $10,000 difference in valuation, the Government furnished Lan-Dale the fifth engine.

58. Lan-Dale personnel had inspected the engines, and the sealant on the cowling, typical of the whole aircraft, clearly indicated it had not been removed for many years. All of the engines had numerous components missing. No two engines were alike, and consequently, all would appraise at a different value. Obviously the engines had not been appraised.

59. Dietrich, in the above untrue representations, arrived at a non-existent total of $40,000 excess value ($25,000 on the five T-39s and $15,000 on the engines). His letter stated that "because the appraisals for the engines and new T-39 came in higher than expected the contractor would have to bear the costs associated with presentation." This representation was neither realistic nor factual.

Furthermore the fifth T-39 was to have a value commensurate with the other four ($50,000 to $55,000), as agreed at the Settlement Meeting. The independent appraisal of the fifth T-39 is $20,000. In reality, Lan-Dale has been "short-changed" by $30,000.

Lan-Dale is fully aware and believes, and on that basis alleges that, in this letter Dietrich made numerous misrepresentations and false statements with intent to deceive, all in direct violation of SECNAVINST 5370.2H Sec.X Para K. (See 18 USC §. 1001) (Ibid Exhibit "K").

60. 03 December1999. Tom Hamilton's response to the above letter stated: "A. J. D'Alessandris has reviewed your letter of November 24, 1999 ... [and]...although he completely disagrees with your evaluation regarding the issue of who is to pay for the presentation expense," will sign the contract.

Mr. D'Alessandris, having reviewed the terms and conditions contained in the draft copy of the Award/Contract, made the above decision to sign the contract with full knowledge that upon receipt of the Settlement Award/Contract and attached Bills of Sale DOD released control of all of the items to Lan-Dale. Correspondingly, Lan-Dale or its assigns are the only entities holding the right to, and obligated to, prepare and remove Lan-Dale's property from their current military locations:

> Page 6, §. E-4 stated: " Risk of Loss Prior to Acceptance. The Government assumes no responsibility for maintaining the items described in CLINs 0001AA to 0001AJ [items Lan-Dale is to receive] from signing of this contract to removal by the Contractor. [Emphasis added]. The Lan-Dale Company accepts all risk of loss or damage [sic] these items."
>
> Page 9, Section H-4: [Lan-Dale's aircraft and engines] shall be delivered in "AS IS, WHERE IS" condition. [Emphasis added]. Contractor shall obliterate all stars, bars, insignia and service markings wherever they appear, prior to assuming ownership, without expressed or implied warranty of any kind. Removal of... [aircraft and engines] from military property shall take place within sixty (60) days after the issuing of Bill of Sale.

Page 8, §. G-2. The contract is for the direct exchange of property...[the] result of a settlement of contract claims and disputes between the United States Government and the Lan-Dale Company. In accordance with ASBCA No. 50829, both parties have agreed that there is to be no monetary compensation.

THE AWARD CONTRACT

61. Lan-Dale received the Award/Contract and attached Bills of Sale dated 18 January 2000. (Exhibit "W" attached hereto and by reference made a part hereof). The Bills of Sale were not the originals as required. Lan-Dale's request for the originals resulted in Bills of Sale erroneously dated 07 February 2000 (all future reference to the Bills of Sale will reflect this date). (See Award/Contract page 7, §. F-3). This error on the part of the Contracting Officer was costly to Lan-Dale.

62. Lan-Dale alleges, that as of the date of the Award/Contract and Bills of Sale, the Government released control over any and all of the items exchanged to Lan-Dale. Correspondingly, as civil-owned items, Lan-Dale and or its assigns are the only entities holding the right to, and obligated to, prepare and remove Lan-Dale's property from their current military locations.

63. **A letter dated 08 February 2000 from** Head, Museums Branch, LtCol R. J. Sullivan to Anthony Mazzone, NICP, Philadelphia, PA, Ref: the Award/Contract **stated**:

"Subj: AUTHORIZATION FOR REMOVAL OF AIRCRAFT AND ENGINES"

1. [authorized AMARC to remove the five aircraft and five engines and]

"Lan-Dale Company...will pay [AMARC] for removal of all material."

The Bills of Sale and the Award/Contract preclude AMARC from having any contact with Lan-Dale's Aircraft and engines.

This letter was forwarded to Herb Swetman, Director, NICP ASO FSO, Davis-Monthan, and subsequently submitted to AMARC.

64. Lan-Dale alleges, that Head, Museums Branch, LtCol R. J. Sullivan's letter made false and misleading statements in authorizing AMARC to remove the five aircraft and

five engines stored at AMARC and demand payment from Lan-Dale. He is in direct violation of SECNAVINST 5370.2H §. X Para K. (See 18 USC §. 1001) (Ibid Exhibit "K").

65. A meeting was held on 14 February 2000at AMARC with Herb Swetman and for Lan-Dale, John D'Alessandris and A. J. D'Alessandris. The removal of Lan-Dale's property parked at AMARC was discussed. Swetman was advised the items were to be released at no cost. Lan-Dale stated the terms of the Contract, **of** which Swetman was not aware, and provided him with a copy. Lan-Dale advised its personnel planned on removal of the items in no more than 30 days or by March 15, 2000.

66. Swetman tendered AMARC a copy of the Award/Contract and attached Bills of Sale. AMARC refused to comply with the terms therein, in spite of the fact that AMARC was repeatedly advised that only Lan-Dale had the right to remove the aircraft and engines from Davis-Monthan.

67. The T-34B and VT-39E located at MCAS Cherry Point, upon presentation, were released to Lan-Dale at "no cost." Lan-Dale personnel obliterated all military markings from the aircraft, prepared them for removal, and transported them from their military location, *all in accordance with the terms and conditions of the Award/Contract.* To date, however, the Contracting Officer has failed to release the logbooks for the T-34B and the VT-39E to Lan-Dale. (Note: without log books the aircraft have limited value).

Lan-Dale alleges that the Government **has** failed to comply with the Terms and Conditions of the Award/Contract and attached Bills of Sale by not allowing Lan-Dale to remove its property from their military location prior to 07 April 2000, and placed Lan-Dale in an untenable situation that has proven to be extremely costly to the company. With the realization that the Contracting Officer was not going to enforce the Contract, and having good cause to acquire its property as soon as possible, under duress Lan-Dale was forced to address AMARC's demands.

68. Lan-Dale had received a copy of AMARC's "Actual cost estimate" for removal of the aircraft and engines on 10 February 2000 ($35,029.00) and the "Cost breakdown" on 23 February 2000 (Exhibit "X" attached hereto and by reference made a part hereof).

| | |
|---|---|
| Aircraft: | $19,354.00 |
| Engines: | $15,675.00 |
| Total "actual cost estimate": | $35,029.00 |

The breakdown did not list any removals, but did reveal costs that were ludicrous. Included in their ridiculous total of 202.5 man-hours to remove the five engines, the estimate called for *20 man-hours to "transit & search for pallet & old mattress"* upon which to place the removed engines. In reality, on 21 June 02, with Lan-Dale personnel present as observers, the five engines were removed, placed on Lan-Dale's engine stands, and loaded on Lan-Dale's transport, in *fewer than 20 man-hours.*

69. Considerable effort was expended to demonstrate to AMARC that their actual cost estimate was not factual. Mr. D'Alessandris is knowledgeable of the T-39, having flown numerous trips as co-pilot and been directly involved in engine removal. JET-TECH ENG, Laredo, TX, operates T-39s. Monty Jackson (General Manager), on occasion, requested Lan-Dale's assistance, use of tools, fork lift, etc. In 1996, one of their T-39s requiring an engine change diverted to Tucson. Mr. D'Alessandris operated the fork lift and assisted the two mechanics who removed the engine in 45 minutes.

Mr. D'Alessandris' attempt to advise AMARC of the man-hours required to remove an engine was to no avail. At Lan-Dale's request and expense, a meeting was held at AMARC on 25 May 2000 to discuss the above "actual cost estimate." Present at the meeting on the part of Lan-Dale was Monty Jackson, (who flew in expressly for this meeting), Bill Johnson, and Mr. D'Alessandris. For the Navy Office: Herb Swetman and AK1 Kevin Potts. For the USAF/AMARC: Brooks; Stepp; and Fagan.

Monty Jackson advised that the removal of each engine could easily be accomplished in 3 man-hours, for a total of 15 man-hours. Jackson furnished AMARC personnel with copies of the procedure required for removal, and a list of the 14 disconnect points. The list also included the tools required. (Exhibit "Y" attached hereto and by reference made a part hereof).

The cost for aircraft removal was discussed, but it was apparent AMARC personnel had their own agenda. In the Governmental position they held, their abuse of authority made it apparent to Mr. D'Alessandris that in order for Lan-Dale to acquire its property it had to resign itself to the fact that AMARC would extort as much money from Lan-Dale as they saw fit.

At this meeting, all were advised and agreed that Lan-Dale personnel would be present as observers during any and all activity relative to Lan-Dale's property, and that AMARC would furnish 24-hour advance notice.

70. As a result of the above discussion, another meeting was held at AMARC on 30 May 2000. Present were the Finance Officer, Debbie Ledbetter, Workload Supervisor Dick Fagan, and Herb Swetman, and for Lan-Dale, Bill Johnson and A. J. D'Alessandris. Fagan was asked if AMARC had given any further consideration to the cost estimates discussed in the previous meeting. They were shown calculations Lan-Dale had made which reduced their estimate for removal of the aircraft and engines (From $35,029.00 to $28,255.63, a difference of $6,773.37). Under duress, A. J. D'Alessandris had a check in hand for $28, 255.63 (Exhibit "Z" attached hereto and by reference made a part hereof) for the release of the five T-39s and five engines, which neither Ledbetter nor Fagan would accept. Fagan said he would review the costs and get back to Lan-Dale in the afternoon. He did not. (At a future date, also under duress, Lan-Dale counsel Lindsay Brew tendered $21,199 to the Contracting Officer, Gary Watson, for the release of the five T-39s. Watson did not accept this offer).

71. On 02 June 2000 Lan-Dale received another AMARC actual cost estimate which included extensive removals and the first mention of a Demil removal requirement, in direct violation of the Award/Contract (Exhibit "AA" attached hereto and by reference made a part hereof):

| | |
|---|---|
| Aircraft: | $49,271.00 |
| Engines: | $13,030.00 |
| Total actual cost estimate: | $62,301.00 |

"Demil," or "demilitarization," refers to alterations/removals made from *certain* military aircraft (combat aircraft or weapons carriers; T-39s, besides being antiquated, do not come under these categories), and if required, is to occur *prior* to release from DOD control. As of the date of the Award/Contract and Bills of Sale, the aircraft and engines were released from DOD control and are no longer subject to Government-owned requirements. As civil-owned items, Lan-Dale is required to have only Federal Aviation Administration (FAA) certified facilities make any modifications-alterations to the aircraft.

72. On 06 June 2000, refuting the above Demil requirement, Herb Swetman received an email from the USMC Contracting Officer's Representative ("COR"), *copies to Watson, Smith Christmas , Yohn, Dietrich* [the Government's representatives at the Settlement Meeting], and LtCol Sullivan (Head, Museums Branch), which empathically stated: "This office has been directed by the Secretary of the Navy and the Armed Forces Contract Settlement Board [sic] to negotiate with the Lan-Dale Company in order to close this eleven years litigation...the engines and aircraft were negotiated on an 'as is where is' basis and that there is to [sic] no repeat NO parts removed from the engines and aircraft...NO DEMIL on any of these items." (Exhibit "BB" attached hereto and by reference made a part hereof).

73. Herb Swetman advised AMARC of the Contracting Officer's letter of 06 June 2000, (to wit: no removals, no Demil); they ignored it. Swetman advised Anthony A. Mazzone, NICP, Philadelphia, and Kevin J. Malloy, Counsel to NICP, and made the comment that "Lan-Dale had won its case." Malloy's response: *"We'll see about that."* Herb Swetman retired the end of June 2000.

74. On 06 June 2000, to satisfy AMARC's demands, under duress Mr. D'Alessandris was forced to tender a check in the amount of $13,030.00, (for a task that could of easily been done in house for less than $500.00), for the removal of the five engines, knowing full well that even at AMARC's exorbitant rates $2000.00 was more than sufficient.

75. On Wednesday, 21 June 2000, Lan-Dale received a telephone call from AK1 Potts advising that engine removal was scheduled to start the next day at 6 a.m.

Lan-Dale was well aware that in accordance with the following Term and Condition of the Award/Contract it would be the fully responsible party regarding any activity involving its property located at AMARC:

Page 6, §. E-4 stated: " Risk of Loss Prior to Acceptance. The Government assumes no responsibility for maintaining the items described in CLINs 0001AA to 0001AJ [Items Lan-Dale is to receive] from signing of this contract to removal by the Contractor... *The Lan-Dale Company accepts all risk of loss or damage [sic] these items".* [Emphasis added]

AMARC requested the use of Lan-Dale's engine sling. The job would have been completed in its entirety, and the engines removed from the base all in the same day, but for the failure of the crane operator to return to the job site after lunch as agreed. When the crane operator arrived an hour and a half later, he advised that he was pulled off the job and made to attend a meeting, and would not be able to complete the job until the next day. He said he advised his superiors to no avail that four men were waiting for him at the job site. Time for AMARC workers starts at the "shop" with a half hour allowance to the job site and a half hour for their return. Three men totals 3 man-hours. This additional time would not have been expended had the crane operator been permitted to return as agreed; *the engines would have been removed in 16 man-hours.* The engine removal was completed early Friday morning and the engines were placed on Lan-Dale- furnished engine stands and loaded on Lan-Dale's transport in a total of 19 man-hours, as opposed to AMARC's original estimate of 202.5 man-hours. At $94.76 per/hr, the actual cost of removal was $1,800.44; however, AMARC claimed a cost of $3,891.00 and on 04 August 2000 Lan-Dale received a refund of $9,138.97.

AMARC personnel themselves proved their Actual Cost Estimate to be ludicrous with their refund of $9,138 which reduced their Actual Cost Estimate for removal of the aircraft and engines $35,029 to $25,891. In paragraph # 70 above, Mr. D'Alessandris, under duress, had offered $28,255 for removal of the aircraft and engines--which AMARC refused.

The engines were not complete, many components were missing, and no two engines were alike.

76. On 08 August 2000, *eight months* after the date of the Award/Contract, Tom Hamilton received a letter from John Dietrich which included: (A) the final Actual Cost Estimate of $38,588.00 for Demil and removal; (B) payment instructions; (C) express notice of export restrictions; and notice of a requirement for Defense Logistics Agency (DLA) Form 1822, the End User Certificate (EUC). (Exhibit "CC" attached hereto and by reference made a part hereof.)

77. The above request is in conflict with the Settlement Agreement, the Award/Contract, Bills of Sale, the EUC and prior to release from DOD control..

A. Demil is expressly precluded in this exchange by virtue of the Settlement Agreement memorialized in the Award/Contract and Bills of Sale. The photographs displayed at the Settlement Meeting attest to exactly what Lan-Dale was to receive. The "no Demil" requirement was further attested to by the COR, Mike Starn, in his email on 6 June 00, to Herb Swetman and John Dietrich "NO parts removed from the engines and aircraft...NO DEMIL". (Ibid Exhibit "BB)."

B. As civil-owned aircraft, Lan-Dale and or its assigns are the only entities holding the right to, and obligated to, prepare and remove Lan-Dale's property from their current military locations... no payment required.

C. The EUC requires the form be completed by all applicants and submitted with the *Bid or Proposal*, and constitutes an integral part of the exchange proposal <u>in order to become a part of the contract</u>. To complete the EUC form as presented, Dietrich and the Contracting Officer were requiring Lan-Dale to misrepresent fact and perjure itself, something Lan-Dale could not, and would not do.

John Dietrich submitted a letter to Tom Hamilton dated 25 August 2000: "The Marine Corps Museum and the AMARC personnel are awaiting action by your client...the personnel in Arizona stand ready to perform the demilitarization and delivery to the gate as soon as Lan-Dale submits the requisite documents and funds."

Lan-Dale is fully aware and believes, and on that basis alleges, that the above demand that Lan-Dale "submits the requisite documents and funds" is an extortionate ultimatum; i.e., commit perjury, pay the money, or no airplanes.

78. On 11 September 2000, John Dietrich sent a letter to Tom Hamilton who submitted a copy to Lan-Dale. Dietrich's letter stated "enclosed you will find a document from DLA that identifies the items that are subject to demilitarization. (Exhibit "DD" attached hereto and by reference made a part hereof). The enclosed undated letter was from Jack W. Blackway, DOD Demilitarization Program Manager, DOD Demilitarization and Trade Security Control Program Office, HQ DLA, J-33. The letter stated in part:

" MEMORANDUM FOR MARINE CORPS AIR AND GROUND MUSEUM"

"Attn: M. Starn, Aviation Curator

"Subject: Demilitarization Requirements for Components Contained in T-39 Aircraft"

The memorandum contained a list of items "validated as requiring demilitarization *prior to release from DOD control*" [Emphasis added].

*DOD had released control to Lan-Dale on 18 January 2000, the date of the Award/Contract, with attached Bills of Sale, at which time they became Civil owned aircraft, no longer under DOD control.* By making this *undated* letter available to John Dietrich, Blackway enjoined Dietrich in his deceitful request.

Dietrich's deceit in representing this letter as being authoritative was further enhanced by his admission "Although undated, it was prepared on August 3, 2000."

79. Lan-Dale contacted Counsel Lindsay Brew, of the firm Haralson, Miller, Pitt & McAnally, P.L.C., Tucson, AZ with the intent of commencing with a suit. Mr. D'Alessandris advised that prior to the current exchange, Lan-Dale had completed six exchanges with the MCAGM and that one of the exchanges comprised a two-part exchange. Mr. D'Alessandris further advised that in prior exchanges aircraft and engines were released at no cost to Lan-Dale and that Government-required removals were accomplished by the Government *prior* to the exchange and that *this was the first time he had ever been*

*confronted with Demil or seen an End User Certificate.* After further discussion, Brew suggested Lan-Dale make an effort to acquire its property by offering the balance of payment for the removal of the aircraft. Lan-Dale generously agreed to deduct the $13,030 engine removal amount from the original total $35,029 and submit the balance of $21,999 for removal of the five T-39s located AMARC.

80. 03 October 2000. Lindsay Brew sent a letter to Contracting Officer Gary Watson advising him that his failure to perform in accordance with the terms of the contract constituted a *Breach of Contract and tort, namely conversion*, and that he was prepared to tender the amount of $21,999 to the Contracting Officer for the release of the five T-39s. (Exhibit "EE" attached hereto and by reference made a part hereof).

81. On 24 October 2000, Brew sent another letter to Watson requesting the courtesy of a response. (Exhibit "FF" attached hereto and by reference made a part hereof).

82. On 26 October 2000, Watson sent a letter to Brew: "We are currently in the process of formulating a response, and *it will be mailed to you shortly*." [Emphasis added]. (Exhibit "GG" attached hereto and by reference made a part hereof).

To date, Lindsay Brew has not received the promised written response from Watson nor any government official.

83. Tom Hamilton's two-page letter to John Dietrich on 23 October 2000 advised him in detail of the inconsistencies in the requirements of DLA Form 1822, the End User Certificate. Attempting to complete the form after the fact would require Lan-Dale provide false or misleading information. Dietrich, in his telephone response, suggested to Hamilton that *Lan-Dale pre-date the EUC*. Hamilton did not agree and, furthermore, noted that Lan-Dale would not falsify a document. (Exhibit "HH" attached hereto and by reference made a part hereof). Nevertheless, to date, Contracting Officer's Counsel John Dietrich insists Lan-Dale commit perjury by complying with his demands: complete and sign DLA Form 1822, and pay the money...or the five T-39s will not be released.

In a telephone conference between Hamilton and Dietrich on 10 January 2001, Dietrich insisted Lan-Dale submit the EUC forms. The demand Dietrich was making would require

Lan-Dale commit perjury by signing the EUC forms as presented. Any further monetary considerations on the part of Lan-Dale to acquire its property, was negated by the above demand.

84. Lan-Dale has made every effort, under duress, to obtain its property. John Dietrich's and AMARC's unreasonable demands thwarted this effort which culminated in Dietrich's requirement that A. J. D'Alessandris commit an unlawful act. Lan-Dale waited patiently for Dietrich and Watson to comply with the Terms and Conditions of the Award/Contract. There has been no response. Their illegal seizure of Lan-Dale's property left only one option, file a Claim.

THE CLAIM

85. A Claim for Breach of Contract, dated 12 February 2002, was submitted to the Contracting Officer by Certified Mail on 01 March 2002. Watson acknowledged that he received the Claim on 01 April 2002.

86. At Lan-Dale's request, a Revised Claim dated 06 May 2002, was submitted to the Contracting Officer with a cover letter that stated "This REVISED CLAIM replaces Lan-Dale's original claim in its entirety, and Lan-Dale's original claim is hereby negated in its entirety." (Exhibit "II" attached hereto and by reference made a part hereof).

87. Lan Dale counsel received a letter on 03 June 2002 from the Contracting Officer dated 23 May 2002 wherein he requested additional information "in order to become better informed of the facts," and requested information regarding purported happenings in the time frame *subsequent* to 07 April 2000, the closure date of the Contract.

Watson's letter also stated "please furnish me with answers to the foregoing questions by 5 June 2002 so I can make a timely decision" (Exhibit "JJ" attached hereto and by reference made a part hereof).

88. Lan-Dale's co-counsel, Tom Hamilton, responded on 03 July 2002: "This letter is in response to your letter of 23 May 2002, which the office of Jim Sakrison received on 03 June 2002." Hamilton's letter clearly advised, in part: "...all of the facts of this case lie within the time frame of the Contract 18 January 2000 to its required date of closure, 07 April 2000.

Our Claim of 06 May 2002 encompasses only this time frame and any occurrences subsequent to the closure date, are not relevant to this Claim."

89. Watson's letter dated 17 July 2002, received 22 July 2002, advised "anticipate a response to your claim NLT 16 Aug. 02". (Exhibit "KK", attached hereto and by reference made a part hereof).

90. Watson's letter dated 16 Aug 2002 received 26 Aug 2002 advised "a final decision to you NLT 23 Aug 02" (Exhibit "LL" attached hereto and by reference made a part hereof).

91. Sakrison did not receive the response from Watson as promised in the above letter "NLT 23 August 2002." Twenty-four days later, on 16 September 2002 Sakrison did receive a letter from Watson via regular mail. The letter was predated 22 August 2002, postmarked 10 September 2002, and received 16 September 2002. (Exhibit "MM", attached hereto and by reference made a part hereof). This letter was represented to be a Denial of Lan-Dale's Claim. It did not arrive within the time frame stipulated in the FARs. (Exhibit "NN", attached hereto and by reference made a part hereof). The response was untimely.

The above letter did not address the allegations made in Lan-Dale's Claim, nor did it reference the Terms and Conditions of the Award/Contract. The statements made by the Contracting Officer Gary Watson in this letter are irrelevant to the Claim. (see Paragraphs 76, 77, and 78) .

The Contracting Officer did not address the statements made to him in Hamilton's letter of 03 July 2002, which clearly advised, in part: "*...all of the facts of this case lie within the time frame of the Contract 18 January 2000 to its required date of closure, 07 April 2000. Our Claim of 06 May 2002 encompasses only this time frame.*" The Contracting Officer ignored the designated time frame and addressed only a time frame months *after* the required closure date of the Contract.

The Contracting Officer's lengthy reference to "Demil" is totally out of context, the reasons for which are stated in Paragraphs 76, 77, and 78. His allegation that Lan-Dale made "inconsistent statements" and "possibly submitted a false claim", besides being slanderous,

is totally without merit. Statements made regarding Lan-Dale's presumed prior knowledge are not factual and are totally irrelevant to the issue.

92. Lan-Dale is fully aware and believes, and on that basis alleges, that the Contracting Officer's response to Lan-Dale's Claim in the above manner, is in default of the intent of the FAR as to timeliness and content. 33.211 Contracting Officer's decision. (a) and (b).

<u>IRREPARABLE HARM</u>

93. The harm to Lan-Dale and A. J. D'Alessandris has been ongoing since LtCol Dragotta's modification of Lan-Dale's two-part, two-page proposal of 21 June 1991. This proposal remains the foundation of all Contracts generated in this issue. The improper manner in which this proposal was used does not negate or lessen in any way its requirements, one of which is: "*until such time as a mutually agreed upon exchange is consummated.*" To date this exchange has not been consummated.

The Office of the Inspector General of the Marine Corps, with the publication of Hotline Complaint 950113 of 13 June 1995, deceitfully and with malicious intent damaged the honorable reputation of A. J. D'Alessandris and the Lan-Dale Co. The contributors to this act are numerous. The perpetrator of this dastardly act, Col Ponnwitz, OIC of the MCAGM, who conspired with Col Yenessa of the IGMC's office, knowingly, and with the reckless disregard for the irreparable harm caused, fabricated and labeled false statements as allegations in order to accomplish this end. The Investigating Officer, Col Ferarri, upon initial review of the allegations, labeled them "poor works of fiction." The findings of the investigation itself determined all of the allegations were false.

94. The damage to A. J. D'Alessandris and the Lan-Dale Co. is profound. This outrageous conduct deprives Lan-Dale of rights and significant opportunities that will no longer be available to it. Reputation has always been an essential prerequisite to its business structure.

95. The company itself has suffered irreparable harm. During the past twelve years the government acting through its agents has slandered the credibility, character, and

reputation of A. J. D'Alessandris and Lan-Dale and has resorted to fraud, extortion, and abuse of power, in an effort to avoid performance of the exchange contract. Lan-Dale thus has been prevented from employing its plan to utilize the return of the exchange contract. Closure of the Settlement Agreement should have occurred within three months of the 11 May 1998 Settlement meeting. Lan-Dale should have been in possession of the T-39s and engines and commenced with it's Mexican cargo operation on 11 August 1998, five years ago.

96. Upon receipt, the Bills of Sale were submitted to the FAA and the five T-39s were U.S. registered and immediately deregistered to Mexican registry on 26 May 2000, as follows:

| | | | |
|---|---|---|---|
| BuNo 151336: | XA-AAH | BuNo 150969: | XA-AAJ |
| BuNo 150543: | XA-AAG | BuNo 150548: | XA-AAF |
| BuNo 150547: | XA-AAI | | |

There is a ready market for cargo transport in Mexico and a demand for additional aircraft. Numerous Sabreliners (T-39s) are being utilized for this purpose. Lan-Dale planned to hire Jeff Coffman, a Mexican citizen, as general manager and chief pilot, to handle what Lan-Dale anticipated was an active cargo business in Mexico. A relationship with a Mexican corporation had been established for that purpose. No freight contracts could be entered into because of the failure of the Government to complete the settlement.

The Operational Cost Analysis and profit potential reflect a viable business venture, the likes of which is ongoing at this time. (Exhibit "OO" attached hereto and by reference made a part hereof).

<u>COUNT 1</u>

(Return of Property Under Fed. R. Crim. Proc. 41 (e) )

97. Plaintiff refers to allegations set forth in Paragraphs 1 through 98 above and by this reference incorporate those allegations as though fully set forth at length here.

98. As of 18 January 2000, the date of the Award/Contract and attached Bills of Sale, Lan-Dale Co. had become the rightful owner of the six T-39s, the T-34B, and the five engines.

99. The defendant's seizure of Lan-Dale's property as set forth herein, was illegal in that it was accomplished with total disregard for the Terms and Conditions of the Award Contract and the Bills of Sale thus violating Lan-Dale's rights under the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution. Lan-Dale has been aggrieved by this illegal seizure, and, under Federal Rule of Criminal Procedure 41 (e), is entitled to return of its property.

100. Defendant's continued retention of that property is unreasonable under the terms of the Award/Contract and attached Bills of Sale. Lan-Dale has been aggrieved by the loss of use of its property and, in contrast, the Government can satisfy any legitimate concerns by means other than retention of the aircraft. This provides an alternate basis for return of Lan-Dale's property under Federal Rule of Criminal Procedure 41(e).

101. For reasons stated herein, Lan-Dale has suffered and continues to suffer irreparable harm by virtue of the Government's seizure and continued possession of Lan-Dale's property.

102. Lan-Dale has no alternative legal remedy to address this situation.

COUNT 2

(For loss of profits, Attorney's fees, and Court costs, under Fed. R. Crim. Proc. 41 (e) )

103. The business interests and reputation of Lan-Dale and A. J. D'Alessandris have been irreparably harmed by the duplicity and dishonorable conduct of Government agents and by the negligence of those in authority who failed to invoke and enforce rules and regulations applicable to DOD personnel.

104. Further, the government published documents accusative and injurious to Lan-Dale and A. J. D'Alessandris, all based upon allegations totally lacking substance, and never exonerated the Plaintiffs or published retractions.

105. The modification of Lan-Dale's two-part exchange proposal of

21 June 1991 was documented in the Request for Approval of 15 November 1991. Illegal conduct on the part of the Governmental agencies continued and is ongoing. The government has yet to satisfy the requirements of Lan-Dale's Proposal "*until such time as a mutually agreed upon exchange is consummated.*" The illegal seizure of Lan-Dale's property, among other actions on the part of the Government, has precluded the satisfaction of Lan-Dale's Proposal. The Government's obligation to comply with the above continues. The agreed upon exchange, to date, has not occurred.

WHEREFORE, plaintiff prays as follows:

1. For an order requiring the defendant to release to Lan-Dale the five T-39Ds stored at AMARC;

2. For an order directing the government to comply with its Award/Contract and Bill of Sale and assist, and not to interfere in any way, with Lan-Dale's efforts to remove its property from Davis-Monthan Air Force Base, Tucson, Arizona;

3. For the return of all funds extorted from Lan-Dale by AMARC;

4. For reimbursement of loss of profits arising out of Lan-Dale's inability to pursue its legitimate business interests absent possession of its property;

5. For attorney's fees and costs of the suit; and

6. For such other relief as the Court may deem proper.

Dated: August 19, 2003

SLUTES, SAKRISON, & HILL, P.C.

By
James M. Sakrison
Attorney for Plaintiff LAN-DALE CO.

Tom Hamilton
LaFont, Tunnell, Formby, LaFont & Hamilton
A Limited Liability Partnership
Skaggs Building
701 Broadway
Plainview, TX 79073