In that year Col Beebe II the current Director of the MCAGM, was faced with a problem regarding a C-117D aircraft BuNo# 50834. This aircraft, belonging to the MCAGM, had been serving as the "gate guard" at MCAF Quantico. The Commanding Officer of the facility informed [redacted] Beebe that he wanted the aircraft removed. Removing the aircraft from the facility would have entailed its dis-assembly and removal to the Larson Gymnasium restoration facility. During a conversation with Schwanda he related his predicament and was made aware of the C-117D trade that hwanda [redacted] had made with the Lan-Dale company in 1984. LtCol hwanda [redacted] suggested that since MCAS Cherry Point was desirous of obtaining the aircraft, conducting a similar type of exchange might alleviate the problem LtCol Beebe contacted Mr. D'Alessandris and a two part exchange agreement, similar to the trade previously conducted by LtCol Schwanda except in the specific items traded, was agreed to. Again there was a documented exchange and an undocumented verbal agreement governing the second part of the exchange.

The documented exchange involved the trade of a VC-118B BuNo# 12847 owned by the Lan-Dale Company for the C-117D noted above. The Lan-Dale Company agreed to flight deliver the VC-118B to MCAS Cherry Point at no cost to the government in exchange for the C-117D and assorted trade stock. The undocumented verbal agreement involved trading the C-117D back to the government after the Lan-Dale Company had put the aircraft into flying condition and delivered it to MCAS Cherry Point. It was agreed verbally, between LtCol Beebe and Mr. D'Alessandris, that after the C-117D had been delivered to MCAS Cherry Point the Lan-Dale Company would get right of first refusal on trade stock that may come into the possession of the Marine Corps and that the basis of the trade would be the previously agreed upon valuation of the C-117D at $430,000.

During July of 1991 a request for approval of the first part of the exchange agreement was sent forward, through the chain of command, to the Chief of Naval Operations (CNO). This documentation contained the numerical valuations of the items to be exchanged that had been agreed to by LtCol Beebe and the Lan-Dale Company. The proposal had received positive endorsement at each step until arriving at CNO. At this point the paper trail on this proposal stops until November of 1991.

During September of 1991 LtCol Beebe retired and was replaced by LtCol Dragotta. LtCol Dragotta was apparently briefed by both Beebe and Schwanda regarding the two part exchange agreement pending with the Lan-Dale Company. During October of 1991 the VC-118B was placed in a loan status and flight delivered by the Lan-Dale Company to MCAS Cherry Point. The Lan-Dale company took custody of the C-117D aircraft BuNo# 50834 at approximately the same time. During November of 1991 the proposal mentioned above was re-submitted by LtCol Dragotta to CNO via the chain of command. This proposal contained monetary valuations for the items

to be exchanged that were markedly different than those previously agreed to and submitted for approval. Notably, the C-117D and VC-118B contained significantly lowered valuations while the O-2A was was valued at more than double what was previously agreed to. The assumption is that CNO disapproved the first proposal and a new one was submitted during that month. There is no evidence to indicate that the Lan-Dale Company was informed of the altered valuations contained in the re-submitted proposal. The altered proposal was approved by CNO.

During February of 1992 the formal exchange agreement was executed by the Lan-Dale Company and the contracting officer for MCB Quantico, i.e. the VC-118B was formally traded to the Marine Corps for the C-117D. The agreement does not list the revised valuations of the items to be traded and, again, there is no evidence to suggest that the Lan-Dale company was informed that they had been changed. On 27 February the restored C-117D was placed on loan by the Lan-Dale company and flight delivered to MCAS Cherry Point pending completion of the second part of the exchange, the undocumented verbal agreement.

During the remainder of 1992 through September of 1993, [redacted] of the Lan-Dale Company made several attempts to consummate the second part of the agreement with [redacted] but was unsuccessful. [redacted] does not appear to have been cooperative in these attempts. He does not respond to the Lan-Dale Company's correspondence and does not appear to repudiate the undocumented second exchange, although he is aware of it. He does not inform the Lan-Dale Company of the revised proposal that has been approved by CNO. Rather, he appears to be simply ignoring the efforts of that company to consummate the second part of the exchange agreement for reasons that are not known. During this time [redacted] was, apparently, also seeking employment with helicopter companies located in the state of Pennsylvania.

[redacted] became the Director of the MCAGM after [redacted] retired. A meeting was held at the MCAGM on 10 September 1993 between [redacted], [redacted] and LtCol Schwanda (Ret) in order to try and resolve the issue of the undocumented verbal agreement that was still outstanding. During this meeting [redacted] was first made aware of the revised valuation for the C-117D currently on loan to MCAS Cherry Point. Over the next year there was a continuing dialogue between the Lan-Dale Company and the MCAGM in an effort to resolve the remaining issues and consummate the second part of the exchange agreement. These discussions were at first positive but later became acrimonious and accusatory, generating a large measure of distrust between the Lan-Dale Company and the MCAGM. Nevertheless, these efforts did produce several attempts by both parties to reach resolution. These efforts were unsuccessful mainly due to an inability to reach closure over the question of the valuation of the C-117D BuNo# 50834 previously agreed to by [redacted] and [redacted] and