[redacted]

8 September 1994

[redacted])

Director of Marine Corps History and Museums
Marine Corps Historical Center
Navy Yard, Washington, D.C. 20374

Dear SIMMONS,

This letter is written with some reluctance due to its sensitivity, its impugning of two Marine officers, and its potential for embarrassment to the Marine Corps. Moreover, I have no wish to "rule from the grave" nor even to give the appearance of trying to influence museum matters. However, as I was to some degree a party to the matters at issue, I think it appropriate to voice my recollections and opinions as well as to report on information received from Schwanda

While visiting BONNWITZ a couple of months ago he mentioned a contractual problem he was having with a vendor of old aircraft, a Mr. D'Alessandris. As my recollection of dealings with D'Alessandris was positive, usually in our favor, and in which he always exhibited probity, integrity, forthrightness, and generousity, I resolved to follow up on the matter. These qualities are rare in a business whose practices would make the most rapacious used car dealer blush.

At the time I made no comment to BONNWITZ other than to express disappointment. More recently I was at Cherry Point having been invited to address the MCAA chapter after its dinner. This visit then included a discussion with Schwanda about the D'Alessandris issue. The following recounting of events resulted from this discussion and further refreshing his recollections by reference to

I can reacall at least seven trades with Mr. D'Alessandris, all of which resulted in first class additions to our collection. Coming to mind are the C-117D at El Toro, the N2S-3 in the Early Years hangar, a GH-2 Howard and Timm trainer on loan to the Kalamazoo Yankee Air Force Museum, the Plymouth staff car in the World War II hangar, the VC-118B at Cherry Point and a second C-117D that was initially delivered to Quantico and then later transferred to Cherry Point. All the aircraft were in outstanding shape and, except for the GH-2, were flight delivered. In each case the artifact was complete, everything worked, and it was in museum display condition.

1 — Encl (10) Encl (10)
11 - pages

On a number of occasions Mr. D'Alessandris (retired, wealthy, and a highly qualified pilot who routinely owns 10-12 flying aircraft) has used his considerable resources to get things done for the museum that we could not do for ourselves. In the case of our first C-117D, one of the last two in the Marine Corps, LTCOL BROWN acquired it after it was stricken from the operational inventory in the Philippines an got it back via aircraft carrier as far as NAS North Island. [redacted] initially hoped to get it back to Quantico by the carrier but none were scheduled to transit from West to East Coast in the near future. Moreover, we couldn't afford to put it back into flying condition and, in any event, were barred from flying it without CMC approval. It was too large to move via any combination of ship, train, or truck. As a result, it remained on the ramp at North Island, disassembled and stranded, when [redacted] retired. The North Island USN Captain CO considered the C-117D an eyesore and gave six months to remove it or he would take care of he problem for us by either scrapping it or using it as a Crash, Fire & Rescue training aid.

To resolve this situation, Schwenk entered into an exchange agreement in which D'Alessandris became temporary owner of the C-117D, assembled it, made it flight worthy, flew it to his facility in Tucson for museum quality restoration. He then flight delivered it to MCAS El Toro in a loan status and finally traded it back to the Marine Corps about two years later when trade stock became available.

Mr. D'Alessandris performed the needed services upfront and trusted the Marine Corps to honor its end on the agreement; i.e. giving him the right of first refusal o trade stock as it became avaialable and trade the C117D back to the Marine Corps ownership at the market value established during the initial exchange related to his flight and restoration expenses. After over two years this complex deal was completed, a historic aircraft was saved, and a long-term relationship for the benefit of the museum had been established.

To further establish D'Alessandris' bono fides I cite the story of our Stearman N2S-3 trainer. The aircraft we have is the second of its type delivered by D'Alessandris. The first was perfectly restored but in the process of cataloging it and writing a caption we discoveraed that it really had been an Army Air Corps PT-17. The contract, already completed, called for an N2S-3 and [redacted] brought this discrepancy to D'Alessandris' attention. As I recall, D'Alessandris was genuinely surprised and embarrassed by this revelation and, without quibbling, excuse making, or any attempt at renogotiation, replaced it within a couple of months with a real N2S-3. He took appropariate action without hesitation to honor his agreement to the letter.

In another instance, D'Alessandris traded the Plymouth staff

car to us for three used aircraft engines of estimated comparable value. About a year after the Plymouth had been delivered Schwanda asked him what he had done with the engines. His reply, extracted with reluctance, was that in spite of a log book to the contrary, the best engine had been damaged beyond repair and could only be sold for its core or scrap value. He had no recourse since all exchanges with the Government are without warranty and "as is -- where is." He took this reverse in silence like an honorable man and we would not have known about it if Schwanda had not asked. D'Alessandris is not a whiner.

Several weeks ago, Schwanda called me from Cherry Point and invited me to be guest speaker at the local MCAA Squadron dinner. [redacted] is the Squadron's treasurer. I agreed and while I had him on the line asked what he knew about the situation between D'Alessandris and the museum. We discussed the matter further and in greater detail while I was at Cherry Point. The following story emerged and Schwanda indicated that LtCol Beebe agreed completely.

The second of the last two C-117Ds was acquired in an exchange with D'Alessandris during Schwanda tour at the museum. It was flight delivered to the Air-Ground Museum and placed on loan to MCAF Quantico as a gate guard. During Beebe II tour, MCAF lost interest in caring for the C-117D and told the museum to take it back because it had no longer had the resources or desire to continue the loan agreement.

The museum had no place to put the aircraft and would have had to disassemble it even to get it up the hill to Larson Gym restoration facility or to the exhibit hangars. By that time, Schwanda was at Cherry Point in retirement as the civilian command historian and curator and liaison to the Cunningham air museum foundation. Upon learning that the C-117D might be available, the called Beebe and told him that Cherry Point would like to have it. Beebe's first reaction was to try for permission to flight ferry it to Cherry Point but I dissuaded from that solution due to the basic policy against flying museum aircraft and the dificulty of getting a waiver.

Bill and Rusty were at a loss for a solution until D'Alessandris offered, for a fee of $1.00, to perform the services of putting the aircraft back into flying condition, fueling it, registering it with the FAA, insuring it, and finally flying it to Cherry Point with the assistance of MAJ Banner [redacted], who was qualified in that aircraft. At the time Banner was the ExecO of MCAS Quantico and volunteered to serve as co-pilot and on-site coordinator of repairs. This evolution would have cost D'Alesandris about $25,000 with the only compensation to him being the opportunity to fly the C-117D one last time and make another significant contribution to the museum program. After checking with legal counsel, Beebe reluctantly had to decline

~~significant contribution to our~~
~~C-117D one last time and make another~~ Beebe [redacted] reluctantly had to
~~program. After checking with legal counsel,~~
~~decline~~ this generous offer because the Marine Corps as owner could still be
held liable for any damages caused as a result of such a flight.

Next, Schwanda [redacted] suggested to Beebe [redacted] that maybe the transfer could be accomplished by entering into an agreement with Mr. D'Alessandris similar to the previous one that he had used to rescue the first C-117D from destruction at NAS North Island. Beebe [redacted] agreed and contacted Mr. D'Alessandris to see if he was interested. He was interested in helping, as he had done before, and an exchange agreement was reached. The particulars were as follows. The Marine Corps would get the C-117D TEMPORARILY back into Mr. D'Alessandris' hands by trading it for his VC-118B Cargomaster. This VC-118B (all leather, stainless steel and mahogany on the inside) valued at $500,000 had been the VIP bird of several Commandants during the 1970's and, as such, a highly desirable permanent addition to our aviation collection. A number of lesser valued aircraft and vehicles were thrown into the pot to balance the scales on the side of the lower valued C-117D. At this time, Museum trade stock was depleted, but Mr. D'Alessandris generously accepted the only combination of dregs Beebe [redacted] could put together just so we could get on with the project. This concession was recognized by all directly involved and the expectation was to try to make it up to him in a subsequent trade.

Further, it was understood by all involved that this was a two exchange agreement, and once the C-117D was delivered to Cherry Point, both parties would, as soon as possible, re-enter into good faith negotiations to return it to Marine Corps ownership. The only delay would be the wait until the Museum acquired new trade stock. The intention was to have one C-117D on

the West Coast at El Toro and the second one on the East Coast at Cherry Point. It was clearly understood that a value of $430,000, established by the Museum for the C-117D in the first exchange, would serve as the basis of value for the linked second exchange. Beebe [redacted] indicates he would have accepted the proposal even if the C-117D had been valued at $500,000 vice $430,000. In short, Beebe [redacted] still believes we got a great deal. Also, there was a gentlemens agreement that Mr. D'Alessandris would get get first crack at any available trade stock, as well as any trade stock that might later come into Museum possession, before exchange offers from other parties for these aircraft would be considered. Mr. D'Alessandris indicated repeatedly that he would consider any aircraft or helicopter or combination of the two in order to accomplish the second exchange and complete the entire deal.

It is a matter of record that Mr. D'Alessandris flight delivered the VC-118B to MCAS Cherry Point to obtain temporary ownership of the C-117D, and then, as agreed, later flight delivered the C-117D to Cherry Point from Quantico. Both aircraft were complete, looked great and according to MAJ. [redacted] Banner [redacted] were in flawless operating condition. The VC-118B was delivered in October 1991 and the C-117D in February 1992.

Since then, over two years have passed and the promised second exchange to return the C-117D to Marine Corps ownership has not taken place. The crux of the matter is that the two OIC's that followed Beebe [redacted] have not been willing to honor commitments to Mr. D'Alessandris made during Beebe [redacted] tenure. Mr. D'Alessandris takes the position that he made a very specific agreement with the Marine Corps, at the Marine Corps' request, and while OIC's representing the institution come and go, the institution is obligated to honor its commitments. If you recall, Beebe [illegible] left the Museum much

earlier than he or any of us expected due to USMC personnel drawdown. This didn't allow him time to accomplish the second exchange and complicated the situation. However, I have been assured that both Bogle [redacted] and Schwanda [redacted] on several occasions have each briefed both DRAGOTTA [redacted] and PONOWITZ [redacted] regarding Mr. D'Alessandris' long-term relationship with the Museum and the requirement to honor previously made Marine Corps commitments to him.

After much patience and reflection, Mr. D'Alessandris is now convinced that Dragotta [redacted] treated him quite shabbily and, in fact, was guilty of a number of rather serious infractions - deception, lying, breach of contract, fraud, abuse of power and conflict of interests. Specifically, he asserts that DRAGOTTA [redacted] never once responded in writing to a number of letters attempting to address and resolve this matter. He also discovered that Dragotta [redacted] resubmitted the request for approval to conduct the C-117D/VC-1182 exchange, originally submitted by Bogle [redacted], but with much lower assigned values ($240,000 vice $430,000 value for the C-117D) without requesting or receiving approval from Mr. D'Alessandris. Since then, Ponowitz [redacted] has only been willing to discuss the second trade based on the C-117D valued at $240,000.

Mr. D'Alessandris did not receive right of first refusal as new trade stock was acquired by the Museum during Dragotta [redacted] tenure. When four HH-1K helos were obtained, the most desirable one (lowest engine and rotor blade hours) was committed to Keystone Helicopter Corporation located in Eastern Pennsylvania. Simultaneously, Mr. D'Alessandris indicates he was told that the helicopter was still available, but nothing could be done at the time because the entire exchange program was under review and no exchanges were being processed. Mr. D'Alessandris believes this attempted exchange with Keystone was entered into with the intention of creating a

favorable atmosphere for Dragotta [redacted] to be hired by them or an associated company as a pilot. The deception of having PAYTON [redacted] negotiate an exchange involving the best HH-1K with Keystone so that DraGotta [redacted] could avoid the perception of conflict of interest was readily transparent. The fact is that he was aware that the helicopter should have been offered to Mr. D'Alessandris first. During the same timeframe, DraGotta [redacted] was working on securing a flying position with Keystone first, but basically with anybody that would allow him to stay in the vicinity of his family who had already relocated to Easton, Pennsylvania in anticipation of his approaching retirement. Keystone, besides providing helicopter emergency medical evacuation service, also runs a large helicopter maintenance operation, and, as such, was in a position to either hire DraGotta [redacted] or assist him in finding a position with another company they do business with or who provide similar flight services in adjacent areas. I understand that Dragotta [redacted] was hired as a helo pilot for a company operating in the vicinity of Pittsburgh, Pennsylvania.

Soon after DraGotta [redacted] rather abruptly retired, Mr. D'Alessandris asked for a meeting with the new OIC, Ponnowitz [redacted], at Quantico to get off on the right foot and discuss, face to face, this situation that had already dragged on far too long. Schwanka [redacted] attended this meeting at the request of Mr. D'Alessandris. During the meeting, Mr. D'Alessandris presented his position and concerns while Schwanka [redacted], speaking for himself as well as for Beebe [redacted] who could not attend, briefed the special relationship that had existed between the Museum and Mr. D'Alessandris because of his track record of quality and contribution to the program. During discussions, the change in C-117D value from $430,000 to $240,000 became known to Mr. D'Alessandris for the first time. He was shocked and asked for

a copy of the letter which at the time [redacted] declined to give
him. Quite a while later, a copy was finally provided to Mr. D'Alessandris,
but only after no progress was being made in the matter and a CONGRINT or
litigation became more likely.

Mr. D'Alessandris also indicated to [redacted] that part of the
problem of settling this matter was that he couldn't get [redacted] to
address the issue and respond to official correspondence. [redacted]
assured him that this would not be a problem in dealing with him, he would
respond to everything in writing, and that Mr. D'Alessandris would be
hearing from him shortly after he had an opportunity to review the matter.
However, months passed with letters and proposals left unanswered. In fact,
[redacted] contacted Mr. D'Alessandris only after [redacted] called and
politely prodded him with what he believed to be the no bluff alternative of
either communicating with the man or get ready to respond to a CONGRINT and
a lawsuit. [redacted] choice was to call Mr. D'Alessandris and
leave a message on his recorder. While he was not particularly happy with
the informality of telephone negotiations, Mr. D'Alessandris was reluctant
to make it an issue because at least he was finally communicating. However,
for record purposes, Mr. D'Alessandris recorded all subsequent telephone
discussions and negotiations regarding the C-117D exchange with [redacted]
[redacted] and [redacted]. Simply stated, Mr. D'Alessandris does not trust
[redacted] as a man of his word.

When [redacted] eventually was confronted by Mr. D'Alessandris
with quotes from previous telephone conversations, his response was to
attempt to chastise and proclaim that all future communication would be in
writing. Mr. D'Alessandris' feeling was - about time! However, the
forthcoming correspondence reflected administrative sloppiness bordering on

incompetence (he probably still doesn't realize he's identifying HH-1K's with T-34B Bureau Numbers).

Mr. D'Alessandris also believes Ponnwitz [redacted] does not possess sufficient knowledge of the civil aviation market to seriously negotiate an exchange and is either not getting good advice or is too arrogant to ask for help and learn. Mr. D'Alessandris cites PonnwITZ [redacted] letter indicating three specific T-34B's at Davis-Monthan AFB to be worth in the neighborhood of $150,000, "as is - where is" and without warranty. Mr. D'Alessandris responded with photographs showing that the aircraft were not complete and that someone hadn't done their homework.

In response, PonnwITZ [redacted] chose to focus primarily on the issue of how he got the photograph without the Museum scheduling an official visit to see the aircraft. Mr. D'Alessandris, who maintains an office in Tucson, Arizona, just outside the "bone-yard" gate, keeps detailed records on stricken aircraft in storage there. For your information, I am told that T-34B's out of the bone-yard, depending on their completeness and the content of their logbooks, generally go for anywhere from $30,000 to $65,000 with $50,000 being a good rule-of-thumb average.

About six months ago, Mr. D'Alessandris discovered another instance where the Museum had denied him right of first refusal and even the courtesy of being told that new trade stock was being acquired. Of three T-34B's previously used by Navy recruiting officers, one went to MCAS Cherry Point and two were placed in museums in Indianapolis and Kalamazoo. Since then, Mr. D'Alessandris has been told that these two T-34B's are not available for trade consideration because they are now on loan to these museums. He was told this was necessary because the Museum did not have storage space and those institutions agreed to pay the transportation costs (minimal) to

See

flight deliver the aircraft to them. Mr. D'Alessandris' position is he has made known to the Museum his long-term interest in acquiring a number of T-34's ~~(to do formation work with his son)~~, just as it is also well known that he would have enthusiastically provided transportation monies and temporary hangar storage space, with no strings attached, while the specifics of an exchange were being worked out. According to Mr. D'Alessandris, he confronted [redacted] regarding this matter and indicates that in two separate telephone conversations (both taped), [redacted] agreed to make these particular T-34B's available. At a later date he vehemently denied this verbal commitment in writing.

[redacted] offers that while Mr. D'Alessandris has taken all that he is going to, he is still willing to negotiate and settle this matter in-house and keep the Congressmen and lawyers out of it. However, his stipulations are that the basis of exchange must be that his C-117D is worth $420,000 and that someone else other than [redacted] will negotiate the exchange. In short, Mr. D'Alessandris views [redacted] as a person without integrity or honor, doesn't trust him and doesn't want to deal with him again.

To facilitate settlement, Mr. D'Alessandris has proposed an exchange with you involving HH-1K's and T-34B's for his C-117D and provides supporting rationale. Further, if an exchange agreement cannot be quickly reached, Mr. D'Alessandris would not be opposed to the appointment of a mutually agreeable arbitrator and the use of professional appraisals to determine the current fair market values of Museum trade stock.

According to [redacted] the information contained in this letter, while not known firsthand in its entirety by any one individual, is a collection of facts and documented episodes that he, [redacted] and [redacted]

[redacted] have experienced, as well as a number of unflattering, but hard to
refute, perceptions that Mr. D'Alessandris has slowly formed. Uncomfortable
as it might be for them, if it came to it, the statements and testimony of
these three former Marine Officers would strongly and unequivocally support
Mr. D'Alessandris' position. Schwanda [redacted]y says that while Ponnwitz [redacted] has
mentioned that Quantico Legal has been consulted (implying support of his
position and actions), neither he or Beebe [redacted] have been contacted (even
though both of them have been identified as receiving copies of recent
official correspondence from Mr. D'Alessandris).

Schwanda [redacted] indicates that Mr. D'Alessandris, as well as he and Beebe [redacted]e,
are prepared to talk or meet with you or an appointed arbitrator or
investigator to quickly resolve this matter. Mr. D'Alessandris also asks
that you instruct Ponnwitz [redacted] to not commit any of the HH-1K's and
T-343's (identified in his exchange proposal to you) to another party until
you have had a chance to review the entire matter and make a decision.
Otherwise, even a favorable decision might be further complicated. [redacted]
Ponnwitz [redacted] letter of 11 July 1994 states that previous offers he has made to
Mr. D'Alessandris will only be extended until 15 August 1994.

Being already familiar with the exchange process, albeit from a managerial perspective, I would be willing to serve in any capacity you might desire to quickly and fairly settle this matter before it reaches critical mass.

Very Respectfully,

[redacted]

Col, Nihart

#11