approval of the Installation Commander. (encl: 4, 7, 51)

(67) That both the 8 September 94 letter and the 15 July 94 exchange proposal dated 15 July 94 were attached together and submitted simultaneously to BGen Simmons (encl: 8)

(68) That LtCol Schwanda denies that the 8 Sept 94 letter to BGen Simmons was drafted by him with the express purpose of gaining approval for an exchange proposal dated 15 July 1994 that was submitted to BGen Simmons along with the 8 Sept 94 letter. (encl: 52)

(69) That Mr. D'Alessandris claims that sending the exchange proposal of 15 July 94 to accompany the 8 Sept letter to BGen Simmons was done at his insistence alone, not at the oenest or suggestion of any third party, and with the express intent of providing a basis of negotiations to resolve the outstanding dispute with the MCAGM. (encl: 52)

Opinions

1. It appears that LtCol Schwanda, by entering into an unwritten agreement that purported to bind the U.S. Government to negotiate for a future exchange of excess GOE during the course of a Title 10 aircraft exchange in 1984, may have violated the provisions 5 CFR 2635.101. However no criminal intent was found. He appears to have been motivated only by his desire to extricate the aircraft from an untenable position and have it restored for the Marine Corps Air/Ground Museum collection. However, it should be noted that the statute of limitations for this potential violation has expired. (FF: 3, 4, 6, 7)

2. It appears that BGen Simmons? and possibly CoL Nihart? were aware of the unwritten agreement. (FF: 5)

3. It appears that LtCol Schwanda, in his relationship with the Cunningham Museum Foundation and may have violated the provisions of 18 USC 208 in that , an employee of the excutive branch, participated personally and substantially in the rendering of advice to the Cunningham Foundation, an organization with whom he may have negotiated prospective employment. (FF: 11, 12, 14, 15, 16)

4. It appears that with regard to the potential violations of 18 USC 208 by that they may have occurred with the cognizance of and (FF: 14, 15, 20, 21, 29)

5. It appears that there exists a conflict between Federal employment and "representation" of the

. a non-Federal entity, contrary to 5 CFR 2635.502. (FF 20 thru 25, 29)

6. It appears that LtCol Schwanda and LtCol Beebe may have acted in the capacity of a procurement official as defined by current Federal Appropriation Regulations. (FF: 60)

7. It appears that LtCol Schwanda, by the sum of his actions and the frequent communication between himself and Mr. D'Alessandris, with regard to the ongoing dispute between the MCAGM and the Lan-Dale Company, has given the perception that he has not acted with impartiality and did attempt to intercede on the behalf of the Lan-Dale. However, no criminal intent was found. His motivation appears to be guided by his strong desire to resolve an issue that he perceived could prove to be potentially embarrassing to the Marine Corps. (FF: 51, 56, 58, 63)

8. It appears that, although LtCol Schwandas impartiality may be in question, he did not act as an agent for the Lan-Dale Company as alleged by Col Ponnwitz (FF: 61)

9. It appears that LtCol Schwandadid receive copies of Government documents from Mr. D'Alessandris. It is open to speculation whether they were for his personal comment, guidance or review as alleged by Col Ponnwitz (FF: 4, 5, 63)

10. It is my opinion that there is no factual basis to support the allegation by the Inspector General that LtCol Schwanda by his relationship with the Lan-Dale Company, created a favorable circumstance for his future employment at MCAS Cherry Point. (FF: 64)

11. There appears to be no factual basis to support the claim that LtCol Schwanda traveled with Mr. D'Alessandris as alleged by Col Ponnwitz (FF: 62)

12. It is my opinion, based upon the information I have obtained, that a conspiracy with criminal intent did not exist between Col Nihart and LtCol Schwanda, as alleged by Col Ponnwitz

13. The allegation that LtCol Schwanda violated U.S. statutes by arranging storage and ramp space for a C-117D BuNo: 50834 at MCAS Cherry Point, as alleged by Col Ponnwitz is without merit. The aircraft was sent to MCAS Cherry point at the request of the MCAGM with storage and ramp space arranged with the approval of the Commanding General MCAS Cherry Point. (FF: 66)

14. It is my opinion that LtCol Schwanda did not negotiate on behalf of the Lan-Dale Company in order to ensure a significant margin of profit for that Company as alleged by Col Ponnwitz (FF: 65)

15. It appears that LtCol Schwanda drafted the 8 Sept 94 letter that was partially re-typed signed and submitted by Col Nihart to BGen Simmons. However, on the part of LtCol Schwanda it appears that it was not written with the express intent of gaining approval for an exchange proposal which accompanied the letter, as alledged by Col Ponnwitz. Both LtCol Schwanda and Mr D'Alessandris have asserted that the exchange proposal (dated 15 July) was attached at the insistence of Mr D'Alessandris with the consent of Col Nihart and not at the suggestion or behest of any third party. (FF: 67, 68, 69)

16. It appears that LtCol Beebe II by entering into an unwritten agreement purporting to bind the U.S. Government during the course of a Title 10 aircraft exchange in 1991, may have violated the provisions of 5 CFR 2635.101. However no criminal intent has been found. He appears to have been motivated by his desire to extricate the aircraft from an untenable situation and ultimately transfer it on loan from the MCAGM to MCAS Cherry Point. (FF: 37)

17. [redacted] LtCol Dragottas conflict of interest with Keystone helicopters. [redacted]

18. The sum of the research that I have conducted and the information that I have obtained, lends much credence to the position that the Lan-Dale Company, with regard to the current dispute over the C-117D -- VC-118B exchange agreement, may not have been dealt with fairly or equitably, despite protestations to the contrary. Severe and mutual misunderstanding of intent between the MCAGM and The Lan-Dale Co. appears to have developed. Should the dispute become public thru litigation. considerable embarrassment may be accrued by the USMC.

## Recommendations

1. It is recommended that the potential conflict of interest between LtCol Schwandas Federal employment, and his relationship with the Cunningham Foundation be reviewed by the Station Staff Judge Advocate.

[redacted] 2. It is recommended Dragotta be further reviewed. [redacted]

3. It is recommended that the circumstances and issues surrounding the C-117D -- VC-118B exchange between the MCAGM and the Lan-Dale Company be the subject of further review.

4 It is recommended that the USMC, to avoid public embarrassment, reach a mutually acceptable accommodation with The Lan-Dale Co. regarding the company's current dispute with the MCAGM. Since relations between the MCAGM and The Lan-Dale Co. appear to be irreparable, third party mediation may be required.

[redacted]

LtCol - Ferrari