ORIGINAL

FILED
AUG 2 1 2003
U.S. COURT OF FEDERAL CLAIMS

JAMES M. SAKRISON, AZ. BAR NO. 001948
SLUTES, SAKRISON & HILL, P.C.
33 North Stone Avenue
Tucson, Arizona 85701-1489

Telephone: 520-624-6691

TOM HAMILTON, TX. BAR NO. 08841000
LAFONT, TUNNEL, FORMBY, LAFONT & HAMILTON, LLP
A Limited Liability Partnership
PO Box 1510
Plainview, Texas 79073-1510

Telephone: 806-293-5361

ECF

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| LAN-DALE CO., Plaintiff, v. UNITED STATES OF AMERICA Defendant | Case No. 03-1956C<br>DECLARATION OF ANTHONY J. D'ALESSANDRIS IN SUPPORT OF COMPLAINT FOR BREACH OF SETTLEMENT CONTRACT, SEIZED PROPERTY, DAMAGES AND ATTORNEY'S FEES |

I, Anthony J. D'Alessandris, declare and state as follows:

1. I am the President of The Lan-Dale Co. ("Lan-Dale"). Lan-Dale is a Nevada corporation which was established in February 1970. Since that time, its primary business has been land development, and its avocation has been acquiring and refurbishing historic aircraft, some of which were then offered for sale or exchange. I am a licenced commercial pilot, single- & multi-engine, instrument-rated flight instructor, and am type-rated in the DC-3S (C-117D), DC-6 (VC-118B), and DC-7.

2. Among other projects, Lan-Dale has provided historically significant aircraft to the US Marine Corps (USMC), US Navy (USN), and US Air Force (USAF) Museums.

3. Based on my observations as described herein, I have personal knowledge of the matters set forth below, and could and would testify completely thereto if called as a witness.

## BACKGROUND

4. The Marine Corps Air Ground Museum ("MCAGM") at MCAS Quantico, Virginia, is the Marine Corps' official aviation museum. The mission of the MCAGM is to preserve and enhance the heritage and image of Marine Corps aviation by the collection, preservation and exhibition of memorabilia significant to the history and mission of the Marine Corps.

5. Pursuant to 10 U. S. C. § 2572 and 10 U. S. C. § 7572, the Secretary of the Navy has authority to transfer excess or obsolete material, including aircraft and aircraft parts, to the MCAGM. Many of these items are stored at the Government's Aerospace Maintenance and Regeneration Center ("AMARC") at Davis-Monthan Air Force Base ("Davis-Monthan"), Tucson, Arizona. AMARC stores aircraft for all the military services and, at the direction of the services, reclaims parts from unused aircraft for use in the active fleet. In some cases the MCAGM has traded these surplus items directly with private parties in exchange for historical items. Lan-Dale has been a party to such transactions in the past, conducting six previous exchanges, one of which was a two-part exchange, with the MCAGM in the 1980s.

## THE ISSUE

6. The illegal conduct on the part of Government Agencies commenced with the Fraudulent modification of Lan-Dale's 21 June 1991 proposal and continues with the Award/Contract of 13 February 1992 and the Substitute Award/Contract of 18 January 2000. This latter Award/Contract memorialized the Settlement Agreement requested by the Armed Services Board of Contract Appeals (ASBCA) and was fully disclosed to, and approved by the highest levels of the office of the Secretary of the Navy. The Contracting Officer's letter of 06 June 2000 clearly states the ongoing issue "This office has been directed by the Secretary of the Navy and the Armed Forces Contract Settlement Board

[sic] to negotiate with the Lan-Dale Company in order to close this eleven years litigation." (See Petition Exhibit "BB" attached thereto and by reference made a part hereof).

Since 27 February 1992, Lan-Dale has fully performed, in accordance with terms and conditions of both Award/Contracts and has diligently sought the Government's performance. Lan-Dale's 21 June 1991 proposal stipulated "*until such time as a mutually agreed upon exchange is consummated.*" To date this referenced exchange has not been consummated.

THE TWO-PART EXCHANGE

7. On or about September 1990, Lan-Dale was contacted by LtCol William Beebe II, Officer in Charge (OIC) of the MCAGM, who asked if Lan-Dale would be interested in performing a service for the Marine Corps by flight-delivering the MCAGM's C-117D BuNo 50834 located at MCAS Quantico, Virginia, to MCAS Cherry Point, North Carolina. LtCol Beebe, in consultation with his predecessor, LtCol (Ret) Rudy Schwanda, Command Historian at Cherry Point, sent a letter to Lan-Dale dated 23 May 1991 wherein he outlined a proposal for transporting the C-117D. This proposal was typical of the two-part exchange Lan-Dale conducted during LtCol Schwanda's tenure as OIC, in 1985. At that time C-117D BuNo 50835, which had been stricken from the operational inventory in the Philippines, was acquired by the MCAGM and, wings removed, transported to NAS North Island with the hope that an aircraft carrier would be transiting from the west coast to the east coast and deliver 50835 to Quantico, VA. This did not occur so it remained on the ramp at NAS North Island, disassembled and stranded. The North Island Commanding Officer (CO) considered the disassembled aircraft an eyesore and gave LtCol. Schwanda six months to move the aircraft. LtCol Schwanda made me aware of this problem. Lan-Dale entered into a two-part exchange, assembled the aircraft, and flew it out as a civil aircraft. Subsequently, Lan-Dale did an extensive restoration and, upon completion, at MCAGM's request, I flight- delivered the C-117D to MCAS El Toro, CA. Shortly thereafter, Lan-Dale returned title to 50835 to MCAGM

and received its items of exchange stock. At this time, Gary Watson was the Contracting Officer, Head, Purchasing and Contracting Branch, of MCAGM.

8. LtCol Beebe's proposal was typical of the above two-part exchange. Lan-Dale's investment in this exchange would be its VC-118B, which the museum also wished to acquire. Lan-Dale's VC-118B was valued at $500,000 and agreed to by the parties. Encl (16) of the Inspector General Investigation Report of 07 November1995 (see Petition Exhibit "A" attached thereto and by reference made a part hereof), sets forth LtCol Beebe's statement to the investigating officer relating to this valuation. When asked how he arrived at the $500,000 valuation for the VC-118B, the report states: *"He replied that when he first saw the aircraft and the condition it was in, the number that stuck in his mind was $700,000, which was his own personal estimation. When Mr. D'Alessandris mentioned that he would be willing to assign a valuation of $500,000 he thought it was a great deal and jumped at it."* This particular aircraft is one of a kind, restored to like-new condition, with a luxurious interior of stainless steel and mahogany, used by several Commandants during the aircraft's military career. (See Petition Exhibit "B" a true and correct copy of the photographs of the VC-118B attached thereto and by reference made a part hereof).

9. In accordance with the correspondence and oral communications with LtCol Beebe, Lan-Dale submitted a two-page proposal dated 21 June 1991 (see Petition Exhibit "C" a true and correct copy attached thereto and by reference made a part hereof). The two-page proposal, clearly marked "1 of 2" and "2 of 2", showed on the first page the terms and conditions that applied to this two-part exchange. With reliance upon the integrity and honesty displayed by the OICs in prior exchanges, the contractual commitment for the finalization of this two-part exchange was open ended, as stated in Lan-Dale's Proposal, *"until such time as a mutually agreed upon exchange is consummated."* [emphasis added]. The second page showed the proposal for the first part of the exchange, all as suggested by LtCol Beebe.

A condition of the exchange was for Lan-Dale to absorb all costs for the flight

delivery of the VC-118B from Tucson, Arizona, to MCAS Cherry Point, the restoration to airworthy condition of the C-117D aircraft, and for its flight delivery from MCAS Quantico to MCAS Cherry Point. Lan-Dale was also assured that it would have the right of first refusal over exchange items the MCAGM acquired, for the second part of this exchange.

10. On 28 June 1991 Lan-Dale received the MCAGM's formal acceptance of the two-page proposal (see Petition Exhibit "D" a true and correct copy attached thereto and by reference made a part hereof) and on 03 July 1991 the MCAGM submitted this proposal to SECNAV for approval. (See Petition Exhibit "E" a true and correct copy attached thereto and by reference made a part hereof). On Page 6 of the Investigating Officer's Investigative Report, 22 September 1995, LtCol Ferrari stated that the *"The proposal had received positive endorsement at each step until arriving at CNO. At this point the paper trail on this proposal stops until November of 1991."* (See Petition Exhibit "F" a true and correct copy of Ferrari's report attached thereto and by reference made a part hereof). Apparently the records for this period of time had been done away with.

11. LtCol Beebe retired in September 1991 and LtCol Carmen Dragotta arrived as OIC of the MCAGM in October 1991. Prior to his departure LtCol Beebe reviewed the file with LtCol Dragotta and advised him in detail the specifics of the two-part exchange. Lan-Dale awaited either the contract or notice of disapproval by higher authority. Unknown to Lan-Dale, LtCol Dragotta materially changed the values as stipulated in Lan-Dale's two-page proposal and as listed in LtCol Beebe's Request for Approval. LtCol Dragotta without Lan-Dale's knowledge or consent reduced the value of the VC-118B from $500,000 to $350,000, and Lan-Dale's carryover equity represented by the C-117D, from $430,000 to $240,000, and LtCol Dragotta submitted his fraudulently altered proposal to the Chief of Naval Operations (CNO) on 15 November 1991. This request listed the altered values and was subsequently approved (see Petition Exhibit "G" a true and correct copy attached thereto and by reference made a part hereof).

LtCol Dragotta then submitted the altered exchange package to the USMC Contracting Officer, Gary Watson. *Mr. Watson placed full reliance on the OIC's to negotiate exchanges and acquire CNO approval.* The package logically would have included, among other things, Lan-Dale's two-page proposal and the altered approved request. A review of the documents readily reveals a discrepancy in values, (the VC-118B, $500,000 vs $350,000 and the C-117D, $430,000 vs $240,000). Upon receipt, I signed the Contract on 10 February 1992. Exchange Award/Contracts do not list values, and I signed the Contract with representation that Lan-Dale's two-page proposal of 21 June 1991 had been approved as submitted. (See Petition Exhibit "H" attached thereto and by reference made a part hereof).

12. Lan-Dale flight-delivered the C-117D to MCAS Cherry Point on 27 February 1992. Among the notables awaiting our arrival at Cherry Point was the Assistant Commandant of the Marine Corps, Gen Richard D. Hearney. Enclosed are copies of official USMC photographs of the C-117D relating to its flight delivery (see Petition Exhibit "I" attached thereto and by reference made a part hereof).

13. Lan-Dale's flight delivery of the VC-118B and the C-117D to MCAS Cherry Point completed Lan-Dale's contractual commitment. What remained for closure was performance on the part of the MCAGM in furnishing Lan-Dale trade items totaling $430,000, in exchange for the return of title for BuNo 50834 to the MCAGM.

14. Lan-Dale place numerous phone calls to LtCol Dragotta requesting to be advised immediately of any trade stock that became available to the museum so Lan-Dale could complete the return exchange of the C-117D. During the conversations with LtCol Dragotta, I perceived an evasiveness regarding the return exchange so I submitted a letter to LtCol Dragotta dated 26 May 1992 which set forth the terms and conditions of the two-part exchange (see Petition Exhibit "J" a true and correct copy attached thereto and by reference made a part hereof). LtCol Dragotta never responded to anything in writing, and in the many conversations that followed, LtCol Dragotta never refuted the statements made in Lan-Dale's letter of 26 May 1992.

15. In a telephone conversation Dragotta advised me that the MCAGM had received four HH1K helicopters as trade stock. I expressed an interest in these items. Dragotta advised that only three were available since he had committed one to a Pennsylvania helicopter company. (After he retired, Dragotta was employed by a Pennsylvania helicopter company). Lan-Dale advised that it had the right of first refusal over exchange items the MCAGM acquired and submitted a letter requesting these items as a part of this exchange. Prior to his retirement, Dragotta denied receiving this letter.

16. LtCol Dragotta retired in May 1993. I happened to call the day before and LtCol Dragotta advised he had a job flying helicopters for a Pennsylvania helicopter company.

17. About a month later, in a conversation with Joe Payton, MCAGM's Head of Restorations, I asked the status of the four HH1-Ks and was advised that LtCol Dragotta had committed one of the HH1-Ks in an exchange to a Pennsylvania helicopter company.

18. 23 July, 1993. From the position he held at Headquarters Marine Corps, Washington, D.C., Col A. J. Ponnwitz was assigned to the Marine Corps Museum as the OIC. Lan-Dale arranged for a meeting with Col Ponnwitz at MCAS Quantico on 10 September 1993. I asked LtCol Schwanda to be present because he knew the details of the two-part exchange agreement. When I mentioned that Lan-Dale was to receive $430,000 in trade stock for the return of title of the C-117D to the MCAGM, I was shocked when Col Ponnwitz advised that, in accordance with the approved proposal he had in hand, Lan-Dale was to receive *$240,000* in trade stock and the value of Lan-Dale's VC-118B was *$350,000.* I advised Col Ponnwitz that the terms and conditions of the proposal Lan-Dale submitted stipulated the retained value of the C-117D at *$430,000* and the value of the VC-118B at *$500,000.* Furthermore, I advised Col Ponnwitz that Lan-Dale's proposal afforded the USMC only two options: approval or denial. Making changes in Lan-Dale's proposal without Lan-Dale's knowledge or consent constituted an illegal act. Col Ponnwitz was duty bound to address LtCol Dragotta's fraudulent conduct.

Both LtCol Dragotta and Col Ponnwitz are in violation of the following laws:

SECNAVINST 5370.2H

Subj. OTHER LAWS APPLICABLE TO PRESENT OR FORMER DOD PERSONNEL (See Petition Exhibit "K" a true and correct copy attached thereto and by reference made a part hereof).

The actions of DOD personnel could be considered criminal under the provisions of "Other laws applicable to present or former DOD personnel," Section X, paragraphs B and K:

Section X. "There are legal prohibitions concerning the following activities which may subject present and former DOD personnel to criminal or other penalties:

Para. B: Concealing or failing to report to proper authorities the Commission of a felony under any criminal statue if such person knew of the actual commission of the crime. (See 18 USC Sec. 4)

Para. K: "Committing fraud or making false statements in a government matter.

18 USC Sec.1001: "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined under this title or imprisoned not more than five years, or both."

I asked for a copy of the document which had numerous other changes as well; Col Ponnwitz refused to tender a copy. At a later date a copy was acquired. This document was dated 15 November 1991 (see Ibid. Petition Exhibit "G") and it now became apparent to me that LtCol Dragotta's evasiveness was, in reality, deceit. In the course of the meeting, Col Ponnwitz made the following statement: "Unlike LtCol Dragotta, I *will respond to everything in writing.*"

19. On 20 September 1993, Lan-Dale submitted a written proposal to Col Ponnwitz for the second part of the exchange. Col Ponnwitz' response to this proposal *was not in writing* but in the form of a message left on Lan-Dale's answering machine. In this message, Col Ponnwitz made a false statement, and in the course of future communications, he made more false statements regarding the facts relating to this transaction and exhibited an irrationality to the extent that I determined I could no longer deal with him.

20. On 15 July 1994 Lan-Dale submitted a proposal to the Director of the MCAGM, BrigGen (Ret) E. H. Simmons, USMC. I had hope that he would address this issue and bring it to closure.

21. Col (Ret) F. Brooke Nihart, a former Director of the MCAGM, who was knowledgeable of Lan-Dale's past performance, entered this scene and offered to present the truth of this matter to BrigGen (Ret) Simmons, whom he had known for more than forty-five years. In consultation with LtCol Schwanda, they reviewed the facts of this matter and, accordingly, LtCol Schwanda drafted the letter. At my insistence, a copy of Lan-Dale's 15 July 1994 proposal was enclosed as a basis for negotiations. Col Nihart submitted this letter of 08 September 1994 to BrigGen (Ret) Simmons (see Petition Exhibit "L" a true and correct copy attached thereto and by reference made a part hereof). Among other things, the letter advised BrigGen (Ret) Simmons of the dishonorable conduct on the part of LtCol Dragotta and Col. Ponnwitz, and on page 10 stated: "Further, if an exchange agreement cannot be quickly reached, Mr. D'Alessandris would not be opposed to the appointment of a mutually agreeable arbitrator and the use of professional appraisals to determine the current fair market values of Museum trade stock." On page 11 he states: "Rudy [LtCol Schwanda] indicates that Mr. D'Alessandris, as well as he and Bill Beebe, are prepared to talk or meet with you or an appointed arbitrator or investigator to quickly resolve this matter."

22. BrigGen (Ret) Simmons did not address this issue and failure to take action with respect to the dishonorable conduct of his subordinates is in direct violation of

SECNAVINST 5370. 5A Pg. 3 (d), "It is the duty of each commander and commanding officer to hold his subordinates accountable for their actions and to correct systemic faults." And SECNAVINST 5370.2H Sec X- Para B. Concealing or failing to report to proper authorities the Commission of a felony under any criminal statue if such person knew of the actual commission of the crime. (Ibid, Petition Exhibit "K"). (See 18 USC Sec. 4).

In his letter of 20 September 1994, BrigGen (Ret); Simmons advised Lan-Dale to contact legal counsel to the MCAGM, Ms Penny Clark. He apparently gave Col Ponnwitz a copy of Col Nihart's letter and turned this matter back over to Col Ponnwitz.

23. Col Ponnwitz, in an attempt to discredit the facts presented in Col Nihart's letter, made false statements which he labeled "Allegations." He enjoined Col Yennesa of the IGMC Office and with a Memorandum for the Record dated 20 September 1994 initiated a Hot Line Complaint with the IGMC that contained nothing but false statements. (See Petition Exhibit "M" a true and correct copy attached thereto and by reference made a part hereof). Col Ponnwitz stated in the Complaint that counsel for the USMC [Ms Penny Clark] had reviewed the complaint and concurred with the allegations. This memorandum resulted in the IGMC's investigation dated 13 June 1995, LtCol John Ferrari, Investigating Officer.

24. Tom Hamilton's letters of 19 January 1995, 07 February 1995, and via certified mail return receipt requested on 03 March 1995 to Counsel, MCCDC, Ms. Penny Clark, furnished her a detailed history with documentation of the circumstances relating to the two part exchange agreement entered into between parties and requested her assistance toward an amicable resolution of this matter. (see Petition Exhibit "P" the three letters attached thereto and by reference made a part hereof).

25. Counsel for the USMC Contracting Officer, Ms Penny Clark, in her letters of 08 March 1995, 07 April 1995 and 16 June 1995, to Tom Hamilton, Esq., Counsel for Lan-Dale Co., stated that she declined to pursue discussions or resolution of this issue until the recommendations of the fact finding and investigations became available. In her

June letter she stated: "the Government's position is and has been that the contract has been fully and properly executed with no outstanding actions pending." The *only* part of the contract executed, however, was the *first* part of the two-part exchange listed on page 2 of 2 of Lan-Dale's proposal, and its existence was predicated upon the terms and conditions on page 1 of 2 which also stipulated the second part, the return exchange of the C-117D.

26. The 10 July 1995 letter of instruction from W. W. Scheffler, Chief of Staff, Marine Corps Air Bases, Eastern Area, Cherry Point, to Lt Col Ferrari, initiating the Hot Line Complaint investigation, clearly states in paragraph 2: "You shall investigate *all* [emphasis added] facts and circumstances surrounding the allegations and report findings of facts, opinions, and recommendations upon completion..." [Emphasis added]. (See Petition Exhibit "N" a true and correct copy attached thereto and by reference made a part hereof). A letter from LtCol Ferrari to Scheffler [ca. 19 July 1995] acknowledged his directive to "...investigate <u>all</u> the facts and circumstances..." Scheffler replied on 03 August 1995 reiterating Ferrari's "...responsibility to investigate and resolve all possible issues." The above requirements were not complied with. For example, LtCol Dragotta, the perpetrator of this issue, in his fraudulent modification of Lan-Dale's Proposal did not have his affidavit taken. Gary Watson the Contracting Officer who produced the Contract did not have his affidavit taken.

27. LtCol Ferrari contacted Lan-Dale Counsel Tom Hamilton, and advised that he was the Investigating Officer. Hamilton advised LtCol Ferrari that any response he himself would make would be considered hearsay and suggested LtCol Ferrari contact me directly. Telephone numbers were exchanged. I did not wait for him to call, I contacted LtCol Ferrari immediately and he advised "you are under no obligation to provide any help at all." On the contrary,I told him I would respond and that I had a very detailed file on this issue and, would furnish him Lan-Dale's complete file, and would answer any questions he might have. LtCol Ferrari followed up with a letter on 08 August 1995 confirming the details of our conversation (see Petition Exhibit "O" a true and correct

copy attached thereto and by reference made a part hereof). Enclosed with this letter was a copy of the complaint. His letter stated, among other things, "*Some of these claims are poor works of fiction that are readily transparent.*" [Emphasis added].

I read the complaint and was appalled: the nine allegations listed were false and were totally devoid of substance.

I was infuriated that allegations totally lacking in substance, most of them easily refuted in a review of the Government's own records, would appear in a document published by the USMC Commandant's Inspector General's Office constituted a grossly slanderous injustice to A.J. D'Alessandris and the Lan-Dale co. Persons unknowing, upon review of a document produced by the Commandant of the Marine Corps' Inspector General, would and/or could easily assume the allegations had some merit.

28. The IGMC office's Col Yennesa did not require Col Ponnwitz to submit data substantiating his nine allegations. Had he done so, the allegations readily would have been proven to be false statements. This conduct is in violation of :

SECNAVINST 5370. 5A, the DOD/NAVY HOTLINE PROGRAM, Policy: Para. 5c. "Prompt, responsive, and impartial action will be taken to examine <u>substantive</u> [emphasis added] allegations..." and

Enclosure (1) <u>Investigation Standards</u> Page 2, Para (b). "Reports must not raise unanswered questions nor leave matters open to question or misinterpretation."

Further, in total disregard of the information contained in their own records and the facts presented in Col Nihart's letter, (Ibid Petition Exhibit "L" ) the IGMC generated and published the following allegations.

1. "LtCol Schwanda is alleged to have engaged in questionable practices while serving as the director of the Marine Corps Air Ground Museum (MCAGM) in Quantico VA., by acting as an agent for Lan-Dale Corporation [sic], which permitted him to receive aircraft which were then sent to the museum at Cherry Point, creating a favorable circumstance for his future employment at Cherry Point."

The above is false. The only aircraft Lan-Dale delivered to Cherry Point were the

two relative to this issue: C-117D, BuNo 50834; and VC118B, BuNo128427.

2. "The IGMC has learned that Counsel at MCCDC [Ms Penny Clark] is presently communicating with attorneys for Lan-Dale Corporation [sic] regarding previous 'deals' that were allegedly made between the MCAGM and Lan-Dale Corporation."

This is false. Lan-Dale counsel was not contacted, and prior exchanges are not "alleged", they are a matter of record at the MCAGM.

29. A cursory review of the allegations listed in the Hotline Complaint of 15 June 1995, readily would have revealed they lacked substance, had no basis in fact and were in reality false statements, as LtCol Ferrari stated: "...poor works of fiction." By listing allegations that totally lacked substance and publishing the Hotline Complaint, the IGMC defamed the name of Lan-Dale and A. J. D'Alessandris.

30. The Inspector General of the United States Marine Corps having been made knowledgeable of the dishonorable conduct of subordinates, including fraud and false statements, to the best of my knowledge, did not hold these subordinates accountable in accordance with the following laws, and by not doing so enjoined them in their violations of the following:

<u>MARINE CORPS ORDER 7510.5A</u>

Subj: <u>POLICY</u>.

<u>MARINE CORPS FRAUD, WASTE, AND ABUSE (FWA) OVERSIGHT, AWARENESS, PREVENTION, AND REMEDIES</u>

5. "The Marine Corps is committed to an aggressive program of oversight, awareness, prevention, and remedies of FWA. Our goal is to preclude even the slightest impression of impropriety in the handling of our manpower, material, and money."

Subj: <u>ACCOUNTABILITY</u>.

<u>SECNAVINST 5370. 5A Pg. 3 (d)</u>

"It is the duty of each commander and commanding officer to hold his subordinates accountable for their actions and to correct systemic faults."

SECNAVINST 5370.2H

Subj. OTHER LAWS APPLICABLE TO PRESENT OR FORMER DOD PERSONNEL (Ibid. Petition Exhibit "K")

The actions of DOD personnel could be considered criminal under the provisions of "Other laws applicable to present or former DOD personnel," Section X, paragraphs B and K:

Section X. "There are legal prohibitions concerning the following activities which may subject present and former DOD personnel to criminal or other penalties:

> Para. B. Concealing or failing to report to proper authorities the Commission of a felony under any criminal statue if such person knew of the actual commission of the crime. (See 18 USC Sec. 4)
>
> Para. K. "Committing fraud or making false statements in a government matter. ( See 18 USC Sec.1001)

18 USC Sec.1001: "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined under this title or imprisoned not more than five years, or both."

31. The IGMC HOTLINE COMPLAINT 950113 Completion Report: By letter dated 07 November 1995 submitted to the Commandant of the Marine Corps (IG) Headquarters, Washington DC, MajGen Frederick Mccorkle, Commander, Marine Corps Air bases, Eastern Area, Cherry Point, concurred with the "findings, conclusions and disposition" of the Completion Report as follows:

OPINIONS:

"The sum of the research that I have conducted and the information that I have obtained, lends much credence to the position that the Lan-Dale Company, with

regard to the current dispute over the C-117D – VC-118B exchange agreement, may not have been dealt with fairly or equitably, despite protestations to the contrary. Should the dispute become public through litigation, considerable embarrassment may be accrued by the Marine Corps."

RECOMMENDATIONS:

2. "It is recommended, that the circumstances surrounding LtCol Dragotta's relationship with the Keystone Helicopter Company while he was on active duty, and its influence on his current employment, be the subject of further review.

3. "It is recommended that the circumstances and issues surrounding the C-117D - - VC-118B exchange between the MCGAM and the Lan-Dale Company be the subject of further review.

4. "If the recommendation contained in par. 3 is not deemed to be warranted, it is recommended that the Marine Corps, to avoid public embarrassment, reach a mutually acceptable accommodation with the Lan-Dale company regarding that company's current dispute with the MCAGM." (See Petition Exhibit "Q,""Opinions and Recommendations," a true and correct copy attached thereto and by reference made a part hereof).

32. The Commandant's office did not issue a directive in accordance with the above findings toward the disposition of the Lan-Dale issue. Subordinates were not held accountable. The information in the investigative report furnished to the office of the Commandant clearly reflects willful neglect on the part of the IGMC in ignoring serious violations of Marine Corps Policy, Secretary of the Navy Instructions (SECNAVINST), and Department of Defense (DOD) Law by his subordinates. The IGMC, a part of the Commandant's Office, as the ultimate authority in the Marine Corps, directly violated the rules, regulations, and policy he was duty-bound to enforce. The IGMC displayed illegal conduct, with the intent to do harm, in the production of documents containing allegations totally lacking in substance.

## CONTRACTOR'S CLAIM

33. In accordance with 41 U.S.C. 601-613, The Contract Disputes Act "CDA", Lan-Dale Counsel Jim Sakrison of the law firm Slutes, Sakrison, Grant, Hill & Rubin, P.C., Tucson, AZ, filed a claim with the Contracting Officer on 04 June 1996. The Claim alleged, "Misrepresentation and *fraudulent acts* and omissions".

34. On 27 March 1997, the Contracting Officer denied Lan-Dale's claim. The Contracting Officer's denial contained numerous false statements. In his denial, he contended that Lan-Dale should have contacted him during the course of negotiations with the MCAGM. The format for exchange negotiations between Lan-Dale and the MCAGM, however, had been established in numerous other negotiations (six), one of which was a two-part exchange, conducted by Lan-Dale and the MCAGM since 1983. Lan-Dale was advised that upon completion of the negotiations with the OIC, the MCAGM submitted the documents to CNO for approval. This completed package was then submitted to the Contracting Officer who prepared and signed the contract. Lan-Dale was never instructed to contact, negotiate with, or request any approval from the Contracting Officer. The established format for negotiations of this type is set forth in the following statement made by LtCol Schwanda, former Director (1984 to 1988) of the MCAGM, and at that time Command Historian at MCAS Cherry Point, in his letter dated 05 January 1996 to the Commander of the Marine Corps Air Bases, Eastern Area, Cherry Point, MajGen Frederick McCorkle:

> "The contracting officer at Quantico, and approving authorities at HQMC, NavAirSysCom, CNO, DOD and GAO were fully aware that MCAGM directors served as sole negotiators of proposed exchanges, and never challenged our authority.
>
> "Every MCAGM director for the past 20 years (Col D'Andrea, LtCol Brown, Myself, LtCol Beebe, LtCol Dragotta and Col Ponnwitz) has routinely and continuously engaged in these negotiations."

The denial stated, furthermore, that the contract had been "fully performed by each

Party,"referring once again to the contract for the *first* part of the two-part exchange, *totally ignoring the facts presented and the Opinions and Recommendations disclosed in the IGMC investigative report.*

CONTRACTOR'S COMPLAINT

35. On 24 May 1997 Lan-Dale Counsel Jim Sakrison filed a Complaint with the Armed Services Board of Contract Appeals (ASBCA). John Dietrich, Senior Litigation Trial Attorney, newly appointed Counsel to the Contracting Officer, immediately advised that the IGMC's investigation would not be admissible. Lan-Dale advised him that Counsel for the Contracting Officer, Ms Penny Clark, had stated in her letters that she would defer resolution pending the recommendations of the IGMC investigation. Although the Board's requirements indicated a more informal approach and encouraged settlement, Dietrich immediately filed a formal Motion to Dismiss. The Motion was denied. The Government then requested a Compromise Settlement Meeting.

36. A Settlement Meeting was conducted in Washington, D.C., 11 May 1998. Present at the meeting on the part of the Marine Corps were Counsels John Dietrich and Jim Yohn, Contracting Officer Gary Watson, and MCAGM Curator Ken Smith Christmas. Representing Lan-Dale: A. J. D'Alessandris President, and Counsel Tom Hamilton, Esq., of the firm, Lafont, Tunnell, Formby, Lafont & Hamilton, L.L.P., Plainview, Texas.

37. John Dietrich was asked to confirm that he had the authority to bind the government to a Settlement Agreement. He advised that he had the authority to settle subject to the approval of the Department of the Navy and that the matter was to be resolved on the basis of the Award/Contract of 13 February 1992, the first part of the two-part exchange, and be memorialized as a substitute "Award/Contract." Dietrich then advised that Lan-Dale's position, for the purpose of the meeting, would be considered factual.

A Settlement Agreement was arrived at. It was mutually agreed Lan-Dale would receive five Engines (complete and zero-time if available), one T-34 and six T-39s. One of the T-39s, and the five engines had not been transferred to the MCAGM account at this

time. It was agreed the value of this T-39 would be commensurate with the other four at Davis-Monthan ($50,000 to $55,000). Transfer of the fifth T-39D, BuNo 150548, and the five engines to the MCAGM was a paper transfer readily accomplished. Five of the T-39s and the five engines were stored at Davis-Monthan AFB, Tucson, and the T-34 and one T-39 were stored at MCAS Cherry Point. Dietrich advised me that Lan-Dale would have to accept the items *"as is where is."* I acknowledged, and stipulated *at no cost to Lan-Dale.* Deitrich agreed: *no cost to Lan-Dale.* I then advised that I had heard AMARC was now imposing a fee for preparation and transport of stored items. Neither Dietrich nor anyone on the Government's side of the table made a comment. Dietrich displayed and furnished Lan-Dale 8 x10 color photographs of all the aircraft, both exterior and interior, attesting to exactly what Lan-Dale would receive. (See Petition Exhibit "R," true and correct copies attached thereto and by reference made a part hereof). AMARC subsequently furnished me the CO3A List (items removed and their acquisition cost ) which are attached to the photographs of each of the 5 T-39s located at Davis-Monthan.

<u>THE NAVY AND MARINE CORPS' T-39s</u>

38. In January 1955 the USAF ordered 143 T-39s, and in 1961 the USN ordered 42 as air crew trainer, pilot-proficiency/administrative support, and transport aircraft. At least some of the Marine Corps' out-of-service T-39s were stored at the Government's Aerospace Maintenance and Regeneration Center at Davis-Monthan Air Force Base in Tucson, Arizona. AMARC stores aircraft for all the military services, and at the direction of the services reclaims parts from unused aircraft for use in other aircraft. At such time as reclamation with respect to those aircraft has been completed, certain ones are transferred to the MCAGM's account.

The organization responsible for directing AMARC with respect to the Marine Corps' stored T-39s is the Naval Aviation Supply Office ("ASO") in Philadelphia. The ASO is the Navy and Marine Corps organization responsible for Navy and Marine Corps aviation materials. The ASO has a Detachment Field Supply Office ("ASO FSO") at Davis-Monthan which at that time was under the direction of Herbert Swetman.

39. Based upon the Settlement Agreement entered into by the parties in Washington, D.C., I had reasonable expectations that closure would occur in no more than three (3) months, by 11 August 1998, at which time the T-39s and engines would have fulfilled Lan-Dale's plan for a Mexican cargo operation. Though these items were readily available, I did not have a Contract in hand until a total of *20 months* had passed. This delay proved to be extremely costly to Lan-Dale. (By contrast, LtCol Dragotta submitted his fraudulently modified proposal to CNO in November1991 and the Award/Contract and closure occurred in February 1992,fewer than 3 months).

40. Following the Settlement Conference, Hamilton sent Dietrich a letter on 30 June1998 confirming the terms and conditions mutually agreed upon and, subsequently, a copy was submitted to the ASBCA by Jim Sakrison, *thereby memorializing the Settlement Agreement.* (See Petition Exhibit "S" a true and correct copy attached thereto and by reference made a part hereof).

41. June 1998, one month after the Settlement Meeting and approximately 19 months prior to Lan-Dale's receipt of the Contract, Dietrich was advised in a letter from Anthony A. Mazzone, Navy Inventory Control Point ( NICP), to give consideration to costs involved in removing aircraft from AMARC. Dietrich's receipt of this data was confirmed in a letter from Mazzone June 30, 1999: "About a year ago I wrote to Karen and Mr. Dietrich advising that they should be aware of and give consideration to costs involved in removing aircraft from AMARC." The letter stated as follows:

> "There will be fees for escort, preparation and towing. In order to avoid the untenable situation of AMARC storing aircraft no longer owned by the military services, I suggest that title be turned over only when the aircraft reach the gate and all fees have been paid.
>
> "Also, 5 of the J-60 engines are still installed on the aircraft. AMARC should have provided an estimate for removal.
>
> "I am just sending this as a reminder of what needs to be considered in modifying the contract". (See Petition Exhibit "T" a true and correct copy attached thereto

and by reference made a part hereof).

The Award/Contract of 18 January 2000 does not reflect any consideration to the above.

42. During this period of time, Lan-Dale's attorneys made many calls and submitted many letters to the Contracting Officer and to John Dietrich requesting closure of this issue, i.e., the Award/Contract, Bills of Sale and release of the items.

43. 27 September 1999. Lan-Dale received a draft copy of the Award/Contract.

44. Jim Sakrison's letter of 12 November1998, advised me of his telephone conversation with John Dietrich wherein Dietrich made the following the following statements:

A. That "the fifth T-39, BuNo 150548, which the parties had estimated a value of $50,000, had come in with an appraisal at $70,000."

B. That "the five engines which the parties estimated had a value of $5,000, had an appraisal returned of $10,000."

C. That he had gotten the appraisals in mid-October and was having a difficult time writing his settlement proposal to the Secretary of the Navy because of the disparity of $20,000 on the aircraft and $25,000 on the five engines. He said theoretically the transactions should have balanced out, but now it looks like the Navy is getting "short-changed by $45,000."

The above statements are all false and are the format for Dietrich's scheme in his attempt to circumvent his "no cost to Lan-Dale" commitment.

45. In his 24 November 1999 letter to Tom Hamilton, Dietrich put the above scheme in writing. (See Petition Exhibit "U," a true and correct copy attached thereto and by reference made a part hereof). Dietrich stated the fifth T-39 appraised at $70,000. By comparison, an ocular review of the fifth T-39, BuNo150548, readily revealed it's lesser value compared to the other four, of which the Government valued three of them at $50,000 and one at $55,000. The lesser value of 150548 was further attested to in Davis-

Monthan's CO3A Forms which list the items that had been removed from each T-39 and their acquisition cost. The *total* cost of the removals from BuNo 150548: $321,880.76. The *average* cost of removals from the other four aircraft: $28,476.14. Subsequently, Lan-Dale requested an independent appraisal of this aircraft which reflected a valuation of $20,000. (See Petition Exhibit "V" a true and correct copy attached thereto and by reference made a part hereof). To date, John Dietrich has not responded to the $20,000 appraisal despite his obligation to ensure the fifth T-39 had a minimum value of $50,000 to $55,000, as agreed to at the Settlement Meeting.

46. Dietrich now claims $7,000 was established at the Settlement Meeting as the value of an engine, and that they had subsequently appraised at $10,000. In fact, the valuation of $10,000 was established at the Settlement Meeting when Museum Curator Ken Smith Christmas requested Lan-Dale accept T-34B BuNo140908, which the Government valued at $80,000, in lieu of the one agreed upon, BuNo140931, which the Government valued at $90,000. For the $10,000 difference in valuation, the Government furnished Lan-Dale the fifth engine.

Lan-Dale personnel had inspected the engines, and the sealant on the cowling, typical of the whole aircraft, clearly indicated it had not been removed for many years. All of the engines had numerous components missing. No two engines were alike, and consequently, all would appraise at a different value. Obviously the engines had not been appraised.

47. It was Dietrich's intent that the non-existent excess values would compensate Lan-Dale for AMARC's removal costs as an alternative to his "NO COST TO Lan-Dale" commitment. Furthermore, his attempt to represent the above values as hard-cash dollars is in direct violation of the Award/Contract, Section C-1.2 clearly states that:

> "All estimated values used in negotiation were prepared strictly to assist the Government, and do not constitute warranties or representations *upon which the Lan-Dale Company can reasonably rely.*" [Emphasis added].

Dietrich, in the above false representations, arrived at a non-existent total of

$40,000 excess value ($25,000 on the five T-39s and $15,000 on the engines). His letter stated that "because the appraisals for the engines and new T-39 came in higher than expected the contractor would have to bear the costs associated with presentation."

This representation was neither realistic nor factual. The terms and conditions of the draft of the Settlement Award Contract stated, inter alia:

Page 6, Sec. E-4, [Stated in plain language, that as of the date of the Contract and Bills of Sale Government personnel were precluded from so much as touching Lan-Dale's property]. "The Government assumes no responsibility for maintaining the items...<u>from signing of this contract to removal by the Contractor</u>. [Emphasis added]. The Lan-Dale Company accepts all risk of loss or damage [sic] these items").

<u>Page 9, Section H-4:</u> "[Lan-Dale's items]...shall be delivered in as is where is condition. Contractor shall obliterate all stars, bars, insignia and service markings wherever they appear, prior to assuming ownership...removal from military property, shall take place within sixty (60) days after issuing of Bill of Sale."

48. 03 December1999. Tom Hamilton's response to the above letter stated: "A. J. D'Alessandris has reviewed your letter of Nov. 24, 1999...[and]...although he completely disagrees with your evaluation regarding the issue of who is to pay for the presentation expense," will sign the contract.

Having reviewed the terms and conditions contained in the draft copy of the Award/Contract I made the above decision to sign the contract.

THE AWARD CONTRACT

Lan-Dale received the Award/Contract dated 18 January 2000 and attached Bills of Sale, which were not originals as required. (See Petition Exhibit "W" a true and correct copy attached thereto and by reference made a part hereof). Lan-Dale's request for the originals resulted in Bills of Sale dated 07 February 2000. This error on the part of the Contracting Officer was costly to Lan-Dale. As of the date of the Award/Contract and

Bills of Sale the aircraft and engines were released from DOD control and became "civil owned", subject to the requirements of the Department of Transportation (DOT), specifically the FAA. The Terms and Conditions of the Award Contract also stated that only Lan-Dale and or it's assigns have the right to, and are obligated to, prepare and remove Lan-Dale's property from their current "As is Where is" military locations.

The Award/Contract states, inter alia:

> <u>Page 6, Sec. E-4</u> stated: " Risk of Loss Prior to Acceptance. The Government assumes no responsibility for maintaining the items described in CLINs 0001AA to 0001AJ [items Lan-Dale is to receive] <u>from signing of this contract to removal by the Contractor</u>. [Emphasis added]. The Lan-Dale Company accepts all risk of loss or damage [sic] these items."
>
> <u>Page 9, Section H-4</u>: [Lan-Dale's aircraft and engines] <u>shall be delivered in "AS IS, WHERE IS" condition</u>. [Emphasis added]. Contractor shall obliterate all stars, bars, insignia and service markings wherever they appear, prior to assuming ownership, without expressed or implied warranty of any kind. Removal of... [aircraft and engines] from military property shall take place within sixty (60) days after the issuing of Bill of Sale. (The 60-day period expired 07 April 2000).
>
> Page 8, Sec. G-2:. The contract is for the direct exchange of property...[the] result of a settlement of contract claims and disputes between the United States Government and the Lan-Dale Company. In accordance with ASBCA No. 50829, both parties have agreed that there is to be no monetary compensation.
>
> <u>Page 3, C-1.2</u>: "The Government property...[all of the items Lan-Dale to receive] of this contract shall be, or have been, delivered to Lan-Dale Company 'AS IS, WHERE IS'..." [Emphasis added]. "Further, all estimated values used in negotiation were prepared strictly to assist the Government, and do not constituted [sic] warranties or representations

upon which the Lan-Dale Company can reasonably rely."

The Bills of Sale State, inter alia:

> The Government "*does hereby confirm transfer of all right, title, and interest to said BUYER.*" [Emphasis added].

49. The Government's illegal conduct culminated in its violation of this Settlement Award/Contract by not allowing Lan-Dale the right to acquire its property in accordance with the above terms and conditions. This was accomplished through the inappropriate use of the powers Governmental agencies possess, in effect having seized the five T-39s stored at Davis Monthan with the apparent expectation that Lan-Dale would abandon its property rights given the limited resources available to it to challenge the seizure. In accordance with the terms and conditions of the Award/Contract and the Bills of Sale, there is no legitimate reason why Lan-Dale was not in possession of its property within the time frame stipulated.

The demand that Lan-Dale tender funds to a Government agency for release of its property is in violation of the Contract.

50. The Government is in violation of the Award/Contract in the following letter:

> Head, Museums Branch, LtCol R. J. Sullivan's letter dated 08 February 2000, to Anthony Mazzone, NICP, Philadelphia, PA, Ref: the Award/Contract:
> "Subj: AUTHORIZATION FOR REMOVAL OF AIRCRAFT AND ENGINES"
> Paragraph 1. Authorized AMARC to remove the five aircraft and five engines and "Lan-Dale Company...will pay [AMARC] for removal of all material." This authorization is not in accordance with the Terms and Conditions of the Award Contract: Page 6, Sec. E-4, wherein only Lan-Dale is authorized to remove it's property: "The Government assumes no responsibility for maintaining the items described in CLINs 0001AA to 0001AJ *from signing of this contract to removal by the Contractor*. [Emphasis added]. The Lan-Dale Company accepts all risk of loss or damage [sic] these items."

This letter was forwarded to Herb Swetman, Director of the Naval Inventory Control Point Detachment Field Office (ASO FSO), Davis-Monthan, and subsequently submitted to AMARC.

51. 14 February 2000. Meeting at AMARC with Herb Swetman, my son John present. We discussed Lan-Dale's removal of it's property parked at AMARC. I advised the items were to be released at no cost to Lan-Dale and stated the terms of the Contract, which Swetman was not aware of, and gave him a copy of the Contract. I advised that Lan-Dale personnel planned on removal in no more than 30 days, by March 15. He said he would advise regarding the removal.

52. Swetman tendered AMARC a copy of the Award/Contract and Bills of Sale. AMARC refused to comply with the terms therein, in spite of the fact that AMARC was repeatedly advised that the items were to be released to Lan-Dale "as is, where is" at no cost. This was illegal seizure on the part of the Government and AMARCs demand for money was extortion. Both the Contracting Officer and John Dietrich concurred with AMARC in it's demands.

53. On10 February 2000 AMARC demanded Lan-Dale tender $35,029.00 for the release of it's property, the five T-39s and five engines, in spite of having been appraised of Lan-Dale's rights in accordance with the Contract.

54. The two aircraft located at MCAS Cherry Point, upon presentation, were released to Lan-Dale at "no cost", *all in accordance with the terms and conditions of the Award/Contract.* Lan-Dale personnel obliterated the military markings from the T-34B and VT-39E, prepared the aircraft for removal, and transported them from their military location. To date, however, the Contracting Officer has failed to release the logbooks for the T-34B and the VT-39E to Lan-Dale. (Note: without log books the aircraft have limited value).

55. The government's failure to comply with the Terms and Condition of the Award/Contract by not allowing Lan-Dale access to its property, placed Lan-Dale in an untenable situation that has proven to be extremely costly to the company.

56. With the realization that the Contracting Officer was not going to enforce the Contract, and having good cause to acquire it's property as soon as possible, under duress Lan-Dale was forced to address AMARC's demands. In the Governmental position they held, their abuse of authority made it apparent to me that in order for Lan-Dale to acquire its property it had to resign itself to the fact that AMARC would extort as much money from Lan-Dale as they saw fit.

57. Lan-Dale had received a copy of AMARC's "Actual cost estimate" for removal of the aircraft and engines on 10 February 2000, and requested the "Cost breakdown" received on 23 February 2000. (See Petition Exhibit "X" a true and correct copy attached thereto and by reference made a part hereof).

| | |
|---|---|
| Aircraft: | $19,354.00 |
| Engines: | $15,675.00 |
| Total "actual cost estimate": | $35,029.00 |

This totally unjustified amount of money for a simple task was outrageous. The hourly breakdown revealed costs that were ludicrous and totaled 202.5 man-hours just to remove the engines. The estimate called for 20 man-hours to "transit & search for pallet & old mattress" upon which to place the removed engines.

*In reality, on 21 June 02, Lan-Dale personnel present as observers, the five engines were removed, placed on Lan-Dale-furnished engine stands, and loaded on Lan-Dale's transport, in less than 20 man-hours.*

58. Considerable effort was expended to demonstrate to AMARC that their actual cost estimate was not factual. At my request, a meeting was held at AMARC on 25 May 2000 to discuss the above "actual cost estimate". Present at the meeting on the part of Lan-Dale was a representative of a company operating T-39s, Monty Jackson (General Manger JET-TECH ENG., Laredo, TX, who flew in expressly for this meeting), Bill Johnson, and myself. For the Navy Office: Herb Swetman and AK1 Kevin Potts. For the USAF/AMARC: Brooks; Stepp; and Fagan.

Monty Jackson advised that the removal of each engine could be accomplished in

approximately 3 man-hours, for a total of 15 man-hours. Monty furnished AMARC personnel with copies of the procedure required for removal, and a list of the 14 items involved. The list also included the tools required. (See Petition Exhibit "Y" a true and correct copy attached thereto and by reference made a part hereof). We then discussed the cost for aircraft removal, but it was apparent AMARC had their own agenda.

At this meeting, AMARC personnel and all present were advised and agreed that Lan-Dale personnel would be present as observers during any and all activity relative to Lan-Dale's aircraft and engines and that AMARC was to furnish 24-hour advance notice.

59. As a result of the above discussion, another meeting was held at AMARC on 30 May 2000. Present were the Finance Officer, Debbie Ledbetter, Workload Supervisor Dick Fagan, and Herb Swetman, and for Lan-Dale, Bill Johnson and myself. I asked Fagan if AMARC had given any further consideration to the cost estimates we discussed in our previous meeting. I showed him calculations Lan-Dale had made which reduced their estimate of $35.029.00 to $28,255.63, a difference of $6,773.37. I had a check in hand for $28,255.63 for the release of the five T-39s and five engines, (see Petition Exhibit "Z" a true and correct copy attached thereto and by reference made a part hereof), which neither Ledbetter nor Fagan would accept. Fagan said he would review the costs and get back to us in the afternoon. He did not.

On 02 June 2000 Lan-Dale received another AMARC actual cost estimate which included extensive removals and Demil, in direct violation of the Award/Contract: (see Petition Exhibit "AA" a true and correct copy attached thereto and by reference made a part hereof).

| | |
|---|---|
| Aircraft: | $49,271.00 |
| Engines: | $13,030.00 |
| <u>Total actual cost estimate</u>: | $62,301.00 |

"Demil", or "demilitarization", refers to alterations/removals made from certain military aircraft (combat aircraft or weapons carriers.) The T-39 beside being antiquated, is not a combat aircraft or a weapons carrier and does not come under this category.

On 06 June 2000 Herb Swetman received an E-mail from the USMC Contracting Office which, in part, empathically stated: "This office has been directed by the Secretary of the Navy and the Armed Forces Contract Settlement Board [sic] to negotiate with the Lan-Dale Company in order to close this eleven years litigation...the engines and aircraft were negotiated on an 'as is where is' basis and that there is to [sic] no repeat NO parts removed from the engines and aircraft...NO DEMIL on any of these items." (see Ibid. Petition Exhibit "BB")

60. Herb Swetman advised AMARC of the Contracting Officer's letter of 06 June 2000, (to wit: no removals, no Demil); they ignored it. Herb Swetman retired the end of June 2000.

61. On 06 June 2000, to satisfy AMARC's demands, under duress I was forced to tender a check in the amount of $13,030.00 (for a task that could of easily been done in house for less than $500.00), for the removal of the five engines, knowing full well that even at AMARC's exorbitant hourly rate $2000.00, was more than sufficient. Lan-Dale was well aware that in accordance with the following Term and Condition of the Award Contract it would be the fully responsible party regarding any activity involving its property located at AMARC:

Page 6, Sec. E-4 stated: "Risk of Loss Prior to Acceptance. The Government assumes no responsibility for maintaining the items described in CLINs 0001AA to 0001AJ [items Lan-Dale is to receive] from signing of this contract to removal by the Contractor. [Emphasis added]. The Lan-Dale Company accepts all risk of loss or damage [sic] these items."

62. On Wednesday, 21 June 2000, Lan-Dale received a telephone call from AK1 Potts advising that engine removal was scheduled to start the next day at 6 a.m. *AMARC requested the use of Lan-Dale's engine sling.* The job would have been completed in its entirety and the engines removed from the base all in the same day but for the failure of the crane operator to return to the job site after lunch as agreed. When the crane operator arrived an hour and a half later, he advised that he was pulled off the job

and made to attend a meeting, and would not be able to complete the job until the next day. He said he advised his superiors to no avail that four men were waiting for him at the job site. Time for AMARC workers starts at the "shop" with a half hour allowance to the job site and a half hour for their return. Three men totals 3 man-hours and this additional time would not have been expended had the crane operator been permitted to return as agreed. The engine removal was completed early Friday morning in a total of 19:00 man-hours as opposed to AMARC's original estimate of 202.5 man-hours. At $94.76 per/hr, the actual cost of removal was $1,800.44. AMARC claimed a cost of $3,891.00, and on 04 August 2000 Lan-Dale received a refund of $9,138.97. AMARC personnel themselves proved their Actual Cost Estimate to be ludicrous with their refund of $9,138 which reduced their Actual Cost Estimate for removal of the aircraft and engines from $35,029 to $25,891. As noted in paragraph # 72 above, under duress I had offered $28,255 for removal of the aircraft and engines--which AMARC refused.

The logbooks for the five engines indicated them to be complete, no parts missing. The engines were not complete; many components were missing.

63. On 08 August 2000, *eight months* after the date of the Award/Contract, Tom Hamilton received a letter from John Dietrich which included: (A) the Actual Cost Estimate of $38,588.00 for Demil and removal; (B) payment instructions; (C) express notice of export restrictions; and notice of a requirement for Defense Logistics Agency (DLA) Form 1822, the End User Certificate (EUC). (See Petition Exhibit "CC" a true and correct copy attached thereto and by reference made a part hereof).

The above request is in direct violation of the Settlement Agreement, the Award/Contract and the Bills of Sale. If required, they had to have been complied with, *"prior to release from DOD control."* The EUC requires the form be completed by all applicants and submitted with the *Bid or Proposal*, and constitutes an integral part of the exchange proposal <u>in order to become a part of the contract</u>. To complete the EUC form as presented, Dietrich and the Contracting Officer were requiring Lan-Dale to misrepresent fact and perjure itself, something Lan-Dale could not, and would not do.

64. John Dietrich sent a letter to Tom Hamilton dated 25 August 2000: "The Marine Corps Museum and the AMARC personnel are awaiting action by your client...the personnel in Arizona stand ready to perform the demilitarization and delivery to the gate as soon as Lan-Dale submits the requisite documents and funds."

The above demand that Lan-Dale "submits the requisite documents and funds" is in violation of the terms and conditions of the Award Contract and the (EUC), and is an extortionate ultimatum; i.e., commit perjury, pay the money, or no airplanes.

65. On 11 September 2000, Tom Hamilton received a letter from John Dietrich and submitted a copy to Lan-Dale. Dietrich's letter stated "enclosed you will find a document from DLA that identifies the items that are subject to demilitarization. (See Petition Exhibit "DD" a true and correct copy attached thereto and by reference made a part hereof). Also enclosed was a <u>*undated letter*</u> from Jack W. Blackway, DOD Demilitarization Program Manager, DOD Demilitarization and Trade Security Control Program Office, HQ DLA, J-33. The letter stated in part:

" MEMORANDUM FOR MARINE CORPS AIR AND GROUND MUSEUM"

"Attn: M. Starn, Aviation Curator

" Subject: Demilitarization Requirements for Components Contained in T-39 Aircraft"

The memorandum contained a list of items "validated as requiring demilitarization <u>*prior to release from DOD control"*</u> [Emphasis added]. In reality, *DOD had released control to Lan-Dale on 18 January 2000*, the date of the Award/Contract, with attached Bills of Sale. The DOD Demilitarization Program manager's letter would have to have been presented and dated prior to 18 January 2000 ("*prior to release from DOD control*") in order to meet it's own requirement. By making this letter available to John Dietrich, Blackway enjoined Dietrich in his deceit. Dietrich, in representing this letter as being authoritative, further enhanced his deceit in the following statement: "Although <u>*undated*</u>, it was prepared on August 3, 2000."

The Terms and Conditions of the Award Contract preclude Government personnel

from touching Lan-Dale's property and only Lan-Dale and or it's assigns have the right to, and are obligated to, prepare and remove Lan-Dale's property from their current "As is Where is" military locations.

The Award/Contract states, inter alia:

Page 6, Sec. E-4 stated: " Risk of Loss Prior to Acceptance. The Government assumes no responsibility for maintaining the items described in CLINs 0001AA to 0001AJ [items Lan-Dale is to receive] from signing of this contract to removal by the Contractor. [Emphasis added]. The Lan-Dale Company accepts all risk of loss or damage [sic] these items."

Page 9, Section H-4: [Lan-Dale's aircraft and engines] shall be delivered in "AS IS, WHERE IS" condition. [Emphasis added]. Contractor shall obliterate all stars, bars, insignia and service markings wherever they appear, prior to assuming ownership, without expressed or implied warranty of any kind. Removal of... [aircraft and engines] from military property shall take place within sixty (60) days after the issuing of Bill of Sale. (The 60-day period expired 7 April 2000.)

66. In a conversation with Lindsay Brew of the firm Haralson, Miller, Pitt & McAnnaly, P.L.C., Tucson, AZ., Counsel to Lan-Dale, I advised that Lan-Dale had completed six exchanges with the MCAGM prior to this one, and that one of the exchanges comprised a two-part exchange. I told Brew that in prior exchanges aircraft and engines were released at no cost to Lan-Dale and that any Government-required removals were accomplished by the Government *prior* to the exchange. I told him this was the first time I had ever seen an End User Certificate or been involved with Demil requirements. Brew suggested Lan-Dale make an effort to acquire it's property by offering the balance of payment for the removal of the aircraft. I agreed to deduct the $13,030 engine removal amount from the original total $35,029 and submit the balance of $21,999.

67. 03 October 2000. Lindsay Brew sent a letter to Contracting Officer Gary Watson advising him that his failure to perform in accordance with the terms of the contract constituted a Breach of Contract and tort, namely conversion, and that he was

*prepared to tender the amount of $21,999 to the Contracting officer,* for the release of the five T-39s. (See Petition Exhibit "EE" a true and correct copy attached thereto and by reference made a part hereof).

On 24 October 2000, Brew sent another letter to Watson requesting the courtesy of a response. (See Petition Exhibit "FF" a true and correct copy attached thereto and by reference made a part hereof).

On 26 October 2000, Watson sent a letter to Brew: "We are currently in the process of formulating a response, and it will be mailed to you shortly." (See Petition Exhibit "GG" a true and correct copy attached thereto and by reference made a part hereof).

To date, Lindsay Brew has not received the promised written response from Watson or any government official.

68. 23 October 2000. Tom Hamilton's two-page letter to John Dietrich advised him in detail of the inconsistencies in the requirements of DLA Form 1822, the End User Certificate. Attempting to complete the form after the fact would require Lan-Dale provide false or misleading information. Dietrich, in his telephone response, *suggested to Hamilton that Lan-Dale pre-date the EUC.* Hamilton did not agree and, furthermore, Lan-Dale would not falsify a document. (See Petition Exhibit "HH" a true and correct copy attached thereto and by reference made a part hereof). Nevertheless, to date, the Contracting Officer's Counsel John Dietrich insists Lan-Dale commit perjury by complying with his demands, complete and sign DLA Form 1822, and pay the money or the five T-39s will not be released.

In a telephone conference between Hamilton and Dietrich on10 January 2001, Dietrich insisted Lan-Dale pay and submit the EUC forms.

69. For over two years Lan-Dale has made every effort, under duress, to obtain its property. John Dietrich's and AMARC's unreasonable demands thwarted this effort which culminated in Dietrich's requirement that I commit an unlawful act by complying with his request for the EUC. I waited patiently for Dietrich to arrive at a lawful solution.

There has been no response. Correspondingly, Lan-Dale's only recourse: file the Claim.

THE CLAIM

70. Lan-Dale enjoined the firm of Karp, Heurlin & Weiss, P.C . for the purpose of addressing this issue. The associate counsel assigned to this case was Brian Laird. A Claim for Breach of Contract, dated 12 February 2002, was submitted to the Contracting Officer by Certified Mail on 01 March 2002. The unopened envelope, return-dated 24 March 2002, was received by Laird stamped "unclaimed," "Returned for additional postage," "Additional postage required 20¢." Laird then resubmitted the Claim via Federal Express. Watson acknowledged that he received the Claim on 01 April 2002.

71. At Lan-Dale's request, a Revised Claim dated 06 May 2002, was submitted to the Contracting Officer with a cover letter that stated "This REVISED CLAIM replaces Lan-Dale's original claim in its entirety, and Lan-Dale's original claim is hereby negated in its entirety." (Exhibit "II" attached hereto and by reference made a part thereof).

72. **Mr. D'Alessandris was not satisfied with the legal services furnished by Karp, Heurlin, and Weiss and on** 08 May 2002 **a letter of termination was delivered to the firm.**

73. On 09 May 2002, the Contracting Officer was advised of this termination and that James M. Sakrison of the firm of Slutes, Sakrison & Hill, P.C., was now attorney of record.

74. James Sakrison received a letter from the Contracting Officer dated 23 May 2002 and received on 03 June 2002. (See Petition Exhibit "JJ" a true and correct copy attached thereto and by reference made a part hereof). In this letter Gary Watson requested additional information "in order to become better informed of the facts." The information he requested purportedly occurred months subsequent to the closure date of the contract and displayed an irrationality that will continue throughout his response to Lan-Dale's Claim.

75. Lan-Dale's co-counsel, Tom Hamilton, responded on 03 July 2002: "This letter is in response to your letter of 23 May 2002, which the office of Jim Sakrison

received on 03 June 2002." Hamilton's letter clearly advised, in part: "...all of the facts of this case lie within the time frame of the Contract 18 January 2000 to its required date of closure, 07 April 2000. Our Claim of 06 May 2002 encompasses only this time frame and any occurrences subsequent to the closure date, are not relevant to this Claim."

76. Watson's letter dated 17 July 2002, received 22 July 2002, advised "anticipate a response to your claim NLT 16 Aug. 02." (See Petition Exhibit "KK" a true and correct copy attached thereto and by reference made a part hereof).

77. Watson's letter dated 16 Aug 2002 received 26 Aug 2002 advised "a final decision to you NLT 23 Aug 02." (See Petition Exhibit "LL" a true and correct copy attached thereto and by reference made a part hereof).

78. Sakrison did not receive the response from Watson as promised in the above letter "NLT 23 August 2002." Twenty-four days later, on 16 September 2002, Sakrison did receive a letter from Watson via regular mail. The letter stated that it was a denial of Lan-Dale's Claim. It was *predated 22 Aug 2002, postmarked 10 September 2002*, and *received 16 September 2002.* (See Petition Exhibit "MM" a true and correct copy attached thereto and by reference made a part hereof).

The contracting officers response did not address the allegations made in the Claim nor did it reference the Terms and Conditions of the Award/Contract. Instead the response made numerous false statements referencing occurrences *subsequent* to the closure date of Contract.

Watson ignored the statements made to him in Hamilton's letter of 03 July 2002, which clearly advised, in part: "*...all of the facts of this case lie within the time frame of the Contract 18 January 2000 to its required date of closure, 07 April 2000.* [Emphasis added}. Our Claim of 06 May 2002 encompasses only this time frame."

Watson based his denial on the following four points that are not relevant to the Award Contract nor Lan-Dale's Claim of 06 May 2002, as follows:

1. "Inconsistent Statements. The original claim with attachments and existing documentation in the case file state that you attempted to tender $21,999 to AMARC but

was refused. (Reasons and circumstances not provided) The letter of 3 July 2002, from Mr. Tom Hamilton representing the firm LaFont, Tunnell, Formby, La Font [sic] & Hamilton, L.L.P., stated that besides being irrelevant to the claim, the tender of payment to AMARC for demilitarization never occurred. Based on this information I am now forced to question the credibility of other assertions of facts made in your behalf in previous correspondence regarding your claim and must also consider the possibility of your company having submitted a false claim."

Answer: The above statement made by the Contracting Officer, falsely alleging that Lan-Dale made "inconsistent statements" and "possibly submitted a false claim" besides being slanderous, is obviously without merit, as follows:

A. Lan-Dale *never* tendered payment for "Demil". The only payments Lan-Dale tendered AMARC, under duress, were for the *removal* of it's aircraft and engines.

B. See ¶ 59 above: Meeting at AMARC. I had a check in hand for $28, 255.63 for the *release* of the five T-39s and five engines, (see Ibid, Petition Exhibit "Z"), *which neither the Finance Officer Ledbetter, nor Supervisor Fagan would accept.* Fagan said he would review the costs and get back to us in the afternoon. He did not.

C. See ¶ 61 above: On 06 June 2000, to satisfy AMARC's demands, under duress, I was forced to tender a check in the amount of $13,030.00 for the *release* of the five engines, knowing full well that $2000.00, at AMARC's exorbitant hourly rate, was sufficient to do the job.

D. See ¶ 67 above: 03 October 2000. Lindsay Brew sent a letter to Contracting Officer Gary Watson advising him that his failure to perform in accordance with the terms of the contract constituted a Breach of Contract and tort, namely conversion, and that he was prepared to tender the amount of $21,999 to the Contracting officer for the *release* of the five T-39s. (See Ibid, Petition Exhibit "EE"). Lindsay Brew never received a letter of

request for the payment tendered; he never even received a response to his letter.

2. "Failure on your part to mitigate damages":

Answer: This point is tacit recognition that Lan-Dale has suffered damages. The response is as previously stated in ¶ 69: "For over two years Lan-Dale has made every effort, under duress, to obtain its property. John Dietrich's and AMARC's unreasonable demands thwarted this effort which culminated in Dietrich's requirement that I commit an unlawful act in complying with his request for the EUC. I waited patiently for Dietrich to arrive at a lawful solution. There has been no response. Correspondingly, Lan-Dale's only recourse: file The Claim."

3. "Failure to comply with demilitarization procedures."

Answer:

A. "Demil" first appeared in AMARC's "rough order of magnitude (ROM) estimate" dated 05 June 2000, almost two months after the closure date of the Contract, which was 07 April 2000. (See Ibid, Petition Exhibit "AA")

B. Lan-Dale never tendered payment for "Demil." Demil was not a Term or Condition of the Contract and the word Demil does not even appear in the Contract.

C. On 06 June 2000, the Contracting Officer's Representative (COR) Mike Starn furnished Herb Swetman ("ASO FSO") Davis-Monthan, via E-mail, confirmation of the Terms and Conditions of the Contract, copy to Watson and his counsel John Dietrich. This letter states, inter alia: "This office has been directed by the Secretary of the Navy and the Armed Forces Contract Settlement Board [sic] to negotiate with the Lan-Dale Company in order to close this eleven years litigation...the engines and aircraft were negotiated on an 'as is where is' basis and that there is to [sic] no repeat NO parts removed from the engines and aircraft...NO DEMIL on any of these items." (See Ibid, Petition Exhibit "BB"). Herb Swetman immediately tendered a

copy to AMARC.

D. The Terms and Conditions of the Award Contract preclude Government personnel from touching Lan-Dale's property and only Lan-Dale and or it's assigns have the right to, and are obligated to, prepare and remove Lan-Dale's property from their current "As is Where is" military locations.

E. The Award/Contract states inter alia:

> Page 6, Sec. E-4 stated: "Risk of Loss Prior to Acceptance. The Government assumes no responsibility for maintaining the items described in CLINs 0001AA to 0001AJ [items Lan-Dale is to receive] from signing of this contract to removal by the Contractor. [Emphasis added]. The Lan-Dale Company accepts all risk of loss or damage [sic] these items."
>
> Page 9, Section H-4: [Lan-Dale's aircraft and engines] shall be delivered in "AS IS, WHERE IS" condition. [Emphasis added]. Contractor shall obliterate all stars, bars, insignia and service markings wherever they appear, prior to assuming ownership, without expressed or implied warranty of any kind. Removal of... [aircraft and engines] from military property shall take place within sixty (60) days after the issuing of Bill of Sale. (The 60-day period expired 7 April 2000).

4. "Lack of support for lost profits."

Answer: Upon receipt, the Bills of Sale were submitted to the FAA and the five T-39s were U.S. registered, and immediately deregistered to Mexican registry on 26 May 2000, as follows:

| | | | |
|---|---|---|---|
| BuNo 151336: | XA-AAH | BuNo 150969: | XA-AAJ |
| BuNo 150543: | XA-AAG | BuNo 150548: | XA-AAF |
| BuNo 150547: | XA-AAI | | |

There is a ready market for cargo transport in Mexico and a demand for

additional aircraft. Numerous Sabreliners (T-39s) are being utilized for this purpose. Lan-Dale planned to hire Jeff Coffman, a Mexican citizen, as general manager and chief pilot, to handle what Lan-Dale anticipated was an active cargo business in Mexico. A relationship with a Mexican corporation had been established for that purpose. No freight contracts could be entered into because of the failure of the Government to complete the settlement.

The Operational Cost Analysis and profit potential reflect a viable business venture, the likes of which is ongoing at this time. (See Petition Exhibit "OO " attached hereto and by reference made a part thereof).

Any additional information regarding Lan-Dale's Mexican Cargo Operation is proprietary.

79. The Contracting Officer's response to Lan-Dale's Claim is in default. The law governing this overdue response is the Federal Acquisition Regulations (FARs) (see Petition Exhibit "NN" a true and correct copy attached thereto and by reference made a part hereof), as follows:

FAR. 33.211 (2) "For claims over $100,000, *60 days after receiving a certified claim; provided, however, that if a decision will not be issued within 60 days, the contracting officer shall notify the contractor, within that period, of the time within which a decision will be issued.* [Emphasis added].

(b) "The contracting officer shall furnish a copy of the decision to the contractor by certified mail, return receipt requested, or by any other method that provides evidence of receipt. This requirement shall apply to decisions on claims initiated by or against the contractor." And,

g) "*Any failure of the contracting officer to issue a decision within the required time periods will be deemed a decision by the contracting officer denying the claim and will authorize the contractor to file an appeal or suit on the claim.* [Emphasis added].

(v) " Instead of appealing to the agency board of contract appeals, you may bring

an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) *within 12 months of the date you receive this decision."*

SUMMATION

80. The dishonorable conduct on the part of the Marine Corps and other DOD agencies is in direct violation of one or more of the following:

Ref (b) 1. MARINE CORPS ORDER 7510.5A

Subj: MARINE CORPS FRAUD, WASTE, AND ABUSE (FWA) OVERSIGHT, AWARENESS, PREVENTION, AND REMEDIES

5. Policy. The Marine Corps is committed to an aggressive program of oversight, awareness, prevention, and remedies of FWA. Our goal is to preclude even the slightest impression of impropriety in the handling of our manpower, material, and money.

Ref (b). 2. SECNAVINST 5370 . 5A Pg. 3 (d)

Subj: ACCOUNTABILITY.

It is the duty of each commander and commanding officer to hold his subordinates accountable for their actions and to correct systemic faults.

Ref (c). SECNAVINST 5370.2H

The actions of DOD personnel could be considered criminal under the provisions of other laws applicable to present or former DOD personnel, as outlined in Section X, paragraphs B and K:

Section X. "There are legal prohibitions concerning the following activities which may subject present and former DOD personnel to criminal or other penalties:

Para. B. "Concealing or failing to report to proper authorities the Commission of a felony under any criminal statue if such person knew of the actual commission of the crime. [See 18 USC S4]

Para. K. "Committing fraud or making false statements in a government matter. [See 18 USC S1001]. (See Ibid, Petition Exhibit "K").

IRREPARABLE HARM

81. The harm to Lan-Dale and A. J. D'Alessandris has been ongoing since LtCol Dragotta's fraudulent modification of Lan-Dale's two-part, two-page proposal of 21 June 1991. This proposal remains the foundation of all Contracts generated in this issue. The fraudulent manner in which this proposal was used does not negate or lessen in any way it's requirements, one of which is: "*until such time as a mutually agreed upon exchange is consummated.*" To date this exchange has not been consummated.

The Office of the Inspector General of the Marine Corps, with the publication of Hotline Complaint 950113 of 13 June 1995, deceitfully and with malicious intent destroyed the honorable reputation of A. J. D'Alessandris and the Lan-Dale Co. The contributors to this act are numerous. The perpetrator of this dastardly act, Col Ponnwitz, OIC of the MCAGM, who conspired with Col Yenessa of the IGMC's office, knowingly, and with the reckless disregard for the irreparable harm caused, fabricated and labeled false statements as allegations in order to accomplish this end. The Investigating Officer, Col Ferarri, upon initial review of the allegations, labeled them "poor works of fiction." The findings of the investigation itself determined all of the allegations were false.

82. The damage to A. J. D'Alessandris and Lan-Dale is profound. This outrageous conduct deprives Lan-Dale of rights and significant opportunities that will no longer be available to them. Reputation has always been an essential prerequisite to its business structure. The power of a man's good reputation, and the benefits he can derive therefrom, are boundless.

83. The company itself has suffered irreparable harm in that its resources and business focus have been diverted. Its primary business, land development and construction, had to be seconded to the overriding need to defend itself for the past twelve years against the fraud, extortion, abuse of power, and failure to perform on the part of the government and its agents. I have been forced to live with this matter every day since 1990. Lan-Dale has missed the opportunities the 1990s afforded to grow and develop in an area where construction was thriving. Lan-Dale planned to build a substantial number of

units in Tucson during the 1990s. To initiate this goal, it had acquired a prime 40 acre parcel of land. Its secondary businesses have suffered because after more than twelve years the government has yet to perform its part of this exchange. Lan-Dale thus has been prevented from employing its plan to utilize the return of this disputed contract. Closure of the Settlement Agreement should have occurred within three months of the 11 May 1998 Settlement meeting. Lan-Dale should have been in possession of the T-39s and engines and commenced with it's Mexican cargo operation on 11 August 1998, five years ago.

The Operational Cost Analysis and profit potential reflect a viable business venture, the likes of which is ongoing at this time. (See Ibid, Petition Exhibit "OO ").

84. Attached to this Declaration are photographs of the C-117D aircraft as it appeared when Lan-Dale flight delivered the aircraft from Quantico, Virginia to MCAS Cherry Point, North Carolina, and how it appeared shortly thereafter. All of the damage, including stolen components, vandalism and just about total destruction, occurred during the period of time 50834 has been at MCAS Cherry Point. As depicted in the photographs, 50834 has been reduced to little more than scrap. C-117D, BuNo 50834 is and will always be one of the finest aircraft I will ever have the privilege to fly. I cannot find the words to express my feelings over this travesty, and those words that come to mind would not be proper. The photographs speak for themselves.

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. Executed this 19 day of August 2003 at Tucson, Arizona.

[signature]

A. J. D'Alessandris




27 FEB 92
C-117D BuNo 50834 MCAS
Quantico, VA. pre-flight
to MCAS Cherry Point, NC.

OFFICIAL USMC----PHOTOGRAPH

"I have a very sentimental attachment to this aircraft," said Maj. Gen. Richard D. Hearney, commanding general of the 2d Marine Air Wing.

Hearney flew the "Gooney-Bird" in Vietnam where he was part of the last command to own the aircraft in Iwakuni, Japan in 1983.

"It's a fantastic aircraft. I was just up at Quantico and I watched them prepare it for its flight here."

Hearney was joined for the plane's arrival by Brig. Gen. David A. Richwine, commanding general of Cherry Point.




27 FEB 92

C-117D BuNo 50834

Mission accomplished----------

On the ramp---MCAS CHERRY POINT




CURRENT PHOTO OF
AIRCRAFT BuNo 50834
DEPICTED ABOVE

CURRENT PHOTO OF
AIRCRAFT BuNo 50834
DEPICTED ABOVE





