JAMES M. SAKRISON, AZ.
SLUTES, SAKRISON & HILL, P.C.
33 North Stone Avenue, Suite 1000
Tucson, Arizona 85701-1489
Telephone: 520-624-6691

Attorneys for Plaintiff Lan-Dale Co.

ORIGINAL

FILED
DEC 18 2003
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| LAN-DALE CO.,<br>Plaintiff,<br>vs.<br>UNITED STATES OF AMERICA,<br>Defendant. | Case No. 03-1956C<br><br>AMENDED COMPLAINT OF LAN-DALE CO. FOR BREACH OF CONTRACT, LOSS OF PROFITS, AND ATTORNEY'S FEES |

Plaintiff Lan-Dale Co. alleges as follows:

PRELIMINARY STATEMENT

1. Plaintiff, The Lan-Dale Co. ("Lan-Dale"), is a Nevada corporation. Its primary business has been land development, and its avocation has been acquiring and refurbishing historic aircraft, some of which were then offered for sale or exchange. In the past Lan-Dale completed numerous exchanges with the Marine Corps Air Ground Museum ("MCAGM").

2. On or about September 1990, the Officer in Charge ("OIC") of the MCAGM, asked Lan-Dale to perform the service of flight-delivering the museum's C-117D, BuNo 50834, from Quantico, VA, to Cherry Point, NC. (Museum-owned aircraft cannot be flown). Since the museum also wished to acquire Lan-Dale's VC-118B, they proposed



VLP 14

a two-part exchange. In the first part, Lan-Dale would exchange the VC-118B in return for the C-117D plus several small items. The VC-118B was valued at $500,000, and the small items at $70,000, leaving the value of the C-117D for the purpose of the return exchange at $430,000. In the second part, the return exchange, upon delivery of the C-117D to Cherry Point, Lan-Dale would return title to MCAGM and receive its value in trade stock.

To that end, Lan-Dale submitted a two-page proposal on 21 June 1991. The first page, clearly marked "1 of 2", contained the terms and conditions applicable to both exchanges, and the second page, clearly marked 2 of 2, listed the agreed upon exchange items for the first exchange. The museum did not have sufficient trade stock on hand to list the exchange items for the return exchange. Lan-Dale was assured it had priority over all trade stock the MCAGM acquired and, accordingly, the return exchange was left open ended "*until such time as a mutually agreed upon exchange is consummated.*" To date this exchange has not been consummated.

3. The OIC retired in September 1991 and his replacement arrived in October 1991. Subsequently and unknown to Lan-Dale, the above proposal was modified, approved by the Secretary of the Navy ("SecNav") and used as the basis of the Award/Contract of 13 February 1992. Exchange Award/Contracts do not list values, and Mr. D'Alessandris signed the Contract on 10 February 1992 with representation that Lan-Dale's two-page proposal of 21 June 1991 had been approved as submitted. The flight delivery of the C-117D to MCAS Cherry Point on 27 February 1992 completed Lan-Dale's contractual commitment for both parts of the two-part exchange. What remained was for the Government to perform. The OIC retired in May 1993 and on 23 July 1993, his replacement arrived.

4. The conduct displayed by the replacement OIC resulted in the filing of a Hot Line Complaint with the Marine Corps Inspector General ("IG") on 13 June 1995. This was concurred with by Counsel to Marine Corps Combat Development Command ("MCCDC"). The findings of this investigation stated:

OPINIONS:

"18. The sum of the research that I have conducted and the information that I have obtained, lends much credence to the position that the Lan-Dale Company, with regard to the current dispute over the C-117D–VC-118B exchange agreement, may not have been dealt with fairly or equitably, despite protestations to the contrary. Should the dispute become public through litigation, considerable embarrassment may be accrued by the Marine Corps." (Hot Line Complaint, Completion Report, p. 16, par. 18.)

RECOMMENDATIONS:

"3. It is recommended that the circumstances and issues surrounding the C-117D–VC-118B exchange between the MCGAM and the Lan-Dale Company be the subject of further review. (Hot Line Complaint, Completion Report, p. 16, par. 3.)

"4. "If the recommendation contained in par. 3 is not deemed to be warranted, it is recommended that the Marine Corps, to avoid public embarrassment, reach a mutually acceptable accommodation with the Lan-Dale Company regarding that company's current dispute with the MCAGM." (Hot Line Complaint, Completion Report, p. 17, par. 4.)

5. These recommendations and opinions were ignored by the governmental agencies involved. Forced to defend its interests and following the required legal procedures, Lan-Dale filed a Claim with the Contracting Officer on 04 June 1996. The Contracting Officer's denial of the Claim ignored the dictates of Lan-Dale's two-part exchange proposal and took the position that the contract has been fully and properly executed with no outstanding actions pending. The *only* part of the contract executed, however, was the *first* part of the two-part exchange listed on page 2 of 2, and it's existence was predicated upon the terms and conditions as stipulated on page 1 of 2, to-wit: "Based on the agreed value of $500,000.00 for the VC-118B Bu. #128427, the value of the C-117D Bu #50834, after deducting the value of the items listed in the attached proposal, would amount to

$430,000.00..." which will be in a loan status at MCAS Cherry Point, North Carolina, "*until such time as a mutually agreed upon exchange is consummated.*"

Lan-Dale's two part exchange proposal of 21 June 1991 is and remains to date the document that is paramount in this ongoing issue. The terms and conditions contained therein were in fact the basis of the Settlement Agreement which is the basis of Plaintiff's Complaint.

6. On 22 October 1997, Lan-Dale filed a Complaint with the Armed Services Board of Contract Appeals ("ASBCA") which recommended a meeting to resolve this issue. The meeting was conducted in Washington D.C. on 11 May 1998. A settlement of Lan-Dale's two part Exchange Proposal was reached on that date. The "Settlement Agreement" arrived at was the *settlement of the legal issue* generated by the modification of Lan-Dale's two part Exchange Proposal. This settlement was subsequently memorialized in a letter from Lan-Dale's counsel to the government's counsel dated 30 June 1998, a letter to the ASBCA dated 20 August 1998 and a Substitute Award/Contract dated 18 January 2000 (collectively referred to as "Settlement Agreement"). The Settlement Agreement was authorized and approved by the ASBCA and by the office of the Secretary of the Navy.

7. The government's conduct since the unauthorized modification of Lan-Dale's two-page Proposal 21 June 1991 continues in its failure to perform in accordance with the Settlement Agreement by 1) not allowing Lan-Dale the right to take possession of its property as conveyed by the Bills of Sale; 2) by violating the terms of the Settlement Agreement; and 3) by imposing requirements not included in the Settlement Agreement. This was accomplished through the inappropriate use of the powers governmental agencies possess. In effect, the government retained the five T-39s stored at Davis-Monthan, with the apparent expectation that Lan-Dale will abandon its property rights given the limited resources available to it to effect possession of said aircraft. In accordance with the terms and conditions of the Settlement Agreement and attached Bills of Sale, there is no legitimate reason why Lan-Dale should not have been in possession of the aircraft within the time frame stipulated in the Settlement Agreement.

8. This is an action to recover damages, attorneys' fees and costs by reason of the Government's breach of the Settlement Agreement under the Contract Disputes Act of 1978, 41 USC, §601-603; the Equal Access to Justice Act, 28 USC §2412; the Federal Acquisition Regulations (FARs), §33; and this Court's inherent equitable powers to provide Lan-Dale with relief for the violation of its constitutional rights as well as the irreparable harm it is suffering as a result of the Government's intentional breach of contract.

## PARTIES, JURISDICTION, AND VENUE

9. Plaintiff Lan-Dale Co. is, and at all times mentioned in this Complaint was, a Nevada corporation doing business in Arizona.

10. A. J. D'Alessandris is, and at all times mentioned in this Complaint was, the President of Lan-Dale Co.

11. Gary Watson is, and at all times mentioned in this Complaint was, Contracting Officer and Head, Purchasing and Contracting Branch, of MCAGM.

12. The Aerospace Maintenance and Regeneration Center (AMARC), located Davis-Monthan AFB, Tucson, Arizona, is and at all times mentioned in this Complaint was, the location of the property which is the subject of this suit..

13. The defendant in this action is the United States of America.

14. This action is for breach of contract, enforcement of the contract, damages as a result of the breach, attorneys' fees, and costs. The Court has subject matter jurisdiction over this action pursuant to this Court's general equitable jurisdiction.

15. Venue is within the Court's jurisdiction. The property in question and performance of the Settlement Agreement was to occur at Davis-Monthan Air Force Base in Tucson, Arizona. Such failure of performance is in violation of the Settlement Agreement and the Bills of Sale.

## BACKGROUND

16. Pursuant to 10 U.S.C. § 2572 and 10 U.S.C. § 7572, the Secretary of the Navy has the authority to transfer excess or obsolete material, including aircraft and/or aircraft parts, to non-profit, educational museums, such as the Marine Corps Air Ground Museum

at Quantico, VA. The MCAGM has as its principal mission to preserve and enhance the heritage of the Marine Corps. Department of the Navy aviation-associated museums are tasked with collecting, preserving and displaying artifacts, including vintage aircraft, that are significant and rich in the history, traditions and heritage of Navy and Marine Corps aviation. Under this authorization the Marine Corps has provided the Museum with surplus government owned equipment (GOE), some of which has been exchanged for services or historical items the Museum wished to display.

17. SECNAVINST 5755.2 establishes the policy for the exchange of excess GOE for historical items or specific services. The procedure used by the Museum to exchange GOE with the public contains instructions which require, in part, that

a. an exchange proposal describing the proposed transaction be sent through the appropriate chain of command for approval by the Assistant Secretary of the Navy; and

b. the exchange proposal contain the following information and documentation:

1. a proposed exchange agreement between the Museum and the civilian sector;

2. a discussion of the historical value of the material(s) to be exchanged;

3. a determination of the fair market value of the material(s) to be exchanged, including the initial acquisition cost for all GOE;

4. a statement that the exchange is no-cost to the government;

5. a statement that the GOE material exchanged shall be in an "as is, where is" condition as specified in the proposal, and

6. a statement that the proposed exchange is in the best interest of the U. S. Government.

18. Pursuant to the above, the MCAGM has accepted proposals for the exchange of services and artifacts. Lan-Dale has submitted such proposals in the past, all of which

were successfully consummated in accordance with the Terms and Conditions of the Award/Contracts.

19. On or about September 1990, Lan-Dale was contacted by LtCol William Beebe II, (OIC) of the MCAGM, who asked if Lan-Dale would be interested in performing a service for the United States Marine Corps ("USMC") by flight-delivering the MCAGM's C-117D BuNo 50834 located at MCAS Quantico, VA, to MCAS Cherry Point, NC. LtCol Beebe, in consultation with his predecessor, LtCol (Ret) Rudy Schwanda, Command Historian at Cherry Point, sent a letter to Lan-Dale dated 23 May 1991 wherein he outlined a proposal for transporting the C-117D. This proposal was typical of the two-part exchange Lan-Dale conducted during LtCol Schwanda's tenure as OIC in 1985. At that time, C-117D BuNo 50835, which had been stricken from the operational inventory in the Philippines, was acquired by the MCAGM and, wings removed, transported to NAS North Island with the hope that an aircraft carrier transiting to the east coast would deliver it to Quantico. This did not occur, so it remained on the ramp at NAS North Island, disassembled and stranded. North Island's Commanding Officer considered it an eyesore and gave LtCol Schwanda six months to move the aircraft. Regulation precluded museum-owned aircraft from being flown. MCAGM contacted Mr. D'Alessandris and requested assistance in solving the problem. It was mutually agreed that a two- part exchange offered a solution. In the first part, Lan-Dale acquired ownership of the C-117D, reassembled it, and as a civilian-owned aircraft, flew it to Tucson, Arizona where it underwent extensive restoration. Upon completion, at the MCAGM's request, Mr. D'Alessandris flight delivered the aircraft to MCAS El Toro, CA. Shortly thereafter, in the second part, Lan-Dale returned title to the aircraft to the museum and received its items of exchange stock. At this time Gary Watson was the Contracting Officer, Head, Purchasing and Contracting Branch, of MCAGM.

20. LtCol Beebe's proposal was typical of the above two-part exchange. Lan-Dale's investment in this would be its VC-118B, which the museum also wished to acquire. Lan-Dale's VC-118B was valued at $500,000 by agreement of the parties. Encl (16) of the Inspector General Investigation Report of 07 November 1995 (Exhibit "A" attached hereto

and by reference made a part hereof), sets forth LtCol Beebe's statement to the investigating officer relating to this valuation. When asked how he arrived at the $500,000 valuation for the VC-118B, the report states: "He replied that when he first saw the aircraft and the condition it was in, the number that stuck in his mind was $700,000, which was his own personal estimation. When Mr. D'Alessandris mentioned that he would be willing to assign a valuation of $500,000, he thought it was a great deal and jumped at it." This particular aircraft is one-of-a-kind, restored to like-new condition, with a luxurious interior of stainless steel and mahogany, and had been used by several Commandants during the aircraft's military career. (Exhibit "B" photographs of the VC-118B attached hereto and by reference made a part hereof).

21. Lan-Dale submitted a two-page proposal dated 21 June 1991. Based upon the high level of honesty and integrity displayed by Marine Corps personnel in prior exchanges, the terms and conditions stated on page 1 of 2 were concise and specific. (Exhibit "C" attached hereto and by reference made a part hereof). Clearly marked "1 of 2" and "2 of 2", the proposal showed on the first page the mutually agreed upon terms and conditions that applied to both parts of this two-part exchange, in that the contractual commitment for the finalization of the second part of the exchange (the return to the museum of title to the C-117D, valued at $430,000), was predicated upon the availability of trade stock and was open-ended *"until such time as a mutually agreed upon exchange is consummated."* To date, this has not occurred. The second page was the proposal for part one of the exchange, and it's existence was predicated upon the terms and conditions, as stipulated on page 1 of 2, all as suggested by LtCol Beebe.

22. A condition of the exchange was for Lan-Dale to absorb all costs and liability for the flight delivery of the VC-118B from Tucson to MCAS Cherry Point, the restoration to airworthy condition of the C-117D aircraft, and for its flight delivery from MCAS Quantico to MCAS Cherry Point.

23. On 28 June 1991, Lan-Dale received the MCAGM's formal acceptance of the two-page proposal (Exhibit "D" attached hereto and by reference made a part hereof) and on

03 July 1991 the MCAGM submitted the Request for Approval to SECNAV. (Exhibit "E" attached hereto and by reference made a part hereof).

On Page 6 of the Investigating Officer's Investigative Report, 22 September 1995, LtCol Ferrari stated that the *"The proposal had received positive endorsement at each step until arriving at CNO. At this point the paper trail on this proposal stops until November of 1991."* (Exhibit "F" attached hereto and by reference made a part hereof).

24. LtCol Beebe retired in September 1991 and LtCol Carmen Dragotta arrived as OIC of the MCAGM in October 1991. Prior to his departure, LtCol Beebe reviewed the file with LtCol Dragotta and advised him in detail the specifics of the two-part exchange. Lan-Dale awaited either the contract or notice of disapproval by higher authority. Unknown to Lan-Dale, LtCol Dragotta materially changed the values as stipulated in Lan-Dale's two-page proposal and as listed in LtCol Beebe's Request for Approval. LtCol Dragotta without Lan-Dale's knowledge or consent reduced the value of the VC-118B from $500,000 to $350,000, and Lan-Dale's carryover equity represented by the C-117D, from $430,000 to $240,000 and LtCol Dragotta submitted his Request for Approval to SecNav on 15 November 1991. This request listed the altered values and was subsequently approved. (Exhibit "G" attached hereto and by reference made a part hereof). LtCol Dragotta then submitted the altered exchange package to the USMC Contracting Officer, Gary Watson. The package logically would have included, among other things, Lan-Dale's two-page proposal and the altered approved request. A review of the documents readily reveals a discrepancy in values, (the VC-118B, $500,000 vs $350,000 and the C-117D, $430,000 vs $240,000.)

25. Exchange Award/Contracts do not list values, and Mr. D'Alessandris signed the Contract on 10 February 1992 with representation that Lan-Dale's two-page proposal of 21 June 1991 had been approved. (Exhibit "H" the Award/Contract attached hereto and by reference made a part hereof).

Lan-Dale believes that the contracting officer was guilty of misfeasance and/or nonfeasance in producing a Contract based upon documents which reveal on their face a

discrepancy in values, (the VC-118B, $500,000 vs $350,000 and the C-117D, $430,000 vs $240,000.) which should have been readily apparent to any contracting officer.

26. The flight delivery of the C-117D from MCAS Quantico to MCAS Cherry Point was conducted as a USMC operation. A USMC C-130 escorted the C-117D from Quantico to the new museum location at Cherry Point. Among the notables awaiting the arrival at Cherry Point was the Assistant Commandant of the Marine Corps, Gen Richard D. Hearney. Attached as Exhibit "I" are copies of official USMC photographs of the C-117D relating to its flight delivery. With this flight delivery Lan-Dale fulfilled its contractual commitment for both Award/Contracts. What remained for closure was performance on the part of the MCAGM in furnishing Lan-Dale trade items totaling $430,000, in exchange for the return of the C-117D's title to the MCAGM.

27. Lan-Dale placed numerous phone calls to LtCol Dragotta requesting to be advised immediately of any trade stock that became available to the museum so Lan-Dale could complete the return exchange of the C-117D. During these calls, Lan-Dale reiterated the terms of the exchange, including values, and in the course of conversations perceived an evasiveness on the part of Dragotta.

28. On 26 May 1992, Lan-Dale submitted a letter, with enclosures, to LtCol Dragotta. (Exhibit "J" attached hereto and by reference made a part hereof). This letter documented in detail the terms and conditions of the two-part exchange as agreed to and submitted to SECNAV for approval by LtCol Beebe. LtCol Dragotta never responded in writing, and in the many conversations that followed LtCol Dragotta never refuted the statements made in Lan-Dale's letter of 26 May 1992.

29. Dragotta advised Lan-Dale the MCAGM had received four HH1K helicopters as trade stock. Lan-Dale expressed an interest in these items. Dragotta advised that only three were available since he had committed one to a Pennsylvania helicopter company. (After he retired, Dragotta was employed by a Pennsylvania helicopter company). Lan-Dale advised that it had the right of first refusal over exchange items the MCAGM acquired, and

submitted a letter requesting these items as a part of this exchange. Prior to his retirement, Dragotta denied receiving this letter.

30. Approximately one month later, in a conversation with Joe Payton, MCAGM's Head of Restorations, Mr. D'Alessandris asked the status of the four HH1-Ks and was advised that LtCol Dragotta had committed one of the HH1-Ks in an exchange to a Pennsylvania helicopter company.

31. LtCol Dragotta retired in May 1993 and in July 1993, from the position he held at Headquarters Marine Corps, Washington D.C., Col A. J. Ponnwitz was assigned to the Marine Corps Museum as the OIC. Lan-Dale arranged for a meeting with Col Ponnwitz at MCAS Quantico on 10 September 1993. Mr. D'Alessandris asked LtCol Schwanda to be present because he knew the details of the two-part exchange agreement. During their conversation, Mr. D'Alessandris mentioned that Lan-Dale was to receive $430,000 in trade stock for the return of title of the C-117D to the MCAGM. Col Ponnwitz responded that, in accordance with the approved proposal he had in hand, Lan-Dale was to receive *$240,000* in trade stock and the value of Lan-Dale's VC-118B was *$350,000*. Mr. D'Alessandris advised Col Ponnwitz that the terms and conditions of the proposal Lan-Dale submitted stipulated the retained value of the C-117D at *$430,000* and the value of the VC-118B at *$500,000*. Furthermore, Mr. D'Alessandris advised Col Ponnwitz that Lan-Dale's proposal afforded the USMC only two options: approval or denial. Mr. D'Alessandris asked for a copy of the alleged approved proposal. Col Ponnwitz refused to tender a copy. At a later date, a copy of such document was acquired by Lan-Dale. This document was dated 15 November 1991 (Exhibit "G"). In the course of the meeting, Col Ponnwitz made the following statement: "Unlike LtCol Dragotta, I will respond to everything in writing."

32. On 20 September 1993, Lan-Dale submitted a written proposal to Col Ponnwitz for the second part of the exchange. Col Ponnwitz' response to this proposal, was not in writing but in the form of a message left on Lan-Dale's telephone answering machine.

33. During the course of future communications, Col Ponnwitz displayed an irrationality regarding the facts relating to the transaction to the extent that Mr. D'Alessandris could no longer deal with him.

34. On 15 July 1994 Lan-Dale submitted a proposal to the Director of Marine Corps History and Museums, BrigGen (Ret) E. H. Simmons, USMC, requesting he address the issue.

35. Col (Ret) F. Brooke Nihart, the former Director of the MCAGM, who was knowledgeable of Lan-Dale's past performance, offered to present the truth of this matter to BrigGen Simmons. Nihart consulted with LtCol Schwanda who drafted a letter dated 08 September 1994 to BrigGen Simmons (Exhibit "L" attached hereto and by reference made a part hereof). At Mr. D'Alessandris' request a copy of the above proposal was submitted with this letter. The letter advised BrigGen Simmons of the improper actions on the part of LtCol Dragotta and Col. Ponnwitz and that "Mr. D'Alessandris would not be opposed to the appointment of a mutually agreeable arbitrator and the use of professional appraisals to determine the current fair market values of Museum trade stock." [Emphasis added]. BriGen Simmons referred this matter back to Col Ponnwitz and in his letter of 20 September 1994, advised Lan-Dale to contact legal counsel to the MCCDC, Ms. Penny Clark.

36. In a Memorandum for the Record dated 20 September 1994, Col Ponnwitz, with Counsel's concurrence, initiated a Hot Line Complaint with the Inspector General of the Marine Corps (IGMC) wherein he made false statements which he labeled allegations (Exhibit "M", attached hereto and by reference made a part hereof). This memorandum resulted in the IGMC's investigation dated 13 June 1995, LtCol John Ferrari Investigating Officer. The 10 July 1995 letter of instruction from W.W. Scheffler, Chief of Staff, Marine Corps Air Bases, Eastern Area, Cherry Point, to Lt Col Ferrari, initiating the Hot Line Complaint investigation, states in paragraph 2: "You shall investigate *all* facts and circumstances surrounding the allegations and report findings of facts, *opinions*, and *recommendations* upon completion..." [Emphasis added]. A letter from LtCol Ferrari to Scheffler [ca. 19 July 1995] acknowledged his directive to "...investigate all the facts and

circumstances..." Scheffler replied on 03 August 1995 reiterating Ferrari's "...responsibility to investigate and resolve all possible issues." (Exhibit "N" attached hereto and by reference made a part hereof).

37. LtCol Ferrari contacted Lan-Dale Counsel, Tom Hamilton, and advised that he was the Investigating Officer. Hamilton advised LtCol Ferrari that any response he himself would make would be considered hearsay and suggested LtCol Ferrari contact Mr. D'Alessandris directly. Upon receipt of Ferrari's phone number, Mr. D'Alessandris immediately contacted him and advised that he would furnish him Lan-Dale's complete file and would answer any questions he might have. LtCol Ferrari followed up with a letter on 08 August 1995 confirming the details of the conversation (Exhibit "O", attached hereto and by reference made a part hereof). Enclosed with this letter was a copy of the Hot Line Complaint.

38. Col Ponnwitz did not submit data to substantiate the nine allegations which he furnished to the IGMC in the Hotline Complaint.

39. A cursory review of the allegations listed in the Hotline Complaint of 15 June 1995, would readily have revealed that they lacked substance and were in reality false statements. Upon initial review, Investigating Officer LtCol John Ferrari determined the allegations lacked substance, and wrote: "*Some of these claims are poor works of fiction that are readily transparent.*"

40. In letters of 19 January 1995, 07 February 1995, and via certified mail return receipt requested on 03 March 1995, Tom Hamilton, Counsel for Lan-Dale, furnished to Counsel, MCCDC, Ms. Penny Clark, a detailed history with documentation of the circumstances relating to the two-part exchange agreement entered into between parties and requested her assistance toward a amicable resolution of this matter. (Exhibit "P" the three letters attached hereto and by reference made a part hereof).

41. Ms. Clark made a response to the above three letters to Tom Hamilton 08 March 1995 wherein she stated, inter alia, "I deemed it appropriate to seek further fact finding and investigation." She refers to an NCIS investigation, and in her letter of 07 April

1995, advised the name of the investigating officers, either Ms. Rizzo and/or Ms. Band, and advised "I would respectfully decline to pursue discussions or resolution of Mr. D'Alessandris' concerns until Ms. Rizzo has completed her fact-finding, recommendations, and case closure."

No one contacted Lan-Dale regarding the facts during the course of the above investigation. Ms. Clark's letter of 16 June 1995 stated "...while Ms. Rizzo has completed a review of the information pertinent to Mr. D'Alessandris' allegations, an investigation is still pending before the IG"..."I would prefer to defer discussions regarding Mr. D'Alessandris' allegations until the investigation has been completed." She then stated, "...the Government's position is and has been that the contract has been fully and properly executed with no outstanding actions pending." The *only* part of the contract executed, however, was the *first* part of the two-part exchange listed on page 2 of 2, and its existence was predicated upon the terms and conditions as stipulated on page 1 of 2. Ms. Clark was made well aware that the foundation of the Award/Contract was Lan-Dale's two-part exchange proposal of 21 June 1991 which had been modified by LtCol Dragotta and which stipulated, with reference to the second part of the exchange, the return exchange of the C-117D, "*until such time as a mutually agreed upon exchange is consummated.*" Ms. Clark's refusal to acknowledge the second part of the two-part exchange, and her decision to defer discussions regarding Mr. D'Alessandris' allegations until the investigation has been completed, was an attempt to ignore the findings of the investigations.

42. By letter dated 07 November 1995 that was submitted to the Commandant of the Marine Corps (IG) Headquarters, U.S. Marine Corps, Washington DC, MajGen Frederick McCorkle, Commander, Marine Corps Air Bases, Eastern Area, Cherry Point, concurred with the "findings, conclusions and disposition of the Completion Report, which stated as follows:

<u>OPINIONS:</u>

"18. The sum of the research that I have conducted and the information that I have obtained, lends much credence to the position that the Lan-Dale Company, with

regard to the current dispute over the C-117D – VC-118B exchange agreement, may not have been dealt with fairly or equitably, despite protestations to the contrary. Should the dispute become public through litigation, considerable embarrassment may be accrued by the Marine Corps."

RECOMMENDATIONS:

"2. It is recommended, that the circumstances surrounding LtCol Dragotta's relationship with the Keystone Helicopter Company while he was on active duty, and its influence on his current employment, be the subject of further review.

"3. It is recommended that the circumstances and issues surrounding the C-117D--VC-118B exchange between the MCGAM and the Lan-Dale Company be the subject of further review.

"4. If the recommendation contained in par. 3 is not deemed to be warranted, it is recommended that the Marine Corps, to avoid public embarrassment, reach a mutually acceptable accommodation with the Lan-Dale company regarding that company's current dispute with the MCAGM." (Exhibit "Q" Opinions and Recommendations, attached hereto and by reference made a part hereof).

43. In accordance with 41 U.S.C. 601-613, The Contract Disputes Act, Lan-Dale Counsel James Sakrison of the law firm Slutes, Sakrison & Hill, P.C., Tucson, AZ filed a claim with the Contracting Officer on 04 June 1996.

44. On 27 March 1997, the Contracting Officer denied Lan-Dale's claim. The Contracting Officer's denial contained numerous inaccurate statements and contended that Lan-Dale should have contacted him during the course of negotiations with the MCAGM. However, the format for exchange negotiations between Lan-Dale and the MCAGM had been established in at least six other transactions, one of which was a two-part exchange, conducted by Lan-Dale and the MCAGM since 1983. In each case, Lan-Dale was advised that upon completion of the negotiations with the OIC, the MCAGM submitted the documents to CNO for approval. This completed package was then submitted to the Contracting Officer who prepared and signed the contract. Lan-Dale was never instructed

to contact, negotiate with, or request any approval from the Contracting Officer. The established format for negotiations of this type is set forth in the following statement made by LtCol Schwanda, former Director of the MCAGM and at that time Command Historian at MCAS Cherry Point, in his letter dated 05 January 1996 to the Commander of the Marine Corps Air Bases, Eastern Area, Cherry Point, MajGen Frederick McCorkle:

> "The contracting Officer at Quantico, and approving authorities at HQMC, NavAirSysCom, CNO DOD and GAO were fully aware that MCAGM directors served as sole negotiators of proposed exchanges, and never challenged our authority.
>
> "Every MCAGM director for the past 20 years (Col D'Andrea, LtCol Brown, Myself, LtCol Beebe, LtCol Dragotta and Col Ponnwitz) has routinely and continuously engaged in these negotiations."

The denial stated, furthermore, that the contract had been "fully performed by each Party," referring once again to the contract for the *first* part of the two-part exchange, *totally ignoring the facts presented and the Opinions and Recommendations disclosed in the IGMC investigative report.*

Contractor's complaint:

45. On 24 May 1997 Lan-Dale Counsel James Sakrison filed a Complaint with the Armed Services Board of Contract Appeals (ASBCA). John Dietrich, Senior Litigation Trial Attorney, newly appointed Counsel to the Contracting Officer, immediately advised that the IGMC's investigative report would not be admissible. Lan-Dale Counsel advised him that Counsel for the Contracting Officer, Ms Penny Clark, had stated in her letters that she would defer resolution pending the recommendations of the Inspector General's investigation. Dietrich immediately filed a formal Motion to Dismiss, which Motion was denied. The Government then requested a Compromise Settlement Meeting.

46. A Settlement Meeting was conducted in Washington, D.C., on 11 May 1998. Present at the meeting on the part of the Marine Corps were Counsels John Dietrich and Jim Yohn, Contracting Officer Gary Watson, and MCAGM Curator Ken Smith Christmas.

Representing Lan-Dale: A. J. D'Alessandris President, and Counsel Tom Hamilton, Esq., of the firm, Lafont, Tunnell, Formby, Lafont & Hamilton, L.L.P., Plainview, Texas. John Dietrich advised that this matter was to be resolved on the basis of the Award/Contract of 13 February 1992, the first part of the two-part exchange, and be memorialized as a substitute "Award/ Contract". Dietrich then advised that Lan-Dale's position, for the purpose of the meeting, would be considered factual. A Settlement Agreement was arrived at. It was mutually agreed Lan-Dale would receive five Engines (complete and zero-time if available), one T-34 and six T-39s. One of the T-39s and the five engines had not been transferred to the MCAGM account at this time. It was agreed the value of this T-39 would be commensurate with the other four at Davis-Monthan ($50,000 to $55,000). Transfer of T-39D BuNo 150548 and the five engines to the MCAGM was a paper transfer readily accomplished. Five of the T-39s and the five engines were stored at Davis-Monthan AFB, Tucson, and the T-34 and one T-39 were stored at MCAS Cherry Point. Dietrich displayed 8 x10 color photographs of all the aircraft, both exterior and interior, attesting to exactly what Lan-Dale was to receive and subsequently furnished Lan-Dale copies. (Exhibit "R," copies of the photographs, are attached hereto as Exhibit "R" and by reference made a part hereof). Dietrich advised Mr. D'Alessandris that Lan-Dale would have to accept the items *"as is where is."* Mr. D'Alessandris acknowledged, and stipulated *at no cost to Lan-Dale.* Deitrich agreed: *no cost to Lan-Dale.* Mr. D'Alessandris then advised he had heard AMARC was now imposing a fee for preparation and transport of stored items. Neither Dietrich nor anyone on the Government side of the table made a comment and the meeting ended.

The above was the only reference to removal costs at this meeting. AMARC subsequently furnished Mr. D'Alessandris the CO3A List ( items removed and their acquisition cost ) which are attached to the photographs of each of the 5 T-39s located at Davis-Monthan.

47. In January 1955 the USAF ordered 143 T-39s, and in 1961 the USN ordered 42 as Air Crew Trainer, pilot-proficiency/administrative support, and transport aircraft. At least some of the out-of-service T-39s assigned to the Marine Corps were stored

at AMARC in Tucson. AMARC stores aircraft for all the military services, including the Marine Corps and, at the direction of the services, reclaims parts from stored aircraft for use in active aircraft. After reclamation, some aircraft are transferred to the MCAGM's account.

48. The organization responsible for directing AMARC with respect to the Marine Corps' stored T-39s is the Navy's Aviation Supply Office ("ASO") in Philadelphia. The ASO is the Navy and Marine Corps organization responsible for Navy and Marine Corps aviation materials. The ASO has a Detachment Field Supply Office ("ASO FSO") at Davis-Monthan, which was under the direction of Herbert Swetman.

49. Based upon the settlement agreement in Washington D.C. it was reasonable to expect that closure of the Award/Contract should have occurred in no more than three months, by 11 August 1998, at which time the T-39s and engines would have fulfilled Lan-Dale's plan for a Mexican cargo operation. Though all these items were readily available, Lan-Dale did not have a contract in hand until a total of *20 months* had passed. This delay proved to be extremely costly to Lan-Dale. (By contrast, LtCol Dragotta submitted his modified proposal to SecNav in November1991, and the Award/Contract and closure occurred in February 1992, fewer than three months).

50. Lan-Dale Counsel Tom Hamilton sent a letter dated 30 June1998 to Dietrich confirming the exchange items Lan-Dale was to receive and the *no cost to Lan-Dale* stipulation. A copy was submitted to the ASBCA thereby memorializing the Settlement Agreement. (Exhibit "S" attached hereto and by reference made a part hereof).

51. In June 1998, one month after the settlement meeting and approximately 19 months prior to Lan-Dale's receipt of the Contract, Dietrich was advised in a letter from Anthony A. Mazzone, Navy Inventory Control Point ( NICP), to give consideration to costs involved in removing aircraft from AMARC. Dietrich's receipt of this data was confirmed in a letter from Mazzone on 30 June 1999:

"About a year ago I wrote to Karen and Mr. Dietrich advising that they should be aware of and give consideration to costs involved in removing aircraft from AMARC." The letter continued as follows:

"There will be fees for escort, preparation and towing. In order to avoid the untenable situation of AMARC storing aircraft no longer owned by the military services, I suggest that title be turned over only when the aircraft reach the gate and all fees have been paid.

"Also, 5 of the J-60 engines are still installed on the aircraft. AMARC should have provided an estimate for removal.

"I am just sending this as a reminder of what needs to be considered in modifying the contract." (Exhibit "T" attached hereto and by reference made a part hereof).

Dietrich ignored all of this. The Award/Contract of 18 January 2000 does not reflect any consideration of the above.

52. During this period of time, Lan-Dale's attorneys made many calls and submitted many letters to John Dietrich requesting closure of this issue.

53. On 27 September 1999 Mr. D'Alessandris received a draft copy of the Award/Contract.

54. In his 12 November 1999 letter to Lan-Dale, James Sakrison advised of his telephone conversation with John Dietrich wherein Dietrich made the following statements:

A. "...the fifth T-39, BuNo 150548, which the parties had estimated a value of $50,000, had come in with an appraisal at $70,000.

B. "...the five engines which the parties estimated had a value of $5,000 each, had an appraisal returned of $10,000 each.

C. [He] "...had gotten the appraisals in mid-October and was having a difficult time writing his settlement proposal to the Secretary of the Navy because of the disparity of $20,000 on the aircraft and $25,000 on the five engines. [He said]... theoretically the transactions should have balanced out, but now it looks like the Navy is getting 'short-changed by $45,000.'"

Lan-Dale believes that the above statements are the format for Dietrich's scheme in his attempt to alleviate his "no cost to Lan-Dale" commitment in accordance with the settlement.

55. In his 24 November 1999 letter to Tom Hamilton (Exhibit "U" attached hereto and by reference made a part hereof) Dietrich stated the fifth T-39 appraised at $70,000 in spite of the fact that the Government had valued three of the other four T-39s at $50,000 and one at $55,000. By comparison, an ocular review of the fifth T-39, BuNo150548, readily revealed its lesser value. This was further attested to by the gross amount of items removed from 150548. Davis-Monthan's CO3A Form listed the items removed and their acquisition cost for each of the T-39s. The *total* cost of the removals from BuNo 150548 was $321,880.76. The *average* cost of removals from the other four aircraft was $28,476.14. Subsequently, Lan-Dale requested an independent appraisal of this aircraft which reflected a valuation of $20,000. (Exhibit "V" attached hereto and by reference made a part hereof). To date, John Dietrich has not responded to the $20,000 appraisal.

56. In the above-referenced letter Dietrich claims $7,000 was established at the Settlement Meeting as the value of an engine, and that they had subsequently appraised at $10,000. The valuation of $10,000 was established at the Settlement Meeting when Museum Curator Ken Smith Christmas requested Lan-Dale accept T-34B BuNo140908, which the Government valued at $80,000, in lieu of the one agreed upon, BuNo140931, which the Government valued at $90,000. For the $10,000 difference in valuation, the Government furnished Lan-Dale the fifth engine.

57. Lan-Dale personnel had inspected the engines, and the sealant on the cowling, typical of the whole aircraft, clearly indicated it had not been removed for many years. All of the engines had numerous components missing. No two engines were alike, and consequently, all would appraise at a different value. Obviously the engines had not been appraised.

58. Dietrich, in the above untrue representations, arrived at a non-existent total of $40,000 excess value ($25,000 on T-39 BuNo. 150548 and $15,000 on the five engines).

His letter stated that "because the appraisals for the engines and new T-39 came in higher than expected the contractor would have to bear the costs associated with presentation." This representation was neither realistic nor factual.

Furthermore the fifth T-39 was to have a value commensurate with the other four ($50,000 to $55,000), as agreed at the Settlement Meeting. The independent appraisal of the fifth T-39 is $20,000. In reality, Lan-Dale has been "short-changed" by $30,000.

59. 03 December1999. Tom Hamilton's response to the above letter stated: "A. J. D'Alessandris has reviewed your letter of November 24, 1999 ... [and]...although he completely disagrees with your evaluation regarding the issue of who is to pay for the presentation expense," will sign the contract.

Mr. D'Alessandris, having reviewed the terms and conditions contained in the draft copy of the Award/Contract and Bills of Sale, made the above decision to sign the contract with full knowledge that upon receipt of the Settlement Award/Contract and attached Bills of Sale DOD released control of all of the items to Lan-Dale. Correspondingly, Lan-Dale or its assigns are the only entities holding the right to, and obligated to, prepare and remove Lan-Dale's property from their current military locations:

> <u>Page 6, §. E-4</u> stated: " Risk of Loss Prior to Acceptance. The Government assumes no responsibility for maintaining the items described in CLINs 0001AA to 0001AJ [items Lan-Dale is to receive] <u>from signing of this contract to removal by the Contractor</u>. [Emphasis added]. The Lan-Dale Company accepts all risk of loss or damage [sic] these items."
>
> Page 9, Section H-4: [Lan-Dale's aircraft and engines] <u>shall be delivered in "AS IS, WHERE IS" condition</u>. [Emphasis added]. Contractor shall obliterate all stars, bars, insignia and service markings wherever they appear, prior to assuming ownership, without expressed or implied warranty of any kind. Removal of... [aircraft and engines] from military property shall take place within sixty (60) days after the issuing of Bill of Sale.

Page 8, §. G-2. The contract is for the direct exchange of property...[the] result of a settlement of contract claims and disputes between the United States Government and the Lan-Dale Company. In accordance with ASBCA No. 50829, both parties have agreed that there is to be no monetary compensation.

60. Lan-Dale received the Award/Contract and attached Bills of Sale dated 18 January 2000. (Exhibit "W" attached hereto and by reference made a part hereof). The Bills of Sale were not the originals as required. Lan-Dale's request for the originals resulted in Bills of Sale erroneously dated 07 February 2000 (all future reference to the Bills of Sale will reflect this date). (See Award/Contract page 7, §. F-3). This error on the part of the Contracting Officer was costly to Lan-Dale.

61. Lan-Dale alleges, that as of the date of the Award/Contract and Bills of Sale (18 January 2000), the Government released custody and control , and Lan-Dale assumed right of ownership and possession, over all of the items exchanged. Correspondingly, as civil-owned items, Lan-Dale and/or its assigns are the only entities holding the right to, and obligated to, prepare and remove the exchanged items from their current military locations.

62. A letter dated 08 February 2000 from Head, Museums Branch, LtCol R. J. Sullivan to Anthony Mazzone, NICP, Philadelphia, PA, Ref: the Award/Contract stated:

"Subj: AUTHORIZATION FOR REMOVAL OF AIRCRAFT AND ENGINES"

1. [authorized AMARC to remove the five aircraft and five engines and]

"Lan-Dale Company...will pay [AMARC] for removal of all material."

The Bills of Sale and the Award/Contract preclude AMARC from having any contact with Lan-Dale's Aircraft and engines. This letter was forwarded to Herb Swetman, Director, NICP ASO FSO, Davis-Monthan, and subsequently submitted to AMARC.

63. Lan-Dale alleges, that Head, Museums Branch, LtCol R. J. Sullivan's letter authorizing AMARC to remove the five aircraft and five engines stored at AMARC and demand payment from Lan-Dale was wrong as the aircraft and engines belonged to Lan-Dale by virtue of the Bill of Sale.

64. A meeting was held on 14 February 2000 at AMARC with Herb Swetman and John D'Alessandris and A. J. D'Alessandris of Lan-Dale. The removal of Lan-Dale's property parked at AMARC was discussed. Swetman was advised the items were to be released at no cost. Lan-Dale stated the terms of the Contract, of which Swetman was not aware, and provided him with a copy of same. Lan-Dale advised its personnel planned on removal of the items in no more than 30 days or by March 15, 2000.

65. Swetman tendered AMARC a copy of the Award/Contract and attached Bills of Sale. AMARC refused to comply with the terms therein, in spite of the fact that AMARC was repeatedly advised that only Lan-Dale had the right to remove the aircraft and engines from Davis-Monthan.

66. The T-34B and VT-39E located at MCAS Cherry Point, upon presentation, were released to Lan-Dale at "no cost." Lan-Dale personnel obliterated all military markings from the aircraft, prepared them for removal, and transported them from their military location, *all in accordance with the terms and conditions of the Award/Contract.* To date, however, the Contracting Officer has failed to release the logbooks for the T-34B and the VT-39E to Lan-Dale. Without log books the aircraft have limited value.

Lan-Dale alleges that the Government has failed to comply with the Terms and Conditions of the Award/Contract and attached Bills of Sale by not allowing Lan-Dale to remove its property from their military location prior to 07 April 2000, and placed Lan-Dale in an untenable situation that has proven to be extremely costly to the company. With the realization that the Contracting Officer was not going to enforce the Contract, and having good cause to acquire its property as soon as possible, under duress Lan-Dale was forced to address AMARC's demands.

67. Lan-Dale had received a copy of AMARC's "Actual cost estimate" for removal of the aircraft and engines on 10 February 2000 ($35,029.00) and the "Cost breakdown" on 23 February 2000 (Exhibit "X" attached hereto and by reference made a part hereof).

| | |
|---|---|
| Aircraft: | $19,354.00 |
| Engines: | $15,675.00 |
| Total "actual cost estimate": | $35,029.00 |

The breakdown did not list any removals, but did reveal costs that were ludicrous. Included in their total of 202.5 man-hours to remove the five engines, the estimate called for *20 man-hours to "transit & search for pallet & old mattress"* upon which to place the removed engines. In reality, on 21 June 02, with Lan-Dale personnel present as observers, the five engines were removed, placed on Lan-Dale's engine stands, and loaded on Lan-Dale's transport, in *fewer than 20 man-hours.*

68. Considerable effort was expended to demonstrate to AMARC that their actual cost estimate was not factual. Mr. D'Alessandris is knowledgeable of the T-39, having flown numerous trips as co-pilot and been directly involved in engine removal. JET-TECH ENG, Laredo, TX, operates T-39s. Monty Jackson (General Manager), on occasion, requested Lan-Dale's assistance, use of tools, fork lift, etc. In 1996, one of their T-39s requiring an engine change was diverted to Tucson. Mr. D'Alessandris operated the fork lift and assisted the two mechanics who removed the engine in 45 minutes.

Mr. D'Alessandris' attempt to advise AMARC of the man-hours required to remove an engine was to no avail. At Lan-Dale's request and expense, a meeting was held at AMARC on 25 May 2000 to discuss the above "actual cost estimate." Present at the meeting on the part of Lan-Dale was Monty Jackson, (who flew in expressly for the meeting), Bill Johnson, and Mr. D'Alessandris. For the Navy Office: Herb Swetman and AK1 Kevin Potts. For the USAF/AMARC: Mr. Brooks; Mr. Stepp; and Mr. Fagan.

Monty Jackson advised that the removal of each engine could easily be accomplished in 3 man-hours, for a total of 15 man-hours. Jackson furnished AMARC personnel with copies of the procedure required for removal, and a list of the 14 disconnect points. The list also included the tools required. (Exhibit "Y" attached hereto and by reference made a part hereof).

The cost for aircraft removal was discussed, but it was apparent AMARC personnel had their own agenda. If the Governmental position held, their abuse of authority made it apparent to Mr. D'Alessandris that in order for Lan-Dale to acquire its property it had to resign itself to the fact that AMARC would extort as much money from Lan-Dale as they saw fit.

At this meeting, all were advised and agreed that Lan-Dale personnel would be present as observers during any and all activity relative to Lan-Dale's property, and that AMARC would furnish 24-hour advance notice.

69. As a result of the above discussion, another meeting was held at AMARC on 30 May 2000. Present were the Finance Officer, Debbie Ledbetter, Workload Supervisor Dick Fagan, and Herb Swetman, and for Lan-Dale, Bill Johnson and A. J. D'Alessandris. Fagan was asked if AMARC had given any further consideration to the cost estimates discussed in the previous meeting. They were shown calculations Lan-Dale had made which reduced their estimate for removal of the aircraft and engines from $35,029.00 to $28,255.63, a difference of $6,773.37. Under duress, A. J. D'Alessandris had a check in hand for $28, 255.63 (Exhibit "Z" attached hereto and by reference made a part hereof) for the release of the five T-39s and five engines, which neither Ledbetter nor Fagan would accept. Fagan said he would review the costs and get back to Lan-Dale in the afternoon. He did not. At a future date, also under duress, Lan-Dale counsel Lindsay Brew tendered $21,199 to the Contracting Officer, Gary Watson, for the release of the five T-39s. Watson did not accept this offer.

70. On 02 June 2000 Lan-Dale received another AMARC actual cost estimate which included extensive removals and the first mention of a demilitarization removal requirement, in direct violation of the Award/Contract (Exhibit "AA" attached hereto and by reference made a part hereof):

| | |
|---|---|
| Aircraft: | $49,271.00 |
| Engines: | $13,030.00 |
| Total actual cost estimate: | $62,301.00 |

"Demil," or "demilitarization," refers to alterations/removals made from *certain* military aircraft (combat aircraft or weapons carriers; T-39s, besides being antiquated, do not come under these categories), and if required, is to occur *prior* to release from DOD control. As of the date of the Award/Contract and Bills of Sale, the aircraft and engines were released from DOD control and are no longer subject to Government-owned requirements. As civil-owned items, Lan-Dale is required to have only Federal Aviation Administration (FAA) certified facilities make any modifications-alterations to the aircraft.

71. On 06 June 2000, refuting the above Demil requirement, Herb Swetman received an email from the USMC Contracting Officer's Representative ("COR"), with copies shown to Watson, Smith, Christmas, Yohn, Dietrich (the Government's representatives at the Settlement Meeting), and LtCol Sullivan (Head, Museums Branch), which empathically stated: "This office has been directed by the Secretary of the Navy and the Armed Forces Contract Settlement Board [sic] to negotiate with the Lan-Dale Company in order to close this eleven years litigation...the engines and aircraft were negotiated on an 'as is where is' basis and that there is to [sic] no repeat NO parts removed from the engines and aircraft...NO DEMIL on any of these items." (Exhibit "BB" attached hereto and by reference made a part hereof).

72. Herb Swetman advised AMARC of the Contracting Officer's letter of 06 June 2000, (to wit: no removals, no Demil); they ignored it. Swetman advised Anthony A. Mazzone, NICP, Philadelphia, and Kevin J. Malloy, Counsel to NICP, and made the comment that "Lan-Dale had won its case." Malloy's response: *"We'll see about that."* Herb Swetman retired the end of June 2000.

73. On 06 June 2000, to satisfy AMARC's demands, under duress Mr. D'Alessandris was forced to tender a check in the amount of $13,030.00, (for a task that could of easily been done in house for less than $500.00), for the removal of the five engines, knowing full well that even at AMARC's exorbitant rates $2000.00 was more than sufficient.

74. On Wednesday, 21 June 2000, Lan-Dale received a telephone call from AK1 Potts advising that engine removal was scheduled to start the next day at 6 a.m.

Lan-Dale was well aware that in accordance with the following Term and Condition of the Award/Contract it would be the fully responsible party regarding any activity involving its property located at AMARC:

Page 6, §. E-4 stated: " Risk of Loss Prior to Acceptance. The Government assumes no responsibility for maintaining the items described in CLINs 0001AA to 0001AJ [Items Lan-Dale is to receive] from signing of this contract to removal by the Contractor... *The Lan-Dale Company accepts all risk of loss or damage [sic] these items*". [Emphasis added]

AMARC requested the use of Lan-Dale's engine sling. The job would have been completed in its entirety, and the engines removed from the base all in the same day, but for the failure of the crane operator to return to the job site after lunch as agreed. When the crane operator arrived an hour and a half later, he advised that he was pulled off the job and made to attend a meeting, and would not be able to complete the job until the next day. He said he advised his superiors to no avail that four men were waiting for him at the job site. Time for AMARC workers starts at the "shop" with a half hour allowance to the job site and a half hour for their return. Three men totals 3 man-hours. This additional time would not have been expended had the crane operator been permitted to return as agreed. *The engines would have been removed in 16 man-hours.* The engine removal was completed early Friday morning and the engines were placed on Lan-Dale- furnished engine stands and loaded on Lan-Dale's transport in a total of 19 man-hours, as opposed to AMARC's original estimate of 202.5 man-hours. At $94.76 per/hr, the actual cost of removal was $1,800.44; however, AMARC claimed a cost of $3,891.00 and on 04 August 2000 Lan-Dale received a refund of $9,138.97.

AMARC personnel themselves proved their Actual Cost Estimate to be ludicrous with their refund of $9,138 which reduced their Actual Cost Estimate for removal of the aircraft and engines from $35,029 to $25,891. In paragraph 70 above, Mr. D'Alessandris, under duress, had offered $28,255 for removal of the aircraft and engines--which AMARC refused.

The engines were not complete, many components were missing, and no two engines were alike.

75. On 08 August 2000, *eight months* after the date of the Award/Contract, Tom Hamilton received a letter from John Dietrich which included: (A) the final Actual Cost Estimate of $38,588.00 for Demil and removal; (B) payment instructions; (C) express notice of export restrictions; and notice of a requirement for Defense Logistics Agency (DLA) Form 1822, the End User Certificate (EUC). (Exhibit "CC" attached hereto and by reference made a part hereof.)

76. The above request is in conflict with the Settlement Agreement, the Award/Contract, Bills of Sale, the EUC and prior to release from DOD control.

A. Demil is expressly precluded in this exchange by virtue of the Settlement Agreement memorialized in the Award/Contract and Bills of Sale. The photographs displayed at the Settlement Meeting attest to exactly what Lan-Dale was to receive. The "no Demil" requirement was further attested to by the COR, Mike Starn, in his email on 6 June 00, to Herb Swetman and John Dietrich "NO parts removed from the engines and aircraft...NO DEMIL". (Exhibit "BB).

B. As civil-owned aircraft, Lan-Dale and or its assigns are the only entities holding the right to, and obligated to, prepare and remove Lan-Dale's property from their current military locations... no payment required.

C. The EUC requires the form be completed by all applicants and submitted with the *Bid or Proposal*, and constitutes an integral part of the exchange proposal <u>in order to become a part of the contract</u>. To complete the EUC form as presented, Dietrich and the Contracting Officer were requiring Lan-Dale to misrepresent fact and perjure itself, something Lan-Dale would not do.

John Dietrich submitted a letter to Tom Hamilton dated 25 August 2000, stating: "The Marine Corps Museum and the AMARC personnel are awaiting action by your client...the personnel in Arizona stand ready to perform the demilitarization and delivery to the gate as soon as Lan-Dale submits the requisite documents and funds."

Lan-Dale believes the above demand that Lan-Dale "submit the requisite documents and funds" was an attempt to extort additional monies from Lan-Dale or they would not receive the airplanes.

77. On 11 September 2000, John Dietrich sent a letter to Tom Hamilton who submitted a copy to Lan-Dale. Dietrich's letter stated "enclosed you will find a document from DLA that identifies the items that are subject to demilitarization. (Exhibit "DD" attached hereto and by reference made a part hereof). The enclosed undated letter was from Jack W. Blackway, DOD Demilitarization Program Manager, DOD Demilitarization and Trade Security Control Program Office, HQ DLA, J-33. The letter stated in part:

" MEMORANDUM FOR MARINE CORPS AIR AND GROUND MUSEUM"

"Attn: M. Starn, Aviation Curator

"Subject: Demilitarization Requirements for Components Contained in T-39 Aircraft"

The memorandum contained a list of items " validated as requiring demilitarization *prior to release from DOD control*" [Emphasis added].

As of the date of the Contract and Bills of Sale, the Government relinquished ownership, right of possession, custody, control, and its right to enforce requirements applicable to Government-owned property. By making this *undated* letter available to John Dietrich, Blackway precluded Dietrich's request.

Dietrich's deceit in representing this letter as being authoritative was further enhanced by his admission "Although undated, it was prepared on August 3, 2000."

78. Lan-Dale contacted Counsel Lindsay Brew, of the firm Haralson, Miller, Pitt & McAnally, P.L.C., Tucson, AZ with the intent of commencing a suit. Mr. D'Alessandris advised that prior to the current exchange, Lan-Dale had completed six exchanges with the MCAGM and that one of the exchanges comprised a two-part exchange. Mr. D'Alessandris further advised that in prior exchanges aircraft and engines were released at no cost to Lan-Dale and that Government-required removals were accomplished by the Government *prior* to the exchange and that *this was the first time he had ever been confronted with Demil or*

*seen an End User Certificate.* After further discussion, Brew suggested Lan-Dale make an effort to acquire its property by offering the balance of payment for the removal of the aircraft. Lan-Dale generously agreed to deduct the $13,030 engine removal amount from the original total $35,029 and submit the balance of $21,999 for removal of the five T-39s located AMARC.

79. 03 October 2000. Lindsay Brew sent a letter to Contracting Officer Gary Watson advising him that his failure to perform in accordance with the terms of the contract constituted a breach of contract and that he was prepared to tender the amount of $21,999 to the Contracting Officer for the release of the five T-39s. (Exhibit "EE" attached hereto and by reference made a part hereof).

80. On 24 October 2000, Brew sent another letter to Watson requesting the courtesy of a response. (Exhibit "FF" attached hereto and by reference made a part hereof).

81. On 26 October 2000, Watson sent a letter to Brew: "We are currently in the process of formulating a response, and *it will be mailed to you shortly.*" [Emphasis added]. (Exhibit "GG" attached hereto and by reference made a part hereof).

To date, Lindsay Brew has not received the promised written response from Watson nor any government official.

82. Tom Hamilton's two-page letter to John Dietrich on 23 October 2000 advised him in detail of the inconsistencies in the requirements of DLA Form 1822, the End User Certificate. Attempting to complete the form after the fact would require Lan-Dale provide false or misleading information. Dietrich, in his telephone response, suggested to Hamilton that *Lan-Dale pre-date the EUC.* Hamilton did not agree and, furthermore, noted that Lan-Dale would not falsify a document. (Exhibit "HH" attached hereto and by reference made a part hereof). Nevertheless, to date, Contracting Officer's Counsel John Dietrich insists Lan-Dale commit perjury by complying with his demands: complete and sign DLA Form 1822, and pay the money...or the five T-39s will not be released.

In a telephone conference between Hamilton and Dietrich on 10 January 2001, Dietrich insisted Lan-Dale submit the EUC forms. Any further attempts s on the part of Lan-

Dale to mitigate its losses was negated by the demand Dietrich was making, commit perjury, complete and sign DLA Form 1822, and pay the money...or the five T-39s will not be released.

83. Lan-Dale has made every effort, under duress, to obtain its property. John Dietrich's and AMARC's unreasonable demands thwarted this effort which culminated in Dietrich's requirement that A. J. D'Alessandris commit an unlawful act. Lan-Dale waited patiently for Dietrich and Watson to comply with the Terms and Conditions of the Award/Contract. There has been no response. Their failure to release Lan-Dale's property left only one option, to file a Claim.

84. A Claim for Breach of Contract, dated 12 February 2002, was submitted to the Contracting Officer by Certified Mail on 01 March 2002. Watson acknowledged that he received the Claim on 01 April 2002.

85. At Lan-Dale's request, a Revised Claim dated 06 May 2002, was submitted to the Contracting Officer with a cover letter that stated "This REVISED CLAIM replaces Lan-Dale's original claim in its entirety, and Lan-Dale's original claim is hereby negated in its entirety." (Exhibit "II" attached hereto and by reference made a part hereof).

86. Lan Dale counsel received a letter on 03 June 2002 from the Contracting Officer dated 23 May 2002 wherein he requested additional information "in order to become better informed of the facts," and requested information regarding purported happenings in the time frame *subsequent* to 07 April 2000, the closure date of the Contract.

Watson's letter also stated "please furnish me with answers to the foregoing questions by 5 June 2002 so I can make a timely decision" (Exhibit "JJ" attached hereto and by reference made a part hereof).

87. Lan-Dale's counsel, Tom Hamilton, responded on 03 July 2002: "This letter is in response to your letter of 23 May 2002, which the office of Jim Sakrison received on 03 June 2002." Hamilton's letter clearly advised, in part: "...all of the facts of this case lie within the time frame of the Contract dated 18 January 2000 to its required date of closure,

07 April 2000. Our Claim of 06 May 2002 encompasses only this time frame and any occurrences subsequent to the closure date, are not relevant to this Claim."

88. Watson's letter dated 17 July 2002, received 22 July 2002, advised "anticipate a response to your claim NLT 16 Aug. 02". (Exhibit "KK", attached hereto and by reference made a part hereof).

89. Watson's letter dated 16 Aug 2002 received 26 Aug 2002 advised "a final decision to you NLT 23 Aug 02" (Exhibit "LL" attached hereto and by reference made a part hereof).

90. Sakrison did not receive the response from Watson by 23 Aug 2002 as promised in the above letter. Twenty-four days later, on 16 September 2002 Sakrison did receive a letter from Watson via regular mail. The letter was predated 22 August 2002, postmarked 10 September 2002, and received 16 September 2002. (Exhibit "MM", attached hereto and by reference made a part hereof). This letter was represented to be a Denial of Lan-Dale's Claim. It did not arrive within the time frame stipulated in the FARs. (Exhibit "NN", attached hereto and by reference made a part hereof). The response was untimely.

The above letter did not address the allegations made in Lan-Dale's Claim, nor did it reference the Terms and Conditions of the Award/Contract. The statements made by the Contracting Officer Gary Watson in this letter are irrelevant to the Claim. (see Paragraphs 76, 77, and 78) .

The Contracting Officer did not address the statements made to him in Hamilton's letter of 03 July 2002, which clearly advised, in part: "*...all of the facts of this case lie within the time frame of the Contract 18 January 2000 to its required date of closure, 07 April 2000. Our Claim of 06 May 2002 encompasses only this time frame.*" The Contracting Officer ignored the designated time frame and addressed only a time frame months *after* the required closure date of the Contract.

The Contracting Officer's lengthy reference to "Demil" is totally out of context, the reasons for which are stated in Paragraphs 76, 77, and 78. His allegation that Lan-Dale made "inconsistent statements" and "possibly submitted a false claim", is totally without

merit. Statements made regarding Lan-Dale's presumed prior knowledge are not factual and are totally irrelevant to the issue.

91. Lan-Dale is fully aware and believes, and on that basis alleges, that the Contracting Officer's response to Lan-Dale's Claim in the above manner, is in default of the intent of the FAR as to timeliness and content. (33.211 Contracting Officer's decision. (a) and (b)).

92. The harm to Lan-Dale has been ongoing since LtCol Dragotta's modification of Lan-Dale's two-part, two-page proposal of 21 June 1991. This proposal remains the foundation of all Contracts generated in this issue. The improper manner in which this proposal was used does not negate or lessen in any way its requirements, one of which is: "*until such time as a mutually agreed upon exchange is consummated.*" To date this exchange has not been consummated.

93. The damage to Lan-Dale Co. is profound. This outrageous conduct deprives Lan-Dale of rights and significant opportunities that will no longer be available to it.

94. Lan-Dale has suffered irreparable harm in that it has been prevented from implementing its plan to utilize the items from the exchange contract. Closure of the Settlement Agreement should have occurred within three months of the 11 May 1998 settlement meeting. Lan-Dale should have been in possession of the T-39s and engines and commenced with its use of the equipment on 11 August 1998, or five years ago.

95. Upon receipt, the Bills of Sale were submitted to the FAA and the five T-39s were U.S. registered and immediately deregistered to Mexican registry on 26 May 2000, as follows:

| | | | |
|---|---|---|---|
| BuNo 151336: | XA-AAH | BuNo 150969: | XA-AAJ |
| BuNo 150543: | XA-AAG | BuNo 150548: | XA-AAF |
| BuNo 150547: | XA-AAI | | |

There is a ready market for cargo transport in Mexico and a demand for additional aircraft. Numerous Sabreliners (T-39s) are being utilized for this purpose. Lan-Dale planned to hire Jeff Coffman, a Mexican citizen, as general manager and chief pilot, to handle what

Lan-Dale anticipated was an active cargo business in Mexico. A relationship with a Mexican corporation had been established for that purpose. No freight contracts could be entered into because of the failure of the Government to complete the settlement.

The Operational Cost Analysis and profit potential reflect a viable business venture, the likes of which is ongoing at this time. (Exhibit "OO" attached hereto and by reference made a part hereof).

COUNT I

96. As set forth herein, as of the date of the Award/Contract and Bills of Sale, the Government relinquished ownership, right of possession, custody and control of the six T-39s, the T-34B, and the five engines to Lan-Dale.

97. The defendant's failure to release Lan-Dale's property, was accomplished with total disregard for the Terms and Conditions of the Award/Contract and the Bills of Sale thus violating Lan-Dale's rights under the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

98. Defendant's continued retention of that property and failure to perform under the terms of the Award/Contract and attached Bills of Sale is a breach of the Settlement Agreement. Lan-Dale has been aggrieved by retention of the aircraft and the loss of use of its property.

99. For reasons stated herein, Lan-Dale has suffered and continues to suffer irreparable harm by virtue of the Government's failure to release Lan-Dale's property.

100. Lan-Dale has no alternative legal remedy to address this situation.

COUNT II

101. The business interests of Lan-Dale and A. J. D'Alessandris have been irreparably harmed by the conduct of Government agents and those who failed to honor the terms and conditions of the Settlement Agreement, the Award/Contract, and the Bills of Sale.

102. The modification of Lan-Dale's two-part exchange proposal of 21 June 1991 was documented in the Request for Approval of 15 November 1991. The government has yet to satisfy the requirements of Lan-Dale's Proposal "*until such time as a mutually agreed*

*upon exchange is consummated.*" The failure to release Lan-Dale's property, among other actions on the part of the Government, has precluded the satisfaction of Lan-Dale's Proposal. The Government's obligation to comply with the above continues. The agreed upon exchange, to date, has not occurred, and Lan-Dale has suffered money damages as a result thereof, but not less than $8,000,000, all of which will be proved at trial.

WHEREFORE, plaintiff prays as follows:

A. For enforcement of the Settlement Agreement;

B. For damages caused by Defendant's breach of contract, including but not limited to loss of profits;

C. For attorneys' fees and costs of the suit; and

D. For such other relief as the Court may deem proper.

Dated this 17 day of December, 2003.

SLUTES, SAKRISON, & HILL, P.C.

By [signature]
James M. Sakrison
33 N. Stone, Suite 1000
Tucson, AZ 85701
Attorneys for Plaintiff Lan-Dale Co.

Copy of the foregoing mailed this
17 day of December, 2003, to:

Nancy M. Kim
Trial Attorney
Commercial Litigation Branch, Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street NW
Washington, DC 20530

# TABLE OF CONTENT

LAN-DALE CO. V. UNITED STATES OF AMERICA

THE LIST OF EXHIBITS ATTACHED TO THIS AMENDED COMPLAINT OF 19 DECEMBER 2003 ALSO APPLY TO THE DECLARATION OF 19 AUGUST 2003

LIST OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---|---|
| A | LtCol Beebe's statement of valuation (Enc 16, IG's Investigative Report) |
| B | Photos of VC-118B |
| C | Lan-Dale's two-page proposal, 21 June 1991 |
| D | MCAGM's formal acceptance of the two-page proposal, 28 June 1991 |
| E | MCAGM's request for approval to higher authority, 03 July 1991 |
| F | Pages 6 & 7, Ferrari's Investigative Report, 22 September 1995 |
| G | Dragotta's fraudulent request for approval to higher authority, 15 November 1991 |
| H | Award/Contract, 10 February 1992 |
| I | Photographs of C-117D flight delivery to MCAS Cherry Point, 27 February 1992 |
| J | Lan-Dale letter to Dragotta, 26 May 1992 |
| K | DELETED |
| L | Nihart's letter to Simmons, 08 September 1994 |
| M | Hotline Complaint, 20 September 1994 |
| N | W.W. Scheffler's letters to Ferrari, 10 July & 03 August 1995; Ferrari's letter to Scheffler, undated |
| O | LtCol Ferrari's letter to Lan-Dale, 08 August 1995 |
| P | Hamilton's letters of 19 January, 07 February, & 03 March 1995 to Penny Clark |
| Q | Ferrari's final report Opinions and Recommendations, 07 November 1995 |
| R | Photographs of the T-39s, 11 May 1998 |
| S | Hamilton's letter to Dietrich, 30 June 1998; copy to ASBCA |
| T | Mazzone's letter, 30 June 1999; Dietrich advised one year prior re. costs |
| U | Dietrich's letter to Hamilton, 24 November 1999 |
| V | C & J Sales appraisal $20,000, 20 June 2000 |

| | |
|---|---|
| W | Settlement Award/Contract, 18 January 2000 |
| X | AMARC's Actual Cost Estimate of 10 February 2000 ($35,029.00); and Cost Breakdown of 23 February 2000 |
| Y | Monty Jackson's engine removal procedure, 25 May 2000 |
| Z | Lan-Dale check for $28,255.63, 30 May 2000 |
| AA | AMARC's Actual Cost Estimate of 02 June 2000 [engines] and 05 June 2000 [aircraft] ($62,301.00); first mention of DEMIL |
| BB | Starn's "No Demil" letter, 06 June 2000 |
| CC | Dietrich's letter to Hamilton, 08 August 2000; End User Certificates |
| DD | Dietrich's letter to Hamilton, 11 September 2000 |
| EE | Brew's letter to Watson, 03 October 2000; offered Watson $21,199 |
| FF | Brew's letter to Watson, 24 October 2000 |
| GG | Watson's letter to Brew, 26 October 2000 |
| HH | Hamilton's letter to Dietrich, 23 October 2000 |
| II | Revised Claim, 06 May 2002 |
| JJ | Watson's letter to Sakrison, 23 May 2002; Received 03 June 2002 |
| KK | Watson's letter to Sakrison,17 July 2002 |
| LL | Watson's letter to Sakrison, 16 August 02; final decision NLT 23 August 2002 |
| MM | Watson's Denial of the Claim, received 16 September 2002 |
| NN | Federal Acquisition Regulations (FARs) |
| OO | T-39 Operational Cost |

# EXHIBIT A

6 September 1995

<u>Memorandum</u>

From: LtCol J.W. Ferrari
To: Record

Subj: TELEPHONE CALL WITH [redacted] USMC (Ret)

1. [redacted] was contacted through relatives in the State of Alabama, where he currently resides, on 6 September 1995. The following is an approximate summation of the relevant portions of that conversation.

I identified myself and informed him that I was conducting a preliminary inquiry into allegations of mis-conduct by LtCol Schwanda. He responded, somewhat humorously, that he was surprised they were not investigating him.

I informed him that the inquiry was generated by the circumstances surrounding the C-117D -- C-118B exchange he had arranged in 1991 prior to his retirement. He responded that he was very familiar with that transaction.

I went over the facts of the trade as related to me by LtCol Schwanda. He is in concurrence with those facts.

I asked him if he had entered into an undocumented agreement with the Lan-Dale Company to trade the C-117D BuNo# 50834 back to the Marine Corps for $430,000 in trade stock. He concurred with the undocumented agreement but not with the $430,000 in trade stock. He said that although he was confident that he would have struck a deal that was mutually agreeable to both the MCAGM and the Lan-Dale Company, he didn't think it would have been for quite that much trade stock, implying that he probably would have been successful in bargaining [redacted] down from the $430,000 figure.

I asked him how he arrived at the $500,000 valuation for the VC-118B. He replied that when he first saw the aircraft and the condition it was in, the number that stuck in his mind was $700,000, which was his own personal estimation. When [redacted] mentioned that he would be willing to assign a valuation of $500,000 he thought it was a great deal and jumped at it. He related it is very difficult to assign accurate valuations to one-of-a-kind aircraft when you have nothing to compare it to, and, therefore, did not do a comparative survey of DC-6/C-188B market.

The rest of the conversation was small talk though he did speak of LtCol Schwanda and [redacted] in laudatory terms.

J.W. Ferrari

Encl (16)

# EXHIBIT B



VC-118B BuNo 128427

Oct 91 non-stop Tucson, AZ.
to
MCAS Cherry Point, NC.









# EXHIBIT C

The Lan-Dale Co.

[illegible] TERMINAL WAY
RENO, NEVADA [illegible]
AREA CODE [illegible]

P-1of2

ARIZONA OFFICE:
[illegible] E. AIRPORT DRIVE
TUCSON, ARIZONA [illegible]
([illegible]) [illegible]

PLEASE REPLY TO: TUCSON

June 21, 1991

Lt. Colonel W.A. BEEBE II USMC
Officer-in-Charge
Marine Corps Air-Ground Museum
Quantico, Va. 22134-5001

Dear LtCol Beebe:

The attached exchange proposal is within the parameters we discussed a few days ago.

The Lan-Dale CO. will assume all costs and furnish all required insurance for the Flight Delivery of the VC-118B Bu.#128427 from Tucson, Az. to MCAS Cherry Point, NC. and the Flight Delivery of the C-117D Bu.# 50834 from MCAS Quantico Va. to MCAS Cherry Point, North Carolina.

Based on the agreed value of $500,000.00 for the VC-118B Bu.#128427 the value of the C-117D Bu.#50834, after deducting the balance of the items listed in the attached Proposal, would amount to $430,000.00. The Lan-Dale Co. will retain ownership of the C-117D Bu.#50834, which will be in a loan Status at MCAS Cherry Point, North Carolina, until such time as a mutually agreed upon exchange is consummated.

Very Truly Yours

A.J. D'Alessandris Pres.

(EXHIBIT B-1)

00055

The Lan-Dale Co.

[illegible] TERMINAL WAY
RENO, NEVADA [illegible]
AREA CODE [illegible]

P-2of2

ARIZONA OFFICE
[illegible] E. AIRPORT DRIVE
TUCSON, ARIZONA [illegible]
[illegible]

PLEASE REPLY TO: TUCSON

June 21, 1991

LT. Colonel W.A. BEEBE II USMC
Officer-in-Charge
Marine Corps Air-Ground Museum
Quantico, VA. 22134-5001

Dear LtCol Beebe:

I propose the exchange of one VC-118B Bu.#128427 Flight delivered to MCAS Cherry Point, North Carolina for the following:

1- C-117D Bu.# 50834
1- Cessna O2 Bu.# 721300
2- O470 Continental Engines & Propellers
1- BT-13
2- CJ5 Jeeps

Very Truly Yours

A.J. D'Alessandris Pres.

(EXHIBIT B-2)

# EXHIBIT D

4

UNITED STATES MARINE CORPS
MARINE CORPS AIR-GROUND MUSEUM
AND
MUSEUMS BRANCH ACTIVITIES
QUANTICO, VIRGINIA 22134-5001

IN REPLY REFER TO:
13000
HDM-2 MCAGM 5-91
28 Jun 91

Mr. A. J. D'Alessandris
President, The Lan-Dale Company
2000 E. Airport Drive
Tucson, AZ 85706

Dear Mr. D'Alessandris:

The Marine Corps Air-Ground Museum accepts your proposal of June 21, 1991 pending approval by higher authority. In exchange for a C-118B, BuNo: 128427, flight delivered to MCAS Cherry Point, NC, the Marine Corps will transfer title to the following:

(1) C-117D, BuNo: 50834
(1) Cessna O2A, BuNo: 721300
(2) 0470 Continental engine and propellers
(1) BT-13A, BuNo: 41-10886
(2) CJ-5 jeeps

Please note that all transportation, insurance, and other expenses are to be incurred by the Lan-Dale Company for all exchanged material. The Marine Corps on acceptance of the C-118B in museum display condition will transfer title to the government-owned equipment in an "as is, where is" condition with no warranty implied.

Mr. D'Alessandris, we are looking forward to seeing you again in the future, and thank you for your interest in Marine Corps history.

Sincerely,

W. A. BEEBE II
LtCol USMC
Officer-in-Charge

# EXHIBIT E

DEPARTMENT OF THE NAVY
HEADQUARTERS UNITED STATES MARINE CORPS
MARINE CORPS HISTORICAL CENTER
WASHINGTON NAVY YARD
WASHINGTON, D.C. 20374-0580

IN REPLY REFER TO:
13000
HDM-2 MCAGM 5-
3 Jul 91

From: Commandant of the Marine Corps (HDM)
To: Assistant Secretary of the Navy (RD&A), Washington, DC, 20380-5000
Via: (1) Commander, NAVAIRSYSCOM, Washington, DC 20361 (AIR 41213)
(2) Chief of Naval Operations, Pentagon Room 4E379, Washington, DC, 20350 (OP 505J [redacted]

Subj: REQUEST APPROVAL TO EXCHANGE GOVERNMENT-OWNED EQUIPMENT WITH THE CIVILIAN SECTOR

Ref: (a) SECNAVINST 5755 DTD Apr 22, 1989

Encl: (1) Estimated Values of Exchange
(2) Letter of proposal from A. J. D'Alessandris, the Lan-Dale Company, dtd June 21, 1991

1. In accordance with the guidance in the reference, the following request is submitted.

2. The Marine Corps Air-Ground Museum at Quantico, VA, has been offered an historically significant C-118B aircraft, BuNo: 128427, configured for a former Commandant, in Marine Corps colors and markings, owned by A. J. D'Alessandris, The Lan-Dale Company, 1460 Terminal Way, Reno, NV, 89502, in exchange for the following:

(1) C-117D, BuNo: 50834 (located at Quantico)
(1) Cessna 02A, BuNo: 721300 (located at Quantico)
(2) 0470 Continental engines and propellers (located at Quantico)
(1) BT-13A, BuNo: 41-10886 (located at Yankee Air Force Museum)
(2) CJ-5 jeeps (located at Quantico)

Mr. D'Alessandris will flight deliver, in museum display condition, the C-118B aircraft to MCAS Cherry Point, NC. He will pay all transportation and preparation costs. This exchange is considered to be fair and equitable in value for both parties.

3. Because of the benefit to the Marine Corps and the Marine Corps Air-Ground Museum in acquiring this aircraft, I believe the exchange to be in the best interest of the government and recommend approval.

[redacted]
By direction

(EXHIBIT D-1)

00038

# ESTIMATED VALUES OF EXCHANGE

| | |
|---|---|
| [illegible], BuNo: 128427 | $[illegible]80,000.00 |
| C-117D, BuNo 50834 | $[illegible]30,000.00 |
| Cessna O2A, B[illegible]: 721300 | 30,000.00 |
| 2 O470 engine & props | 30,000.00 |
| BT-13A, BuNo: 41-10886 | 5,000.00 |
| 2 CJ-3 jeeps | 5,000.00 |
| | $500,000.00 |

# EXHIBIT F

In that year Col Beebe II the current Director of the MCAGM, was faced with a problem regarding a C-117D aircraft BuNo# 50834. This aircraft, belonging to the MCAGM, had been serving as the "gate guard" at MCAF Quantico. The Commanding Officer of the facility informed [redacted] Beebe that he wanted the aircraft removed. Removing the aircraft from the facility would have entailed its dis-assembly and removal to the Larson Gymnasium restoration facility. During a conversation with Schwanda he related his predicament and was made aware of the C-117D trade that hwanda [redacted] had made with the Lan-Dale company in 1984. LtCol hwanda [redacted] suggested that since MCAS Cherry Point was desirous of obtaining the aircraft, conducting a similar type of exchange might alleviate the problem LtCol Beebe contacted Mr. D'Alessandris and a two part exchange agreement, similar to the trade previously conducted by LtCol Schwanda except in the specific items traded, was agreed to. Again there was a documented exchange and an undocumented verbal agreement governing the second part of the exchange.

The documented exchange involved the trade of a VC-118B BuNo# 12847 owned by the Lan-Dale Company for the C-117D noted above. The Lan-Dale Company agreed to flight deliver the VC-118B to MCAS Cherry Point at no cost to the government in exchange for the C-117D and assorted trade stock. The undocumented verbal agreement involved trading the C-117D back to the government after the Lan-Dale Company had put the aircraft into flying condition and delivered it to MCAS Cherry Point. It was agreed verbally, between LtCol Beebe and Mr. D'Alessandris, that after the C-117D had been delivered to MCAS Cherry Point the Lan-Dale Company would get right of first refusal on trade stock that may come into the possession of the Marine Corps and that the basis of the trade would be the previously agreed upon valuation of the C-117D at $430,000.

During July of 1991 a request for approval of the first part of the exchange agreement was sent forward, through the chain of command, to the Chief of Naval Operations (CNO). This documentation contained the numerical valuations of the items to be exchanged that had been agreed to by LtCol Beebe and the Lan-Dale Company. The proposal had received positive endorsement at each step until arriving at CNO. At this point the paper trail on this proposal stops until November of 1991.

During September of 1991 LtCol Beebe retired and was replaced by LtCol Dragotta. LtCol Dragotta was apparently briefed by both Beebe and Schwanda regarding the two part exchange agreement pending with the Lan-Dale Company. During October of 1991 the VC-118B was placed in a loan status and flight delivered by the Lan-Dale Company to MCAS Cherry Point. The Lan-Dale company took custody of the C-117D aircraft BuNo# 50834 at approximately the same time. During November of 1991 the proposal mentioned above was re-submitted by LtCol Dragotta to CNO via the chain of command. This proposal contained monetary valuations for the items

to be exchanged that were markedly different than those previously agreed to and submitted for approval. Notably, the C-117D and VC-118B contained significantly lowered valuations while the O-2A was was valued at more than double what was previously agreed to. The assumption is that CNO disapproved the first proposal and a new one was submitted during that month. There is no evidence to indicate that the Lan-Dale Company was informed of the altered valuations contained in the re-submitted proposal. The altered proposal was approved by CNO.

During February of 1992 the formal exchange agreement was executed by the Lan-Dale Company and the contracting officer for MCB Quantico, i.e. the VC-118B was formally traded to the Marine Corps for the C-117D. The agreement does not list the revised valuations of the items to be traded and, again, there is no evidence to suggest that the Lan-Dale company was informed that they had been changed. On 27 February the restored C-117D was placed on loan by the Lan-Dale company and flight delivered to MCAS Cherry Point pending completion of the second part of the exchange, the undocumented verbal agreement.

During the remainder of 1992 through September of 1993, [redacted] of the Lan-Dale Company made several attempts to consummate the second part of the agreement with [redacted] but was unsuccessful. [redacted] does not appear to have been cooperative in these attempts. He does not respond to the Lan-Dale Company's correspondence and does not appear to repudiate the undocumented second exchange, although he is aware of it. He does not inform the Lan-Dale Company of the revised proposal that has been approved by CNO. Rather, he appears to be simply ignoring the efforts of that company to consummate the second part of the exchange agreement for reasons that are not known. During this time [redacted] was, apparently, also seeking employment with helicopter companies located in the state of Pennsylvania.

[redacted] became the Director of the MCAGM after [redacted] retired. A meeting was held at the MCAGM on 10 September 1993 between [redacted], [redacted] and LtCol Schwanda (Ret) in order to try and resolve the issue of the undocumented verbal agreement that was still outstanding. During this meeting [redacted] was first made aware of the revised valuation for the C-117D currently on loan to MCAS Cherry Point. Over the next year there was a continuing dialogue between the Lan-Dale Company and the MCAGM in an effort to resolve the remaining issues and consummate the second part of the exchange agreement. These discussions were at first positive but later became acrimonious and accusatory, generating a large measure of distrust between the Lan-Dale Company and the MCAGM. Nevertheless, these efforts did produce several attempts by both parties to reach resolution. These efforts were unsuccessful mainly due to an inability to reach closure over the question of the valuation of the C-117D BuNo# 50834 previously agreed to by [redacted] and [redacted] and

# EXHIBIT G

DEPARTMENT OF THE NAVY
HEADQUARTERS UNITED STATES MARINE CORPS
MARINE CORPS HISTORICAL CENTER
WASHINGTON NAVY YARD
WASHINGTON, D.C. 20374-0580

IN REPLY REFER TO
13000
HDM-2 MCAGM 5-91
15 Nov 91

From: Commandant of the Marine Corps (HDM)
To: Assistant Secretary of the Navy (RD&A), Washington, DC 20380-5000
Via: (1) Commander, NAVAIRSYSCOM, Washington, DC 20361 (AIR 41213)
(2) Chief of Naval Operations, Pentagon Room 4E379, Washington, DC 20350 (OP 505J LCdr Baxter)

Subj: REQUEST APPROVAL TO EXCHANGE GOVERNMENT-OWNED EQUIPMENT WITH THE CIVILIAN SECTOR

Ref: (a) SECNAVINST 5755 dtd 27 Apr 89

Encl: (1) Letter of proposal from A. J. D'Alessandris, The Lan-Dale Company, dtd June 21, 1991
(2) Letter of acceptance, pending approval by higher authority, from LtCol W. A. Beebe II, Marine Corps Air-Ground Museum, dtd June 28, 1991

1. IAW reference (a), the following request is submitted.

2. The Marine Corps Air-Ground Museum at Quantico, VA, has been offered a C-118B aircraft, BuNo: 128427, configured for a former Commandant in Marine Corps colors and markings, owned by A. J. D'Alessandris, The Lan-Dale Company, 1460 Terminal Way, Reno, NV, 89502, in exchange for the following:

(1) C-117D, BuNo: 50834 (located at Quantico)
(1) Cessna 02A, BuNo: 721300 (located at Quantico)
(2) 0470 Continental engines and propellers (located at Quantico)
(1) BT-13A, BuNo: 41-10886 (located at Yankee Air Force Museum)
(2) CJ-5 jeeps (located at Quantico)

Enclosures (1) and (2) are the proposed exchange agreements between the museum and Mr. A. J. D'Alessandris.

3. The C-118 is historically significant, as it was the official transportation for several Commandants. It has been restored and is in excellent original condition and is also in final operational configuration. It has been indicated that it is the last remaining VC-118B of its type and configuration and is definitely historically valuable.

4. A determination of the fair market value was made utilizing trade journals and corresponding with aircraft dealers and is as follows:

| | |
|---|---|
| (1) C-118 | $350,000 |
| (1) C-117 | $240,000 |
| (1) BT-13 | $ 5,000 |
| (1) 02A | $ 75,000 |

Subj: REQUEST APPROVAL TO EXCHANGE GOVERNMENT-OWNED EQUIPMENT WITH THE CIVILIAN SECTOR

| | |
|---|---|
| (2) C-J5 jeeps | $ 5,000 |
| (2) 0470 engines | $ 16,000 |
| (2) McCauley props | $ 7,000 |
| | $348,000 |

The acquisition costs have been determined to the best of our knowledge as:

| | |
|---|---|
| C-118 | $1,200,000 |
| C-117 | 398,000 |
| BT-13 | 20,000 |
| 02A | 92,000 |
| (1) C-J5 jeep | 4,000 |
| (1) 0470 engine | 8,402 |
| (1) McCauley prop | 5,000 |

5. This exchange is at "no cost to the government." Mr. D'Alessandris will flight deliver, in museum display condition, the C-118 aircraft to MCAS Cherry Point, NC. He will pay all transportation, preparation, insurance, and other expenses to be incurred for all exchanged material.

6. All government-owned equipment is an "as is, where is" condition, with no warranty implied.

7. Because of the benefit to the U.S. Marine Corps and the Marine Corps Air-Ground Museum in acquiring this aircraft, I believe this exchange to be in the best interest of the government and highly recommend approval.

D. M. SMITH
By direction



00 1́.5

# EXHIBIT H

# AWARD/CONTRACT

1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 350) ▶ RATING | PAGE 1 OF 14 PAGES

2. CONTRACT (Proc. Inst. Ident.) NO. M00264-92-C-0010

3. EFFECTIVE DATE FEB 13 1992

4. REQUISITION/PURCHASE REQUEST/PROJECT NO. 13000 HDM-2 MCAGM 5-91

5. ISSUED BY CODE M00264
PURCHASING & CONTRACTING BRANCH
2010 ZEILIN ROAD
QUANTICO, VA. 22134-5098

ATTN: GARNETTE CANNON (703-640-3596)

6. ADMINISTERED BY (If other than Item 5) CODE

**DUPLICATE ORIGINAL**
**CONTRACTORS' COPY**

7. NAME AND ADDRESS OF CONTRACTOR (No., street, city, county, State and ZIP Code)
THE LAN-DALE COMPANY
Mr. A. J. D'Alessandris
1460 Terminal Way
Reno, Nevada 89502

8. DELIVERY
☐ FOB ORIGIN ☒ OTHER (See below)

9. DISCOUNT FOR PROMPT PAYMENT

10. SUBMIT INVOICES (4 copies unless otherwise specified) TO THE ADDRESS SHOWN IN: ▶ ITEM

CODE | FACILITY CODE

11. SHIP TO/MARK FOR CODE
SEE SCHEDULE

12. PAYMENT WILL BE MADE BY CODE
EXCHANGE - NO EXCHANGE OF FUNDS

13. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION:
☐ 10 U.S.C. 2304(c)( ) ☐ 41 U.S.C. 253(c)( )

14. ACCOUNTING AND APPROPRIATION DATA
EXCHANGE/SALE TRANSACTION

| 15A. ITEM NO. | 15B. SUPPLIES/SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT |
|---|---|---|---|---|---|
| | | | | | |

15G. TOTAL AMOUNT OF CONTRACT ▶ $

## 16. TABLE OF CONTENTS


| (✓) | SEC. | DESCRIPTION | PAGE(S) | (✓) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I — THE SCHEDULE | | | | PART II — CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 7 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 2 | | | PART III — LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH. | |
| X | C | DESCRIPTION/SPECS./WORK STATEMENT | 2 | X | J | LIST OF ATTACHMENTS ("A"-"G") | 8 |
| | D | PACKAGING AND MARKING | | | | PART IV — REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 3 | X | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | 9-14 |
| X | F | DELIVERIES OR PERFORMANCE | 4 | | | | |
| X | G | CONTRACT ADMINISTRATION DATA | 4 | | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | |
| X | H | SPECIAL CONTRACT REQUIREMENTS | 5-6 | | M | EVALUATION FACTORS FOR AWARD | |


*CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE*

17. ☒ CONTRACTOR'S NEGOTIATED AGREEMENT (Contractor is required to sign this document and return 1 copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.)

18. ☐ AWARD (Contractor is not required to sign this document.) Your offer on Solicitation Number ______ including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.

19A. NAME AND TITLE OF SIGNER (Type or print)
A.J. D'Alessandris
President

20A. NAME OF CONTRACTING OFFICER
WANDA D. LABELLE

19B. NAME OF CONTRACTOR
The Lan-Dale Co.
BY [signature]
(Signature of person authorized to sign)

19C. DATE SIGNED 02-10-92

20B. UNITED STATES OF AMERICA
BY Wanda D. LaBelle
(Signature of Contracting Officer)

20C. DATE SIGNED 2/13/92

NSN 7540-01-152-8069
PREVIOUS EDITION UNUSABLE

26-107

STANDARD FORM 26 (REV. 4-85)
Prescribed by GSA
FAR (48 CFR) 53.214(a)

SECTION B - SUPPLIES OR SERVICES AND PRICES/COSTS
AND
:CTION C - DESCRIPTION/SPECS/WORK STATEMENT

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | | AMOUNT |
|---|---|---|---|---|
| | EXCHANGE OF AIRCRAFT, JEEPS, ENGINES & PROPELLERS (CLIN's 0001 THRU 0006) owned by the Marine Corps, for Aircraft (CLIN 0007) owned by The Lan-Dale Company, (Mr. A. J. D'Alessandris), 1460 Terminal Way, Reno, Nevada 89502. | | | |
| 0001. | Aircraft, C-117D, BuNo 50834; | 1 | EA | EXCHANGE |
| 0002. | Aircraft, Cessna 02A, BuNo 721300; | 1 | EA | EXCHANGE |
| 0003. | Engine, Continental, Model 0470-4, Serial #51063-5-M and #116216R; | 2 | EA | EXCHANGE |
| 0004. | Propeller, McCauley, Model 2AF34C55-0, Serial #851543 and #851540; | 2 | EA | EXCHANGE |
| 0005. | Aircraft, BT-13A, BuNo 41-10886; | 1 | EA | EXCHANGE |
| 0006. | CJ-5 Jeep, 1975, Model 8300, Serial #063605 and #063606; | 2 | EA | EXCHANGE |
| 0007. | Aircraft, C-118-B, BuNo 128427; configured for a former Commandant in Marine Corps colors and markings, in Museum display condition; | 1 | EA | EXCHANGE |

CLIN's 0001, 0002, 0003, 0004 and 0006 are located at: Marine Corps Air-Ground Museum, MCCDC, Quantico, Va. CLIN 0005 is located at: Yankee Air Force Museum, Ypsilanti, Michigan.

NAME OF OFFEROR: THE . .-DALE COMPANY



## ECTION E - INSPECTION AND ACCEPTANCE

E-1. MATERIAL INSPECTION AND RECEIVING REPORT
As evidence of acceptance of CLIN 0007, the Contracting Officer's Technical Representative (COTR) shall prepare and sign or as appropriate, have the Contractor, sign a Material Inspection and Receiving Report (DD 250) with the block numbers 1, 2, 3, 7, 8, 9, 15, 16, 17 and 21B completed. The original shall be furnished to the Contracting Officer, MCCDC, Quantico, Virginia, with a copy furnished to the Contractor or the Contracting Officer's Technical Representative, as appropriate.

E-2. Inspection and acceptance shall be made at MCAS, Cherry Point, N.C., with the final acceptance made by the Marine Corps Air-Ground Museum, Marine Corps Combat Development Command, Quantico, Virginia.

E-3. FAR 52.252-2 CLAUSES INCORPORATED BY REFERENCE (JUN 1988)

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available.

I. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CLAUSES

| NUMBER | FAR REFERENCE | CLAUSE OR PROVISION TITLE | DATE |
|---|---|---|---|
| 1. | 52.246-02 | Inspection of Supplies-Fixed Price | JUL 1985 |
| 2. | 52.246-16 | Responsibility for Supplies | APR 1984 |

SECTION F - DELIVERIES OR PERFORMANCE

F-1. CLIN 0007 shall be delivered by the Contractor, via air transportation, to MCAS, Cherry Point, N.C., on an F.O.B. Destination basis within sixty (60) days from effective date of contract. All transportation, preparation, insurance, etc. shall be at Contractor's expense. CLIN 0007 shall be delivered in Marine Corps Colors and markings in Museum display condition.

F-2 Title to CLIN 0007 shall transfer to the Government upon acceptance and will be evidenced by execution of a Material Inspection and Receiving Report (DD-250).

F-3. Title to CLIN's 0001-0006 shall transfer to the Contractor upon execution by the Government of a Bill of Sale which shall be accomplished after receipt of the Material Inspection and Receiving Report referenced in F-2 above. Sample Bill of Sale shown in Attachments "A" thru "G".

F-4. (FAR) 52.252-2 CLAUSES INCORPORATED BY REFERENCE (JUN 1988)

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available.

I. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CLAUSES

| NUMBER | FAR REFERENCE | CLAUSE OR PROVISION TITLE | DATE |
|---|---|---|---|
| 1. | 52.247-34 | F.O.B. Destination | APR 1984 |

SECTION G - CONTRACT ADMINISTRATION DATA

G-1. All contract administration functions will be retained by the Procuring Office.

G-2. Any inquiries pertaining to the administration or performance of this contract should be directed to the Contract Administrator, telephone 703/640-3466.

G-3. Report of Property Received (DD 250) shall be prepared by the Officer in Charge, Marine Corps Museum, or his authorized representative, in accordance with local requirements and paragraph E-1 in Section E.

## CTION H - SPECIAL PROVISIONS

H-1 The Contracting Officer's Technical Representative (COTR) for this project is The Officer in Charge, Marine Corps Air-Ground Museum, MCCDC, Quantico, Virginia or his duly authorized representative.

H-2 The authority of the Technical Representative or his duly authorized representative is confined to inspection and acceptance of the deliverable items as specified herein, and to coordinate and monitor the service performed hereunder. Only the Contracting Officer has the authority to authorize deviations from the terms and conditions of this contract, including deviation from specification requirements. In the event the Contractor does deviate without written approval of the Contracting Officer, such deviation shall be at the risk of, and any cost related thereto shall be borne by the Contractor.

H-3 CLIN's 0001-0006 shall be delivered in an "AS IS" condition. Contractor shall obliterate all stars, bars, insignia and service markings wherever they appear, prior to asssuming ownership, without expressed or implied warranty of any kind. Removal of CLIN's 0001-0006 shall not take place until CLIN 0007 has been delivered and accepted by the Government and a Bill of Sale issued. Removal of CLIN's 0001-0006 shall take place within sixty (60) days after the issuing of Bill of Sales.

H-4. Both the Contractor and Government represent that the equipment exchanged hereunder is for static display purposes only and neither party warrants its fitness for any purpose other than static display. The Contractor undertakes and agrees to indemnify and hold the Government, its agents, officer and employees harmless from any and all loss or liability (whether in tort or in contract) which might arise from the use of the equipment exchanged under this contract for any purpose other than static display when such use results in (i) injury to or death of personnel of the Contractor or third parties; or (ii) damage to or destruction of real or personal property of the contractor or third parties.

( continued )

-5. GOVERNMENT BILL OF SALE (CLIN's 0001-0006)
As evidence of transfer of title of Government-owned equipment to the Contractor as required by DOD Property Disposal Manual DOD 4160.21-M-1, the Contracting Officer shall, upon the receipt of DD Form 250 evidencing delivery and acceptance of CLIN 0007, furnish the Contractor a Bill of Sale covering CLIN's 0001-0006 using the format required by DOD Property Disposal Manual DOD 4160-21-M-1. A copy of the Bill of Sale Document to be provided is included as Attachments "A" thru "G".

H-6. CONSTRUCTIVE CHANGE ORDERS:
No understanding or agreement, contract modification, change or other matter deviating from or constituting an alteration or change of terms of the contract will be effective or binding upon the Government unless formalized by contractual documents executed by the Contracting Officer or his duly authorized representative.

H-7. SPECIAL CANCELLATION PROVISION:
IN THE EVENT THE CONTRACTOR FAILS TO DELIVER/PERFORM IN ACCORDANCE WITH THE TERMS OF THIS CONTRACT, THE GOVERNMENT RESERVES THE RIGHT TO ISSUE A SIMPLE NO-COST/NO-LIABILITY CANCELLATION OF THE ENTIRE CONTRACT. THIS RIGHT IS IN ADDITION TO THE PROVISIONS OF GENERAL PROVISIONS NO. 23 (TERMINATION FOR CONVENIENCE OF THE GOVERNMENT) AND NO. 24 (DEFAULT) AND MAY BE EXERCISED AT THE SOLE OPTION OF THE GOVERNMENT IN LIEU THEREOF.

.RT II - CONTRACT CLAUSES

SECTION I - CONTRACT CLAUSES

(FAR 52.252-2) CLAUSES INCORPORATED BY REFERENCE (JUN 1988) This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available.

I. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CLAUSES

| NUMBER | FAR REFERENCE | CLAUSE OR PROVISION TITLE | DATE |
|---|---|---|---|
| 1. | 52.202-01 | Definitions | APR 1984 |
| 2. | 52.203-01 | Officials Not To Benefit | APR 1984 |
| 3. | 52.203-03 | Gratuities | APR 1984 |
| 4. | 52.203-05 | Covenant Against Contingent Fees | APR 1984 |
| 5. | 52.203-07 | Anti-Kickback Procedures | OCT 1988 |
| 6. | 52.215-01 | Examination of Records by Comptroller General | APR 1984 |
| 7. | 52.215-02 | Audit - Negotiation | DEC 1989 |
| 8. | 52.219-08 | Utilization of Small Business Concerns and Small Disadvantaged Business Concerns | FEB 1990 |
| 9. | 52.219-13 | Utilization of Woman-Owned Small Businesses | AUG 1986 |
| 10. | 52.220-03 | Utilization of Labor Surplus Area Concerns | APR 1984 |
| 11. | 52.222-20 | Walsh Healey Public Contracts Act | APR 1984 |
| 12. | 52.222-26 | Equal Opportunity | APR 1984 |
| 13. | 52.222-35 | Affirmative Action for Special Disabled and Vietnam Era Veterans | APR 1984 |
| 14. | 52.222-36 | Affirmative Action for Handicapped Workers | APR 1984 |
| 15. | 52.222-37 | Employment Records on Special Disabled Veterans and Veterans of the Vietnam Era | JAN 1988 |
| 16. | 52.223-06 | Drug-Free Workplace | JUL 1990 |
| 17. | 52.229-03 | Federal, State and Local Taxes | JAN 1991 |
| 18. | 52.229-05 | Taxes, Contracts Performed in U.S. Possessions or Puerto Rico | APR 1984 |
| 19. | 52.232-11 | Extras | APR 1984 |
| 20. | 52.233-01 | Disputes | APR 1984 |
| 21. | 52.243-01 | Changes - Fixed Price | AUG 1987 |
| 22. | 52.246-23 | Limitation of Liability | APR 1984 |
| 23. | 52.249-01 | Termination for Convenience of the Government (Fixed Price) (Short Form) | APR 1984 |
| 24. | 52.249-08 | Default (Fixed Price Supply and Service) | APR 1984 |

( continued )

PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACHMENTS

SECTION J - LIST OF ATTACHMENTS

| | |
|---|---|
| ATTACHMENT "A" | Government Bill of Sale, Aircraft C-117D; |
| ATTACHMENT "B" | Government Bill of Sale, Aircraft, Cessna 02A |
| ATTACHMENT "C" | Government Bill of Sale, Engines (2), Continental, Model 0470-4; |
| ATTACHMENT "D" | Government Bill of Sale, Propellers (2), McCauley, Model 2AF34C55-0; |
| ATTACHMENT "E" | Government Bill of Sale, Aircraft, BT-13A; |
| ATTACHMENT "F" | Government Bill of Sale, CJ-5 Jeep, Model 8300, 1975, Serial #063605; |
| ATTACHMENT "G" | Government Bill of Sale, CJ-5 Jeep, Model 8300, 1975, Serial #063606; |

RT IV- REPRESENTATIONS AND INSTRUCTIONS

SECTION K - REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS

K-1. (FAR) 52.203-4 CONTINGENT FEE REPRESENTATION AND AGREEMENT (APR 1984)

(a) Representation. The offeror represents that, except for full-time bona fide employees working solely for the offeror, the offeror -
NOTE: The offeror must check the appropriate boxes. For interpretation of the representation, including the term "bona fide employee", see Subpart 3.4 of the Federal Acquisition Regulation.
(1) [ ] has, [X] has not employed or retained any person or company to solicit or obtain this contract; and
(2) [ ] has, [X] has not paid or agreed to pay to any person or company employed or retained to solicit or obtain this contract any commission, percentage, brokerage, or other fee contingent upon or resulting from the award of this contract.
(b) Agreement. The offeror agrees to provide information relating to the above Representation as requested by the Contracting Officer and, when subparagraph (a)(1) or (a)(2) is answered affirmatively, to promptly submit to the Contracting Officer -
(1) A completed Standard Form 119, Statement of Contingent or Other Fees, (SF 119); or
(2) A signed statement indicating that the SF 119 was previously submitted to the same contracting office, including the date and applicable solicitation or contract number, and representing that the prior SF 119 applies to this offer or quotation.

K-2. (FAR) 52.209-5 CERTIFICATION REGARDING DEBARMENT, SUSPENSION, PROPOSED DEBARMENT, AND OTHER RESPONSIBILITY MATTERS (MAY 1989)
(a)(1) The Offeror certifies, to the best of its knowledge and belief, that--
(i) The Offeror and/or any of its Principals--
(A) Are [ ] are not [X] presently debarred, suspended, proposed for debarment, or declared ineligible for the award of contracts by any Federal agency;
(B) Have [ ] have not [X], within a three-year period preceding this offer, been convicted of or had a civil judgment rendered against them for; commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, state, or local) contract or subcontract; violation of Federal or state antitrust statutes relating to the submission of offers; or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property; and

( continued )

(C) Are [ ] are not [X] presently indicted for, or otherwise criminally or civilly charged by a governmental entity with, commission of any of the offenses enumerated in subdivision (a)(1)(i)(B) or this provision.
(ii) The Offeror has [ ] has not [X] within a three year period preceding this offer, had one or more contracts terminated for default by any Federal agency.
(2) "Principals," for the purposes of this certification, means officers; directors; owners; partners; and, persons having primary management or supervisory responsibilities within a business entity (e.g., general manager; plant manager; head of a subsidiary, division, or business segment, and similar positions).
THIS CERTIFICATION CONCERNS A MATTER WITHIN THE JURISDICTION OF AN AGENCY OF THE UNITED STATES AND THE MAKING OF A FALSE, FICTITIOUS, OR FRAUDULENT CERTIFICATION MAY RENDER THE MAKER SUBJECT TO PROSECUTION UNDER SECTION 1001, TITLE 18, UNITED STATES CODE.
(b) The Offeror shall provide immediate written notice tothe Contracting Officer if, at any time prior to contract award, the Offeror learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.
(c) A certification that any of the items in paragraph (a) of this provision exists will not necessarily result in with-holding of an award under this solicitation. However, the certification will be considered in connection with a determination of the Offeror's responsibility. Failure of the Offeror to furnish a certification or provide such additional information as requested by the Contracting Officer may render the Offeror nonresponsible.
(d) Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render, in good faith, the certification required by paragraph (a) of this provision. The knowledge and information of an Offeror is not required to exceed that which is normally possessed by a prudent person in the ordinasry course of business dealings.
(e) The certification in paragraph (a) of this provision is a material representation of a fact upon which reliance was placed when making award. If it is later determined that the Offeror knowingly rendered an erroneous certification, in addition to other remedies available to the Government, the Contracting Officer may terminate the contract resulting from this solicitation for default.

3. (FAR) 52.215-06 TYPE OF BUSINESS ORGANIZATION (JUL 1987)
The offeror or quoter, by checking the applicable box, represents that-
(a) It operates as [X] a corporation incorporated under the laws of the State of NEVADA, [ ] an individual, [ ] a partnership, [ ] a nonprofit organization, or [ ] a joint venture.
(b) If the offeror or quoter is a foreign entity, it operates as [ ] an individual, [ ] a partnership, [ ] a nonprofit organization, [ ] a joint venture, or [ ] a corporation, registered for business in ______________.
(country)

K-4. (FAR) 52.219-01 SMALL BUSINESS CONCERN REPRESENTATION (FEB 1990)
(a) Representation. The offeror represents and certifies as part of its offer that it [ ] is, [X] is not a small business concern and that [ ] all, [ ] not all end items to be furnished will be manufactured or produced by a small business concern in the United States, its territories or possessions, Puerto Rico, or the Trust Territory of the Pacific Islands.
(b) Definition.
"Small business concern", as used in this provision, means a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the criteria and size standards in this solicitation.
(c) Notice. Under 15 U.S.C. 645(d), any person who misrepresents a firm's status as a small business concern in paragraph (a) of this clause in order to obtain a contract to be awarded under the preference programs established pursuant to sections 8(a), 8(d), 9, or 15 of the Small Business Act or any other provision of Federal law that specifically references section 8(d) for a definition of program eligibility, shall (1) be punished by imposition of a fine, imprisonment, or both; (2) be subject to administrative remedies; and (3) be ineligible for participation in programs conducted under the authority of the Act.

K-5. (FAR) 52.219-3 WOMEN-OWNED SMALL BUSINESS REPRESENTATION (APR 1984)
(a) Representation. The offeror represents that it [ ] is, [X] is not a women-owned small business concern.
(b) Definitions.
"Small Business Concern" as used in this provision, means a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the criteria and size standards in 13 CFR 121.
"Women-owned", as used in this provision, means a small business that is at least 51 percent owned by a woman or women who are U.S. citizens and who also control and operate the business.

-6. (FAR) 52.222-22 PREVIOUS CONTRACTS AND COMPLIANCE REPORTS (APR 1984)
The offeror represents that:
(a) It [ ] has, [X] has not participated in a previous contract or subcontract subject either to the Equal Opportunity clause of this solicitation, the clause originally contained in Section 310 of Executive Order No. 10925, or the clause contained in Section 201 of Executive Order No. 11114;
(b) It [ ] has, [ ] has not, filed all required compliance reports; and
(c) Representations indicating submission of required compliance reports, signed by proposed subcontractors, will be obtained before subcontract awards.

N/A.

K-7. (FAR) 52.222-25 AFFIRMATIVE ACTION COMPLIANCE (APR 1984)
The offeror represents that (a) it [ ] has developed and has on file, [ ] has not developed and does not have on file, at each establishment, affirmative action programs required by the rules and regulations of the Secretary of Labor (41 CFR 60-1 and 60-2), or (b) it [ ] has not previously had contracts subject to the written affirmative action programs requirement of the rules and regulations of the Secretary of Labor.

N/A

K-8. (DFAR) 252.219-7000 SMALL DISADVANTAGED BUSINESS CONCERN REPRESENTATION (DoD Contracts)(DEC 1991).

(a) Definition.

"Small disadvantaged business concern", as used in this provision, means a small business concern, owned and controlled by individuals who are both socially and economically disadvantaged, as defined by the Small Business Administration at 13 CFR Part 124, the majority of earnings of which directly accrue to such individuals. This term also means a small business concern owned and controlled by an economically disadvantaged Indian tribe or Native Hawaiian organization which meets the requirements of 13 CFR 124.112 or 13 CFR 124.113, respectively, In general, 13 CFR Part 124 describes a small disadvantaged business concern as a small business concern--

NA

(1) Which is at least 51 percent unconditionally owned by one or more socially and economically disadvantaged individuals; or

(2) In the case of any publicly owned business, at least 51 percent of the voting stock is unconditionally owned by one or more socially and economically disadvantaged individuals; and

(3) Whose management and daily business operations are controlled by one or more such individuals.

( continued )

(b) Representation.

Check the category in which your ownership falls--

_______Subcontinent Asian (Asian-Indian) American (US Citzen with origins from India, Pakistan, Bangladesh, Sri Lanka, Bhutan, or Nepal)

_______Asian-Pacific American (US Citizen with origins from Japan, China, the Philippines, Vietnam, Korea, Samoa, Guam, U.S. Trust Territory of the Pacific Islands, (Republic of Palau), the Northern Mariana Islands, Laos, Kampuchea (Cambodia), Taiwan), Burma, Thailand, Malaysia, Indonesia, Singapore, Brunei, Republic of the Marshall Islands, or the Federated States of Micronesia)

N.A.

_______Black American (US Citizen)

_______Hispanic American (US Citizen with origins from South America, Central America, Mexico, Cuba, the Dominican Republic, Puerto Rico, Spain or Portugal)

_______Native American (American Indians, Eskimos, Aleuts, or Native Hawaiians, including Indian tribes or Native Hawaiian Organizations)

_______Individual/concern, other than one of the preceding, currently certified for participation in the Minority Small Business and Capital Ownership Development Program under section 8(a) of the Small Business Act.

_______Other

(c) Certifications.
Complete the following--

(1) The Offeror is ____, is not __X__ a small disadvantaged business concern.

(2) The Small Business Administration (SBA) has _____has not _______ made a determination concerning the Offeror's status as a small disadvantaged business concern. If the SBA has made such a determination, the date of the determination was _____________________and the offeror--

_______Was found by the SBA to be socially and economically disadvantaged and no circumstances have changed to vary that determination.

_______Was found by the SBA not to be socially and economically disadvantaged but circumstances which caused the determination have changed.

( continued )

(d) Notification.
Notify the Contracting Officer before award if your status as a small disadvantaged business concern changes.

(e) Penalties and Remedies.
Anyone who misrepresents the status of a concern as a small disadvantaged business for the purpose of securing a contract or subcontract shall--

(1) Be punished by imposition of a fine, imprisonment, or both;

(2) Be subject to administrative remedies, including suspension and debarment; and

(3) Be ineligible for participation in programs conducted under authority of the Small Business Act.

M00264-92-C-0010
ATTACHMENT "A"

BILL OF SALE- AIRCRAFT, C-117D

KNOW YE, that the United States of America (hereinafter referred to as the "SELLER"), represented by the Sale Contracting Officer, MCCDC, Quantico, Virginia, acting on behalf of the United States, sole owner of Aircraft, C-117D, BuNo 50834; for and in consideration of (1) Aircraft, C-118-B, BuNo 128427, configured for a former Commandant in Marine Corps colors and markings, in Museum display condition, and other good and valuable consideration to it in hand paid by The Lan-Dale Company, (Mr. A.J. D'Alessandris), 1460 Terminal Way, Reno, Nevada 89502 (hereinafter referred to as the "BUYER") receipt of which is hereby acknowledged has bargained and sold Aircraft, and by those present does hereby confirm transfer of all right, title, and interest to said "BUYER".

TO HAVE AND TO HOLD, the Aircraft unto the BUYER, The Lan-Dale Company, BUYER(s) heirs, administrators, executors, successors and assigns forever.

IN TESTIMONY WHEREOF, the said SELLER has caused this instrument to be executed at the Marine Corps Combat Development Command, Quantico, Virginia, the ________ day of ____________________ in the year of our Lord, one thousand nine hundred and ninety-two, A.D. (1992).

UNITED STATES OF AMERICA
By:

WANDA D. LABELLE
Contracting Officer
United States Marine Corps

STATE OF VIRGINIA
COUNTY OF PRINCE WILLIAM

BE IT KNOWN, that on this ________ day of ____________________, 1992, personally appeared before me, Wanda D. Labelle, and acknowledged the within instrument to be her free act and deed. IN TESTIMONY WHEREOF, I have hereunto set my hand and seal this ________ day of ____________, 1992 A.D.

Notary______________________________

______________________________

MY COMMISSION EXPIRES

M00264-92-C-0010
ATTACHMENT "B"

BILL OF SALE- AIRCRAFT, Cessna 02A

KNOW YE, that the United States of America (hereinafter referred to as the "SELLER"), represented by the Sale Contracting Officer, MCCDC, Quantico, Virginia, acting on behalf of the United States, sole owner of Aircraft, Cessna 02A, BuNo 721300; for and in consideration of (1) Aircraft, C-118-B, BuNo 128427, configured for a former Commandant in Marine Corps colors and markings, in Museum display condition, and other good and valuable consideration to it in hand paid by The Lan-Dale Company, (Mr. A.J. D'Alessandris), 1460 Terminal Way, Reno, Nevada 89502 (hereinafter referred to as the "BUYER") receipt of which is hereby acknowledged has bargained and sold Aircraft, and by those present does hereby confirm transfer of all right, title, and interest to said "BUYER".

TO HAVE AND TO HOLD, the Aircraft unto the BUYER, The Lan-Dale Company, BUYER(s) heirs, administrators, executors, successors and assigns forever.

IN TESTIMONY WHEREOF, the said SELLER has caused this instrument to be executed at the Marine Corps Combat Development Command, Quantico, Virginia, the ________ day of ______________________ in the year of our Lord, one thousand nine hundred and ninety-two, A.D. (1992).

UNITED STATES OF AMERICA
By:

WANDA D. LABELLE
Contracting Officer
United States Marine Corps

STATE OF VIRGINIA
COUNTY OF PRINCE WILLIAM

BE IT KNOWN, that on this ________ day of ______________________, 1992, personally appeared before me, Wanda D. Labelle, and acknowledged the within instrument to be her free act and deed. IN TESTIMONY WHEREOF, I have hereunto set my hand and seal this ________ day of ______________, 1992 A.D.

Notary______________________________

______________________________
MY COMMISSION EXPIRES

M00264-92-C-0010
ATTACHMENT "C"

BILL OF SALE- ENGINE, CONTINENTAL

KNOW YE, that the United States of America (hereinafter referred to as the "SELLER"), represented by the Sale Contracting Officer, MCCDC, Quantico, Virginia, acting on behalf of the United States, sole owner of (2) Engines, Continental, Model 0470-4, Serial #51063-5-M and #116216R; for and in consideration of (1) Aircraft, C-118-B, BuNo 128427, configured for a former Commandant in Marine Corps colors and markings, in Museum display condition, and other good and valuable consideration to it in hand paid by The Lan-Dale Company, (Mr. A.J. D'Alessandris), 1460 Terminal Way, Reno, Nevada 89502 (hereinafter referred to as the "BUYER") receipt of which is hereby acknowledged has bargained and sold Engines, and by those present does hereby confirm transfer of all right, title, and interest to said "BUYER".

TO HAVE AND TO HOLD, the Engines unto the BUYER, The Lan-Dale Company, BUYER(s) heirs, administrators, executors, successors and assigns forever.

IN TESTIMONY WHEREOF, the said SELLER has caused this instrument to be executed at the Marine Corps Combat Development Command, Quantico, Virginia, the ________ day of ____________________ in the year of our Lord, one thousand nine hundred and ninety-two, A.D. (1992).

UNITED STATES OF AMERICA
By:

WANDA D. LABELLE
Contracting Officer
United States Marine Corps

STATE OF VIRGINIA
COUNTY OF PRINCE WILLIAM

BE IT KNOWN, that on this ________ day of ____________________, 1992, personally appeared before me, Wanda D. Labelle, and acknowledged the within instrument to be her free act and deed. IN TESTIMONY WHEREOF, I have hereunto set my hand and seal this ________ day of ____________, 1992 A.D.

Notary____________________________

____________________________

MY COMMISSION EXPIRES

M00264-92-C-0010
ATTACHMENT "D"

BILL OF SALE- PROPELLERS, MCCAULEY

KNOW YE, that the United States of America (hereinafter referred to as the "SELLER"), represented by the Sale Contracting Officer, MCCDC, Quantico, Virginia, acting on behalf of the United States, sole owner of (2) Propellers, McCauley, Model 2AF34C55-0, Serial #851543 and #851540; for and in consideration of (1) Aircraft, C-118-B, BuNo 128427, configured for a former Commandant in Marine Corps colors and markings, in Museum display condition, and other good and valuable consideration to it in hand paid by The Lan-Dale Company, (Mr. A.J. D'Alessandris), 1460 Terminal Way, Reno, Nevada 89502 (hereinafter referred to as the "BUYER") receipt of which is hereby acknowledged has bargained and sold Propellers, and by those present does hereby confirm transfer of all right, title, and interest to said "BUYER".

TO HAVE AND TO HOLD, the Propellers unto the BUYER, The Lan-Dale Company, BUYER(s) heirs, administrators, executors, successors and assigns forever.

IN TESTIMONY WHEREOF, the said SELLER has caused this instrument to be executed at the Marine Corps Combat Development Command, Quantico, Virginia, the _______ day of _________________ in the year of our Lord, one thousand nine hundred and ninety-two, A.D. (1992).

UNITED STATES OF AMERICA
By:

WANDA D. LABELLE
Contracting Officer
United States Marine Corps

STATE OF VIRGINIA
COUNTY OF PRINCE WILLIAM

BE IT KNOWN, that on this ________ day of _________________, 1992, personally appeared before me, Wanda D. Labelle, and acknowledged the within instrument to be her free act and deed. IN TESTIMONY WHEREOF, I have hereunto set my hand and seal this _______ day of ___________, 1992 A.D.

Notary_________________________

_________________________
MY COMMISSION EXPIRES

M00264-92-C-0010
ATTACHMENT "E"

BILL OF SALE- AIRCRAFT, BT-13A

KNOW YE, that the United States of America (hereinafter referred to as the "SELLER"), represented by the Sale Contracting Officer, MCCDC, Quantico, Virginia, acting on behalf of the United States, sole owner of Aircraft, BT-13A, BuNo 41-10886; for and in consideration of (1) Aircraft, C-118-B, BuNo 128427, configured for a former Commandant in Marine Corps colors and markings, in Museum display condition, and other good and valuable consideration to it in hand paid by The Lan-Dale Company, (Mr. A.J. D'Alessandris), 1460 Terminal Way, Reno, Nevada 89502 (hereinafter referred to as the "BUYER") receipt of which is hereby acknowledged has bargained and sold Aircraft, and by those present does hereby confirm transfer of all right, title, and interest to said "BUYER".

TO HAVE AND TO HOLD, the Aircraft unto the BUYER, The Lan-Dale Company, BUYER(s) heirs, administrators, executors, successors and assigns forever.

IN TESTIMONY WHEREOF, the said SELLER has caused this instrument to be executed at the Marine Corps Combat Development Command, Quantico, Virginia, the ________ day of ________________________ in the year of our Lord, one thousand nine hundred and ninety-two, A.D. (1992).

UNITED STATES OF AMERICA
By:

WANDA D. LABELLE
Contracting Officer
United States Marine Corps

STATE OF VIRGINIA
COUNTY OF PRINCE WILLIAM

BE IT KNOWN, that on this ________ day of ______________________, 1992, personally appeared before me, Wanda D. Labelle, and acknowledged the within instrument to be her free act and deed. IN TESTIMONY WHEREOF, I have hereunto set my hand and seal this ________ day of ______________, 1992 A.D.

Notary______________________________

______________________________

MY COMMISSION EXPIRES

M00264-92-C-0010
ATTACHMENT "F"

BILL OF SALE- JEEP, CJ-5

KNOW YE, that the United States of America (hereinafter referred to as the "SELLER"), represented by the Sale Contracting Officer, MCCDC, Quantico, Virginia, acting on behalf of the United States, sole owner of Jeep, CJ-5, 1975, Model 8300, Serial #063605; for and in consideration of (1) Aircraft, C-118-B, BuNo 128427, configured for a former Commandant in Marine Corps colors and markings, in Museum display condition, and other good and valuable consideration to it in hand paid by The Lan-Dale Company, (Mr. A.J. D'Alessandris), 1460 Terminal Way, Reno, Nevada 89502 (hereinafter referred to as the "BUYER") receipt of which is hereby acknowledged has bargained and sold Jeep, and by those present does hereby confirm transfer of all right, title, and interest to said "BUYER".

TO HAVE AND TO HOLD, the Jeep unto the BUYER, The Lan-Dale Company, BUYER(s) heirs, administrators, executors, successors and assigns forever.

IN TESTIMONY WHEREOF, the said SELLER has caused this instrument to be executed at the Marine Corps Combat Development Command, Quantico, Virginia, the ________ day of ____________________ in the year of our Lord, one thousand nine hundred and ninety-two, A.D. (1992).

UNITED STATES OF AMERICA
By:

WANDA D. LABELLE
Contracting Officer
United States Marine Corps

STATE OF VIRGINIA
COUNTY OF PRINCE WILLIAM

BE IT KNOWN, that on this ________ day of ____________________, 1992, personally appeared before me, Wanda D. Labelle, and acknowledged the within instrument to be her free act and deed. IN TESTIMONY WHEREOF, I have hereunto set my hand and seal this ________ day of ____________, 1992 A.D.

Notary______________________________

______________________________

MY COMMISSION EXPIRES

BILL OF SALE- JEEP, CJ-5

KNOW YE, that the United States of America (hereinafter referred to as the "SELLER"), represented by the Sale Contracting Officer, MCCDC, Quantico, Virginia, acting on behalf of the United States, sole owner of Jeep, CJ-5, 1975, Model 8300, Serial #063606; for and in consideration of (1) Aircraft, C-118-B, BuNo 128427, configured for a former Commandant in Marine Corps colors and markings, in Museum display condition, and other good and valuable consideration to it in hand paid by The Lan-Dale Company, (Mr. A.J. D'Alessandris), 1460 Terminal Way, Reno, Nevada 89502 (hereinafter referred to as the "BUYER") receipt of which is hereby acknowledged has bargained and sold Jeep, and by those present does hereby confirm transfer of all right, title, and interest to said "BUYER".

TO HAVE AND TO HOLD, the Jeep unto the BUYER, The Lan-Dale Company, BUYER(s) heirs, administrators, executors, successors and assigns forever.

IN TESTIMONY WHEREOF, the said SELLER has caused this instrument to be executed at the Marine Corps Combat Development Command, Quantico, Virginia, the ________ day of ______________________ in the year of our Lord, one thousand nine hundred and ninety-two, A.D. (1992).

UNITED STATES OF AMERICA
By:

WANDA D. LABELLE
Contracting Officer
United States Marine Corps

STATE OF VIRGINIA
COUNTY OF PRINCE WILLIAM

BE IT KNOWN, that on this ________ day of ____________________, 1992, personally appeared before me, Wanda D. Labelle, and acknowledged the within instrument to be her free act and deed. IN TESTIMONY WHEREOF, I have hereunto set my hand and seal this ________ day of ______________, 1992 A.D.

Notary____________________________

____________________________

MY COMMISSION EXPIRES

# EXHIBIT I




"I have a very se... mental attachment to this aircraft," said Maj. Gen. Richard D. Hearney, commanding general of the 2d Marine Air Wing.

Hearney flew the "Gooney-Bird" in Vietnam where he was part of the last command to own the aircraft in Iwakuni, Japan in 1983.

"It's a fantastic aircraft. I was just up at Quantico and I watched them prepare it for its flight here."

Hearney was joined for the plane's arrival by Brig. Gen. David A. Richwine, commanding general of Cherry Point.

27 FEB 92

C-117D BuNo 50834

Mission accomplished-------

On the ramp---MCAS CHERRY POINT

OFFICIAL U.S.M.C. PHOTOGRAPH



C-117D BuNo 50834
C-130 Escort enroute to
MCAS Cherry Point, NC.

OFFICIAL U.S.M.C. PHOTOGRAPH





Top inset: "It flew beautifully." Bottom inset: Maj Jerry Banner, C-117 pilot, briefed Maj William A. Franchi and Capt Christopher P. Balesteri who followed i[illegible] KC-130.






27 FEB 92
C-117D BuNo 50834 MCAS
Quantico, VA. pre-flight
to MCAS Cherry Point, NC.

OFFICIAL USMC----PHOTOGRAPH

# EXHIBIT J

*The Lan-Dale Co.*

1460 TERMINAL WAY
RENO, NEVADA 89502
AREA CODE 702/786-1460

ARIZONA OFFICE:
2000 E. AIRPORT DRIVE
TUCSON, ARIZONA 85706
(602) 748-1130

PLEASE REPLY TO: TUCSON

May 26, 1992

LtCol Carmen Dragotta
Officer-in-Charge
Marine Corps Air-Ground Museum
Quantico, VA 22134-5001

Dear LtCol Dragotta:

The enclosed documentation and pictures are for your files with regard to the VC-118B exchange. The motivating factor that prompted the exchange at the time was the MCAM's desire to have the C-117D, Bureau #50834 located at MCAS, Quantico,VA relocated to MCAS Cherry Point, NC.

This exchange was mutually agreed upon both in concept and monetary values by LtCol Beebe and myself.

Enclosed are the following:

1) My two page exchange proposal dated June 21, 1991 (marked Exhibit "A") and LtCol Bebee's acceptance dated June 28, 1991 (marked Exhibit "B"). The value of the VC-118B, Bureau #128427, based on current market values, was established at $500,000 and the values of the items to be received by the Lan-Dale Co. were established by the MCM.

2) Recent or current values of cargo C-118's (marked Exhibit "C") high time engines and air frames valued at $415,00 +. These are well used straight cargo air craft.

Also enclosed are pictures of the VC-118B taken the day prior to its delivery to MCAS Cherry Point, NC; the C-117D, Bureau #50834 was successfully flown to MCAS, Cherry Point, NC and is in a loan status pending a mutually agreed upon exchange. Its exchange value is as previously agreed $430,000.

This is the total and complete file and all of the information I have regarding this exchange.

Very truly yours,

A. J. D'Alessandris

AJD/b
Copies to: LtCol Rudy Schwanda
LtCol W. Beebe
Mr. Joseph Payton

# EXHIBIT L

[redacted]

8 September 1994

[redacted])

Director of Marine Corps History and Museums
Marine Corps Historical Center
Navy Yard, Washington, D.C. 20374

Dear SIMMONS,

This letter is written with some reluctance due to its sensitivity, its impugning of two Marine officers, and its potential for embarrassment to the Marine Corps. Moreover, I have no wish to "rule from the grave" nor even to give the appearance of trying to influence museum matters. However, as I was to some degree a party to the matters at issue, I think it appropriate to voice my recollections and opinions as well as to report on information received from Schwanda

While visiting BONNWITZ a couple of months ago he mentioned a contractual problem he was having with a vendor of old aircraft, a Mr. D'Alessandris. As my recollection of dealings with D'Alessandris was positive, usually in our favor, and in which he always exhibited probity, integrity, forthrightness, and generousity, I resolved to follow up on the matter. These qualities are rare in a business whose practices would make the most rapacious used car dealer blush.

At the time I made no comment to BONNWITZ other than to express disappointment. More recently I was at Cherry Point having been invited to address the MCAA chapter after its dinner. This visit then included a discussion with Schwanda about the D'Alessandris issue. The following recounting of events resulted from this discussion and further refreshing his recollections by reference to

I can reacall at least seven trades with Mr. D'Alessandris, all of which resulted in first class additions to our collection. Coming to mind are the C-117D at El Toro, the N2S-3 in the Early Years hangar, a GH-2 Howard and Timm trainer on loan to the Kalamazoo Yankee Air Force Museum, the Plymouth staff car in the World War II hangar, the VC-118B at Cherry Point and a second C-117D that was initially delivered to Quantico and then later transferred to Cherry Point. All the aircraft were in outstanding shape and, except for the GH-2, were flight delivered. In each case the artifact was complete, everything worked, and it was in museum display condition.

1 — Encl (10) 11 pages

Encl (10)

On a number of occasions Mr. D'Alessandris (retired, wealthy, and a highly qualifed pilot who routinely owns 10-12 flying aircraft) has used his considerable resources to get things done for the museum that we could not do for ourselves. In the case of our first C-117D, one of the last two in the Marine Corps, LTCOL BROWN ~ an acquired it after it was stricken from the operational inventory in the Philippines an got it back via aircraft carrier as far as NAS North Island. [redacted] initially hoped to get it back to Quantico by the carrier but none were scheduled to transit from West to East Coast in the near future. Moreover, we couldn't afford to put it back into flying condition and, in any event, were barred from flying it without CMC approval. It was too large to move via any combination of ship, train, or truck. As a result, it remained on the ramp at North Island, disassembled and stranded, when [redacted] retired. The North Island USN Captain CO considered the C-117D an eyesore and gave six months to remove it or he would take care of he problem for us by either scrapping it or using it as a Crash, Fire & Rescue training aid.

To resolve this situation, Schwenk entered into an exchange agreement in which D'Alessandris became temporary owner of the C-117D, assembled it, made it flight worthy, flew it to his facility in Tucson for museum quality restoration. He then flight delivered it to MCAS El Toro in a loan status and finally traded it back to the Marine Corps about two years later when trade stock became available.

Mr. D'Alessandris performed the needed services upfront and trusted the Marine Corps to honor its end on the agreement; i.e. giving him the right of first refusal o trade stock as it became avaialable and trade the C117D back to the Marine Corps ownership at the market value established during the initial exchange related to his flight and restoration expenses. After over two years this complex deal was completed, a historic aircraft was saved, and a long-term relationship for the benefit of the museum had been established.

To further establish D'Alessandris' bono fides I cite the story of our Stearman N2S-3 trainer. The aircraft we have is the second of its type delivered by D'Alessandris. The first was perfectly restored but in the process of cataloging it and writing a caption we discoveraed that it really had been an Army Air Corps PT-17. The contract, already completed, called for an N2S-3 and [redacted] brought this discrepancy to D'Alessandris' attention. As I recall, D'Alessandris was genuinely surprised and embarrassed by this revelation and, without quibbling, excuse making, or any attempt at renogotiation, replaced it within a couple of months with a real N2S-3. He took appropariate action without hesitation to honor his agreement to the letter.

In another instance, D'Alessandris traded the Plymouth staff

car to us for three used aircraft engines of estimated comparable value. About a year after the Plymouth had been delivered Schwanda asked him what he had done with the engines. His reply, extracted with reluctance, was that in spite of a log book to the contrary, the best engine had been damaged beyond repair and could only be sold for its core or scrap value. He had no recourse since all exchanges with the Government are without warranty and "as is -- where is." He took this reverse in silence like an honorable man and we would not have known about it if Schwanda had not asked. D'Alessandris is not a whiner.

Several weeks ago, Schwanda called me from Cherry Point and invited me to be guest speaker at the local MCAA Squadron dinner. [redacted] is the Squadron's treasurer. I agreed and while I had him on the line asked what he knew about the situation between D'Alessandris and the museum. We discussed the matter further and in greater detail while I was at Cherry Point. The following story emerged and Schwanda indicated that (Lt.Col. Beebe) agreed completely.

The second of the last two C-117Ds was acquired in an exchange with D'Alessandris during Schwanda tour at the museum. It was flight delivered to the Air-Ground Museum and placed on loan to MCAF Quantico as a gate guard. During Beebe II tour, MCAF lost interest in caring for the C-117D and told the museum to take it back because it had no longer had the resources or desire to continue the loan agreement.

The museum had no place to put the aircraft and would have had to disassemble it even to get it up the hill to Larson Gym restoration facility or to the exhibit hangars. By that time, Schwanda was at Cherry Point in retirement as the civilian command historian and curator and liaison to the Cunningham air museum foundation. Upon learning that the C-117D might be available, he called Beebe and told him that Cherry Point would like to have it. Beebe's first reaction was to try for permission to flight ferry it to Cherry Point but I dissuaded from that solution due to the basic policy against flying museum aircraft and the dificulty of getting a waiver.

Bill. and Rusty were at a loss for a solution until D'Alessandris offered, for a fee of $1.00, to perform the services of putting the aircraft back into flying condition, fueling it, registering it with the FAA, insuring it, and finally flying it to Cherry Point with the assistance of MAJ. Banner - [redacted], who was qualified in that aircraft. At the time Banner was the ExecO of MCAS Quantico and volunteered to serve as co-pilot and on-site coordinator of repairs. This evolution would have cost D'Alesandris about $25,000 with the only compensation to him being the opportunity to fly the C-117D one last time and make another significant contribution to the museum program. After checking with legal counsel, Beebe reluctantly had to decline

~~C-117D one last time and make another significant contribution to the program. After checking with legal counsel,~~ Beebe [redacted] ~~reluctantly had to decline~~ this generous offer because the Marine Corps as owner could still be held liable for any damages caused as a result of such a flight.

Next, Schwankl [redacted] suggested to Beebe [redacted] that maybe the transfer could be accomplished by entering into an agreement with Mr. D'Alessandris similar to the previous one that he had used to rescue the first C-117D from destruction at NAS North Island. Beebe [redacted] agreed and contacted Mr. D'Alessandris to see if he was interested. He was interested in helping, as he had done before, and an exchange agreement was reached. The particulars were as follows. The Marine Corps would get the C-117D <u>TEMPORARILY</u> back into Mr. D'Alessandris' hands by trading it for his VC-118B Cargomaster. This VC-118B (all leather, stainless steel and mahogany on the inside) valued at $500,000 had been the VIP bird of several Commandants during the 1970's and, as such, a highly desirable permanent addition to our aviation collection. A number of lesser valued aircraft and vehicles were thrown into the pot to balance the scales on the side of the lower valued C-117D. At this time, Museum trade stock was depleted, but Mr. D'Alessandris generously accepted the only combination of dregs Beebe [redacted] could put together just so we could get on with the project. This concession was recognized by all directly involved and the expectation was to try to make it up to him in a subsequent trade.

Further, it was understood by all involved that this was a two exchange agreement, and once the C-117D was delivered to Cherry Point, both parties would, as soon as possible, re-enter into good faith negotiations to return it to Marine Corps ownership. The only delay would be the wait until the Museum acquired new trade stock. The intention was to have one C-117D on

the West Coast at El Toro and the second one on the East Coast at Cherry Point. It was clearly understood that a value of $430,000, established by the Museum for the C-117D in the first exchange, would serve as the basis of value for the linked second exchange. Beebe [redacted] indicates he would have accepted the proposal even if the C-117D had been valued at $500,000 vice $430,000. In short, Beebe [redacted] still believes we got a great deal. Also, there was a gentlemens agreement that Mr. D'Alessandris would get get first crack at any available trade stock, as well as any trade stock that might later come into Museum possession, before exchange offers from other parties for these aircraft would be considered. Mr. D'Alessandris indicated repeatedly that he would consider any aircraft or helicopter or combination of the two in order to accomplish the second exchange and complete the entire deal.

It is a matter of record that Mr. D'Alessandris flight delivered the VC-118B to MCAS Cherry Point to obtain temporary ownership of the C-117D, and then, as agreed, later flight delivered the C-117D to Cherry Point from Quantico. Both aircraft were complete, looked great and according to MAT [redacted] BANNER [redacted] were in flawless operating condition. The VC-118B was delivered in October 1991 and the C-117D in February 1992.

Since then, over two years have passed and the promised second exchange to return the C-117D to Marine Corps ownership has not taken place. The crux of the matter is that the two OIC's that followed Beebe [redacted] have not been willing to honor commitments to Mr. D'Alessandris made during Beebe [redacted] tenure. Mr. D'Alessandris takes the position that he made a very specific agreement with the Marine Corps, at the Marine Corps' request, and while OIC's representing the institution come and go, the institution is obligated to honor its commitments. If you recall, Beebe [illegible] left the Museum much

earlier than he or any of us expected due to USMC personnel drawdown. This didn't allow him time to accomplish the second exchange and complicated the situation. However, I have been assured that both Beebe [redacted] and Schwanda [redacted] on several occasions have each briefed both DRAGOTTA [redacted] and PONNOWITZ [redacted] regarding Mr. D'Alessandris' long-term relationship with the Museum and the requirement to honor previously made Marine Corps commitments to him.

After much patience and reflection, Mr. D'Alessandris is now convinced that DraGotta [redacted] treated him quite shabbily and, in fact, was guilty of a number of rather serious infractions - deception, lying, breach of contract, fraud, abuse of power and conflict of interests. Specifically, he asserts that DRAGOTTA [redacted] never once responded in writing to a number of letters attempting to address and resolve this matter. He also discovered that DraGotta [redacted] resubmitted the request for approval to conduct the C-117D/VC-118B exchange, originally submitted by Beebe [redacted], but with much lower assigned values ($240,000 vice $430,000 value for the C-117D) without requesting or receiving approval from Mr. D'Alessandris. Since then, Ponnowitz [redacted] has only been willing to discuss the second trade based on the C-117D valued at $240,000.

Mr. D'Alessandris did not receive right of first refusal as new trade stock was acquired by the Museum during DraGotta [redacted] tenure. When four HH-1K helos were obtained, the most desirable one (lowest engine and rotor blade hours) was committed to Keystone Helicopter Corporation located in Eastern Pennsylvania. Simultaneously, Mr. D'Alessandris indicates he was told that the helicopter was still available, but nothing could be done at the time because the entire exchange program was under review and no exchanges were being processed. Mr. D'Alessandris believes this attempted exchange with Keystone was entered into with the intention of creating a

favorable atmosphere for Dragotta [redacted] to be hired by them or an associated company as a pilot. The deception of having Payton [redacted] negotiate an exchange involving the best HH-1K with Keystone so that DraGotta [redacted]a could avoid the perception of conflict of interest was readily transparent. The fact is that he was aware that the helicopter should have been offered to Mr. D'Alessandris first. During the same timeframe, Dragotta [redacted] was working on securing a flying position with Keystone first, but basically with anybody that would allow him to stay in the vicinity of his family who had already relocated to Easton, Pennsylvania in anticipation of his approaching retirement. Keystone, besides providing helicopter emergency medical evacuation service, also runs a large helicopter maintenance operation, and, as such, was in a position to either hire DraGotta [redacted] or assist him in finding a position with another company they do business with or who provide similar flight services in adjacent areas. I understand that Dragotta [redacted] was hired as a helo pilot for a company operating in the vicinity of Pittsburgh, Pennsylvania.

Soon after Dragotta [redacted] rather abruptly retired, Mr. D'Alessandris asked for a meeting with the new OIC, Ponnwitz [redacted], at Quantico to get off on the right foot and discuss, face to face, this situation that had already dragged on far too long. Schwanka [redacted] attended this meeting at the request of Mr. D'Alessandris. During the meeting, Mr. D'Alessandris presented his position and concerns while Schwanka [redacted], speaking for himself as well as for Beebe [redacted] who could not attend, briefed the special relationship that had existed between the Museum and Mr. D'Alessandris because of his track record of quality and contribution to the program. During discussions, the change in C-117D value from $430,000 to $240,000 became known to Mr. D'Alessandris for the first time. He was shocked and asked for

a copy of the letter which at the time [redacted] declined to give him. Quite a while later, a copy was finally provided to Mr. D'Alessandris, but only after no progress was being made in the matter and a CONGRINT or litigation became more likely.

Mr. D'Alessandris also indicated to [redacted] that part of the problem of settling this matter was that he couldn't get [redacted] to address the issue and respond to official correspondence. [redacted] assured him that this would not be a problem in dealing with him, he would respond to everything in writing, and that Mr. D'Alessandris would be hearing from him shortly after he had an opportunity to review the matter. However, months passed with letters and proposals left unanswered. In fact, [redacted] contacted Mr. D'Alessandris only after [redacted] called and politely prodded him with what he believed to be the no bluff alternative of either communicating with the man or get ready to respond to a CONGRINT and a lawsuit. [redacted] choice was to call Mr. D'Alessandris and leave a message on his recorder. While he was not particularly happy with the informality of telephone negotiations, Mr. D'Alessandris was reluctant to make it an issue because at least he was finally communicating. However, for record purposes, Mr. D'Alessandris recorded all subsequent telephone discussions and negotiations regarding the C-117D exchange with [redacted] and [redacted]. Simply stated, Mr. D'Alessandris does not trust [redacted] as a man of his word.

When [redacted] eventually was confronted by Mr. D'Alessandris with quotes from previous telephone conversations, his response was to attempt to chastise and proclaim that all future communication would be in writing. Mr. D'Alessandris' feeling was - about time! However, the forthcoming correspondence reflected administrative sloppiness bordering on

incompetence (he probably still doesn't realize he's identifying HH-1K's with T-34B Bureau Numbers).

Mr. D'Alessandris also believes [redacted] does not possess sufficient knowledge of the civil aviation market to seriously negotiate an exchange and is either not getting good advice or is too arrogant to ask for help and learn. Mr. D'Alessandris cites [redacted] letter indicating three specific T-34B's at Davis-Monthan AFB to be worth in the neighborhood of $150,000, "as is - where is" and without warranty. Mr. D'Alessandris responded with photographs showing that the aircraft were not complete and that someone hadn't done their homework.

In response, [redacted] chose to focus primarily on the issue of how he got the photograph without the Museum scheduling an official visit to see the aircraft. Mr. D'Alessandris, who maintains an office in Tucson, Arizona, just outside the "bone-yard" gate, keeps detailed records on stricken aircraft in storage there. For your information, I am told that T-34B's out of the bone-yard, depending on their completeness and the content of their logbooks, generally go for anywhere from $30,000 to $65,000 with $50,000 being a good rule-of-thumb average.

About six months ago, Mr. D'Alessandris discovered another instance where the Museum had denied him right of first refusal and even the courtesy of being told that new trade stock was being acquired. Of three T-34B's previously used by Navy recruiting officers, one went to MCAS Cherry Point and two were placed in museums in Indianapolis and Kalamazoo. Since then, Mr. D'Alessandris has been told that these two T-34B's are not available for trade consideration because they are now on loan to these museums. He was told this was necessary because the Museum did not have storage space and these institutions agreed to pay the transportation costs (minimal) to

flight deliver the aircraft to them. Mr. D'Alessandris' position is he has made known to the Museum his long-term interest in acquiring a number of T-34's ~~[illegible] work with his son)~~, just as it is also well known that he would have enthusiastically provided transportation monies and temporary hangar storage space, with no strings attached, while the specifics of an exchange were being worked out. According to Mr. D'Alessandris, he confronted Ponnwitz [redacted] regarding this matter and indicates that in two separate telephone conversations (both taped), [redacted] Ponnwitz [redacted] agreed to make these particular T-34B's available. At a later date he vehemently denied this verbal commitment in writing.

Schwanda [redacted] offers that while Mr. D'Alessandris has taken all that he is going to, he is still willing to negotiate and settle this matter in-house and keep the Congressmen and lawyers out of it. However, his stipulations are that the basis of exchange must be that his C-117D is worth $430,000 and that someone else other than Ponnwitz [redacted] will negotiate the exchange. In short, Mr. D'Alessandris views Ponnwitz [redacted] as a person without integrity or honor, doesn't trust him and doesn't want to deal with him again.

To facilitate settlement, Mr. D'Alessandris has proposed an exchange with you involving HH-1K's and T-34B's for his C-117D and provides supporting rationale. Further, if an exchange agreement cannot be quickly reached, Mr. D'Alessandris would not be opposed to the appointment of a mutually agreeable arbitrator and the use of professional appraisals to determine the current fair market values of Museum trade stock.

According to Schwanda [redacted] the information contained in this letter, while not known firsthand in its entirety by any one individual, is a collection of facts and documented episodes that he, Bade [redacted] and [redacted] Bauner

[redacted] have experienced, as well as a number of unflattering, but hard to refute, perceptions that Mr. D'Alessandris has slowly formed. Uncomfortable as it might be for them, if it came to it, the statements and testimony of these three former Marine officers would strongly and unequivocally support Mr. D'Alessandris' position. Schwanda [redacted]y says that while Ponnowitz [redacted] has mentioned that Quantico Legal has been consulted (implying support of his position and actions), neither he or Beebe [redacted] have been contacted (even though both of them have been identified as receiving copies of recent official correspondence from Mr. D'Alessandris).

Schwanda [redacted] indicates that Mr. D'Alessandris, as well as he and Beebe [redacted], are prepared to talk or meet with you or an appointed arbitrator or investigator to quickly resolve this matter. Mr. D'Alessandris also asks that you instruct Ponnowitz [redacted] to not commit any of the HH-1K's and T-34B's (identified in his exchange proposal to you) to another party until you have had a chance to review the entire matter and make a decision. Otherwise, even a favorable decision might be further complicated. [redacted] Ponnowitz [redacted] letter of 11 July 1994 states that previous offers he has made to Mr. D'Alessandris will only be extended until 15 August 1994.

Being already familiar with the exchange process, albeit from a managerial perspective, I would be willing to serve in any capacity you might desire to quickly and fairly settle this matter before it reaches critical mass.

Very Respectfully,

[redacted]

Col, Nihart

# EXHIBIT M

HEADQUARTERS UNITED STATES MARINE CORPS
MUSEUMS BRANCH
MARINE CORPS HISTORY AND MUSEUMS DIVISION
2014 ANDERSON AVENUE
QUANTICO, VIRGINIA 22134-5002

In Reply Refer To:
HDM/AJP
20 Sep 1994
[redacted]

MEMORANDUM FOR THE RECORD

Subj: ISSUES FOR INVESTIGATION BY THE INSPECTOR GENERAL

1. Due to recently disclosed actions, I am concerned that an employee of the U.S. Government, Rudy T. Schwanda, Command Historian, MCAS Cherry Point, North Carolina may have acted in a manner inappropriate for an employee in his position.

2. Mr. Schwanda is a retired Marine Lieutenant Colonel currently employed by MCAS Cherry Point as the Command Historian and Liaison to the A.A. Cunningham Aviation Museum Foundation. While on active duty he served as the Officer-in-Charge of the Marine Corps Air-Ground Museum at MCB Quantico.

3. In the course of a U.S.C. Title 10 exchange transaction between the Marine Corps Air-Ground Museum (MCAGM) and The Lan-Dale Co., I believe Mr. Schwanda established a personal relationship with the President of that company, Mr. A. J. D'Alessandris. That personal relationship has interfered with this matter. It is possible that LtCol Schwanda, USMC (Ret) has:

1) acted as representative or agent for The Lan-Dale Co.,

2) given Mr. D'Alessandris information relating to museum aircraft and their disposition,

3) has advised Mr. D'Alessandris on his opinion relating to discussions between the MCAGM and Lan-Dale in which he has no authority to interfere,

4) traveled with Mr. D'Alessandris,

5) received copies of government documents from Mr. D'Alessandris for his personal comment, guidance, and review,

6) attempted to negotiate on behalf of The Lan-Dale Co. in order to ensure a significant margin of profit for that company,

7) arranged storage and ramp space at MCAS Cherry Point, at government expense, for a C-117D, BuNo 50834 aircraft, which is owned by The Lan-Dale Co.,

8) conspired with Col B. Nihart, USMC (Ret) to create a favorable circumstance in which Mr. D'Alessandris could introduce an exchange proposal to the Marine Corps which, if approved, would result in significant profit (about $500,000) for The Lan-Dale Co. which would violate existing regulations,

00079

(EXHIBIT F-2)

9) drafted and faxed a letter to Col Nihart, USMC (Ret)(which Col Nihart partially retyped and presented to BGen Simmons USMC (Ret), the Director of the History and Museums Division, HQMC) which was used in an unsuccessful effort to gain approval for an exchange proposal from which was received on 15 Sept 1994.

4. All documents relating to the exchange of the C-117D, BuNo 50834 are on file at the Marine Corps Air-Museum, Building 2014, MCB Quantico, Va. and have been reviewed by the Counsel to the Commanding General, Marine Corps Combat Development Command, Quantico, Va. This entire matter was reviewed by Counsel during the entire period of discussions with Mr. D'Alessandris. It is with Counsel's concurrence that I bring this matter before the Inspector General.

A. J. PONNWITZ
Colonel, U.S. Marine Corps
Head, Museums Branch

00020

# EXHIBIT N

UNITED STATES MARINE CORPS
MARINE CORPS AIR BASES, EASTERN ARE
CHERRY POINT, NORTH CAROLINA 28533-5000

IN REPLY REFER TO:

INS
10 Jul 95

From: Chief of Staff, Marine Corps Air Bases, Eastern Area, Cherry Point
To: Lieutenant Colonel John W. Ferrari [redacted] USMC

Subj: PRELIMINARY INQUIRY INTO ALLEGATIONS OF MISCONDUCT AND CONSPIRACY WHILE CONDUCTING U.S.C. TITLE 10 AIRCRAFT EXCHANGES FOR THE MARINE CORPS MUSEUM

1. You are directed to conduct a preliminary inquiry to inquire into the circumstances surrounding the subject allegations.

2. You shall investigate all facts and circumstances surrounding the allegations and report findings of facts, opinions, and recommendations upon completion of the inquiry.

3. The Staff Judge Advocate, Marine Corps Air Station, Cherry Point will be available to provide technical and legal advice throughout the course of the inquiry. The Station Inspector's Office, Marine Corps Air Station, Cherry Point will provide necessary clerical assistance for recording the proceedings and preparing the record.

W. W. SCHEFFLER

Copy to:
SJA, MCAS
Inspector, MCAS

ENC. (1)

From: Lieutenant Colonel J.W. Ferrari
To: Chief of Staff Marine Corps Air Bases Eastern Area, Cherry Point
Via: Staff Judge Advocate Marine Corps Air Station, Cherry Point

Subj: PRELIMINARY INQUIRY INTO ALLEGATIONS OF MISCONDUCT AND CONSPIRACY WHILE CONDUCTING U.S.C. TITLE 10 AIRCRAFT EXCHANGES FOR THE MARINE CORPS MUSEUM

Ref: (a) Yr ltr 5800 ovr INS dtd 10 Jul 95
(b) CMC ltr 5370 ovr IGA dtd 13 June 95
(c) Phonecon w/Major Sabal, CMC, of 17 June 95

1. Reference (a) indicates that the subject inquiry should investigate all the facts and circumstances surrounding the allegations. The issues outlined reference (b) regard allegedly inappropriate actions taken by an officer (since retired) while on active duty as a member of the HQMC Museums Branch and stationed at MCB Quantico. Reference (c) indicates that the reason the investigation was assigned to MCABE was that MCAS Cherry Point was the primary beneficiary of his actions. Accordingly, the extent of the investigation may demand a considerable period of time before resolution can be reached, and involve 1 or more funded trips to review pertinent documents and interview those who could have information bearing on the subject.

2. Given the complexity of the issues and the fact that these actions took place while the subject officer was on active duty, working for the HQMC Museums Division and based at MCB Quantico, it would appear that the investigation should properly fall under the cognizance of HQMC vice MCABE. The reasoning cited by reference (c) is not relevant. JAGINST 5800.7C para 0206 supports this.

3. Recommend the investigation be returned to the Inspector General without action as a matter that falls under the purview of HQMC vice MCABE. If this is not possible, request clarification on the intended scope of the inquiry.

Very Respectfully

UNITED STATES MARINE CORPS
MARINE CORPS AIR STATION
PSC BOX 8003
CHERRY POINT, NORTH CAROLINA 28533-0003

IN REPLY REFER TO:
7510
INS
3 Aug 95

From: Chief of Staff, Marine Corps Air Bases, Eastern Area, Cherry Point
To: Lieutenant Colonel John W. Ferrari [redacted] USMC

Subj: PRELIMINARY INQUIRY INTO ALLEGATIONS OF MISCONDUCT AND CONSPIRACY WHILE CONDUCTING U.S.C. TITLE 10 AIRCRAFT EXCHANGES FOR THE MARINE CORPS MUSEUM

Ref: (a) Yr ltr 5800 FSC of 19 Jul 95

1. In response to the reference, I do not concur with your recommendation to return this investigation over to the HQMC Inspector General without action.

2. There are many issues concerning Lieutenant Colonel Schwanda, USMC (retired) which can and should be addressed by this Command. It is the Investigating Officer's responsibility to investigate and resolve all possible issues. Those issues that you believe can not be answered through Lieutenant Colonel Schwanda's testimony and records he has on file should be addressed separately. We will take further action as deemed appropriate at that time.

3. If you believe that funded temporary additional duty trips are required, contact me and we will discuss the matter. For now, proceed with your inquiry and keep me informed of your progress.

W. W. SCHEFFLER

ENCL. (2)

# EXHIBIT O

P. 01

MEMORANDUM

8 August 1995

RE: Preliminary Inquiry

Dear Mr. D'Alessandris,

I sincerely enjoyed talking with you the other evening and apologize for not faxing this immediately, too much going on around here.

What you should have is a copy of the forwarding correspondence from the Headquarters U.S. Marine Corps Inspector General's office sending the allegations made by Col. Ponnwitz down to Cherry Point for resolution, and the memorandum which contains Col. Ponnwitz's original allegations...4 pages total including this note.

In all there are 10 points to answer. The first is in the forwarding correspondence where it alleges that LtCol. Schwanda, while on active duty, established a relationship with the Lan Dale Company which ultimately led to the creation of a favorable circumstance for his employment at MCAS Cherry Point. Curiously, you will note that this is not an allegation made by Col. Ponnwitz in his original memorandum. I can only speculate as to why the Inspector General's office is adding this to the claims made by Col. Ponnwitz. It seems rather odd to me. The other 9 allegations are contained in the memorandum from Col. Ponnwitz to the Inspector General.

Some of these claims are poor works of fiction that are readily transparent. Never-the-less, they need to addressed in order to provide the proper response to the Inspector General. Any comment you may have to offer will be more than adequate. If you do not wish to comment or have no knowledge of specific allegations that is certainly acceptable.

Your assistance in bringing this matter to a conclusion is sincerely appreciated, especially since you are under no obligation to provide any help at all. It is hoped that the conclusion of this inquiry will speed favorable resolution of the issue with the Quantico Museum.

I will give a copy of the inquiry to LtCol Schwanda when it is comleted. Since Col. Ponnwitz is not available before the 20th of August to interview, that probably won't happen before the end of this month. I believe this inquiry is the "IG investigation" mentioned by Ms. Clark in her 16 June 95 letter to Mr. Hamilton.

Semper Fidelis,

John W. Ferrari
LtCol. USMC

OPTIONAL FORM 99 (7-90)

FAX TRANSMITTAL # of pages ▸ 4

| | |
|---|---|
| To A.J. D'Alessandris | From LtCol J.W. Ferrari |
| Dept./Agency Lan Dale Company | Phone # 919 466-5901 |
| Fax # | Fax # 919 466-5707 |

# EXHIBIT P

07

LAFONT, TUNNELL, FORMBY, LAFONT & HAMILTON, L.L.P.

ATTORNEYS AND COUNSELORS

P.O. BOX 1510
PLAINVIEW, TEXAS 79073-1510

H.M. LAFONT
GRADDY TUNNELL
MARSHALL FORMBY (1911-1984)
BILL LAFONT*
*BOARD CERTIFIED, CIVIL TRIAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION
TOM HAMILTON

701 BROADWAY
SKAGGS BUILDING
Telephone(806)293-5361
Telecopy(806)293-5366

January 19, 1995

Penny M. Clark
Counsel for the Commanding General
Marine Corp Combat Division Development Command
Quantico, Virginia 22134-5001

Re: Exchange of C-117D BuNo. 50834 for four (4) HH-1Ks and three (3) T-34Bs

Dear Ms. Clark:

I have attempted to contact you by telephone on several occasions in regard to the above referred to exchange contract. It is my understanding that you have been out of the office. We need to take some action in regard to this matter in the near future. Consequently, I am forwarding to you three letters which I have in my file concerning the exchange contract. It is my understanding that the letter dated August 3, 1994 addressed to General Simmons, which outlines the circumstances regarding the exchange contract was prepared by Lieutenant Colonel R. Schwanda for Colonel F. Brooke Nihart. You should have in your file a cover letter from Colonel Nihart which was attached to the letter addressed to General Simmons, dated August 3, 1994.

Also enclosed is a letter from E. H. Simmons, Brigadier General, United States Marine Corps, Retired, to A. J. D'Alessandris, dated September 20, 1994, and a letter to this firm from Major Gerald A. Banner.

The enclosed documents set forth a rather detailed history of the circumstances relating to the exchange agreements entered into between the parties.

I believe it would be helpful to you to talk personally with the individuals with the United States Marine Corps who were directly involved in the transactions which are the subject matter of this dispute. For this reason, I am furnishing to you the name, address and telephone number so that you can contact the individuals personally for the purpose of reviewing the facts and circumstances relating to the exchange contract:

1. Colonel F. Brooke Nihart
   United States Marine Corps, Retired
   6208 Kellogg Drive
   McLean, Virginia 22101
   Telephone Number: (703) 356-6714

2. Lieutenant Colonel William Beebe II
   United States Marine Corps, Retired
   250 Maverick
   Route 3, Box 705
   Ashville, Alabama 35953-9511
   Telephone Number: (205) 594-4419

3. Lieutenant Colonel R. Schwanda
   United States Marine Corps, Retired
   202 Sumpter Court
   Havelock, North Carolina 28532
   Telephone Number - Office: (919) 466-4479
   Home: (919) 444-6220
   Fax: (919) 466-3287

4. Major Gerald A. Banner
   United States Marine Corps, Retired
   Defense Attache Office
   United States Embassy
   Windhoek, Namibia
   Telephone Number: 264-61-221601
   Private Fax: 264-61-426811

Mr. D'Alessandris has in the past enjoyed good and cordial working relationship with the United States Marine Corps Museum. It is certainly not his desire to become entangled in litigation regarding the exchange contracts, however, this issue has to be resolved promptly.

After you have had an opportunity to review the enclosed documents and talk with the above named individuals concerning this matter, I would certainly appreciate it if you would contact me at your earliest convenience.

Sincerely yours,

LaFONT, TUNNELL, FORMBY,
LaFONT & HAMILTON, L.L.P.

By: Tom Hamilton
Tom Hamilton

TH:tjb
Enclosures

xc: A. J. D'Alessandris
*Via Fax 602-889-0226*

xc: Colonel F. Brooke Nihart
United States Marine Corps, Retired
6208 Kellogg Drive
McLean, Virginia 22101

xc: Lieutenant Colonel William Beebe II
United States Marine Corps, Retired
250 Maverick
Route 3, Box 705
Ashville, Alabama 35953-9511

xc: Lieutenant Colonel R. Schwanda
United States Marine Corps, Retired
202 Sumpter Court
Havelock, North Carolina 28532

xc: Major Gerald A. Banner
United States Marine Corps, Retired
Defense Attache Office
United States Embassy
Windhoek, Namibia

92

LAFONT, TUNNELL, FORMBY, LAFONT & HAMILTON, L.L.P.

ATTORNEYS AND COUNSELORS

P.O. BOX 1510
PLAINVIEW, TEXAS 79073-1510

H.M. LAFONT
GRADDY TUNNELL
MARSHALL FORMBY (1911-1984)
BILL LAFONT*
*BOARD CERTIFIED, CIVIL TRIAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION
TOM HAMILTON

701 BROADWAY
SKAGGS BUILDING
Telephone(806)293-5361
Telecopy(806)293-5356

February 7, 1995

"Certified Mail, Return Receipt Requested No. Z 698 619 584"

Penny M. Clark
Counsel for the Commanding General
Marine Corps Combat Development Command
Quantico, Virginia 22134-5001

Re: Exchange of C-117D BuNo. 50834 for four (4) HH-1Ks and three (3) T-34Bs

Dear Ms. Clark:

On January 19, 1995, I wrote a letter to you which contained pertinent documentation regarding exchange of the above referred to aircraft. I have received no response from you. A. J. D'Alessandris is interested in getting the issues relating to the exchange of aircraft resolved at the earliest possible date. It is certainly not his desire to become involved in litigation; however, this issue has been pending for quite sometime and no real progress has been made in solving the problem. Consequently, it is beginning to appear that unless we can get some response from the U.S. Marine Corps Museum concerning the matter, the only option available to Mr. D'Alessandris is litigation.

I have talked at length with Mr. D'Alessandris concerning this matter. He would like to make arrangements to have a meeting with counsel, along with representatives of the U.S. Marine Corps Museum and the various parties who have been involved in this transaction for the purpose of attempting to resolve the problem.

Mr. D'Alessandris has requested that we make arrangements for a meeting in the near future to review all of the aspects of the exchange contract with Colonel F. Brooke Nihart, Lieutenant Colonel William Beebe II, and Lieutenant Colonel R. Schwanda present at the meeting.

We suggest that the meeting take place at the U.S. Marine Corps Museum in Quantico, Virginia, or such other location as might be convenient with all the parties.

COPY

Please contact me concerning this matter at your earliest convenience and let me know what is being done to get this problem resolved.

Sincerely yours,

LaFONT, TUNNELL, FORMBY,
LaFONT & HAMILTON

ORIGINAL SIGNED BY
By: TOM HAMILTON
Tom Hamilton

TH:dey

xc: √Tony D'Alessandris
The Lan-Dale Company
2000 East Airport Drive
Tucson, Arizona 85706

xc: Colonel F. Brooke Nihart
United States Marine Corps, Retired
6208 Kellogg Drive
McLean, Virginia 22101

xc: Lieutenant Colonel William Beebe II
United States Marine Corps, Retired
250 Maverick
Route 3, Box 705
Ashville, Alabama 35953-9511

xc: Lieutenant Colonel R. Schwanda
United States Marine Corps, Retired
202 Sumpter Court
Havelock, North Carolina 28532

LAFONT, TUNNELL, FORMBY, LAFONT & HAMILTON, L.L.P.

ATTORNEYS AND COUNSELORS

P.O. BOX 1510
PLAINVIEW, TEXAS 79073-1510

H.M. LAFONT
GRADDY TUNNELL
MARSHALL FORMBY (1911-1984)
BILL LAFONT*
*BOARD CERTIFIED, CIVIL TRIAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION
TOM HAMILTON

701 BROADWAY
SKAGGS BUILDING
Telephone (806)293-5361
Telecopy (806)293-5366

March 3, 1995

*(Certified Mail - Return Receipt Requested - #Z 033 759 583)*

Penny M. Clark
Counsel for the commanding General
Marine Corps Combat Development Command
Quantico, Virginia 22134-5001

Re: Exchange of C-117D BuNo. 50834 for four (4) HH-1Ks and three (3) T-34Bs

Dear Ms. Clark:

On February 7, 1995, I wrote a letter to you in regard to the above referred to exchange contract. The purpose of this letter was to furnish information which would be helpful in evaluating the circumstances relating to the contracts. We believe that a review of the facts relating to the exchange agreement would establish the following:

1. A. J. D'Alessandris was originally contacted by the Officer in Charge of the U. S. Marine Corps Museum and asked if he would assist the museum in making arrangements to transport the C117D located at MCAS Quantico, Virginia to MCAS Cherry Point, North Carolina.

2. It was determined that A. J. D'Alessandris would become the temporary owner of the C-117D and at the suggestion of the Officer in Charge exchange agreements, which are the subject matter of this dispute, were prepared for the purpose of accommodating the U.S. Marine Corps Museum in their effort to transport the C-117D to MCAS Cherry Point, North Carolina.

3. The two page exchange proposal submitted by A. J. D'Alessandris was approved by the Museum subject to approval by higher authority.

4. Upon receipt of the Exchange Contract from the Museum's Contracting Office, Mr. D'Alessandris signed this contract knowing that his two page proposal had been approved by higher authority as submitted.

5. Representatives of the U. S. Marine Corps Museum either through

95



negligence or willful intent failed to notify Mr. D'Alessandris that the aforesaid two page exchange proposal had been modified.

6. In reliance upon the representations which were made to him, Mr. D'Alessandris performed his part of the exchange contract.

7. After the contract had been completed by Mr. D'Alessandris, he was notified by representatives of the museum that his two page proposal, which was the basis for this contract, had been modified without his knowledge, approval or consent.

8. Once the aircraft was transferred to the MCAS Cherry Point, North Carolina, the representatives of the museum seem to have lost interest in taking action necessary to uphold the agreements entered into between the parties.

I have previously sent a number of letters to you concerning this matter, including the name and addresses of individuals who have pertinent knowledge of the facts relevant to the negotiations and agreements entered into between the parties.

To date I have received no response from any party concerning this matter. I believe if representatives of the museum would take the time necessary to investigate the circumstances relating to these transactions, the merit of Mr. D'Alessandris's claim would become readily apparent.

As I indicated to you in my letter of February 7, 1995, it is not Mr. D'Alessandris's desire to become involved in litigation; however, he has sustained substantial damages as a result of the failure of representatives of the museum to notify him that the proposed agreement had been modified.

Ignoring this problem will not make it go away. It is the desire of Mr. D'Alessandris to resolve the issue in an equitable matter without litigation. However, if the museum continues to ignore his request that some action be taken to remedy this inequity, the parties will become involved in Congressional action-litigation.

Sincerely yours,

LaFONT, TUNNELL, FORMBY,
LaFONT & HAMILTON, L.L.P.

By: Tom Hamilton
Tom Hamilton

COPY

TH:tjb

xc: A. J. D'Alessandris
The Lan-Dale Company
2000 East Airport Drive
Tucson, Arizona 85706

xc: Colonel F. Brooke Nihart
United States Marine Corps, Retired
6208 Kellogg Drive
McLean, Virginia 22101

xc: Lieutenant Colonel William Beebe II
United States Marine Corps, Retired
250 Maverick
Route 3, Box 705
Ashville, Alabama 35953-9511

xc: Lieutenant Colonel R. Schwanda
United States Marine Corps, Retired
202 Sumpter Court
Havelock, North Carolina 28532

# EXHIBIT Q

approval of the Installation Commander. (encl: 4, 7, 51)

(67) That both the 8 September 94 letter and the 15 July 94 exchange proposal dated 15 July 94 were attached together and submitted simultaneously to BGen Simmons (encl: 8)

(68) That LtCol Schwanda denies that the 8 Sept 94 letter to BGen Simmons was drafted by him with the express purpose of gaining approval for an exchange proposal dated 15 July 1994 that was submitted to BGen Simmons along with the 8 Sept 94 letter. (encl: 52)

(69) That Mr. D'Alessandris claims that sending the exchange proposal of 15 July 94 to accompany the 8 Sept letter to BGen Simmons was done at his insistence alone, not at the behest or suggestion of any third party, and with the express intent of providing a basis of negotiations to resolve the outstanding dispute with the MCAGM. (encl: 52)

Opinions

1. It appears that LtCol Schwanda, by entering into an unwritten agreement that purported to bind the U.S. Government to negotiate for a future exchange of excess GOE during the course of a Title 10 aircraft exchange in 1984, may have violated the provisions 5 CFR 2635.101. However no criminal intent was found. He appears to have been motivated only by his desire to extricate the aircraft from an untenable position and have it restored for the Marine Corps Air/Ground Museum collection. However, it should be noted that the statute of limitations for this potential violation has expired. (FF: 3, 4, 6, 7)

2. It appears that BGen Simmons? and possibly Col. Nihart? were aware of the unwritten agreement. (FF: 5)

3. It appears that LtCol Schwanda, in his relationship with the Cunningham Museum Foundation and may have violated the provisions of 18 USC 208 in that , an employee of the excutive branch, participated personally and substantially in the rendering of advice to the Cunningham Foundation, an organization with whom he may have negotiated prospective employment. (FF: 11, 12, 14, 15, 16)

4. It appears that with regard to the potential violations of 18 USC 208 by that they may have occurred with the cognizance of and
(FF: 14, 15, 20, 21, 29)

5. It appears that there exists a conflict between Federal employment and "representation" of the

2635.502. (FF 20 thru 25, 29) , a non-Federal entity, contrary to 5 CFR

6. It appears that LtCol Schwanda and LtCol Beebe may have acted in the capacity of a procurement official as defined by current Federal Appropriation Regulations. (FF: 60)

7. It appears that LtCol Schwanda, by the sum of his actions and the frequent communication between himself and Mr. D'Alessandris, with regard to the ongoing dispute between the MCAGM and the Lan-Dale Company, has given the perception that he has not acted with impartiality and did attempt to intercede on the behalf of the Lan-Dale. However, no criminal intent was found. His motivation appears to be guided by his strong desire to resolve an issue that he perceived could prove to be potentially embarrassing to the Marine Corps. (FF: 51, 56, 58, 63)

8. It appears that, although LtCol Schwandas impartiality may be in question, he did not act as an agent for the Lan-Dale Company as alleged by Col Ponnwitz (FF: 61)

9. It appears that LtCol Schwandadid receive copies of Government documents from Mr. D'Alessandris. It is open to speculation whether they were for his personal comment, guidance or review as alleged by Col Ponnwitz (FF: 4, 5, 63)

10. It is my opinion that there is no factual basis to support the allegation by the Inspector General that LtCol Schwanda by his relationship with the Lan-Dale Company, created a favorable circumstance for his future employment at MCAS Cherry Point. (FF: 64)

11. There appears to be no factual basis to support the claim that LtCol Schwanda traveled with Mr. D'Alessandris as alleged by Col Ponnwitz (FF: 62)

12. It is my opinion, based upon the information I have obtained, that a conspiracy with criminal intent did not exist between Col Nihart and LtCol Schwanda, as alleged by Col Ponnwitz

13. The allegation that LtCol Schwanda violated U.S. statutes by arranging storage and ramp space for a C-117D BuNo: 50834 at MCAS Cherry Point, as alleged by Col Ponnwitz is without merit. The aircraft was sent to MCAS Cherry point at the request of the MCAGM with storage and ramp space arranged with the approval of the Commanding General MCAS Cherry Point. (FF: 66)

14. It is my opinion that LtCol Schwanda did not negotiate on behalf of the Lan-Dale Company in order to ensure a significant margin of profit for that Company as alleged by Col Ponnwitz (FF: 65)

15. It appears that LtCol Schwanda drafted the 8 Sept 94 letter that was partially re-typed signed and submitted by Col Nihart to BGen Simmons However, on the part of LtCol Schwanda it appears that it was not written with the express intent of gaining approval for an exchange proposal which accompanied the letter, as alledged by Col Ponnwitz Both LtCol Schwanda and Mr D'Alessandris have asserted that the exchange proposal (dated 15 July) was attached at the insistence of Mr D'Alessandris with the consent of Col Nihart and not at the suggestion or behest of any third party. (FF: 67, 68, 69)

16. It appears that LtCol Beebe I by entering into an unwritten agreement purporting to bind the U.S. Government during the course of a Title 10 aircraft exchange in 1991, may have violated the provisions of 5 CFR 2635.101. However no criminal intent has been found. He appears to have been motivated by his desire to extricate the aircraft from an untenable situation and ultimately transfer it on loan from the MCAGM to MCAS Cherry Point. (FF: 37)

17. [redacted] LtCol Dragottas conflict of interest with Keystone helicopters. [redacted]

18. The sum of the research that I have conducted and the information that I have obtained, lends much credence to the position that the Lan-Dale Company, with regard to the current dispute over the C-117D -- VC-118B exchange agreement, may not have been dealt with fairly or equitably, despite protestations to the contrary. Severe and mutual misunderstanding of intent between the MCAGM and The Lan-Dale Co. appears to have developed. Should the dispute become public thru litigation. considerable embarrassment may be accrued by the USMC.

## Recommendations

1. It is recommended that the potential conflict of interest between LtCol Schwandas Federal employment, and his relationship with the Cunningham Foundation be reviewed by the Station Staff Judge Advocate.

[redacted]
2. It is recommended Dragotta be further reviewed. [redacted]

3. It is recommended that the circumstances and issues surrounding the C-117D -- VC-118B exchange between the MCAGM and the Lan-Dale Company be the subject of further review.

4 It is recommended that the USMC, to avoid public embarrassment, reach a mutually acceptable accommodation with The Lan-Dale Co. regarding the company's current dispute with the MCAGM. Since relations between the MCAGM and The Lan-Dale Co. appear to be irreparable, third party mediation may be required.

[redacted]

LtCol - Ferrari

# EXHIBIT R



BuNo. 150548





BuNo 150548





BuNo. 150548

| AMARC ID | NSN | C I | ISG # | UM | NOMENCLATURE | ERR | WHY | QTY | ISS | UNIT PRICE | AC S | MDS | ACFT SR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AN7T0008 | 1377007561384E | U | | EA | CART FIRE EXT | XB3 | | 2 | 0 | $42.49 | PC | T039D | 00150548 |
| AN7T0008 | 1560000182328 | U | 5074 | EA | PANEL ASSEMBLY,SLID | XB3 | | 1 | 0 | $3,094.32 | PC | T039D | 00150548 |
| AN7T0008 | 1560P0501432373 | U | | EA | MODIFICATION KIT | XB3 | | 1 | 0 | $1,000.00 | PC | T039D | 00150548 |
| AN7T0008 | 1650009045836 | U | 5976 | EA | CYLINDER ASSEMBLY,A | XD2 | | 1 | 0 | $3,777.27 | PC | T039D | 00150548 |
| AN7T0008 | 1660006530170 | U | | EA | INDICATOR ASSY O YG | XB3 | | 3 | 0 | $82.00 | PC | T039D | 00150548 |
| AN7T0008 | 1660010455827G | U | 4809 | EA | CONTROL BOX,ELECTR | XD2 | | 1 | 0 | $1,810.00 | PC | T039D | 00150548 |
| AN7T0008 | 1680004317945 | U | | EA | BELT,AIRCRAFT SAFET | XB3 | F | 1 | 0 | $228.66 | PC | T039D | 00150548 |
| AN7T0008 | 2915009170849P | U | | EA | FUEL CONTROL,MAIN T | XD2 | | 2 | 0 | $48,293.31 | PC | T039D | 00150548 |
| AN7T0008 | 2915009667731G | 7 | | EA | PUMP,SUBMERGED,AIR | XD2 | | 1 | 0 | $4,310.98 | PC | T039D | 00150548 |
| AN7T0008 | 2995008886103 | U | 5069 | EA | VALVE,REGULATOR,T39 | XD2 | | 1 | 0 | $1,966.07 | PC | T039D | 00150548 |
| AN7T0008 | 4140009672070G | U | | EA | FAN,VANE,AXIAL,T39 | XB3 | | 1 | 0 | $2,184.16 | PC | T039D | 00150548 |
| AN7T0008 | 4320008690561G | U | | EA | PUMP,AXIAL PISTONS | XD2 | | 2 | 0 | $4,960.00 | PC | T039D | 00150548 |
| AN7T0008 | 4820008066172 | U | | EA | VALVE,REGULATOR,FL | XD2 | | 1 | 0 | $3,702.49 | PC | T039D | 00150548 |
| AN7T0008 | 5110008142027 | U | | EA | AXE,CRASH | XB3 | | 1 | 0 | $46.50 | PC | T039D | 00150548 |
| AN7T0008 | 5821006010481FZ | 7 | | EA | RECEIVER ASSY,RADIO | XD2 | | 1 | 0 | $5,070.00 | PC | T039D | 00150548 |
| AN7T0008 | 5826008133020 | 7 | 5437 | EA | INDICATOR,BEARING | XD2 | | 2 | 0 | $4,402.71 | PC | T039D | 00150548 |
| AN7T0008 | 5826008821203 | 7 | 7583 | EA | INDICATOR,BEARING | XD2 | | 1 | 0 | $3,440.00 | PC | T039D | 00150548 |
| AN7T0008 | 5826009480417 | 7 | 1381 | EA | RECEIVER-TRANSMITTE | XD2 | | 1 | 0 | $14,330.00 | PC | T039D | 00150548 |
| AN7T0008 | 5826009539465 | 7 | 6750 | EA | INDICATOR,BEARING | XD2 | | 1 | 0 | $3,090.00 | PC | T039D | 00150548 |
| AN7T0008 | 5831000085602FZ | U | 1446 | EA | CONTROL,INTERCOMMU | XD2 | | 1 | 0 | $15,570.00 | PC | T039D | 00150548 |
| AN7T0008 | 5831009600839G | U | | EA | SWITCHING UNIT ASSE | XB3 | | 1 | 0 | $10,550.00 | PC | T039D | 00150548 |
| AN7T0008 | 5831009898978FZ | U | 6740 | EA | CONTROL,INTERCOMMU | XD2 | | 4 | 0 | $646.00 | PC | T039D | 00150548 |
| AN7T0008 | 5895001491319 | 7 | 5089 | EA | RECEIVER-TRANSMITTE | XD2 | | 1 | 0 | $12,400.00 | PC | T039D | 00150548 |
| AN7T0008 | 5895004713174C | 7 | 1590 | EA | MONITOR,TRANSPONDE | XD2 | | 1 | 0 | $2,979.73 | PC | T039D | 00150548 |
| AN7T0008 | 5985000198501 | U | 3851 | EA | ANTENNA | XB3 | | 2 | 0 | $69.00 | PC | T039D | 00150548 |
| AN7T0008 | 5985000198501 | U | 3851 | EA | ANTENNA | XB3 | L | 4 | 0 | $69.00 | PC | T039D | 00150548 |
| AN7T0008 | 5985007629925E | 7 | 5745 | EA | ANTENNA | XD2 | | 1 | 0 | $4,560.00 | PC | T039D | 00150548 |
| AN7T0008 | 6110000191385FZ | U | 7823 | EA | REGULATOR,VOLTAGE | XD2 | | 1 | 0 | $1,550.00 | PC | T039D | 00150548 |
| AN7T0008 | 6115009881713U | U | | EA | GENERATOR ALTERNATI | XD2 | | 1 | 0 | $4,162.58 | PC | T039D | 00150548 |
| AN7T0008 | 6125005002078FZ | U | 3361 | EA | MOTOR-GENERATOR | XD2 | | 1 | 0 | $305.00 | PC | T039D | 00150548 |
| AN7T0008 | 6130012206331 | U | | EA | CIRCUIT CARD ASSEMB | XB3 | F | 1 | 0 | $1,019.70 | PC | T039D | 00150548 |
| AN7T0008 | 6140009128935 | U | 1703 | EA | BATTERY | XF3 | | 2 | 0 | $1,317.60 | PC | T039D | 00150548 |
| AN7T0008 | 6605000342500 | 7 | 1805 | EA | INDICATOR,HORIZONTA | XD2 | | 1 | 0 | $8,405.05 | PC | T039D | 00150548 |

578

| AMARC ID | NSN | C 1 | ISG # | UM | NOMENCLATURE | ERR | WHY | QTY | ISS | UNIT PRICE | AC S | MDS | ACCT SR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AN7T0008 | 6605008068120G | 7 | 3313 | EA | AMPLIFIER ASSEMBLY | XD2 | | 1 | 0 | $4,247.74 | PC | T039D | 00150548 |
| AN7T0008 | 6610001795175B | 7 | 1813 | EA | INDICATOR,VERTICAL | XD2 | | 1 | 0 | $481.47 | PC | T039D | 00150548 |
| AN7T0008 | 6610001811746FZ | 7 | 5994 | EA | TRANSDUCER,COUNTIN | XD2 | | 1 | 0 | $3,080.00 | PC | T039D | 00150548 |
| AN7T0008 | 6610004056461 | 7 | 7368 | EA | ALTIMETER,PRESSURE | XD2 | | 1 | 0 | $4,892.72 | PC | T039D | 00150548 |
| AN7T0008 | 6610008724303 | 7 | 3064 | EA | COMPUTER | XD2 | | 1 | 0 | $1,517.71 | PC | T039D | 00150548 |
| AN7T0008 | 6610009395237 | 7 | 1808 | EA | INDICATOR,ATTITUDE | XD2 | | 1 | 0 | $8,036.66 | PC | T039D | 00150548 |
| AN7T0008 | 6610010395020B | U | 2432 | EA | ALTIMETER,PRESSURE | XD2 | | 1 | 0 | $4,630.00 | PC | T039D | 00150548 |
| AN7T0008 | 6615000209327B | 7 | 3211 | EA | GYROSCOPE,DISPLACE | XD2 | | 1 | 0 | $8,650.00 | PC | T039D | 00150548 |
| AN7T0008 | 6615000613131 | 7 | 1914 | EA | GYROSCOPE,RATE | XD2 | | 2 | 0 | $2,408.38 | PC | T039D | 00150548 |
| AN7T0008 | 6615008038211 | 7 | | EA | GYROSCOPE,DISPLACE | XD2 | | 1 | 0 | $6,779.46 | PC | T039D | 00150548 |
| AN7T0008 | 6615008326601FZ | 7 | 3211 | EA | GYROSCOPE,DISPLACE | XD2 | | 1 | 0 | $8,650.00 | PC | T039D | 00150548 |
| AN7T0008 | 6615010597909 | 7 | 1916 | EA | GYROSCOPE,RATE | XD2 | | 1 | 0 | $4,312.29 | PC | T039D | 00150548 |
| AN7T0008 | 6620006781935 | U | 2039 | EA | INDICATOR RATE OF | XD2 | | 1 | 0 | $2,831.84 | PC | T039D | 00150548 |
| AN7T0008 | 6620006908905 | U | | EA | INDICATOR,PRESSURE | XB3 | | 1 | 0 | $311.00 | PC | T039D | 00150548 |
| AN7T0008 | 6620007379762 | U | 2917 | EA | TRANSMITTER,RATE OF | XD2 | | 1 | 0 | $5,426.57 | PC | T039D | 00150548 |
| AN7T0008 | 6620009933403 | U | 2039 | EA | INDICATOR | XD2 | | 1 | 0 | $2,831.84 | PC | T039D | 00150548 |
| AN7T0008 | 6645005887611 | J | 5878 | EA | CLOCK,AIRCRAFT | XD2 | | 2 | 0 | $913.07 | PC | T039D | 00150548 |
| AN7T0008 | 6645008141706 | J | 5878 | EA | CLOCK,AIRCRAFT,MECH | XD2 | | 1 | 0 | $913.07 | PC | T039D | 00150548 |
| AN7T0008 | 6680004660657G | U | 3314 | EA | INDICATOR LIQUID QU | XD2 | | 2 | 0 | $3,851.38 | PC | T039D | 00150548 |
| AN7T0008 | 6685009611677G | U | 3728 | EA | INDICATOR ASSEMBLY | XD2 | | 1 | 0 | $9,110.00 | PC | T039D | 00150548 |

**TOTAL** $ 321,880.76



BuNo. 150547





| AMARC ID | NSN | C I | ISG # | UM | NOMENCLATURE | ERR | WHY | QTY | ISS | UNIT PRICE | AC S | MDS | ACFT SR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AN7T0021 | 1377007561384E | U | | EA | CART FIRE EXT | XB3 | | 2 | 0 | $42.49 | PC | T039D | 00150547 |
| AN7T0021 | 1650009611678G | U | 4760 | EA | MOTOR,HYDRAULIC | XD2 | | 1 | 0 | $8,350.00 | PC | T039D | 00150547 |
| AN7T0021 | 1660010455827G | U | 4809 | EA | CONTROL BOX,ELECTR | XD2 | | 1 | 0 | $1,810.00 | PC | T039D | 00150547 |
| AN7T0021 | 1680004317945 | U | | EA | BELT,AIRCRAFT SAFET | XB3 | F | 1 | 0 | $228.66 | PC | T039D | 00150547 |
| AN7T0021 | 4240008513430 | U | | EA | GOGGLES,INDUSTRIAL | XB3 | | 1 | 0 | $6.72 | PC | T039D | 00150547 |
| AN7T0021 | 5110008142027 | U | | EA | AXE,CRASH | XB3 | | 1 | 0 | $46.50 | PC | T039D | 00150547 |
| AN7T0021 | 5821006010481FZ | 7 | | EA | RECEIVER ASSY,RADIO | XD2 | | 1 | 0 | $5,070.00 | PC | T039D | 00150547 |
| AN7T0021 | 5985000198501 | U | 3851 | EA | ANTENNA | XB3 | | 2 | 0 | $69.00 | PC | T039D | 00150547 |
| AN7T0021 | 5985000198501 | U | 3851 | EA | ANTENNA | XB3 | L | 6 | 0 | $69.00 | PC | T039D | 00150547 |
| AN7T0021 | 6130009667836 | U | | EA | POWER SUPPLY | XB3 | | 2 | 0 | $465.08 | PC | T039D | 00150547 |
| AN7T0021 | 6130012206331 | U | | EA | CIRCUIT CARD ASSEMB | XB3 | F | 1 | 0 | $1,019.70 | PC | T039D | 00150547 |
| AN7T0021 | 6645005887611 | J | 5878 | EA | CLOCK,AIRCRAFT | XD2 | | 2 | 0 | $913.07 | PC | T039D | 00150547 |
| AN7T0021 | 6645009508599 | J | 6832 | EA | CLOCK,PANEL | XD2 | | 1 | 0 | $653.70 | PC | T039D | 00150547 |

TOTAL $ 20,578.56


BuNo: 151336







BuNo 151336





C...IST

| AMARC ID | NSN | C I | ISG # | UM | NOMENCLATURE | ERR | WHY | QTY | ISS | UNIT PRICE | AC S | MDS | ACFT SR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AN7T0025 | 1377007561384E | U | | EA | CART FIRE EXT | XB3 | | 2 | 0 | $42.49 | PC | T039D | 00151336 |
| AN7T0025 | 1650009045836 | U | 5976 | EA | CYLINDER ASSEMBLY,A | XD2 | | 1 | 0 | $3,777.27 | PC | T039D | 00151336 |
| AN7T0025 | 1660010455827G | U | 4809 | EA | CONTROL BOX,ELECTR | XD2 | | 1 | 0 | $1,810.00 | PC | T039D | 00151336 |
| AN7T0025 | 1680004317945 | U | | EA | BELT,AIRCRAFT SAFET | XB3 | L | 1 | 0 | $228.66 | PC | T039D | 00151336 |
| AN7T0025 | 2995008886103 | U | 5069 | EA | VALVE,REGULATOR,T39 | XD2 | | 1 | 0 | $1,966.07 | PC | T039D | 00151336 |
| AN7T0025 | 4240008513430 | U | | EA | GOGGLES,INDUSTRIAL | XB3 | | 2 | 0 | $6.72 | PC | T039D | 00151336 |
| AN7T0025 | 5110008142027 | U | | EA | AXE,CRASH | XB3 | | 2 | 0 | $46.50 | PC | T039D | 00151336 |
| AN7T0025 | 5821006010481FZ | 7 | | EA | RECEIVER ASSY,RADIO | XD2 | | 1 | 0 | $5,070.00 | PC | T039D | 00151336 |
| AN7T0025 | 5831009600839G | U | | EA | SWITCHING UNIT ASSE | XB3 | | 1 | 0 | $10,550.00 | PC | T039D | 00151336 |
| AN7T0025 | 5985000198501 | U | 3851 | EA | ANTENNA | XB3 | | 2 | 0 | $69.00 | PC | T039D | 00151336 |
| AN7T0025 | 5985000198501 | U | 3851 | EA | ANTENNA | XB3 | L | 4 | 0 | $69.00 | PC | T039D | 00151336 |
| AN7T0025 | 6130009667836 | U | | EA | POWER SUPPLY | XB3 | | 2 | 0 | $465.08 | PC | T039D | 00151336 |
| AN7T0025 | 6130012206331 | U | | EA | CIRCUIT CARD ASSEMB | XB3 | F | 1 | 0 | $1,019.70 | PC | T039D | 00151336 |
| AN7T0025 | 6140009128935 | U | 1703 | EA | BATTERY | XF3 | | 2 | 0 | $1,317.60 | PC | T039D | 00151336 |
| AN7T0025 | 6645005887611 | J | 5878 | EA | CLOCK,AIRCRAFT | XD2 | | 3 | 0 | $913.07 | PC | T039D | 00151336 |

TOTAL $ 31,331.69



BuNo. 150543







BuNo. 150543





| AMARC ID | NSN | C-I | SG # | UM | NOMENCLATURE | ERR | WHY | QTY | ISS | UNIT PRICE | AC S | MDS | ACFT SR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AN7T0027 | 1377007561384E | U | | EA | CART FIRE EXT | XB3 | | 2 | 0 | $42.49 | PC | T039D | 00150543 |
| AN7T0027 | 1560P150543 | U | | EA | MOUNTING BRACKET | XB3 | | 1 | 0 | $50.00 | PC | T039D | 00150543 |
| AN7T0027 | 1660011409400 | U | | EA | MASK,OXYGEN | XF3 | | 9 | 0 | $150.00 | PC | T039D | 00150543 |
| AN7T0027 | 1680004317945 | U | | EA | BELT,AIRCRAFT SAFET | XB3 | F | 1 | 0 | $228.66 | PC | T039D | 00150543 |
| AN7T0027 | 5110008142027 | U | | EA | AXE,CRASH | XB3 | | 1 | 0 | $46.50 | PC | T039D | 00150543 |
| AN7T0027 | 5821006010481FZ | 7 | | EA | RECEIVER ASSY,RADIO | XD2 | | 1 | 0 | $5,070.00 | PC | T039D | 00150543 |
| AN7T0027 | 5841ND324565LX | U | | EA | RECEIVER TRANSMITTE | XB3 | H | 1 | 0 | $17,680.91 | PC | T039D | 00150543 |
| AN7T0027 | 5841P900625F | U | | EA | ANTENNA,T39D ACFT | XB3 | H | 1 | 0 | $100.00 | PC | T039D | 00150543 |
| AN7T0027 | 5841P900626F | U | | EA | RADAR IND,T39D ACFT | XB3 | H | 1 | 0 | $100.00 | PC | T039D | 00150543 |
| AN7T0027 | 5841PAPX-93 | U | | EA | REC/TRANS,IFF,T39D | XB3 | H | 1 | 0 | $1,000.00 | PC | T039D | 00150543 |
| AN7T0027 | 6130009667836 | U | | EA | POWER SUPPLY | XB3 | | 1 | 0 | $465.08 | PC | T039D | 00150543 |
| AN7T0027 | 6130010055392FZ | U | | EA | INVERTER,POWER,STAT | XD2 | H | 1 | 0 | $4,500.00 | PC | T039D | 00150543 |
| AN7T0027 | 6140012384932 | U | | EA | BATTERY ASSEMBLY | XB3 | | 2 | 0 | $780.10 | PC | T039D | 00150543 |
| AN7T0027 | 6545009196650 | U | | EA | FIRST AID KIT,GENER | XB3 | H | 1 | 0 | $29.95 | PC | T039D | 00150543 |
| AN7T0027 | 6645000763050 | J | 5878 | EA | CLOCK,PANEL | XD2 | | 1 | 0 | $913.07 | PC | T039D | 00150543 |
| AN7T0027 | 6645003274005 | J | 5878 | EA | CLOCK,AIRCRAFT,MECH | XD2 | | 1 | 0 | $913.07 | PC | T039D | 00150543 |

TOTAL $ 34,092.42



BuNo: 150984







BuNo 150969





CC .T 07.

| AMARC ID | NSN | C:I | ISG # | UM | NOMENCLATURE | ERR | WHY | QTY | ISS | UNIT PRICE | AC_S | MDS | ACFT_SR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AN7T0026 | 1377007561384E | U | | EA | CART FIRE EXT | XB3 | | 2 | 0 | $42.49 | PC | T039D | 00150969 |
| AN7T0026 | 1680004317945 | U | | EA | BELT,AIRCRAFT SAFET | XB3 | L | 1 | 0 | $228.66 | PC | T039D | 00150969 |
| AN7T0026 | 5110008142027 | U | | EA | AXE,CRASH | XB3 | | 1 | 0 | $46.50 | PC | T039D | 00150969 |
| AN7T0026 | 5821006010481FZ | 7 | | EA | RECEIVER ASSY,RADIO | XD2 | | 1 | 0 | $5,070.00 | PC | T039D | 00150969 |
| AN7T0026 | 5841ND324565LX | U | | EA | RECEIVER TRANSMITTE | XB3 | H | 1 | 0 | $17,680.91 | PC | T039D | 00150969 |
| AN7T0026 | 5841P900625F | U | | EA | ANTENNA,T39D ACFT | XB3 | H | 1 | 0 | $100.00 | PC | T039D | 00150969 |
| AN7T0026 | 5841P900626F | U | | EA | RADAR IND,T39D ACFT | XB3 | H | 1 | 0 | $100.00 | PC | T039D | 00150969 |
| AN7T0026 | 5841PAPX-93 | U | | EA | REC/TRANS,IFF,T39D | XB3 | H | 1 | 0 | $1,000.00 | PC | T039D | 00150969 |
| AN7T0026 | 6130009667836 | U | | EA | POWER SUPPLY | XB3 | | 1 | 0 | $465.08 | PC | T039D | 00150969 |
| AN7T0026 | 6140012384932 | U | | EA | BATTERY ASSEMBLY | XB3 | | 2 | 0 | $780.10 | PC | T039D | 00150969 |
| AN7T0026 | 6645003274005 | J | 5878 | EA | CLOCK,AIRCRAFT,MECH | XD2 | | 1 | 0 | $913.07 | PC | T039D | 00150969 |
| AN7T0026 | 6645009508599 | J | 6832 | EA | CLOCK,PANEL | XD2 | | 1 | 0 | $653.70 | PC | T039D | 00150969 |

TOTAL $ 27,903.10


157354























# EXHIBIT S

P.02

# LAFONT, TUNNELL, FORMBY, LAFONT & HAMILTON, L.L.P.

Attorneys and Counselors
P. O. Box 1510
Plainview, Texas 79073-1510

H. M. LaFONT
GRADDY TUNNELL
MARSHALL FORMBY (1911-1984)
BILL LaFONT*
*BOARD CERTIFIED CIVIL TRIAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION
TOM HAMILTON
BRENT HAMILTON

701 Broadway
Skaggs Building
Telephone 806-293-5361
Telecopy 806-293-5364

June 30, 1998

John A. Dietrich
Senior Trial Attorney
Navy Litigation Office
General Counsel of the Navy
901 M Street, SE, Bldg. 36
Washington, DC 20374

*Via Fax 202-685-6795*

Re: Settlement Agreement - The Lan-Dale Co./United States Marine Corps Air Ground Museum Exchange Contracts

Dear Mr. Dietrich:

It has been some time since I have received any communication from you regarding the preparation of settlement documents to conclude the settlement agreement entered into between the parties on May 11, 1998.

I attempted to contact you by telephone, but missed you. I am concerned that the Armed Services Board of Contract Appeals' extension will expire prior to the time that the settlement agreement has been approved and executed by the parties. My records indicate that the Board of Contract Appeals extended the stay for 45 days, until 15 July 1998. For this reason, Lan-Dale requests that you immediately forward to this office for review and signature the settlement agreement for transfer the following items and aircraft to Lan-Dale:

<u>Davis-Monthan AFB</u>:

| | |
|---|---|
| T-39D | BuNo 151336 |
| T-39D | BuNo 150543 |
| T-39D | BuNo 150547 |
| T-39D | BuNo 150969 |
| T-39D | BuNo Unknown (to be designated) |

Cherry Point:

| | |
|---|---|
| VT-39E | BuNo 157354 |
| T-34B | BuNo 140908 |

Five (5) T-39D (J60-P3) zero time engines as agreed (to be designated)

All aircraft located Davis Montham and Cherry Point to be released to Lan-Dale at no cost.

Lan-Dale acquires aircraft and engines on "as is, where-is" basis.

Please furnish the settlement agreement to Lan-Dale for review and approval at the earliest possible date.

Sincerely yours,

LaFONT, TUNNELL, FORMBY,
LaFONT & HAMILTON, L.L.P.

By: [signature]
Tom Hamilton

TH:dey

xc: A. J. D'Alessandris, President
THE LAN-DALE CO.
2000 East Airport Drive
Tucson, Arizona 85706

*Via Fax 520-889-0226*

# EXHIBIT T

**Hays Roxann Civ AMARC/FSO**

**From:** anthony_mazzone@icpphil navy mil
**Sent:** Wednesday, June 30, 1999 8 49 AM
**To:** walsh michael@hq.navy.mil
**Subject:** T-39s

Mike:

Thanks for the copy of the MEMORANDUM, June 22, 1999, "APPROVAL OF MODIFICATION OF GOE WITH THE CIVILIAN SECTOR".

About a year ago I wrote to Karen and Mr. Dietrich advising that they should be aware of, and give consideration to, costs involved in removing aircraft from AMARC. There will be fees for escort, preparation and towing In order to avoid the untenable situation of AMARC storing aircraft no longer owned by the military services, I suggest that title be turned over only when the aircraft reach the gate and all fees have been paid.

Also, 5 of the J-60 engines are still installed on the aircraft. AMARC should have provided an estimate for removal.

I'm just sending this as a reminder of what needs to be considered in modifying the contract.

# EXHIBIT U

DEPARTMENT OF THE NAVY
NAVY LITIGATION OFFICE
OFFICE OF THE GENERAL COUNSEL
BUILDING 36 WASHINGTON NAVY YARD
901 M STREET SE
WASHINGTON DC 20374-5012

24 November 1999

Mr. Tom Hamilton
LaFont, Tunnell, Formby, LaFont & Hamilton,LLP
Attorneys and Counselors
P.O. Box 1510
Plainview, Texas 79073-1510

Re: ASBCA No. 50829
Appeal of Lan-Dale Company
Under Contract No. M00264-92-C-0010

Dear Mr. Hamilton:

I recently learned that the parties are at odds regarding payment of presentation costs to prepare items for transfer to Mr. D'Alissandris. This issue is discussed in your letter of November 10, 1999.

The settlement meeting in May set forth a framework for the parties to reach a settlement. Whereas one of the items of discussion was the presentation costs, the appellant also wanted five additional engines and one additional T-39. The Government was reluctant to settle on these terms because the Marine Corps did not have such items in its own inventory. See my letter of 22 February 1999. During the course of the settlement discussions, Mr D'Alissandris presented an estimate that indicated that the engines were worth $7,000 apiece. Offer of May 11, 1998. The parties used this figure as a benchmark, but no final agreement could be made because the museum did not have the equipment, or, obviously, independent appraisals of the value.

The engines, as it turns out, have been independently appraised at $10,000 apiece, meaning that the appellant will receive $15,000 in additional value. Further, the additional T-39 appraised at $70,000, more than $25,000 above the highest figure shown on Mr. D'Alissandris' offer. Thus, as the deal is currently structured, Mr. D'Alissandris will receive approximately $40,000 ($15,000 plus $25,000) in excess value over estimates at the May meeting.

After the appraisal was completed, the Government forwarded to your offices a copy of the draft settlement agreement. Letter of 21 December 1998. Contemporaneous with that letter, you and I spoke regarding the structure of the agreement. I highlighted for your review such facts as the "substitute agreement" feature, and specifically, the terms in C-3 regarding the costs. I specifically stated that because the appraisals for the engines and new T-39 came in higher than expected, the contractor would have to bear the costs associated with presentation. On 22 December 1998, you conveyed to me your



This document is [illegible]

client's acceptance of the terms in the draft. Now, on the eve of execution, after having the clause eleven months, your client raises an objection.

Your client's reversal of his position has serious implications. As indicated in your letter to the Board of February 24, 1999, the settlement document was part of the approval package. Approval of the deal was premised on the entire exchange of assets, including the appellant bearing the burden of the costs. Your client's tardy objections have the potential of nullifying the approval since it adds further expense to the Department of the Navy.

As I am sure your client is well aware, there has been a moratorium on exchanges for some time. Obtaining extraordinary approval for your client in this special circumstance has been difficult. I suggest that to start the process over would not meet either party's needs. Further, recognizing that Mr. D'Alissandris is obtaining at least $40,000 in consideration above what either party anticipated, he would hardly be justified in objecting to terms he did not object to eleven months earlier and which address relatively minor expenses.

I am available to discuss this matter. My telephone number is (202) 685-6559, ext. 302.

Sincerely,

JOHN A. DIETRICH
Senior Trial Attorney



This document is protected by FRE 408.

# EXHIBIT V

C & J
SALES

800 / 828-3597
phone/fax/mess.
805 / 389-1950
outside U S A
805 / 484-5840
hangar

50 Durley Avenue
Camarillo, CA 93010

June 20, 2000

To: Whom It May Concern
RE: North American T-39D buno 150548

C & J Sales primary business is the sales, support and repair of the military surplus aircraft. We have been in business since 1988 and are recognized by lenders and insurance underwriters as a source for evaluation and appraisal.

This estimation of value is in response to a previous appraisal summary that appears below. It is clear that a miscalculation was made in the valuation of T-39D buno 150548.

| | | | | |
|---|---|---|---|---|
| T-39D | buno 151336 | $50,000 | removed items | $ 31,331.69 |
| T-39D | buno 150543 | $50,000 | removed items | $ 34,092.42 |
| T-39D | buno 150547 | $55,000 | removed items | $ 20,578.56 |
| T-39D | buno 150969 | $50,000 | removed items | $ 27,903.10 |
| T-39D | buno 150548 | $70,000 | removed items | $321,880.76 |

All aircraft were inspected on June 13, 2000 and appear to be similar in condition and total airframe/engine time. Buno 150548, however, does not show any reason to have the higher value of $70,000 versus the other aircraft of $50,000. Further, I would reduce the valuation of buno 150548 by the removed items being 10 times more than the other four aircraft included in the previous appraisal.

Valuation of T-39D buno 150548 should be $20,000 and it should be considered a parts aircraft because of the cost of replacement of the removed items.

Sincerely,

Charles S. Smith

Charles S. Smith

# EXHIBIT W

# AWARD/CONTRACT

1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 350)

RATING: DO-C9E

PAGE 1 OF PAGES 5

2. CONTRACT (Proc. Inst. Ident.) NO.: M00254-99-C-0003

3. EFFECTIVE DATE:

4. REQUISITION/PURCHASE REQUEST/PROJECT NO.:

5. ISSUED BY — CODE M00264
COMMANDING GENERAL - PANDC BR (B215)
CATLIN AVENUE
MARINE CORPS BASE
QUANTICO, VA 22134

6. ADMINISTERED BY (If other than item 5) — CODE
See Item 5.

7. NAME AND ADDRESS OF CONTRACTOR (No., street, city, county, state and zip code)
THE LAN-DALE CO
5985 ALPHA AVENUE
RENO, NV 89506

CODE — FACILITY CODE

8. DELIVERY
[ ] FOB ORIGIN [X] OTHER (See below)

9. DISCOUNT FOR PROMPT PAYMENT
EXCHANGE - THERE IS NOT EXCHANGE OF FUNDS

10. SUBMIT INVOICES (4 copies unless otherwise specified) TO THE ADDRESS SHOWN IN: — ITEM

11. SHIP TO/MARK FOR — CODE
NO CONTACTS IDENTIFIED
TMO
BLDG 2009
QUANTICO, VA 22134

12. PAYMENT WILL BE MADE BY — CODE
DFAS - KC/FE
1500 E. 95TH STREET
KANSAS CITY, MO 64197-0013

13. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION:
[ ] 10 U.S.C. 2304(c)( ) [ ] 41 U.S.C. 253(c)( )

14. ACCOUNTING AND APPROPRIATION DATA

| 15A. ITEM NO. | 15B. SUPPLIES/ SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT |
|---|---|---|---|---|---|
| | **SEE SCHEDULE** | | | | |

15G. TOTAL AMOUNT OF CONTRACT: $0.00

16. TABLE OF CONTENTS

| (X) | SEC. | DESCRIPTION | PAGE(S) | (X) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I - THE SCHEDULE | | | | PART II - CONTRACT CLAUSES | |
| | A | SOLICITATION/ CONTRACT FORM | | | I | CONTRACT CLAUSES | |
| X | B | SUPPLIES OR SERVICES AND PRICES/ COSTS | 2 | | | PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACHMENTS | |
| | C | DESCRIPTION/ SPECS./ WORK STATEMENT | | | J | LIST OF ATTACHMENTS | |
| | D | PACKAGING AND MARKING | | | | PART IV - REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 3 | | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | |
| X | F | DELIVERIES OR PERFORMANCE | 4 | | | | |
| X | G | CONTRACT ADMINISTRATION DATA | 5 | | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | |
| | H | SPECIAL CONTRACT REQUIREMENTS | | | M | EVALUATION FACTORS FOR AWARD | |

CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE

17. [ ] CONTRACTOR'S NEGOTIATED AGREEMENT (Contractor is required to sign this document and return copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.)

18. [ ] AWARD (Contractor is not required to sign this document.) Your offer on Solicitation Number ______ including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.

19A. NAME AND TITLE OF SIGNER (Type or print)
A.J. D'ALESSANDRIS President

20A. NAME AND TITLE OF CONTRACTING OFFICER
KATHY GERBERT / CONTRACT SPECIALIST
GARY E. WATSON
CONTRACTING OFFICER

19B. NAME OF CONTRACTOR
The Lan-Dale Co.
BY [signature] (Signature of person authorized to sign)

19C. DATE SIGNED

20B. UNITED STATES OF AMERICA
BY [signature] (Signature of Contracting Officer)

20C. DATE SIGNED
1/18/00

NSN 7540-01-152-8069
PREVIOUS EDITION UNUSABLE

26-107
GPO 1985 O - 469-794

STANDARD FORM 26 (REV. 4-85)
Prescribed by GSA
FAR (48 CFR) 53.214(a)

SECTION B

SUPPLIES OR SERVICE AND PRICES/COSTS

| ITEM NUMBER | SUPPLIES / SERVICES | QUANTITY | AMOUNT |
|---|---|---|---|
| 0001 | EXCHANGE OF AIRCRAFT, in an "as is, where is" condition, (CLIN's 0001AA through 0001AJ) owned by the U.S. Marine Corps, for AIRCRAFT (CLIN 0002AA and 0002AB) owned by THE LAN-DALE COMPANY, 5995 Alpha Ave., RENO, NV 89506 | | |
| 0001AA | T-34B, BuNo 140908 | 1 EACH | EXCHANGE |
| 0001AB | T-39D, BuNo 151336 | 1 EACH | EXCHANGE |
| 0001AC | T-39D, BuNo 150543 | 1 EACH | EXCHANGE |
| 0001AD | T-39D, BuNo 150547 | 1 EACH | EXCHANGE |
| 0001AE | T-39D, BuNo 150969 | 1 EACH | EXCHANGE |
| 0001AF | T-39D, BuNo 150548 | 1 EACH | EXCHANGE |
| 0001AG | VT-39E, BuNo 157354 | 1 EACH | EXCHANGE |
| 0001AH | T-39, ENGINES<br>S/N J60P-3A-637667<br>S/N J60P-3A-637670<br>S/N J60P-3A-637593<br>S/N J60P-3A-637597<br>S/N J60P-3A-637671 | 5 EACH | EXCHANGE |
| 0001AJ | MISC. ITEMS EXCHANGE | 1 LT | EXCHANGE |
| 0001AK | RESTORE AND TRANSPORT C-117-D, BuNo 50834 | 1 EACH | EXCHANGE |
| 0002 | EXCHANGE OF AIRCRAFT in an "as is, where is" condition, (CLIN 0002AA) owned by THE LAN-DALE COMPANY, 5995 Alpha Ave., RENO, NV 89506 for AIRCRAFT (CLIN's 0001AA through 0001AK) owned by the U.S. Marine Corps | | |
| 0002AA | VC-118, BuNo 128427 | 1 EACH | EXCHANGE |
| 0002AB | C-117-D, BuNo. 50834 | 1 EACH | EXCHANGE |

## SECTION C
## DESCRIPTION / SPECS / WORK STATEMENT

C-1 SCOPE OF WORK

C-1.1 RECITATIONS, PURPOSE AND RELEASE

C-1.1.1 WHEREAS, the Lan-Dale Company (hereinafter, "the contractor" or "the Lan-Dale Company") filed a claim with the contracting officer and an appeal to the Armed Services Board of Contract Appeals, docketed as ASBCA No. 50829; and,

C-1.1.2 WHEREAS, both the Lan-Dale Company and the Government desire a complete and universal resolution of all disputes, claims and appeals, of every kind and nature; and,

C-1.1.3 NOW, THEREFORE, this substituted contract (see paragraph H-8, *infra.*) resolves all disputes between the United States Marine Corps and The Lan-Dale Company during the period 1 January 1990 to the date of this contract. The acceptance of this contract by The Lan-Dale Company constitutes full resolution of disputes, claims and appeals against the United States Government. By accepting the terms and conditions of this contract, the Lan-Dale Company irrevocably and absolutely releases, remises, waives and forever discharges all claims, liabilities, damages, suits, actions or causes of action which it ever had, now has, or may have against the United States Government under contract number M00264-92-C-0010 and all oral agreements related to said contract.

C-1.2 The Government Property listed in CLINS 0001AA to 0001AJ of Section "B" of this contract shall be, or have been, delivered to The Lan-Dale Company "AS IS, WHERE IS", with no warranties implied or operational condition guaranteed. The Government does not warrant that all parts necessary for operation are present on the Government property identified in CLINS 0001AA to 0001AJ. Additionally, the Government does not warrant that the parts identified in logbooks are present. Further, all estimated values used in negotiation were prepared strictly to assist the Government, and do not constituted warranties or representations upon which the Lan-Dale Company can reasonably rely.

C-2 GOVERNMENT PROPERTY LOCATION

C-2.1 CLIN 0001AA and 0001AG are located at Marine Corp Air Station, Cherry Point, NC.

C-2.2 CLINs 0001AB, 0001AC, 0001AD, 0001AE, 0001AF, and 0001AH are located at Davis Monthan Air Force Base, AZ

C-2.3 CLIN 0001AJ is already in the possession of the Lan-Dale Company.

C-3 CONTRACTOR RESPONSIBILITIES

C-3.1 The transportation of all equipment from current locations shall be the responsibility of the Contractor.

C-3.2 All costs for transportation, presentation, insurance, and incidentals Related to the movement of the property shall be at the Contractor's expense.

C-3.3 The services required under CLIN 0001AK have already been performed by the contractor.

C-4 This agreement does not relieve the Lan-Dale company of any past, present or future tax obligations it may have to the United States.

C-5 The parties acknowledge that this is a jointly drafted, integrated contract. The parties acknowledge that they have fully read and understood this contract. The parties further acknowledge that they employed licensed legal counsel to

advise them of the binding legal meaning of the obligations set forth in this contract.

C-6 RATIFICATION OF BILLS OF SALE PREVIOUSLY EXCHANGED UNDER CONTRACT No. M00264-92-C-0010

Recognizing that the Government has previously executed Bills of Sale in favor of the Lan-Dale Company under Contract No. M00264-92-C-0010, and further recognizing that the present contract substitutes for Contract No. M00264-92-C-0010 (see paragraphs H.8, *infra*,), the parties hereby ratify anew the following previously executed Bills of Sale as good and proper consideration in this present contract:

C-6.1 CLIN 0001AJ:

The bills of sale listed below constitute full satisfaction of the Government's obligations under CLIN 0001AJ of this contract

- Bill of Sale - Aircraft, Cessna 02A, 20 Feb 1992
- Bill of Sale - Engine, Continental, 20 Feb 1992
- Bill of Sale - Propellers, McCauley, 20 Feb 1992
- Bill of Sale - Aircraft, BT-13A, 20 Feb 1992
- Bill of Sale - Jeep, CJ-5, 20 Feb 1992 (Serial No. 063605)
- Bill of Sale - Jeep, CJ-5, 20 Feb 1992 (Serial No. 063606)

Copies of the Bills of Sale listed above are contained in attachment I of this contract

C-6.2 CLINs 0001AK AND 0002AB:

The parties also ratify anew the Government's Bill of Sale - Aircraft, C-117D, dated 20 Feb 1992, that pertains to the C-117D, BuNo. 50834, and identified in CLINs 0001AK and 0002AB of this contract. The Lan-Dale Company, by signing this contract, agrees to convey titled back to the Government under CLIN 0002AB. The Government shall accept title in accordance with paragraph F.1 and F.2, *infra*.

C-7 The official signing this contract on behalf of the Lan-Dale Company warrants that he is duly authorized by the Lan-Dale Company to execute this contract as a binding obligation of the Lan-Dale Company. Further the official signing this contract warrants that the Lan-Dale Company, its officers, its principals and its agents have not assigned or otherwise transferred all or any part of the company's rights arising out of contract number M00264-92-C-0010.

- REMAINDER OF PAGE INTENTIONALLY LEFT BLANK -

## SECTION D
## PACKAGING AND MARKING

D-1 Shipping, licensing and minimum insurance requirements shall conform with current federal, state and local regulations for each state included in the Contractor travel arrangements.

- REMAINDER OF PAGE INTENTIONALLY LEFT BLANK -

## SECTION E
## INSPECTION AND ACCEPTANCE

E-1 MATERIAL INSPECTION AND RECEIVING REPORT
As evidence of acceptance of CLINs 0002AA and 0002AB, the Contracting Officer's Representative (COR) shall prepare and sign or as appropriate, have the Contractor sign Material Inspection and Receiving Reports (DD 250) with the block numbers 1, 2, 3, 7, 8, 9, 15, 16, 17 and 21B completed. The originals shall be furnished to the Contracting Officer, MCB, Quantico, VA , with a copy furnished to the Contractor.

E-2 Acceptance for CLINs 0001AA and 0001AG will be made at MCAS Cherry Point, NC; acceptance for CLINs 0001AB, 0001AC, 0001AD, 0001AE, 0001AF, and 0001AH will be made at Davis Monthan AFB, AZ.

E-3 FAR 52.252-2 CLAUSES INCORPORATED BY REFERENCE (JUN 1988)

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full test. Upon request the Contracting officer will make their full text available.

I. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CLAUSES

| FAR REFERENCE | CLAUSE OR PROVISION TITLE | DATE |
|---|---|---|
| 52.246-02 | Inspection of Supplies Fixed Price | JUL 1985 |
| 52.246-16 | Responsibility for Supplies | APR 1984 |

E-4 Risk of Loss Prior to Acceptance. The Government assumes no responsibility for maintaining the items described in CLINs 0001AA to 0001AJ from signing of this contract to removal by the contractor. The Lan-Dale Company accepts all risk of loss or damage these items.

- REMAINDER OF PAGE INTENTIONALLY LEFT BLANK -

SECTION F
DELIVERIES OR PERFORMANCE

F-1 The Airplanes listed in CLINs 0002AA and 0002AB are currently located at Cherry Point, MCB, NC and shall be transferred in place "AS IS, WHERE IS", on an F.O.B. Destination basis within sixty (60) days from effective date of the contract.

F-2 Titles to CLIN 0002AA and CLIN 0002AB shall transfer to the Government upon acceptance and will be evidenced by execution of a Material Inspection and Receiving Report (DD-250).

F-3 Title to CLINs 0001AA, 0001AB, 0001AC, 0001AD, 0001AE, 0001AF, 0001AG, 0001AH shall transfer to the Contractor upon execution by the Government of a Bill of Sale which shall be accomplished after receipt of the Material Inspection and Receiving Report referenced in section E-1. Bills of Sale shown in attachments "A" through "H".

F-4 FAR 52.252-2 CLAUSES INCORPORATED BY REFERENCE (JUN 1988)

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full test. Upon request the Contracting officer will make their full text available.

I. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CLAUSES

| FAR REFERENCE | CLAUSE OR PROVISION TITLE | DATE |
|---|---|---|
| 52.247-34 | F.O.B. Destination | APR 1984 |

- REMAINDER OF PAGE INTENTIONALLY LEFT BLANK -

SECTION G
CONTRACT ADMINISTRATION DATA

G-1 All contract Administration functions shall be retained by the Contracting Officer, Purchasing and Contracting Branch (B-215), 2010 Henderson Road, Quantico, VA 22134. Any inquiries pertaining to the administration or performance of this contract should be directed to the Contract Administrator, telephone (703)784-1925. See H-2

G-2 This contract is for the direct exchange of property between the United States Government and The Lan-Dale Company. The exchange is a result of a settlement of contract claims and disputes between the United States Government and The Lan-Dale Company. In accordance with as ASBCA No. 50829, both parties have agreed that there is to be no monetary compensation.

G-3 The Contractor shall provide the United States Government with Bills of Sale for CLINs 0002AA and 0002AB to the address below:

COMMANDING GENERAL
PURCHASING AND CONTRACTING (B215)
3250 CATLIN ROAD
QUANTICO, VA 22134

G-4 Report of Property received (DD 250) shall be prepared by the Contracting Officer's Representative, in accordance with local requirements and paragraph E-1 in section E.

- REMAINDER OF PAGE INTENTIONALLY LEFT BLANK -

SECTION H
SPECIAL CONTRACT REQUIREMENTS

H-1 Concurrent with the execution of this contract, the Parties hereby agree to release and withdraw, with prejudice any claims now pending against the other in any forum whatsoever, including ASBCA Appeal Number 50829, and that the Parties shall relinquish forever any claims known or unknown, arising now or at any time in the future against the other in connection with this exchange agreement or any previous transaction; provided however, that this release shall not abridge, enlarge, or abrogate the rights of each Party to this Agreement to secure free and clear title and ownership to the items of exchange set forth in Section C of this Agreement. The Appellant specifically releases the Government from claims for attorney's fees, interest and for costs arising out of or related to its ASBCA Claim No. 50829.

H-2 The Contracting Officer's Representative (COR) for this project is Mike Starn, Quantico Marine Air / Ground Museum. - See G-1

H-3 The authority of the COR is confined to inspection and acceptance of the deliverable items as specified herein, and to coordinate and monitor the service performed hereunder. Only the Contracting Officer has the authority to authorize deviations from specifications or requirements. In the event the Contractor does deviate without written approval of the Contracting Officer, such deviations shall be at the risk of, and any cost related thereto shall be borne by, the Contractor.

H-4 CLINs 0001AA, 0001AB, 0001AC, 0001AD, 0001AE, 0001AF, 0001AG, 0001AH, 0001AJ shall be delivered in "AS IS, WHERE IS" condition. Contractor shall obliterate all stars, bars, insignia and service markings wherever they appear, prior to assuming ownership, without expressed or implied warranty of any kind. Removal of CLINs 0001AA, 0001AB, 0001AC, 0001AD, 0001AE, 0001AF, 0001AG, 0001AH, 0001AJ shall not take place until CLINs 0002AA and 002AB has been delivered and accepted by the Government and a Bill of Sale issued. Removal of CLINs 0001AA, 0001AB, 0001AC, 0001AD, 0001AE, 0001AF, 0001AG, 0001AH, from military property, shall take place within sixty (60) days after the issuing of Bill of Sale.

H-5 Both the Contractor and Government represent that the equipment exchanged under the terms and conditions of this contract is in satisfaction of the Contractor's ASBCA Claim No 50829, Neither party warrants the fitness of the equipment exchanged hereunder for any purpose. The Contractor undertakes and agrees to indemnify and hold the Government, its agents, officers and employees harmless from any and all loss or liability (whether in tort or in contract) which might arise from the use of the equipment exchanged under this contract for any purpose other than static display when such use results in (i) injury to or death of personnel of the Contractor or third parties; or (ii) damage to or destruction of real or personal property of the Contractor or third parties.

H-6 GOVERNMENT BILL OF SALE (CLINs 0001AA, 0001AB, 0001AC, 0001AD, 0001AE, 0001AF, 0001AG, 0001AH)
As evidence of transfer of title of Government-owned equipment to the Contractor as required by DOD Property Disposal Manual DOD 4160.21-1, the Contracting Officer shall, upon the receipt of DD Form 250 evidencing delivery and acceptance of CLIN 0002AB, furnish the Contractor a Bill of Sale covering CLINs 0001AA - 0001AH using the format required by DOD Property Disposal Manual DOD 4160-21-M-1. A copy of the Bill of Sale Document to be provided is included as Attachments "A" through "J".

H-7 CONSTRUCTIVE CHANGE ORDERS
No understanding or agreement, contract modification, change or other matter deviating from or constituting an alternation or change of terms of the contract will be effective or binding upon the Government unless formalized by contractual documents executed by the Contracting Officer or his duly authorized representative.

H-8 This contract, Contract No. M00264-99-C-0003, is a substitute contract in place of Contract No. M00264-92-C-0010. This contract is accepted by each party in satisfaction and discharge of the other's obligations under Contract No. M00264-92-C-0010. Breach of this substituted contract does not give either party the right to enforce duties under Contract No. M00264-92-C-0010.

- REMAINDER OF PAGE INTENTIONALLY LEFT BLANK -

SECTION I

CONTRACT CLAUSES

FAR 52.252-2 CLAUSES INCORPORATED BY REFERENCE (IAW FAR 52.107(b)) JUN 1988

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available.

| | | |
|---|---|---|
| 52.202-1 | DEFINITIONS | OCT 1995 |
| 52.203-3 | GRATUITIES | APR 1984 |
| 52.203-5 | COVENANT AGAINST CONTINGENT FEES | APR 1984 |
| 52.203-6 | RESTRICTIONS ON SUBCONTRACTOR SALES TO THE GOVERNMENT | JUL 1995 |
| 52.203-7 | ANTI-KICKBACK PROCEDURES | JUL 1995 |
| 52.203-10 | PRICE OR FEE ADJUSTMENT FOR ILLEGAL OR IMPROPER ACTIVITY | JAN 1997 |
| 52.203-12 | LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS | JAN 1990 |
| 52.204-4 | PRINTING/COPYING DOUBLE-SIDED ON RECYCLED PAPER | JUN 1996 |
| 52.215-2 | AUDIT AND RECORDS--NEGOTIATION | AUG 1996 |
| 52.222-20 | WALSH-HEALEY PUBLIC CONTRACTS ACT | DEC 1996 |
| 52.223-2 | CLEAN AIR AND WATER | APR 1984 |
| 52.223-6 | DRUG-FREE WORKPLACE | JAN 1997 |
| 52.223-13 | CERTIFICATION OF TOXIC CHEMICAL RELEASE REPORTING | OCT 1996 |
| 52.223-14 | TOXIC CHEMICAL RELEASE REPORTING | OCT 1996 |
| 52.228-5 | INSURANCE - WORK ON A GOVERNMENT INSTALLATION | JAN 1997 |
| 52.228-7 | INSURANCE - LIABILITY TO THIRD PERSONS | MAR 1996 |
| 52.233-1 | DISPUTES | DEC 1998 |
| 52.233-3 | PROTEST AFTER AWARD | AUG 1996 |
| 52.237-2 | PROTECTION OF GOVERNMENT BUILDINGS, EQUIPMENT AND VEGETATION | APR 1984 |
| 52.242-13 | BANKRUPTCY | JUL 1995 |
| 52.243-1 | CHANGES--FIXED-PRICE | AUG 1987 |
| 52.244-6 | SUBCONTRACTS FOR COMMERCIAL ITEMS AND COMMERCIAL COMPONENTS | OCT 1998 |
| 52.245-4 | GOVERNMENT-FURNISHED PROPERTY (SHORT FORM) | APR 1984 |

| | | |
|---|---|---|
| 52.245-19 | GOVERNMENT PROPERTY FURNISHED "AS IS" | APR 1984 |
| 52.249-2 | TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) | SEP 1996 |
| 52.249-8 | DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) | APR 1984 |
| 52.252-6 | AUTHORIZED DEVIATIONS IN CLAUSES | APR 1984 |

(a) The use in this solicitation or contract of any Federal Acquisition Regulation (48 CFR Chapter 1) clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the date of the clause.

(b) The use in this solicitation or contract of any Defense Federal Acquisition Regulation Supplement (48 CFR Chapter 2) clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the name of the regulation.

| DFAR PARA | CLAUSE TITLE | DATE |
|---|---|---|
| 252.243-7001 | PRICING OF CONTRACT MODIFICATIONS | DEC 1991 |

- REMAINDER OF PAGE INTENTIONALLY LEFT BLANK -

SECTION J
LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACHMENTS

| | |
|---|---|
| ATTACHMENT "A" | Government Bill of Sale, T-34, BuNo 140908 |
| ATTACHMENT "B" | Government Bill of Sale, T-39D, BuNo 151336 |
| ATTACHMENT "C" | Government Bill of Sale, T-39D, BuNo 150543 |
| ATTACHMENT "D" | Government Bill of Sale, T-39D, BuNo 150547 |
| ATTACHMENT "E" | Government Bill of Sale, T-39D, BuNo 150969 |
| ATTACHMENT "F" | Government Bill of Sale, T-39D, BuNo 150548 |
| ATTACHMENT "G" | Government Bill of Sale, VT-39E, BuNo 157354 |
| ATTACHMENT "H" | Government Bill of Sale, T-39, ENGINES |
| ATTACHMENT "I" | Government Bills of Sale ratified pursuant to paragraph C.6 |

- REMAINDER OF PAGE INTENTIONALLY LEFT BLANK -

C4502P22
COMMAND: B

DOC NBR: M20409 9211 0004
(SUPPLY OFFICER APPROVED)

DATE: 990730
ACTION-CODE: A

DIC: A0B RIC: MQD M&S: 0 NSN:
UI: MO QTY: 2
DEM: R SUP ADDR: MMQ999 SIG: J PROJ: PRI: 07 RDD: 225 ADV:
UP: 8594.46 FY: 1999 FIP: M00002 22 20 BH 2332 6A40 CO MMXX XXX X

COST CODE: 122292110004 SAC: MEC: SSC: MSDS: TOTAL PRI: 17,188.92
PART#: CONTRACT
CAGE:
MANUFACTURER: BELL ATLANTIC
RECORD TYPE: W

SOS: NAME: BELL ATLANTIC
TICKET NBR:
STREET ADDRESS: 2059 CHAIN BRIDGE ROAD
CITY-STATE: VIENNA VA
ZIP: 22182
TELEPHONE: 202 494 2465 EXT: POC: RENEÈ

NOMEN: SERVICE CONTRACT 2 MO AIR TIME 39.99 MO X 114 X 2 AND ADDITI
ONAL AIRTIME 118 X 114 PHONES X 2 MO @ .30
_CED APPROVAL

PF 1 - TOP PF 3 - PAGE TWO PF 4 - SCROLL PF 6 - PRINT PF 12-MENU

LAN-DALE COMPAN . M00264-99-C-0003

ATTACHMENT "A"

BILL OF SALE - AIRCRAFT

KNOW YE, that the United States of America (hereinafter referred to as the "SELLER"), represented by the Sale Contracting Officer, MCB, Quantico, Virginia, acting on behalf of the Seller, sole owner of (1) T-34B, BuNo 140908 Airplane, for and in consideration of (1) VC-118, BuNo 128427 Airplane and other good and valuable consideration to it in hand paid by The Lan-Dale Company, (Mr. A.J. D'Alessandris), 5995 Alpha Ave., Reno, Nevada 89506 (hereinafter referred to as the "BUYER") receipt of which is hereby acknowledged has bargained and sold Aircraft, and by those present does hereby confirm transfer of all right, title, and interest to said "BUYER".

TO HAVE AND TO HOLD, the Parts unto the BUYER, The Lan-Dale Company, BUYERS(s) heirs, administrators, executors, successors and assigns forever.

IN TESTIMONY WHEREOF, the said SELLER has caused this instrument to be executed at Marine Corps Base, Quantico, Virginia, the 7th day of FEB in the year of our Lord, two thousand, A.D. (2000).

UNITED STATES OF AMERICA
By: [signature]
GARY E. WATSON
Contracting Officer
United States Marine Corps

STATE OF VIRGINIA
COUNTY OF PRINCE WILLIAM

BE IT KNOWN, that on this 7th day of February, 2000, personally appeared before me, Gary E. Watson, and acknowledged the within instrument to be his free act and deed. IN TESTIMONY WHEREOF, I have hereunto set my hand and seal this 7th day of February, 2000 A.D.

Nov. 31, 2001 [signature: Shirley T. Bates]
NOTARY

MY COMMISSION EXPIRES

LAN-DALE COMPANY M00264-99-C-0003

**ATTACHMENT "B"**

BILL OF SALE - AIRCRAFT

KNOW YE, that the United States of America (hereinafter referred to as the "SELLER"), represented by the Sale Contracting Officer, MCB, Quantico, Virginia, acting on behalf of the Seller, sole owner of (1) T-39D, BuNo 151336 Airplane, for and in consideration of (1) VC-118, BuNo 128427 Airplane and other good and valuable consideration to it in hand paid by The Lan-Dale Company, (Mr. A.J. D'Alessandris), 5995 Alpha Ave., Reno, Nevada 89506 (hereinafter referred to as the "BUYER") receipt of which is hereby acknowledged has bargained and sold Aircraft, and by those present does hereby confirm transfer of all right, title, and interest to said "BUYER".

TO HAVE AND TO HOLD, the Parts unto the BUYER, The Lan-Dale Company, BUYERS(s) heirs, administrators, executors, successors and assigns forever.

IN TESTIMONY WHEREOF, the said SELLER has caused this instrument to be executed at Marine Corps Base, Quantico, Virginia, the 9th day of Feb in the year of our Lord, two thousand, A.D. (2000).

UNITED STATES OF AMERICA
By: [signature]
GARY E. WATSON
Contracting Officer
United States Marine Corps

STATE OF VIRGINIA
COUNTY OF PRINCE WILLIAM

BE IT KNOWN, that on this 9th day of February, 2000, personally appeared before me, Gary E. Watson, and acknowledged the within instrument to be his free act and deed. IN TESTIMONY WHEREOF, I have hereunto set my hand and seal this 9th day of February, 2000 A.D.

Nov. 30, 2001 [signature]
NOTARY

MY COMMISSION EXPIRES

**ATTACHMENT "C"**

BILL OF SALE - AIRCRAFT

KNOW YE, that the United States of America (hereinafter referred to as the "SELLER"), represented by the Sale Contracting Officer, MCB, Quantico, Virginia, acting on behalf of the Seller, sole owner of (1) T-39D, BuNo 150543 Airplane, for and in consideration of (1) VC-118, BuNo 128427 Airplane and other good and valuable consideration to it in hand paid by The Lan-Dale Company, (Mr. A.J. D'Alessandris), 5995 Alpha Ave., Reno, Nevada 89506 (hereinafter referred to as the "BUYER") receipt of which is hereby acknowledged has bargained and sold Aircraft, and by those present does hereby confirm transfer of all right, title, and interest to said "BUYER".

TO HAVE AND TO HOLD, the Parts unto the BUYER, The Lan-Dale Company, BUYERS(s) heirs, administrators, executors, successors and assigns forever.

IN TESTIMONY WHEREOF, the said SELLER has caused this instrument to be executed at Marine Corps Base, Quantico, Virginia, the 7th day of FEB in the year of our Lord, two thousand, A.D. (2000).

UNITED STATES OF AMERICA
By: Gary E. Watson

GARY E. WATSON
Contracting Officer
United States Marine Corps

STATE OF VIRGINIA
COUNTY OF PRINCE WILLIAM

BE IT KNOWN, that on this 7th day of February, 2000, personally appeared before me, Gary E. Watson, and acknowledged the within instrument to be his free act and deed. IN TESTIMONY WHEREOF, I have hereunto set my hand and seal this 7th day of February, 2000 A.D.

Nov. 30, 2001 Shirley J. Bates
NOTARY

MY COMMISSION EXPIRES

LAN-DALE COMPANY M00264-99-C-0003

ATTACHMENT "D"

BILL OF SALE - AIRCRAFT

KNOW YE, that the United States of America (hereinafter referred to as the "SELLER"), represented by the Sale Contracting Officer, MCB, Quantico, Virginia, acting on behalf of the Seller, sole owner of (1) T-39D, BuNo 150547 Airplane, for and in consideration of (1) VC-118, BuNo 128427 Airplane and other good and valuable consideration to it in hand paid by The Lan-Dale Company, (Mr. A.J. D'Alessandris), 5995 Alpha Ave., Reno, Nevada 89506 (hereinafter referred to as the "BUYER") receipt of which is hereby acknowledged has bargained and sold Aircraft, and by those present does hereby confirm transfer of all right, title, and interest to said "BUYER".

TO HAVE AND TO HOLD, the Parts unto the BUYER, The Lan-Dale Company, BUYERS(s) heirs, administrators, executors, successors and assigns forever.

IN TESTIMONY WHEREOF, the said SELLER has caused this instrument to be executed at Marine Corps Base, Quantico, Virginia, the 7th day of FEB in the year of our Lord, two thousand, A.D. (2000).

UNITED STATES OF AMERICA
By:

Gary E. Watson

GARY E. WATSON
Contracting Officer
United States Marine Corps

STATE OF VIRGINIA
COUNTY OF PRINCE WILLIAM

BE IT KNOWN, that on this 7th day of February, 2000, personally appeared before me, Gary E. Watson, and acknowledged the within instrument to be his free act and deed. IN TESTIMONY WHEREOF, I have hereunto set my hand and seal this 7th day of February, 2000 A.D.

Nov. 30, 2001 Shirley P. Bates
NOTARY

MY COMMISSION EXPIRES

**ATTACHMENT "E"**

BILL OF SALE - AIRCRAFT

KNOW YE, that the United States of America (hereinafter referred to as the "SELLER"), represented by the Sale Contracting Officer, MCB, Quantico, Virginia, acting on behalf of the Seller, sole owner of (1) T-39D, BuNo 150969 Airplane, for and in consideration of (1) VC-118, BuNo 128427 Airplane and other good and valuable consideration to it in hand paid by The Lan-Dale Company, (Mr. A.J. D'Alessandris), 5995 Alpha Ave., Reno, Nevada 89506 (hereinafter referred to as the "BUYER") receipt of which is hereby acknowledged has bargained and sold Aircraft, and by those present does hereby confirm transfer of all right, title, and interest to said "BUYER".

TO HAVE AND TO HOLD, the Parts unto the BUYER, The Lan-Dale Company, BUYERS(s) heirs, administrators, executors, successors and assigns forever.

IN TESTIMONY WHEREOF, the said SELLER has caused this instrument to be executed at Marine Corps Base, Quantico, Virginia, the 7th day of FEB in the year of our Lord, two thousand, A.D. (2000).

UNITED STATES OF AMERICA
By:

Gary E. Watson

GARY E. WATSON
Contracting Officer
United States Marine Corps

STATE OF VIRGINIA
COUNTY OF PRINCE WILLIAM

BE IT KNOWN, that on this 7th day of February, 2000, personally appeared before me, Gary E. Watson, and acknowledged the within instrument to be his free act and deed. IN TESTIMONY WHEREOF, I have hereunto set my hand and seal this 7th day of February, 2000 A.D.

Nov. 30, 2001 Shirley J. Bates
NOTARY

MY COMMISSION EXPIRES

ATTACHMENT "F"

BILL OF SALE - AIRCRAFT

KNOW YE, that the United States of America (hereinafter referred to as the "SELLER"), represented by the Sale Contracting Officer, MCB, Quantico, Virginia, acting on behalf of the Seller, sole owner of (1) T-39D, BuNo 150548 Airplane, for and in consideration of (1)VC-118, BuNo 128427 Airplane and other good and valuable consideration to it in hand paid by The Lan-Dale Company, (Mr. A.J. D'Alessandris), 5995 Alpha Ave., Reno, Nevada 89506 (hereinafter referred to as the "BUYER") receipt of which is hereby acknowledged has bargained and sold Aircraft, and by those present does hereby confirm transfer of all right, title, and interest to said "BUYER".

TO HAVE AND TO HOLD, the Parts unto the BUYER, The Lan-Dale Company, BUYERS(s) heirs, administrators, executors, successors and assigns forever.

IN TESTIMONY WHEREOF, the said SELLER has caused this instrument to be executed at Marine Corps Base, Quantico, Virginia, the 7th day of FEB in the year of our Lord, two thousand, A.D. (2000).

UNITED STATES OF AMERICA
By: [signature]
GARY E. WATSON
Contracting Officer
United States Marine Corps

STATE OF VIRGINIA
COUNTY OF PRINCE WILLIAM

BE IT KNOWN, that on this 7th day of February, 2000, personally appeared before me, Gary E. Watson, and acknowledged the within instrument to be his free act and deed. IN TESTIMONY WHEREOF, I have hereunto set my hand and seal this 7th day of February 2000 A.D.

Nov. 30, 2001 Shirley J. Bates
NOTARY

MY COMMISSION EXPIRES

**ATTACHMENT "G"**

BILL OF SALE - AIRCRAFT

KNOW YE, that the United States of America (hereinafter referred to as the "SELLER"), represented by the Sale Contracting Officer, MCB, Quantico, Virginia, acting on behalf of the Seller, sole owner of (1) VT-39E, BuNo 157354 Airplane, for and in consideration of (1)VC-118, BuNo 128427 Airplane and other good and valuable consideration to it in hand paid by The Lan-Dale Company, (Mr. A.J. D'Alessandris), 5995 Alpha Ave., Reno, Nevada 89506 (hereinafter referred to as the "BUYER") receipt of which is hereby acknowledged has bargained and sold Aircraft, and by those present does hereby confirm transfer of all right, title, and interest to said "BUYER".

TO HAVE AND TO HOLD, the Parts unto the BUYER, The Lan-Dale Company, BUYERS(s) heirs, administrators, executors, successors and assigns forever.

IN TESTIMONY WHEREOF, the said SELLER has caused this instrument to be executed at Marine Corps Base, Quantico, Virginia, the 7th day of FEB in the year of our Lord, two thousand, A.D. (2000).

UNITED STATES OF AMERICA
By:

[signature]
GARY E. WATSON
Contracting Officer
United States Marine Corps

STATE OF VIRGINIA
COUNTY OF PRINCE WILLIAM

BE IT KNOWN, that on this 7th day of February, 2000, personally appeared before me, Gary E. Watson, and acknowledged the within instrument to be his free act and deed. IN TESTIMONY WHEREOF, I have hereunto set my hand and seal this 7th day of February, 2000 A.D.

Nov. 30, 2001 [signature: Shirley J. Bates]
NOTARY

MY COMMISSION EXPIRES

ATTACHMENT "H"

BILL OF SALE - AIRCRAFT

KNOW YE, that the United States of America (hereinafter referred to as the "SELLER"), represented by the Sale Contracting Officer, MCB, Quantico, Virginia, acting on behalf of the Seller, sole owner of (5) T-39 Engines, S/N J60P-3A-637667, J60P-3A-637670, J60P-3A-637593, J60P-3A-637597, J60P-3A-637671, for and in consideration of (1) VC-118, BuNo 128427 Airplane and other good and valuable consideration to it in hand paid by The Lan-Dale Company, (Mr. A.J. D'Alessandris), 5995 Alpha Ave., Reno, Nevada 89506 (hereinafter referred to as the "BUYER") receipt of which is hereby acknowledged has bargained and sold Aircraft, and by those present does hereby confirm transfer of all right, title, and interest to said "BUYER".

TO HAVE AND TO HOLD, the Parts unto the BUYER, The Lan-Dale Company, BUYERS(s) heirs, administrators, executors, successors and assigns forever.

IN TESTIMONY WHEREOF, the said SELLER has caused this instrument to be executed at Marine Corps Base, Quantico, Virginia, the 7th day of Feb in the year of our Lord, two thousand, A.D. (2000).

UNITED STATES OF AMERICA
By:

GARY E. WATSON
Contracting Officer
United States Marine Corps

STATE OF VIRGINIA
COUNTY OF PRINCE WILLIAM

BE IT KNOWN, that on this 7th day of February, 2000, personally appeared before me, Gary E. Watson, and acknowledged the within instrument to be his free act and deed. IN TESTIMONY WHEREOF, I have hereunto set my hand and seal this 7th day of February, 2000 A.D.

Nov. 30, 2001 NOTARY

MY COMMISSION EXPIRES

ATTACHMENT "I"

Copies of prior bills of sale pertaining to CLIN 0001AJ.

- REMAINDER OF PAGE INTENTIONALLY LEFT BLANK -

BILL OF SALE- AIRCRAFT, C-117D

KNOW YE, that the United States of America (hereinafter referred to as the "SELLER"), represented by the Sale Contracting Officer, MCCDC, Quantico, Virginia, acting on behalf of the United States, sole owner of Aircraft, C-117D, BuNo 50834; for and in consideration of (1) Aircraft, C-118-B, BuNo 128427, configured for a former Commandant in Marine Corps colors and markings, in Museum display condition, and other good and valuable consideration to it in hand paid by The Lan-Dale Company, (Mr. A.J. D'Alessandris), 1460 Terminal Way, Reno, Nevada 89502 (hereinafter referred to as the "BUYER") receipt of which is hereby acknowledged has bargained and sold Aircraft, and by those present does hereby confirm transfer of all right, title, and interest to said "BUYER".

TO HAVE AND TO HOLD, the Aircraft unto the BUYER, The Lan-Dale Company, BUYER(s) heirs, administrators, executors, successors and assigns forever.

IN TESTIMONY WHEREOF, the said SELLER has caused this instrument to be executed at the Marine Corps Combat Development Command, Quantico, Virginia, the 20th day of February in the year of our Lord, one thousand nine hundred and ninety-two, A.D. (1992).

UNITED STATES OF AMERICA
By:

Wanda D. LaBelle
WANDA D. LABELLE
Contracting Officer
United States Marine Corps

STATE OF VIRGINIA
COUNTY OF PRINCE WILLIAM

BE IT KNOWN, that on this 20th day of February, 1992, personally appeared before me, Wanda D. Labelle, and acknowledged the within instrument to be her free act and deed. IN TESTIMONY WHEREOF, I have hereunto set my hand and seal this 20th day of February, 1992 A.D.

Notary Shirley J. Bates

May 24, 1993
MY COMMISSION EXPIRES

BILL OF SALE- ENGINE, CONTINENTAL

KNOW YE, that the United States of America (hereinafter referred to as the "SELLER"), represented by the Sale Contracting Officer, MCCDC, Quantico, Virginia, acting on behalf of the United States, sole owner of (2) Engines, Continental, Model 0470-4, Serial #51063-5-M and #116216R; for and in consideration of (1) Aircraft, C-118-B, BuNo 128427, configured for a former Commandant in Marine Corps colors and markings, in Museum display condition, and other good and valuable consideration to it in hand paid by The Lan-Dale Company, (Mr. A.J. D'Alessandris), 1460 Terminal Way, Reno, Nevada 89502 (hereinafter referred to as the "BUYER") receipt of which is hereby acknowledged has bargained and sold Engines, and by those present does hereby confirm transfer of all right, title, and interest to said "BUYER".

TO HAVE AND TO HOLD, the Engines unto the BUYER, The Lan-Dale Company, BUYER(s) heirs, administrators, executors, successors and assigns forever.

IN TESTIMONY WHEREOF, the said SELLER has caused this instrument to be executed at the Marine Corps Combat Development Command, Quantico, Virginia, the 20th day of February in the year of our Lord, one thousand nine hundred and ninety-two, A.D. (1992).

UNITED STATES OF AMERICA
By:

Wanda D. LaBelle
WANDA D. LABELLE
Contracting Officer
United States Marine Corps

STATE OF VIRGINIA
COUNTY OF PRINCE WILLIAM

BE IT KNOWN, that on this 20th day of February, 1992, personally appeared before me, Wanda D. Labelle, and acknowledged the within instrument to be her free act and deed. IN TESTIMONY WHEREOF, I have hereunto set my hand and seal this 20th day of February, 1992 A.D.

Notary Shirley J. Bates

May 24, 1993
MY COMMISSION EXPIRES

BILL OF SALE- AIRCRAFT, BT-13A

KNOW YE, that the United States of America (hereinafter referred to as the "SELLER"), represented by the Sale Contracting Officer, MCCDC, Quantico, Virginia, acting on behalf of the United States, sole owner of Aircraft, BT-13A, BuNo 41-10886; for and in consideration of (1) Aircraft, C-118-B, BuNo 128427, configured for a former Commandant in Marine Corps colors and markings, in Museum display condition, and other good and valuable consideration to it in hand paid by The Lan-Dale Company, (Mr. A.J. D'Alessandris), 1460 Terminal Way, Reno, Nevada 89502 (hereinafter referred to as the "BUYER") receipt of which is hereby acknowledged has bargained and sold Aircraft, and by those present does hereby confirm transfer of all right, title, and interest to said "BUYER".

TO HAVE AND TO HOLD, the Aircraft unto the BUYER, The Lan-Dale Company, BUYER(s) heirs, administrators, executors, successors and assigns forever.

IN TESTIMONY WHEREOF, the said SELLER has caused this instrument to be executed at the Marine Corps Combat Development Command, Quantico, Virginia, the 20th day of February in the year of our Lord, one thousand nine hundred and ninety-two, A.D. (1992).

UNITED STATES OF AMERICA
By:

Wanda D. LaBelle

WANDA D. LABELLE
Contracting Officer
United States Marine Corps

STATE OF VIRGINIA
COUNTY OF PRINCE WILLIAM

BE IT KNOWN, that on this 20th day of February, 1992, personally appeared before me, Wanda D. Labelle, and acknowledged the within instrument to be her free act and deed. IN TESTIMONY WHEREOF, I have hereunto set my hand and seal this 20th day of February, 1992 A.D.

Notary: Shirley J. Bates

May 24, 1993
MY COMMISSION EXPIRES

# BILL OF SALE- PROPELLERS, MCCAULEY

KNOW YE, that the United States of America (hereinafter referred to as the "SELLER"), represented by the Sale Contracting Officer, MCCDC, Quantico, Virginia, acting on behalf of the United States, sole owner of (2) Propellers, McCauley, Model 2AF34C55-O, Serial #851543 and #851540; for and in consideration of (1) Aircraft, C-118-B, BuNo 128427, configured for a former Commandant in Marine Corps colors and markings, in Museum display condition, and other good and valuable consideration to it in hand paid by The Lan-Dale Company, (Mr. A.J. D'Alessandris), 1460 Terminal Way, Reno, Nevada 89502 (hereinafter referred to as the "BUYER") receipt of which is hereby acknowledged has bargained and sold Propellers, and by those present does hereby confirm transfer of all right, title, and interest to said "BUYER".

TO HAVE AND TO HOLD, the Propellers unto the BUYER, The Lan-Dale Company, BUYER(s) heirs, administrators, executors, successors and assigns forever.

IN TESTIMONY WHEREOF, the said SELLER has caused this instrument to be executed at the Marine Corps Combat Development Command, Quantico, Virginia, the 20th day of February in the year of our Lord, one thousand nine hundred and ninety-two, A.D. (1992).

UNITED STATES OF AMERICA
By:

Wanda D. LaBelle

WANDA D. LABELLE
Contracting Officer
United States Marine Corps

STATE OF VIRGINIA
COUNTY OF PRINCE WILLIAM

BE IT KNOWN, that on this 20th day of February, 1992, personally appeared before me, Wanda D. Labelle, and acknowledged the within instrument to be her free act and deed. IN TESTIMONY WHEREOF, I have hereunto set my hand and seal this 20th day of February, 1992 A.D.

Notary Shirley J. Bates

May 24, 1993
MY COMMISSION EXPIRES

# EXHIBIT X

10 Feb 2000

To: Tony D'Alesandris (Lan-Dale Company)
From: AK1 Kevin Potts (Logistics NAVICP DET FSO Tucson AZ)

Subj: **Cost estimate to remove 5 T-39's and 5 engines from AMARC to Lan-Dale gate**

1. Mr. D'Alesandris this is to inform you of the cost involved to remove the Aircraft and Engines stated in USMC letter dated 8 Feb 2000.

2. To remove A/C BUNO's 151336,150543,150547,150969 and 150548 and Engine S/N's: 637667,637670,637593,637597 and 6377671 the cost estimate from AMARC is $35,029.00.

3. Any questions on this estimate can be addressed to AK1 Potts at (520) 228-8466.

AK1 Kevin L. Potts
AK1(AW) USN

HEADQUARTERS UNITED STATES MA...E CORPS
MUSEUMS BRANCH
MARINE CORPS HISTORY AND MUSEUMS DIVISION
2014 ANDERSON AVENUE
QUANTICO, VIRGINIA 22134-5002

In Reply Refer To

13000
HDM-2
8 Feb 00

From: Head Museums Branch
To: Naval Aviation Supply Office, ATTN: Anthony Mazzone, Code 03432.06, 700 Robbins Avenue, Philadelphia, PA 19111

Ref: (a)MCCDC Exchange Contract M00264-99-C-0003

Subj: AUTHORIZATION FOR REMOVAL OF AIRCRAFT AND ENGINES

1. Per Ref (a) this activity requests your assistance to obtain a removal schedule with AMARC for the following aircraft and engines:

T-39D Aircraft
BuNos: 151336, 150543, 150547, 150969, 150548

J60P-3A Engines
S/Ns: 637667, 637670,637593, 637597, 637671

Owner: Lan-Dale Company
Mr. Tony D'Alesandris
1460 Terminal Way
Reno, NV 89502
Phone No.: (520)889-3036

will pay for removal of all material.

2. Request removal of the above aircraft and engines at the earliest possible date and notify this activity upon completion of removal.

3. POC for this activity is Mr Michael Stam DSN 278-2606/7/8 Comm. (703)784-2606/7/8

R. J. SULLIVAN
LtCol, USMC

Copy To:
NAVICP Det AMARC
MCCDC Counsel

23 Feb 2000

To: Tony
From: Kevin Potts

Subj: Cost breakdown for the movement of T-39 A/C and Engines

1. As per our phonecon here is the breakdown of functions that will need to be preformed in conjunction with your aircraft move.
2. If there are any questions please feel free to contact me at 228-8466 or my Cell phone at (520) 237-0875. I will be out of the office between 24 Feb and 9 March. I will return on the 10th. My Cell # will be on most of the time I am away from the office.

Ak1 Kevin Potts

Job Plan Description
?LAN7TTG T-39 ACFT NAVY TOW TO GATE

| OPN | Work Center | Description | Std Hours |
|---|---|---|---|
| 10 | 4D2742 | NOTIFY RECORDS | .5 |
| 20 | 4D2742 | REMOVE ALL TECH DATA FROM ACFT | 1.0 |
| 30 | 4D2755 | CW EGRESS FINALS | 2.0 |
| 40 | 4D2742 | CW WITH RAD INSPECTION | 1.0 |
| 50 | 4D2742 | CW WITH RAD SWIPES/ANNOTATE/ NO REMOVALS | 4.0 |
| 60 | 4D2752 | CW RAD FINALS | 2.0 |
| 70 | 4D2752 | CW FINAL DEMIL INSPECTION | 2.0 |
| 80 | 4D2724 | CW CLASSIFIED FINAL /REMOVAL | 2.0 |
| 90 | 4D2742 | DRAIN ALL HAZARDOUS FLUIDS & ACCUMULATORS | 4.0 |
| 100 | 4D2742 | CW ASBESTOS INSP/ANNOTATE/NO REMOVALS | 3.0 |
| 110 | 4D4141 | ISSUE C 03 ITEMS | 3.0 |
| 120 | 4D2742 | ENSURE C 03 ITEMS ARE STOWED IN ACFT | 2.0 |
| 130 | 4D2742 | PICKUP RECORDS | 1.0 |
| 140 | 4D2724 | CW WITH TOWABILITY INSPECTION | 2.0 |
| 150 | 4D2715T | SERVICE TIRES AND STRUTS | 1.5 |
| 160 | 4D2757 | INSTALL WHEELS ON RIMS IF REQUIRED | 4.0 |
| 170 | 4D2715 | TOW ACFT TO DESIGNATED | 12.0 |
| 180 | 4D2742 | CLEAN & SECURE AREA | 3.0 |

Total Hours: 50.0

[illegible]

**Job Plan** **Description**
OLJ60ENG T-39 ENGINE (J60-P-3) REMOVE & TRANSPORT TO GATE

| OPN | Work Center | Description | Std Hours |
|---|---|---|---|
| 10 | 4D2743 | NOTIFY RECORDS OF ENG. OVERLAND | .5 |
| 20 | 4D2743 | TRANSIT & SEARCH FOR PALLET & OLD MATTRESS | 4.0 |
| 30 | 4D2743 | DRAIN HAZARDOUS FLUIDS ( REF 1T39-2-2) | 1.5 |
| 40 | 4D2743 | CW RAD INSPECTION | 1.0 |
| 50 | 4D2743 | CW RAD SWIPE/ANNOTATE/NO REMOVALS | 1.0 |
| 60 | 4D2752 | CW RAD FINAL/NO REMOVALS | 2.0 |
| 70 | 4D2743 | REMOVE ENG. IAW 1T-39-2-3 ( SLING/AGE/KQ641) | 12.0 |
| 80 | 4D2715M | ASSIST ENG. REMOVAL | 3.0 |
| 90 | 4D2743 | PLACE ENG ON PALLET & OLD MATRESS OR SUIT SUB. | 1.0 |
| 100 | 4D2743 | RE-INSTALL COWLING ON ACFT (REF 1T-39-2-3) | 2.0 |
| 110 | 4D2743 | NOTIFY ENGINE MGR | .5 |
| 120 | 4D2743 | PICK UP ENG. RECORDS | 1.0 |
| 130 | 4D2744 | TAG ENGINE | 1.0 |
| 140 | 4D2725R | RESEAL ACFT ENGINE COMPARTMENT | 5.0 |
| 150 | 4D4143 | CUT SHIPPER | 1.0 |
| 160 | 4D2715M | TRANSPORT ENG. ON PALLET TO GATE | 4.0 |
| | | Total Hours: | 40.5 |

TOTAL P.02

# EXHIBIT Y

JET-TECH ENG.

To Whom It May Concern:

T 39 Engine Removal

1. Un cowl engine disconnect fire warning on top and bottom of cowling.
2. Install engine sling on top lifting eye.
3. Remove wires from starter generator.
4. Disconnect throttle lever and remove screw from arm on cross shaft.
5. Remove fuel hose from elbow.
6. Remove ETP hose from pylon.
7. Remove EGT harness form pylon.
8. Remove bleed air line on top of engine.
9. Remove bolt from front mount.
10. Apply tension on lifting sling.
11. Disconnect the two main cannon plugs on top of engine.
12. Remove both hydraulic lines from pylon.
13. Loosen main mount nuts in board and out board; pull out T bolts and open clamps.
14. Lower engine to the ground.

Note: Three men can easily remove an engine in one hour, if done IAW T.O.IT-39A-2-3 paragraph 3-80.

Monty Jackson
General Manager

5513 THOMAS • LAREDO, TEXAS 78041 • TEL. (956) 725-0582 • FAX (956) 725-6251

From Marty

J-60 ENGINE REMOVAL

**NOTE: COMPLETE STEPS 1 THROUGH 9 FOR ALL ENGINES FIRST. THEN PROCEED WITH STEPS 10 THROUGH 14**

1. Un cowl engine. disconnect fire warning on top and bottom of cowling.

2. Remove wires from starter generator.
The generators are on the left side of the engines.

3. Disconnect throttle lever and remove screws from arm on cross shaft .
Both are on the pylon. Disconnect from the cross shaft. There is a clevis rod that comes down, it has an arm on it, and you just disconnect it from the bearing. There's a 10/32 screw with a castle nut on it.

4. Remove fuel hose from elbow.
On the bottom of the engine, disconnect it at the elbow. A stainless steel line, it comes off the fuel controller and goes up to the back by the fire shield. On the left engine, it travels from the pylon, over the top, and then down to connect with the elbow. It's a long hose with a #10 or 12 fitting, that stays with the pylon. When the engine is lowered, feed the hose out of the way. The right engine has a short, stubby hose that's connected to the elbow. Disconnect it at the elbow and drop the engine.

5. Remove ETP hose from the pylon.
Disconnect it from the bottom of the exhaust case. There's a little T-fitting, like a little steel flex hose, you disconnect it from the exhaust case.

6. Remove EGT harness from pylon.
It should be removed at the pylon. Located in the back, where the exhaust case is, are two cannon plugs; one has a cap on the end of it that is for the jet calibrator machine. The other one has a harness that comes down underneath the engine and plugs into the pylon. Leave it attached to the engine.

7. Remove bleed air on top of engine.
Just loosen the clamps and just snap them back; pull that line back. It is a ½ inch socket. Located on top of the engine, near the middle, it is a condensed-looking hose. It comes off right behind the fire shield. It has a stainless steel elbow, all solid. It goes down to another one that goes beside the pylon and goes into the back fuselage, underneath the pylon.

8. Disconnect two main cannon plugs on top of the engine.

9. Remove both hydraulic lines from the pylon.

10. Install engine sling on top lifting eye.

11. Apply tension on lifting ring.

12. Loosen main mounts both inboard and outboard and pull the T-bolts and open the clamps.
Pull the T-bolts and open the clamps or the bolts will get bent.

13. Remove bolt from front mount.
Loosen the top mount, take out the cotter key, pull the nut off it, support the front, slip the bolt out of it, **but make sure you save the little serrated spacer** (an eccentric cam) that locks it in.

14. Lower engine and secure to engine stand, and place on Lan-Dale flatbed trailer.

# EXHIBIT Z

THE LAN-DALE CO.
5995 ALPHA AVE.
RENO, NV 89506

1416

94-72/1224

VOIDED

DATE 30 May 2000

PAY TO THE ORDER OF ACCOUNTING and FINANCE OFFICER $ 28,255.63

THE SUM 28255 DOLS 63 CTS DOLLARS

Bank of America
P.O. Box 20000 #121
Reno, Nevada 89520-0025 (800) 388-2265

FOR

⑈0000 1416⑈ ⑆122400724⑆ 9610 22506⑈

# EXHIBIT AA

KB-2

**DEPARTMENT OF THE AIR FORCE**
HEADQUARTERS, AEROSPACE MAINTENANCE AND REGENERATION CENTER (AFMC)
DAVIS-MONTHAN AIR FORCE BASE, ARIZONA

5 June 2000

MEMORANDUM FOR DIRECTOR, NAVICP Det FSO

FROM: AMARC/FMW
4855 S. Wickenburg Ave
Davis-Monthan AFB AZ 85707-4334

SUBJECT: Cost Estimate – T-39 - Tow to Gate (***Revised***)

1. Our rough order of magnitude (ROM) estimate to prep and tow 5 each T-39 aircraft to Landale Air as per FSO ltr 19 Nov 99, SER 357 and revised to reflect actual cost customer and Demil requirements is $5,735.00 for aircraft 150548 and $10,884 per aircraft for the remaining 4 aircraft.

2. Breakdown by process to perform the work equates to 65.0 hours for aircraft 150548. Hours that would be worked are listed below:

| RCC | SHOP | HOURS |
|---|---|---|
| LAR | RECLAMATION | 20.3 |
| LASG | EGRESS | 2.0 |
| LASAR | RADIO | 22.0 |
| LAIR | RECEIVING | 4.0 |
| LAET | TRANSPORATION | 14.0 |
| LASN | PNEUDRAULIC | 2.0 |
| LARIS | SMALL PARTS | 0.5 |

3. Breakdown by process to perform the work equates to 129.0 hours per aircraft for aircraft numbers 151336,150543,150547 & 150969. Hours that would be worked are listed below:

| RCC | SHOP | HOURS |
|---|---|---|
| LAR | RECLAMATION | 37.3 |
| LASG | EGRESS | 2.0 |
| LASAR | RADIO | 69.0 |
| LAIR | RECEIVING | 4.0 |
| LAET | TRANSPORATION | 14.0 |
| LASN | PNEUDRAULIC | 2.0 |
| LARIS | SMALL PARTS | 0.5 |

P-B-3

4. If you have any further questions, please contact Mr. Gary Criss, FMW, ext. 228-8200.

William H Pope

WILLIAM H. POPE
Acting Chief, Workload Division

P-B-4

ITEMS ON AIRCRAFT TO BE DEMIL

T-39 62-150548

SECTION - A – FORWARD FUSELAGE

1. VOL-FIG-INDEX: 6-8-10
NSN 5821-00-613-2241
Item Name: RECEIVER,TRANSMITTER
Part Number: RT332ARC52 or 118777 or 522-0952-005
DML: C

2. VOL-FIG-INDEX: 6-8-12
NSN 5821-00-592-5059
Item Name: RELAY ASSY UHF
Part Number RE219ARR40 OR 284D200 OR 808848G1
DML: D

3. VOL-FIG-INDEX: 6-8-17
NSN 5895-00-729-1250
Item Name: AMPLIFIER,ELECTRONIC CONTROL
Part Number AM1777ARA25A
DML: C

SECTION - B – PILOT'S COMPARTMENT

4. VOL-FIG-INDEX: 6-13A-24
NSN 5840-00-950-9135
Item Name: CONTROL UNIT
Part Number C-6280A(P)/APX
DML: D

5. VOL-FIG-INDEX: 6-10-1
NSN 5820-00-511-9051
Item Name: CONTROL,RADIO SET TRANSFER
Part Number C2010ARN52
DML: D

6. VOL-FIG-INDEX: 6-11-5
NSN 5826-00-505-1675
Item Name: CONTROL,RECEIVER
Part Number C-996/A
DML: D

7 . VOL-FIG-INDEX: 5-12-3
NSN 6610-00-165-5827
Item Name: INDICATOR,SPECIAL
Part Number MS17401-1 or 112940
DML: D

8 . VOL-FIG-INDEX: 6-9-13
NSN 5821-00-611-8107
Item Name: CONTROL
Part Number C1607ARC52 or 118548 or 522-0274-004
DML: D

SECTION - C – COAT COMPARTMENT

P-B-5

9 . VOL-FIG-INDEX. 6-11-15
NSN: 5826-00-223-4872
Item Name: RECEIVER,RADIO
Part Number R-540/ARN-14 or R-540/ARN-14C OR R541/ARN14D
DML: C

10. VOL-FIG-INDEX: 6-11-19
NSN 5826-00-519-7559
Item Name: INDICATOR,COURSE
Part Number ID-251/ARN OR 7301-1C3B1
DML: D

11. VOL-FIG-INDEX: 6-12-6
NSN 5841-00-845-4271
Item Name: SWITCHING UNIT,RADI
Part Number SA791AAPN141V OR 1267 OR 1267-2900
DML: D

12. VOL-FIG-INDEX: 6-12-5
NSN 5841-00-723-9473
Item Name: RECEIVER-TRANSMITTER,RADAR
Part Number RT601AAPN141V
DML: D

SECTION - D – NAVIGATOR COMPARTMENT

13. VOL-FIG-INDEX: 5-10-5 [THREE EACH]
NSN 6610-00-804-6312
Item Name: INDICATOR,VERTICAL VELOCITY
Part Number AAU-9/A OR MIL-127196
DML: D

SECTION - R – EXTERIOR FUSELAGE

14. VOL-FIG-INDEX: 6-10-5, 9, 24F & 6-13A-16, 19 & 6-13-7, 23
NSN 5985-00-106-0906 four each
Item Name: ANTENNA
1:TOP FUSELAGE STATION 40
2: TOP FUSELAGE STATION 143
3: BOTTOM FUSELAGE STATION 150
4: BOTTOM FUSELAGE STATION 365
Part Number AT-741B/A or AT741A
DML: D

15. VOL-FIG-INDEX: 6-4-7
NSN 5985-00-538-0741 two each
Item Name: ANTENNA
Part Number AT536ARN
DML: D

16. VOL-FIG-INDEX: 6-9-26 & 34
NSN 5985-00-757-0550
Item Name: ANTENNA
Part Number D-1347
DML: D

J-B-6

THE FOLLOWING ITEMS FOR DEMILITARIZATION ARE FROM A PERSONNAL INVENTORY OF THE AIRCRAFT AND THE AIRCRAFT INVENTORY RECORD AND NAVAIR 01-60GBA-4-SERIES, ILLUSTRATED PARTS BREAKDOWN MANUALS FOR NAVY MODEL T-39D AIRCRAFT. [dated: 1 February 1965, with Change 22, dated 15 October 1984,] [As of Monday, June 05, 2000]

SECTION "A": FORWARD FUSELAGE

1. NSN 5821-00-601-0481
Item Name: RECEIVER ASSY,RADIO
Part Number: R550ARR40 or 808833G1
DML: D

CODE EXPLANATION
D MLI-Demilitarize by mutilation (total destruction of item and components) by melting, cutting, tearing, scratching, crushing, breaking, punching, neutralizing, etc. (As an alternate, burial and deep-water dumping may be used when authorized by the DoD Demilitarization officer.)

2. NSN 5821-00-613-2241
Item Name: RECEIVER,TRANSMITTE
Part Number: RT332ARC52 or 118777 or 522-0952-005
DML: C

CODE EXPLANATION
C MLI-Remove and/or demilitarize installed key point(s) as prescribed in Defense Demilitarization Manual (DoD 4160.21-M-1), or lethal parts, components, and accessories.

3. NSN 5821-00-592-5059
Item Name: RELAY ASSY
Part Number: RE219ARR40 or 284D200 or 808848G1
DML: D

4. NSN 5895-00-729-1250
Item Name: AMPLIFIER,ELECTRONIC CONTROL
Part Number AM1777ARA25A
DML: C

5. NSN 5895-00-089-7179
Item Name: RECEIVER-TRANSMITTER,RADIO
Part Number: RT859APX72
DML: D

6. NSN 5841-00-470-5164
Item Name: ANTENNA-RECEIVER
Part Number AS2272APQ126
DML: D

7. for NSN 5841-00-470-5196
Item Name: TRANSMITTER,RADAR
Part Number T1091APQ126V
DML: D

P-B-7

8. NSN 6130-00-168-7712
Item Name: POWER SUPPLY
Part Number PP6130APQ126V
DML: D

9. NSN 5841-00-001-7109
Item Name: COMPUTER,COMMAND
Part Number CP954APQ126V
DML: D.

SECTION "B" : PILOT'S COMPARTMENT

10. for NSN 6610-00-855-9349
Item Name: INDICATOR,ATTITUDE
Part Number : MM-3A or ARU-13/A or MIL-I-27710
DML: D

11. NSN 5840-00-950-9135
Item Name: CONTROL UNIT
Part Number C-6280A(P)/APX
DML: D

12. NSN 5826-00-813-3020
Item Name: INDICATOR,BEARING-HEADING
Part Number 9813-07
DML: D

13. NSN 5895-00-804-7640
Item Name: INDICATOR,AZIMUTH-RANGE
Part Number: IP626AAPQ94
DML: G

| CODE | EXPLANATION |
| --- | --- |
| G | MLI Demilitarization Required-AEDA. Demilitarization, and, if required, declassification and/or removal of sensitive marking or information, will be accomplished prior to physical transfer to a DRMO. This code will be used for all AEDA items including those which also require declassification and/or removal of sensitive markings or information.. |

14. for NSN 5821-00-611-8107
Item Name: CONTROL UHF
Part Number C1607ARC52
DML: D

15. NSN 5820-00-511-9051
Item Name: CONTROL,RADIO SET TRANSFER TACAN
Part Number C2010ARN52
DML: D

F-B-6

16. NSN 5826-00-505-1675
Item Name: CONTROL,RECEIVER VOR
Part Number C-996/A
DML: D

17. NSN 5826-00-813-3020
Item Name: INDICATOR,BEARING-HEADING
Part Number 9813-07
DML: D

18. NSN 6610-00-933-5951
Item Name: INDICATOR,ATTITUDE
Part Number MS17400-1 OR 102300
DML: D

19. NSN 6610-00-968-6602
Item Name: INDICATOR,INDICATED AIR SPEED
Part Number A3675210001
DML: D

20. NSN 5841-00-845-5264
Item Name: INDICATOR,HEIGHT
Part Number ID881APN141
DML: D

21. NSN 6610-00-804-6312
Item Name: INDICATOR,VERTICAL VELOCITY [TWO EACH]
Part Number AAU-9/A
DML: D

22. NSN 6610-00-939-5237
Item Name: INDICATOR,ATTITUDE
Part Number ARU2BA
DML: D

23. NSN 6605-01-223-2399
Item Name: INDICATOR,HORIZONTAL SITUATION
Part Number AQU-2/A
DML: D

24. NSN 5821-00-596-9796
Item Name: CONTROL,RADIO SET
Part Number C1457ARR40
DML: C

25. NSN 5841-00-110-5377
Item Name: INDICATOR,DISPLAY
Part Number IP940APQ126V
DML: D

26. NSN 5841-00-110-5370 THREE EACH
Item Name: CONTROL,RADAR SET
Part Number C8251APQ126V
DML: D

7-89

27. NSN 5841 00 148 5998.
Item Name: CONTROL,RADAR SET
Part Number C9443APQ126VT1
DML: D

28. NSN 5841 00 148 5997 THREE EACH
Item Name: CONTROL,CURSOR
Part Number C9444APQ126VT1
DML: D

SECTION "C": BAGGAGE COMPARTMENT

29. NSN 5841 00 109 6060
Item Name: ISOLATOR,FAULT
Part Number MX8195APQ126
DML: D

30. NSN 6610-00-872-4303
Item Name: COMPUTER,FLIGHT DIRECTOR
Part Number MIL-C-27170
DML: D

31. NSN: 5841 001485999
Item Name: PROCESSOR,TRAIN
Part Number MX9468APQ126VT1
DML: D

32. NSN: 5841 001486001
Item Name: INTERCONNECTING
Part Number: J3209APQ126VT1
DML: D

33. NSN 5826-00-505-3097
Item Name: RECEIVER,RADIO
Part Number R666AARN32
DML: C

34. NSN 6615-00-803-8211
Item Name: GYROSCOPE,DISPLACEMENT
Part Number 522-1513-06
DML: D

35. NSN 6615-01-059-7909
Item Name: GYROSCOPE, RATE
Part Number TRU-2A/A
DML: D

36. NSN 5895-00-947-5234
Item Name: RECEIVER-TRANSMITTER SUBASSEMBLY
Part Number 265-710021-51
DML: D

37. NSN 6615-00-903-4414
Item Name: GYROSCOPE,DISPLACEMENT
Part Number MD1
DML: D

P-B-1C

38. NSN 6615-00-768-5019
Item Name: GYROSCOPE,RATE
Part Number MC-1
DML: D

39. NSN 5826-00-910-4756
Item Name: RECEIVER-TRANSMITTER,TACAN
Part Number RT384ARN52V
DML: D

40. NSN 5841-00-723-9473
Item Name: RECEIVER-TRANSMITTER,RADAR
Part Number RT601AAPN141V
DML: D

41. NSN 5841-00-845-4271
Item Name: SWITCHING UNIT,RAD2
Part Number SA791APN141
DML: D

42. NSN 5826-00-505-0992
Item Name: RECEIVER,RADIO
Part Number R541ARN14D
DML: C

43. NSN 5996-00-806-8120
Item Name: AMPLIFIER ASSEMBLY
Part Number 522-1619-04
DML: D

44. NSN 5826-00-519-7559
Item Name: INDICATOR,COURSE
Part Number ID-251/ARN
DML: D

45. NSN 5841-00-927-4103
Item Name: COUPLER,LINEARIZER
Part Number CU1464APN141V
DML: D

46. NSN 5826-00-001-7116
Item Name: GENERATOR,SWEEP
Part Number SG811APQ126V
DML: D

SECTION "D" NAVIGATOR'S COMPARTMENT [STUDENTS]

47. NSN 5826-01-096-7531
Item Name: INDICATOR,BEARING-DISTANCE-HEADING
Part Number MIL-1-22075
DML: D

P-B-18

48. NSN 5841-00-110-4130 THREE EACH
Item Name: INDICATOR,HEIGHT
Part Number MIL-A-19679A
DML: D

50. NSN 5841-00-110-5377 THREE EACH
Item Name: INDICATOR,DISPLAY
Part Number IP940APQ126V
DML: G

51. NSN 5841-00-110-5370 TWO EACH
Item Name: CONTROL,RADAR SET
Part Number C8251APQ126V
DML: D

SECTION "R" EXTERIOR FUSELAGE

52. for NSN 5985-00-106-0906
Item Name: ANTENNA
FOUR EACH
1:TOP FUSELAGE STATION 40
2: TOP FUSELAGE STATION 143
3: BOTTOM FUSELAGE STATION 150
4: BOTTOM FUSELAGE STATION 365
Part Number AT-741B/A or AT741A
DML: D

53. NSN 5985-00-538-0741 two each
Item Name: ANTENNA
Part Number AT536ARN
DML: D

54. for NSN 5985-00-757-0550
Item Name: ANTENNA
Part Number D-1347
DML: D

55. NSN 5985-00-762-9925
Item Name: ANTENNA
Part Number AS578BARA25
DML: D

56. NIIN: UNKN [WING ROOT R.H. STATION 190]
ITEM NAME ANTENNA two each
Part Number AS-1233/APN-141A
DML: D

DE. .RTMENT OF THE AIR FORC .
HEADQUARTERS. AEROSPACE MAINTENANCE AND REGENERATION CENTER (AFMC)
DAVIS-MONTHAN AIR FORCE BASE, ARIZONA

2 June 2000

MEMORANDUM FOR DIRECTOR, NAVICP Det FSO

FROM: AMARC/FMW
4855 S. Wickenburg Ave
Davis-Monthan AFB AZ 85707-4334

SUBJECT: Cost Estimate – T-39 Engines (***Revised***)

1. Our rough order of magnitude (ROM) estimate to prep and tow T-39 engines to a contractor gate as identified in FSO ltr 14 Dec 99, SER 366 and revised to reflect actual cost customer is $13,030.00

2. Breakdown by process to perform the work equates to 27.5 hours per engine. Hours that would be worked are listed below:

| RCC | SHOP | HOURS |
|---|---|---|
| LAR | RECLAMATION | 13.0 |
| LAEM | MOTOR POOL | 6.0 |
| LASAR | RADIO SHOP | 2.0 |
| LARI | NDI | 1.0 |
| LAIS | STORAGE SERVICES | 5.0 |
| LGLPM | SHIPPING | 0.5 |

NOTE: Estimate is based on customer supplying engine transportation stand and providing waiver for HAZMAT fluids.

3. If you have any further questions, please contact Mr. Gary Criss, FMW, ext. 228-8200.

| | |
|---|---|
| Amount Paid | $13,030.00 |
| Refund | 9,138.97 |
| Cost | 3,891.03 |

RICHARD B FAGAN
Chief, Workload Division

HOURLY RATE:
27.5hrs per/engine X 5= 137.5hrs
137.5hrs @ $13,030.00 = $94.76per/hour

$3,891.03 divided by $94.76 per/hour = 41.06 hours.

# EXHIBIT BB

**Swetman Herb Civ AMARC/FSO**

| | |
|---|---|
| **om:** | Starn GS11 Michael E [STARNME@NT QUANTICO USMC.MIL] |
| **Sent:** | Tuesday, June 06, 2000 8 48 AM |
| **To:** | 'herb.swetman@dm.af mil' |
| **Cc:** | Sullivan LtCol Robert J. Smith-Christmas GS12 Kenneth; Yohn Mr James L; Watson Mr Gary E; 'dietrich john@hq navy mil' |
| **Subject:** | Lan-Dale AC Removal |

Starn GS09 Michael E vcf

Herb,

After talking with you this morning I called Mr Yohn to confirm my facts on the removal of the aircraft negotiated with Mr D'Alesandris. These are the facts of this case:

1. This office was directed by the Secretary of the Navy and the Armed Forces Contract Settlement Board to negotiate with the Lan-Dale Company in order to close this eleven years litigation

2. Through the negotiation process it was decided that Mr. D'Alesandris would receive, among other items, five T-39 engines and five T-39 aircraft located at Davis Monthan in an "as is where is" condition

3. After confirming with your office the availability of these aircraft and ngines it would cost $35,029.00 for removal

All of the conditions of the contract have been met with the exception of the removal of the engines and aircraft at Davis Monthan. It is my understanding that Mr. D'Alesandris is coming out today with a partial payment to remove the engines and that removal of the aircraft will be at a future date. It must be reiterated at this time that the engines and aircraft where negotiated on an "as is where is" basis and that there is to no repeat NO parts removed from the engines or aircraft. Once Mr. D'Alesandris has paid the balance of the $35,029.00 the engines and aircraft are his to be picked up there is to be NO DEMIL on any of these items.

If there are any problems or if someone needs clarification I am in the office M-F 0630-1500 Eastern Time.

Have a great MARINE CORPS day

Mike

Michael E Starn
Aviation Curator
History and Museums Division, Museums Branch
2014 Anderson Ave
Quantico, VA 22134-5002

(703)784-2606/7/8 DSN 278-2606/7/8
FAX (703)784-5856 DSN 278-5856
<<Starn GS09 Michael E.vcf>>

# EXHIBIT CC

NT LAW FIRM 806 293 5366 P.02
P.02/28

DEPARTMENT OF THE NAVY
OFFICE OF THE GENERAL COUNSEL
NAVY LITIGATION OFFICE
720 KENNON STREET SE RM 233
WASHINGTON NAVY YARD DC 20374-5013

**VIA TELEFACSIMILE TRANSMISSION AND U.S. MAIL**

8 August 2000

Thomas Hamilton, Esq.
LaFont, Tunnell, Formby, LaFont & Hamilton, L.L.P.
Attorneys and Counselors
P.O. Box 1510
Plainview TX 79073-1510

Re: ASBCA No. 50829
Appeal of Lan-Dale Company
Under Contract No. M00264-92-C-0010

Dear Mr. Hamilton:

Enclosed you will find several documents pertaining to the delivery of the aircraft to LanDale as discussed over the last several business days.

The first document is date 8 August 2000, entitled, "MEMORANDUM FOR DIRECTOR, NAVICP Det FSO." It contains the final cost estimate to tow the T-39 aircraft to the gates for delivery to LanDale. The costs are broken-down by plane.

The second document explains the payment instructions.

The third document is an express notice of export restrictions on these items called to you and your client's attention to ensure compliance with applicable laws.

The final series of documents contains DLA 1822 forms for each aircraft. LanDale must complete the forms completely, and Federal Express (to expedite the process) the signed originals to Mr. Michael Starn at:

Mr. Michael E. Starn
Aviation Curator
Marine Corps Air-Ground Museum
& Museum Branch Activities
2014 Anderson Avenue
Quantico, VA 22134-5002

Although Mr. D'Alissandris most likely is familiar with these forms, instructions are included.

I am available for discussing this matter. My number is (202) 685-6559, ext. 302.

Sincerely,

JOHN A. DIETRICH
Senior Trial Attorney

Enclosures (as stated)

AUG-08-2000 09:34 806 293 5366 P.04

520-228-8595 AUG 08 '00 10:22 No.004 P.02

# DEPARTMENT OF THE AIR FORCE

HEADQUARTERS, AEROSPACE MAINTENANCE AND REGENERATION CENTER (AFMC)
DAVIS-MONTHAN AIR FORCE BASE, ARIZONA

8 August 2000

MEMORANDUM FOR DIRECTOR, NAVICP Det FSO

FROM: AMARC/FMW
4855 S. Wickenburg Ave
Davis-Monthan AFB AZ 85707-4334

SUBJECT: Cost Estimate – T-39 - Tow to Gate *(3rd Revision)*

1. Our rough order of magnitude (ROM) estimate to prep and tow 5 each T-39 aircraft to Landale Air as per FSO ltr 19 Nov 99, SER 357 and revised to reflect actual cost customer and Demil requirements is $5,228.00 for aircraft 150548, $8,812.00 per aircraft for aircraft 151336 & 150547, and $7,868.00 per aircraft for aircraft 150969 & 150543.

2. Breakdown by process to perform the work equates to 58.8 hours for aircraft 150548. Hours that would be worked are listed below:

| RCC | SHOP | HOURS |
|---|---|---|
| LAR | RECLAMATION | 17.3 |
| LASG | EGRESS | 2.0 |
| LASAR | RADIO | 19.0 |
| LAIR | RECEIVING | 4.0 |
| LAET | TRANSPORATION | 14.0 |
| LASN | PNEUDRAULIC | 2.0 |
| LARIS | SMALL PARTS | 0.5 |

3 Breakdown by process to perform the work equates to 103.8 hours per aircraft for aircraft numbers 151336 & 150547. Hours that would be worked are listed below:

| RCC | SHOP | HOURS |
|---|---|---|
| LAR | RECLAMATION | 27.3 |
| LASG | EGRESS | 2.0 |
| LASAR | RADIO | 54.0 |
| LAIR | RECEIVING | 4.0 |
| LAET | TRANSPORATION | 14.0 |
| LASN | PNEUDRAULIC | 2.0 |
| LARIS | SMALL PARTS | 0.5 |

4. Breakdown by process to perform the work equates to 91.8 hours per aircraft for aircraft numbers 150969 & 150543. Hours that would be worked are listed below.

| RCC | SHOP | HOURS |
|---|---|---|
| LAR | RECLAMATION | 25.3 |
| LASG | EGRESS | 2.0 |
| LASAR | RADIO | 44.0 |
| LAIR | RECEIVING | 4.0 |
| LAET | TRANSPORATION | 14.0 |
| LASN | PNEUDRAULIC | 2.0 |
| LARIS | SMALL PARTS | 0.5 |

5. If you have any further questions, please contact Mr. Gary Criss, FMW, ext. 228-8200.

RICHARD B. FAGAN
Chief, Workload Division

58.8hrs
207.6hrs
183.6hrs

TOTAL 450.0hrs @ $38,588.00 equals $85.75 per/hour

# DEPARTMENT OF THE AIR FORCE

HEADQUARTERS, AEROSPACE MAINTENANCE AND REGENERATION CENTER (AFMC)
DAVIS-MONTHAN AIR FORCE BASE, ARIZONA

Date: 3 August 2000

MEMORANDUM FOR ALL CIVILIAN CUSTOMERS

FROM: AMARC/FM
4850 S. Wickenburg Avenue
Davis-Monthan AFB, AZ 85707-4333

SUBJECT: Check Preparation Procedures

1. The following information is provided reference procedures for issuance of check (company or certified) for payment of AMARC services (to be provided prior to induction of work requirement):

**MAKE CHECK PAYABLE TO:**

Accounting and Finance Officer

**NOTE:** *These are to be the only words on the check. If the check is made out different than from what is stated above or if additional information is provided on the check, it will be returned as unacceptable. I can not accept checks made out to me personally.*

**MAIL CHECK TO:**

AMARC/FM
ATTN: Mrs. Jenny Henderson
4850 S. Wickenburg Ave., Bldg 7513
Davis-Monthan AFB, AZ 85707-4333

2. If you have any questions or concerns, please contact Mrs. Jenny Henderson at (520) 228-8340. Our fax number is (520) 228-8223.

*Debbie Ledbetter*

DEBBIE LEDBETTER
DPEM/MSD Program Manager

# RECIPIENT NOTIFICATION

The use, disposition, export and re-export of this property is subject to all applicable U.S. laws and regulations, including the Arms Export Control Act (PL 90-629), the Export Administration Act of 1979 (P.L. 96-72), continued under Executive Order 12924; International Traffic in Arms Regulations (22 CFR 120 et seq.); Export Administration Regulations (15 CFR 730 et seq.); Foreign Assets Control Regulations (31 CFR 500 et seq.); and the Espionage Act (37 U.S.C. 791 et seq.) which among other things, prohibits:

a. The making of false statements and concealment of any material information regarding the use or disposition, export or re-export of the property, and

b. Any use or disposition, export or re-export of the property which is not authorized in accordance with the provisions of the above cited laws and regulations.

Before any export or re-export of this property is attempted, contact the Office of Defense Trade Controls, Department of State and the Bureau of Export Administration, Department of Commerce to obtain a validated export license or other authorization.

0eucnot30.doc

# INSTRUCTIONS FOR COMPLETING DLA FORM 1822, END-USE CERTIFICATE (9/21/98)

All individuals wanting to acquire DoD surplus property, identified as Munitions List Items or Strategic List Items, are required to fully complete this End-Use Certificate (EUC), DLA Form 1822, which will become part of the contract. It is your responsibility to fully complete the DLA Form 1822. The use of "home made" EUCs is discouraged because they are not covered under the Paperwork Reduction Act. Due to the critical nature of this document, failure to comply with these instructions or use of a "home made" EUC will cause your transaction to be placed on hold to undergo additional review. This could significantly delay or preclude the award/offer.

Type or print all entries clearly. When providing the required information and additional space is needed, you may use a separate sheet of paper citing the appropriate block number and/or letter. **Every block must have an entry.** When the information being requested does not apply to you, the only entries which will be acceptable are: "NONE", "DOES NOT APPLY", or "NOT APPLICABLE" (do not use N/A or N/R). If you have previously entered similar information in another block, you should cite that block number and/or letter; i.e., "SAME AS BLOCK X". The Approving Official (Sales Contracting Officer, Plant Clearance Officer, or other designated individual) will review the EUC for completeness.

## PAGE 1
## AT TOP OF FORM

1. IFB/CONTRACT/OFFER/SF122/SF123 ORDER NO:
   Enter the number of the Invitation for Bid (IFB), contract offer, proposal number, or order number which is used to identify the sale or exchange (if it has not been pre-printed).

2. THIS STATEMENT IS SUBMITTED IN CONNECTION WITH:
   Check the block that best identifies the type of transaction you are entering into:
   - SALE – DRMS or Excess Property Contractor Sales.
   - EXCHANGE – used for Service Museum transactions where title to government property passes to an entity in exchange for agreed upon property.
   - OTHER – for those transactions which are not a sale or exchange and where title to property may or may not pass from government control.

3. LINE ITEM NUMBER/COMMODITY:
   Enter the line item number for each MLI/SLI item you are interested in acquiring. For negotiated exchanges, or other types of transactions, enter the name or nomenclature of the property for which you are negotiating.

4. NAME (Last, First, Middle Initial):
   Please print/type your complete name so it is legible. The name you place here must be the same as the name placed on the bid document/exchange proposal. Do not use initials in place of first name; full name must be provided. Include any other names ever used (i.e., maiden name, nick-names, acronyms, aliases, doing business as (dba) and/or "also known as (aka)"

name(s)). Failure to provide your complete name could result in delays or denial in obtaining the Trade Security Control Clearance.

5. SSN (SOCIAL SECURITY NUMBER)/ALIEN CARD NO./COUNTRY ID:
   If you are a US Citizen/National, enter your Social Security Number.
   If you are a Permanent Resident, enter your Alien Identification Number.
   If you are a non-US citizen/national, non-Permanent Resident, enter your Country Identification Number.
   If you are bidding as a company, enter Not Applicable.

6. DATE OF BIRTH: Enter as Month/Day/Year (MM/DD/YY).
   If bidding as a company, enter Not Applicable.

7. PLACE OF BIRTH (City or County, State, Country):
   If using abbreviations for State or Country, make sure they are accurate.
   If bidding as a company, enter Not Applicable.

8. TELEPHONE NUMBER: Remember to include Area Code.

9. MAILING ADDRESS:
   Enter mailing address of individual or company/business submitting bid.
   If your mailing address is a Post Office Box, enter your actual (physical) address in Block 10.
   Do not use abbreviations for street or city names.
   The two-letter abbreviation for your state or country is acceptable.

10. PHYSICAL ADDRESS:
   If your physical address is the same as your mailing address, write Same As Mailing Address. If you have provided a Post Office Box number in the Mailing Address box, you must write in your actual (physical) address.
   Do not use abbreviations for street or city names.
   The two-letter abbreviation for your state is acceptable.
   Any address other then a physical address will result in delays in processing this certificate and your transaction.

SECTION I. GENERAL INFORMATION

11. BLOCK 1. TYPE OF FIRM:
   Check the box which most closely describes your organization.
   If you are acting as an agent, check Other and specify.
   If you bid as an individual, enter Not Applicable.

12. BLOCK 2. NATURE OF END-USER'S BUSINESS:
   Self-explanatory.
   If you are acting as an agent for someone else, describe the association and the end user's business.
   If this does not apply to you enter Not Applicable.

13. BLOCK 3 - NATURE OF PRINCIPAL'S BUSINESS
   If you are the principle, enter SAME AS BLOCK 2.
   If you are acting for someone else, describe that person/companies' business.

If this block does not apply to you, enter Not Applicable.

14. BLOCK 4 - FIRM'S ID/FEDERAL TAX NUMBER:
Self -explanatory
If bidding as an individual, enter Not Applicable.

15. BLOCK 5 – BUSINESS/CORPORATION HEADQUARTERS
If bidding as an individual, enter Not Applicable.

16. BLOCK 5A - NAME:
Enter the complete name (including aliases and acronyms). If business name is the same as used in the NAME block, enter Same As Name Block.
If you are acting as agent, enter the business/company name of the principle's business headquarters.
If you are bidding as an individual, enter Not Applicable.

17. BLOCK 5B - ADDRESS:
Give full physical address.
If business/company address is same as physical address (para 10 above), enter Same As Physical Address.
If address of business/company headquarters is different, enter address of the headquarters.
Do not use abbreviations for street or city names.
The two-letter abbreviation for your state is acceptable.
Any address other then a physical address will result in delays in processing this certificate and your transaction.
If you are acting as an agent, enter the address of the principle's business/company headquarters.
If you do not have a business enter None.

18. BLOCK 6 - BRANCH OFFICE
If this block does not apply to you, enter Not Applicable.

19. BLOCK 6A - NAME:
If names of branch offices are the same as BLOCK 5A, enter Same as BLOCK 5A.
If names of branch offices are different, enter new names.
If names of principle's branch offices are different, enter the names of the branch offices.
If there are no branch offices, enter None.
If this block does not apply to you, enter Not Applicable.

20. BLOCK 6B - ADDRESS:
Enter full, physical addresses of branch offices.
Do not use abbreviations for street or city names.
The two-letter abbreviation for your state is acceptable.
Any address other then a physical address will result in delays in processing this certificate and your transaction.
If there are no branch offices, enter None.
If this block does not apply to you, enter Not Applicable.

21. BLOCK 7 - ATTACH A SEPARATE SHEET OF PAPER WITH NAMES, ADDRESSES, SSNs, DATES AND PLACES OF BIRTH OF CORPORATE OFFICERS, DIRECTORS AND/OR PARTNERS.

Failure to comply will cause your transaction to be placed on hold or not considered.
If this block does not apply to you, enter Not Applicable.

22. BLOCK 8 - ATTACH A SEPARATE SHEET OF PAPER WITH NAMES, ADDRESSES, SSNs, DATES AND PLACES OF BIRTH OF PRINCIPALS (if applicant is acting as agent).

Failure to comply will cause your transaction to be placed on hold or not considered.
If this block does not apply to you, enter Not Applicable.

SECTION II. END-USERS/USER INFORMATION

"X" and complete appropriate item(s) below. In the case of resale, item 1F or 1G must be marked and each successful purchaser/recipient must also complete this certificate and retain in their files or deliver it to the Approving Official. If this is a negotiated exchange, identify the property being exchanged. If this is not a negotiated exchange, enter Not Applicable.

23. BLOCK 1 - PURPOSE. THE PROPERTY REFERRED TO IN ABOVE IFB/NEGOTIATED EXCHANGE NUMBER WILL BE UTILIZED FOR THE FOLOWING:

24. BLOCK 1A - RETENTION FOR THE FOLLOWING SPECIFIC USE (see note at bottom of page 1 of this form)

Give specific information about use of item(s).
If this block does not apply to you, enter Not Applicable.

25. BLOCK 1B - Resold in form received for the following use (see note at bottom of page 1 of this form).

Give specific information about resale of item(s).
If this block does not apply to you, enter Not Applicable.

26. BLOCK 1C - The property will not be sold or otherwise disposed of for use outside of the U.S. or to non-U.S. Citizens/Nationals in the U.S.

If this block does not apply to you, enter Not Applicable.

27. BLOCK 1D - The property may be re-exported in the form received to the following country/countries:

List all countries that apply. (If necessary use a separate sheet of paper for this. Refer to "BLOCK 1D" on the sheet of paper).
If this block does not apply to you, enter Not Applicable.

28. BLOCK 1E - Resale after following alteration (description of final production): describe what the final product will be (if necessary, use a separate sheet of paper. Refer to "BLOCK 1E" on that sheet);

in (Country/Countries): list all countries that apply (if necessary, use a separate sheet of paper. Refer to "BLOCK 1E" on that sheet);

and distribution in Country/Countries: list all countries that apply (if necessary, use a separate sheet of paper. Refer to "BLOCK 1E" on that sheet).

If this block does not apply to you, enter Not Applicable.

29. BLOCK 1F - If sold, name, address, and telephone number of sub-purchaser(s):

If this/these item(s) is/are sold, give the full name, physical address and telephone number of the individual/company that purchased the item(s).

If this block does not apply to you, enter Not Applicable.

30. BLOCK 1G - The customers are unknown at this time. If required by the contract/offer, I will obtain prior written approval for the resale of any of the property covered by this contract. I will require the sub-purchaser to submit a DLA Form 1822 to the Approving Official as required in Section IV.

If this block does not apply to you, enter Not Applicable.

31. ADDITIONAL INFORMATION: State any other material facts relating to end user and use of the property which may be of value to considering the proposal:

If this block does not apply to you, enter Not Applicable.
For negotiated exchanges, enter description of the item(s) being exchanged.

PAGE 2

SECTION III - UNDERSTANDING AND NOTIFICATION

32. Please read carefully. This section cites the various laws and regulations you must adhere to which govern the use, disposition and export of property.

SECTION IV - CERTIFICATION STATEMENT TO BE SIGNED BY BIDDER AT TIME OF RESPONSE TO IFB.

33. This section is self-explanatory. By signing and dating this form, you are certifying that all the information you are providing is true and correct and you understand and agree to all the provisions in this end use certificate. This form will become part of the contract.

34. PARAGRAPH 4. The person signing this DLA Form 1822 is:

Check the block that applies to you.

34. BLOCK A - NAME (Type or Print)

Be sure your name is legible.

35. BLOCK B - SIGNATURE

Be sure you sign this form.

36. BLOCK C - DATE SIGNED

Be sure you date this form.

SECTION V - CERTIFICATION STATEMENT TO BE SIGNED BY ANY U.S. CITIZEN/NATIONAL/PERMANENT RESIDENT HOLDER TO WHOM MATERIAL IS SOLD

37. **Original Purchaser, do not complete this section. It is intended for completion by the sub-purchaser.** This section is to be completed only when the property is being resold/transferred/exchanged by the party whose name appears on this End-Use Certificate. When the subpurchaser signs and dates this section, it is acknowledged that the seller has advised that subpurchaser of the export requirements stated in SECTION III of this form and that the subpurchaser agrees to be bound by the U.S. laws cited. The subpurchaser also agrees to inform any subsequent buyers of the conditions stated in this End-Use Certificate when reselling the property.

# EXHIBIT CC

Ensure that the Sale/IFB Number appears on all paperwork.

IFB/CONTRACT/OFFER/SF122/SF123 ORDER NO. Enter the IFB # M00264-99-C-0003

# END-USE CERTIFICATE

## (STATEMENT REGARDING DISPOSITION AND USE OF PROPERTY)

*(Please read Privacy Act Statement on reverse before completing this form. If additional space is required, use separate sheets and identify by Block Number)*

TYPE OR PRINT ALL INFORMATION

| FOR AGENCY USE ONLY | | | | | | |
|---|---|---|---|---|---|---|
| TSC CLD | PRIMARY PURCHASER | SUB-PURCHASER 1 | 2 | 3 | 4 | |
| YES | | | | | | |
| NO | | | | | | |

*Form Approved OMB No. 0704-0382 Expires Sep 30, 2001*

The public reporting burden for this collection of information is estimated to average 28 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to DoD, Washington Headquarters Services, DIOR (0704-0382), 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302. Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number. Please DO NOT RETURN your form to either of those addresses. RETURN COMPLETED FORM TO THE OFFICE STATED ON THE IFB, SOLICITATION OR PROPOSAL.

*INSTRUCTIONS. This form must be fully completed by all applicants for Munitions List Items (MLI)/Strategic List Items (SLI) prior to acceptance by the U.S. Government and constitues an integral part of this bid. The information given must be true and correct and will become a part of this contract. Every block MUST have an entry. If necessary, insert "NONE", "SAME AS BLOCK X", or "NOT APPLICABLE" (do not use "N/A"). If the applicant is acting solely as an Agent, A DLA Form 1822 must be signed by the Principal. The term Approving Official is used to indicate the person authorized to act for the U.S. Government (Sales Contracting Officer, Plant Clearance Officer, or other designated individual). FOR ALL SALES OF PROPERTY APPROVED BY PLANT CLEARANCE OFFICERS, UPON THE REMOVAL OF THE PROPERTY, ALL DOCUMENTATION REQUIRED BY THIS FORM WILL BE FORWARDED TO THE IDENTIFIED TRADE SECURITY CONTROL OFFICE.*

*The following applies to all property subject to sale using this form: the use, disposition, export, or reexport of this property is subject to the publications, penalties, and other provisions of the economic programs administered by the Office of Foreign Assets Control, U.S. Treasury Department, 31 CFR Chapter V.*

THIS STATEMENT IS SUBMITTED IN CONNECTION WITH:

☐ SALE ☑ EXCHANGE ☐ OTHER:

LINE ITEM NUMBER/COMMODITY: 0001AE T-39D BuNo:150969

NAME *(Last, First, M.I.)*

SSN/ALIEN CARD NO./COUNTRY ID

DATE OF BIRTH *(MM/DD/YY)*

PLACE OF BIRTH *(City or County, State, Country)*

TELEPHONE NUMBER *(Include Area Code)*

MAILING ADDRESS

PHYSICAL ADDRESS

## SECTION I. GENERAL INFORMATION

APPLICABILITY. This statement applies to the property for which we have submitted our bid/offer persuant to the above identified invitation.

1. TYPE OF FIRM

☐ SOLE PROPRIETORSHIP ☐ PARTNERSHIP ☐ CORPORATION ☐ OTHER *(Specify)*:

2. NATURE OF END-USER'S BUSINESS

3. NATURE OF PRINCIPAL'S BUSINESS

4. FIRM'S ID/FEDERAL TAX NUMBER

5. BUSINESS/CORPORATION HEADQUARTERS
A. NAME
B. ADDRESS *(Physical location)*

6. BRANCH OFFICE
A. NAME
B. ADDRESS *(Physical location)*

7. ATTACH A SEPARATE SHEET OF PAPER WITH NAMES, ADDRESSES, SSNs, DATES AND PLACES OF BIRTH OF CORPORATE OFFICERS, DIRECTORS OR PARTNERS.

8. ATTACH A SEPARATE SHEET OF PAPER WITH NAMES, ADDRESSES, SSNs, DATES AND PLACES OF BIRTH OF ALL PRINCIPALS *(If applicant is acting as agent)*.

## SECTION II. END USE/USER INFORMATION.

"X" and complete appropriate item*(s)* below. In the case of resale, item 1.F. or 1.G. MUST be marked and each successful purchaser/recipient must also complete this certificate and retain in their files or deliver it to the Approving Official. If this is a negotiated exchange, identify the property being exchanged:

1. PURPOSE. THE PROPERTY REFERRED TO IN ABOVE IFB/OFFER NUMBER WILL BE UTILIZED FOR THE FOLLOWING:

☐ A. Retention for the following specific use *(see note)*:

☐ B. Resold in the form received for the following use *(see note)*:

☐ C. The property will not be sold or otherwise disposed of for use outside of the U.S. or to non-U.S. Citizens/Nationals in the U.S.

☐ D. The property may be reexported in the form received to the following country/

☐ E. Resale after following alteration *(description of final production)* ______ in *(Country/Countries)*: ______ and distribution in *(Country/Countries)*: ______

☐ F. If sold, name, address, and telephone no. of *sub-purchaser (s)*:

☐ G. The customers are unknown at this time. If required by the contract/offer, I will obtain prior written approval for the resale of any of the property covered by this contract. I will require the sub-purchaser to submit a DLA Form 1822 to the Approving Official as required in Section IV.

ADDITIONAL INFORMATION: State any other material facts relating to end user and use of the property which may be of value in considering the proposal:

NOTE: Example of specific uses: AIRCRAFT. The bidder/recipient certifies that the aircraft will be used: as a flyable aircraft; as a nonflyable aircraft to be used only for parts, display, or ground instruction, etc.; for resale as a flyable aircraft. *(Furnish all data required in blocks 1C and 1D for each buyer/receiver.)*

Ensure that the Sale/IFB Number appears on all paperwork. Enter the IFB#____________________

**SECTION III. UNDERSTANDING AND NOTIFICATIONS**

1. The use, disposition, export and reexport of this property is subject to all applicable U.S. Laws and Regulations, including the Arms Export Control Act *(22 USC 2751 et seq.)*; Export Administration Act of 1979 (50 USC App. 2401 et seq.) continued under Executive Order 12924; International Traffic in Arms Regulations *(22 CFR 120 et seq.)*; Export Administration regulations *(15 CFR 730 et seq.)*; Foreign Assets Control Regulations *(31 CFR 500 et seq.)* and the Espionage Act *(18 USC 793 et seq.)*; which, among other things, prohibit:
   A. The making of false statements and concealment of any material information regarding the use or disposition, export or reexport of the property; and
   B. Any use, disposition, export or reexport of the property which is not authorized in accordance with the provisions of this contract.
2. The submission of false or misleading information and/or concealment of any material facts regarding the use, disposition or export of this property may constitute a violation of provisions of 18 USC 793/1001, 22 USC 2778/2779, 50 USC App. 2410, and 50 USC App. 1-44. Sanctions for violations will be in conformity with U.S. laws and regulations *(including Federal Acquisition Regulations and DoDI 2030.6)* and may include the denial of U.S. export privileges and of any participation in future U.S. Government contracts.
3. The Invitation For Bid and Sale/Exchange Contract number must be referenced when submitting an application for an export license to the Department of State for MLI or Department of Commerce for SLI.
4. When MLI/SLI property is transferred, the information regarding the above laws and regulations must be passed to the subsequent purchaser/receiver, who must be a U.S. Citizen/National or Permanent Resident of the United States of America, and who must sign the resale statement below. Records of Resale must be available for Trade Security Controls Office review, if required.
5. MLI and SLI property can only be transferred *(exported, sold, or given)* to a foreign country, non-U.S. Citizen/National or non-Permanent Resident by either the U.S. Government via a Foreign Military Sales Case or a U.S. Citizen/National or Permanent Resident possessing a validated export license from the appropriate licensing department or agency.
6. The Purchase/Recipient agrees to cooperate with and to permit all authorized Government representatives to inspect and verify the existence and condition of MLI/SLI.

**SECTION IV. CERTIFICATION STATEMENT TO BE SIGNED BY BIDDER AT TIME OF RESPONSE TO IFB**

1. I do certify that all information given in this statement is true and correct to the best of my knowledge and belief and have not knowingly omitted any information which is inconsistent with this statement. I understand this statement will be referred to and be a part of the contract of sale/exchange with the U.S. Government. I agree to submit a written request for amendment of this statement to the Approving Official prior to effecting any change of fact or intention from that stated herein or in any prior amendment, whether occurring before or after the release of the commodities, and not to effect such changes without first receiving written approval of the Approving Official.
2. I acknowledge having been advised that the MLI/SLI property I purchased is controlled by the U.S. Government and cannot be transferred *(exported, sold or given)* to a non-U.S. Citizen/National or non-Permanent Resident without a valid State/Commerce Department license. Should I transfer this property to another U.S. Citizen/National or non-Permanent Resident, I will obtain their signature as having read and understood this restriction and their certification that they will place the same restriction on any subsequent transfer and obtain signature thereto and will provide a copy to the Approving Official. Should I transfer this property to a non-U.S. Citizen/National or non-Permanent Resident, I will obtain a validated State/Commerce Department license before transferring the MLI/SLI to that person or any exportation from the U.S. I will not transfer this property to countries, regimes and nationals targeted under the sanctions program administered by the U.S. Treasury Department's Office of Foreign Assets Control.
3. Neither the applicant, corporate officers, directors or partners is:
   A. The subject of an indictment for or has been convicted of violating any of the U.S. Criminal statutes enumerated in 22 CFR 120.24 since the effective date of the Arms Export Control Act, Public Law 94-329, 90 Statute 729 *(June 30, 1976)*; or
   B. Ineligible to contract with, or to receive, a license or other approval from any agency of the U.S. Government.
4. The person signing this DLA Form 1822 is:

☐ a Citizen of the United States of America, or

☐ lawfully admitted to the U.S. for Permanent Residence and maintains such residence under the Immigration and Nationality Act, as amended, (8 USC 1101(a), 20, 60 Statute 163), or

☐ a Citizen of________________________________________, and/or

☐ is an official of a foreign government entity in the United States.

| A. NAME *(Type or print)* | B. SIGNATURE | C. DATE SIGNED |
|---|---|---|
| | | |

**SECTION V. CERTIFICATION STATEMENT TO BE SIGNED BY ANY U.S. CITIZEN/NATIONAL/PERMANENT RESIDENT HOLDER TO WHOM MATERIAL IS SOLD**

I, ________________________________________, acknowledge having been advised that the MLI/SLI property I have purchased/received from Mr./Ms./Mrs./Miss________________________________________ on *(date)*____________________, is controlled by the U.S. Government and cannot be transferred *(exported, sold, or given)* to a non-U.S. Citizen/National or non-Green Card non-Permanent Resident without a validated State/Commerce Department license. Should I transfer this property to another U.S. Citizen/National or U.S. Permanent Resident, I will obtain their signature as having read and understood this restriction and their certification that they will place the same restriction on any subsequent transfer and obtain signature thereto and retain in their files or, upon request, provide a copy to the Approving Official. Should I transfer this property to a non-U.S. Citizen/National or non-Permanent Resident, I will obtain a validated State/Commerce Department license before I transfer the MLI/SLI to that person. I will not transfer this property to countries, regimes and nationals targeted under the sanctions programs administered by the U.S. Treasury Department's Office of Foreign Assets Control.

| A. NAME *(Type or print)* | B. SIGNATURE | C. DATE SIGNED |
|---|---|---|
| | | |

| | |
|---|---|
| AUTHORITY: | 10 USC 136; 40 USC 471;50 USC 2411; 22 USC 2751; and EO 9397. |
| PRINCIPAL PURPOSE(S): | Determine applicant eligibility to participate in the program and ensure that property recipients comply with the terms of the sale. |
| ROUTINE USES: | Data will be disclosed to Department of State, Department of the Treasury, the Federal Aviation Administration. |
| DISCLOSURE: | Voluntary; however, failure to provide the requested information may result in ineligibility to bid on or receive surplus or foreign personal property. DLA PRIVACY ACT SYSTEM NOTICE S800.10MM APPLIES. |

# EXHIBIT DD

DEPARTMENT OF THE NAVY
OFFICE OF THE GENERAL COUNSEL
NAVY LITIGATION OFFICE
720 KENNON STREET SE RM 233
WASHINGTON NAVY YARD DC 20374-5013

**VIA TELEFACSIMILE TRANSMISSION AND U.S. MAIL**

11 September 2000

Thomas Hamilton, Esq.
LaFont, Tunnell, Formby, LaFont & Hamilton, L.L.P.
Attorneys and Counselors
P.O. Box 1510
Plainview TX 79073-1510

Re: ASBCA No. 50829
Appeal of Lan-Dale Company
Under Contract No. M00264-92-C-0010

Dear Mr. Hamilton:

In response to your fax from last week, enclosed you will find a document from DLA that identifies the items that are subject to demilitarization. Although undated, it was prepared on August 3, 2000.

I am available for discussing this matter. My number is (202) 685-6559, ext. 302.

Sincerely,

JOHN A. DIETRICH
Senior Trial Attorney

By TH Date 9/18/00

DEPARTMENT OF DEFENSE
DEMILITARIZATION PROGRAM OFFICE
8725 JOHN J. KINGMAN ROAD, SUITE 2533
FT. BELVOIR, VIRGINIA 22060-6221

IN REPLY REFER TO J-33

MEMORANDUM FOR MARINE CORPS AIR AND GROUND MUSEUM,
Attn: M. Starn, Aviation Curator

SUBJECT: Demilitarization Requirements for Components Contained in T-39 Aircraft

We have reviewed the list of components parts forwarded to us on June 26, 2000 by the Aircraft Regeneration and Maintenance Center, Davis-Mothan AFB. Of the 71 items on the listing, the attached list (ATT 1) euumerates those validated as requiring demilitarization prior to release from DoD control.

To satisfy the requirements of DoDD 2030.8, Trade Security Controls on DoD Excess and Surplus Personal Property, request that you require the recipient to complete DLA Form 1822, End Use Certification (available at http://www.drms.dla.mil/catalog/forms/Form1822.pdf) and ensure that the transfer/release documentation contains the "Recipient Notification" found at ATT 2. A copy of the release document and the completed DLA Form 1822 should be forwarded to this office.

If there are any questions regarding this matter, please contact the undersigned at DSN 427-1539/28/42, COMM (703)767-xxxx.

JACK W. BLACKWAY
DoD Demilitarization Program Manager
DoD Demilitarization and Trade
Security Control Program Office
HQ DLA, J-33

DEMIL Required Items on T-39 Aircraft

| NSN | ITEM | CODE |
|---|---|---|
| 5820-00-511-9051 | Control | D |
| 5821-00-592-5059 | Relay Assy | D |
| 5821-00-596-9796 | Control | D |
| 5821-00-601-0481 | Receiver | C |
| 5821-00-611-8107 | Control | D |
| 5821-00-613-2241 | Receiver | C |
| 5826-00-001-7116 | Generator | D |
| 5826-00-223-4872 | Receiver | C |
| 5826-00-505-0992 | Receiver | C |
| 5826-00-505-1675 | Control | D |
| 5826-00-506-3097 | Receiver | C |
| 5826-00-813-3020 | Indicator | D |
| 5826-00-910-4756 | Receiver | C |
| 5828-01-096-7531 | Indicator | D |
| 5841-00-001-7109 | Computer | D |
| 5841-00-110-4130 | Indicator | D |
| 5841-00-110-5370 | Control | D |
| 5841-00-110-5377 | Indicator | D |
| 5841-00-148-5997 | Control | D |
| 5841-00-148-5998 | Processor | D |
| 5841-00-148-5999 | Processor | D |
| 5841-00-470-5164 | Antenna | D |
| 5841-00-470-5196 | Transmitter | D |
| 5841-00-723-9473 | Receiver | C |
| 5895-00-089-7179 | Receiver | C |
| 5895-00-729-1250 | Amplifier | D |
| 5895-00-729-1250 | Amplifier | D |
| 5895-00-804-7640 | Indicator | D |
| 5895-00-947-5234 | Receiver Transmitter Subassy | C |
| 5985-00-106-0906 | Antenna | D |
| 5985-00-538-0741 | Antenna | D |
| 5985-00-757-0550 | Antenna | D |
| 5985-00-762-9925 | Antenna | D |
| 5996-00-806-8120 | Amplifier | D |
| 6610-00-165-5827 | Indicator | D |
| 6615-00-768-5019 | Gyro | D |
| 6615-00-803-8211 | Gyro | D |
| 6615-00-903-4414 | Gyro | D |
| 6615-01-059-7909 | Gyro | D |
| P/N AS-1233/APN-141A | Antenna | D |

# EXHIBIT EE

HARALSON, MILLER, PITT & McANALLY, P.L.C.
(A PROFESSIONAL LIMITED LIABILITY COMPANY COMPRISED OF
DALE HARALSON, P.C. AND MILLER, PITT & MCANALLY, P.C.)
ONE SOUTH CHURCH AVENUE, SUITE 900
TUCSON, ARIZONA 85701-1620
(520) 792-3836
FAX (520) 624-5080
WWW.HMPMLAW.COM

MILLER, PITT & MCANALLY, P.C.
G. EUGENE ISAAK
GERALD MALTZ
T. PATRICK GRIFFIN
PHILIP J. HALL
THOMAS G. COTTER
LINDSAY BREW
ARMANDO RIVERA
GUS ARAGÓN, JR.
CAROLE A. SUMMERS
BRADLEY P. MILLER
TRACI L. RICCITELLO

DALE HARALSON, P.C.
DALE HARALSON
JOHN P. LEADER

OF COUNSEL
RICHARD L. MCANALLY
JANICE A. WEZELMAN
GRACE MCILVAIN

RETIRED
ROBERT F. MILLER
DONALD PITT

BARRY N. AKIN
(1939-1988)

October 3, 2000

Gary Watson
Purchasing and Contracting Board (B-215)
2010 Henderson Road
Quantico, VA 22134

*Re: Contract No. M00264-99-C-0003*
*Lan-Dale Co.*

Dear Mr. Watson:

Our firm represents Lan-Dale Company. We write to you as the designated contracting officers of the above-referenced contract pursuant to Section G-1. Our client is unable to obtain performance of the contract by the United States of America.

For nearly a decade, Lan-Dale has been trying to obtain performances of a contact entered into with the United States of America in the early 1990's. On January 18, of this year, th referenced contract was executed to resolve that issue.

Under the terms of the January 18 agreement, Lan-Dale received several exchange items. These items were transferred to Lan-Dale "as is where is" and Lan-Dale was required to remove them from military property within 60 days of the issuance of bills of sale. Risk of loss from damage to the items passed to Lan-Dale on the effective date of the contract. Lan-Dale has received bills of sale for the items.

Pursuant to the contract Lan-Dale received and removed "as is where is" T-39 (Bu No. 157354) and T-39 (Bu No. 140908) at MCAS Cherry Point.

Lan-Dale has fully performed its obligations under the agreement.

304\00010.014\2000100308120400

HARALSON, MILLER, PITT & McANALLY, P.L.C.



On May 30, 2000, Lan-Dale tendered a check in the amount of $13,030 to Davis-Monthan for release of five engines that were included in the exchanged property. This was based on an "estimate" of 202.5 man hours to remove the engines. Lan-Dale took possession of the engines on June 23. The total of man hours that were actually expended in removal of the engines was 19.

For several months, Lan-Dale has been attempting, without success, to obtain the remainder of the exchange property consisting of five T-39 airplanes (Bu Nos. 151336, 150543, 150547, 150969, and 150548) from Davis-Monthan. Davis-Monthan refuses to deliver them in accordance with the terms of the contract and insists on unilateral material alterations of the terms of the contract.

First, Davis Monthan insists on removing a number of items from the aircraft. Since the items were attached to and part of the airplanes when they were sold "as is where is" to Lan-Dale ,the items on the list are now its property and are no longer the property of the government. The removal of the items is a breach of the contract. It is also a tort, namely conversion.

Davis Monthan has been told that no items are to be removed from the aircraft (see Exhibit 1) but continues to insist on removing the property.

If this were not bad enough, Davis Monthan insists that Lan-Dale pay its personnel to remove the parts from the planes.

The actions of Davis Monthan are a material breach of the contract. There was an agreed upon exchange of property without monetary compensation. Davis Monthan's actions significantly reduce the value of the property below the agreed exchange and requires Lan-Dale to pay monetary compensation.

Lan-Dale has attempted to obtain delivery of the airplanes by tendering the remaining balance of $21,999 as referenced in Mr. Stam's letter of June 6 ($35,029 less $13,030 paid for estimated costs of delivery of engines). That tender has been refused. This office is in possession of funds in the account of Lan-Dale sufficient to pay this balance and will tender same upon receipt of notice that the government is prepared to comply with the contract.

HARALSON, MILLER, PITT & McANALLY, P.L.C.

Gary Watson
October 3, 2000
Page 3

Lan-Dale has altered its position in reasonable reliance upon the promise of the government to deliver the airplanes. Continued refusal by the government to perform places Lan-Dale in immediately jeopardy of loss of valuable contracts. These damages are direct and readily foreseeable from the government's breach of the contract.

As contracting officers we are requesting that you obtain performance of the contract by the government, and particularly by Davis Monthan. If you are unable to obtain performance of the contract by the government, we would like to be informed in writing of that fact and any reasons for it.

If the government wishes to renegotiate the terms of the agreement and allow the removal of the listed items, Lan-Dale is prepared to discuss the matter. Lan-Dale would expect that the removal would be entirely at the cost of the government.

Sincerely

HARALSON, MILLER, PITT & McANALLY, P.L.C.

Lindsay Brew

cc James Yohn
John A. Dietrich
Lt. Col. R. J. Sullivan, Head
Ken Smith-Christmas, Curator
Michael E. Starn, Aviation Curator
Tim Horn

# EXHIBIT FF

HARALSON, MILLER, PITT & McANALLY, P.L.C.

(A PROFESSIONAL LIMITED LIABILITY COMPANY COMPRISED OF
DALE HARALSON, P.C. AND MILLER, PITT & McANALLY, P.C.)
ONE SOUTH CHURCH AVENUE, SUITE 900
TUCSON, ARIZONA 85701-1620
(520) 792-3836
FAX (520) 624-5080
WWW.HMPMLAW.COM

MILLER, PITT & McANALLY, P.C.
G. EUGENE ISAAK
GERALD MALTZ
T. PATRICK GRIFFIN
PHILIP J. HALL
THOMAS G. COTTER
LINDSAY BREW
ARMANDO RIVERA
GUS ARAGÓN, JR.
CAROLE A. SUMMERS
BRADLEY P. MILLER
TRACI L. RICCITELLO
PETER T. LIMPERIS

DALE HARALSON, P.C.
DALE HARALSON
JOHN P. LEADER

OF COUNSEL
RICHARD I. McANALLY
JANICE A. WEZELMAN
GRACE McILVAIN

RETIRED
ROBERT F. MILLER
DONALD PITT

BARRY N. AKIN
(1939-1998)

October 24, 2000

Gary Watson
Purchasing and Contracting Board (B-215)
2010 Henderson Road
Quantico, VA 22134

*Re: Contract No. M00264-99-C-0003*
*Lan-Dale Co.*

Dear Mr. Watson:

On October 3, 2000, we wrote to you as the designated contracting officer on the above-referenced contract. A second copy of the letter is enclosed. Please give us the courtesy of a response.

Sincerely,

HARALSON, MILLER, PITT & McANALLY, P.L.C.

Lindsay Brew

/bks
Enclosure

cc: James Yohn/Via Fax (703)784-5128

309\1eb\20001024154137000

# EXHIBIT GG

UNITED STATES MARINE CORPS
MARINE CORPS BASE
QUANTICO, VIRGINIA 22134-5001

IN REPLY REFER TO:
4200
B 215
26Oct00

Haralson, Miller, Pitt & McAnally, P.L.C.
One ... th Church Avenue
...ite 900
Tucson, AZ 85701-1820

Ref: Contract No. M00264-99-C-0003 (Lan-Dale)

Dear Ms. Brew:

We have received and read your October 3, 2000, letter. We are currently in the process of formulating a response, and it will be mailed to your shortly.

Should you require additional information, please feel free to contact the undersigned at telephone 703-784-1921 or via facsimile at 703-784-3597.

Sincerely,

GARY E. WATSON

# EXHIBIT HH

LAFONT, TUNNELL, FORMBY, LAFONT & HAMILTON, L.L.P.

ATTORNEYS AND COUNSELORS

P.O. BOX 1510
PLAINVIEW, TEXAS 79073-1510

H.M. LAFONT
GRADDY TUNNELL
MARSHALL FORMBY (1911-1984)
BILL LAFONT*
*BOARD CERTIFIED, CIVIL TRIAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION
TOM HAMILTON
BRENT HAMILTON

701 BROADWAY
SKAGGS BUILDING
Telephone: (806) 293-5361
Telecopy: (806) 293-5366
e-mail: thamilton@lafontlaw.com

October 23, 2000

Mr. John A. Dietrich
Senior Trial Attorney
Navy Litigation Office
General Counsel of the Navy
901 M. Street, SE Bldg. 36
Washington, DC 20374
*Via Fax:* *202685-6795*

**Re: ASBCA No. 50829**
**Appeal the Lan-Dale Company**
**Under Contract No. M00264-C-0010**

Dear Mr. Dietrich:

In your letter of 8 August, 2000, you sent the following documents to this office, you requested that Lan-Dale complete and sign the enclosed DLA Forms 1822, and forward by Federal Express to Mr. Michael E. Starn.

We are unable to comply with the request for the following reasons:

1. DLA Form 1822 states in the instructions, in part: "This form must be fully completed by applicants for Munitions List Items (MLI)/Strategic List Items (SLI) **prior to acceptance by the US Government and constitutes an integral part of this bid.**"

2. Under SECTION 1, APPLICABILITY, is stated: "This statement applies to the property for which we have submitted our bid/offer pursuant to the above identified invitation."

Lan-Dale is **not an applicant making a bid for Government property.**

This substitute Contract began as a Proposal submitted to the Marine Crops Air Ground Museum in 1991 by the Lan-Dale Co. at the Museum's request. The Proposal was accepted and a Contract was entered into in 1992. As a result of disputes related to that Contract, the issue was

referred to the Board of Contract Appeals as ASBCA No. 50829 which resulted in a Settlement meeting in May 1998. An agreement was reached at that meeting, and substitute Contract M00264-92-C-0003 was signed on January 18, 2000. Enclosed were Bills of Sale for the aircraft and engines dated February 7, 2000. The contract stated the items covered by the Bills of Sale were the property of Lan-Dale "as is where is" as of the date of the Bills of Sale and Lan-Dale was to remove the items within 60 days, which was 8 April 2000.

3. Under DLA Form 1822 "SECTION I. GENERAL INFORMATION APPLICABILITY. "This statement applies to the property for which we have submitted our bid/off pursuant to the above identified invitation."

Lan-Dale was not appraised of the requirement to submit DLA Form 1822 until August, 2000, and cannot meet the requirement that Form 1822 be submitted along with the proposal in 1991.

In summary, DLA Form 1822 does not accommodate these exigencies, and is inconsistent with the terms of the contract. We believe that attempting to complete the form after the fact would require Lan-Dale provide false or misleading information in violation of SECTION III. 2.

Also another matter needs to be brought to your attention. Your letter of 24 November 1999 states "Further the additional T-39 appraised at $70,000.00." A. J. D'Alessandris was not given the opportunity to inspect this particular aircraft, BuNo 150548, until after the contract was consummated. Then upon inspection it became readily apparent to him that 150548 was not of the quality and value of the other four T-39 aircraft. Many critical components had been removed from the airframe and engines.

At this point A. J. D'Alessandris requested an independent appraisal of 150548 for the purpose of determining the market value. A copy of the appraisal is attached marked Exhibit "A". You will note that the appraisal is $20,000.00.

Sincerely yours,

LaFONT, TUNNELL, FORMBY,
LaFONT & HAMILTON, L.L.P.

By: Tom Hamilton
Tom Hamilton

TH:js

Enclosure

xc: Mr. A. J. D'Alessandris
LAN-DALE COMPANY
2000 East Airport Drive
Tucson, Arizona 85706

# EXHIBIT II

THE LAW FIRM OF

KARP, HEURLIN & WEISS, P.C.

STEPHEN M. WEISS
BRUCE R. HEURLIN
LEONARD KARP
LAURA C. BELLEAU
GREGORY J. FOSTER
CYNDY A. VALDEZ
CHARLES R. HAMM
BRIAN A. LAIRD

3060 NORTH SWAN ROAD, SUITE 100
TUCSON, ARIZONA 85712-1225

TELEPHONE (520) 325-4200
FACSIMILE (520) 325-4224
WWW.KHAW-LAW.COM

MARY C. CLEMENTS
CERTIFIED PUBLIC ACCOUNTANT

May 6, 2002

Gary E. Watson
Head, Purchasing and Contracting Branch
Contracting Officer
United States Marine Corps
Marine Corps Base
2010 Zeilin Road
Quantico, Virginia 22134-5098

**Re: Breach of Contract: No. M00264-99-C-0003**
**Date of Contract: January 18, 2000**
**Contractor: The Lan-Dale Co.**

Dear Mr. Watson:

Attached is Lan-Dale's REVISED CLAIM, which constitutes Lan-Dale's Claim against the Contracting Officer. This REVISED CLAIM replaces Lan-Dale's original claim in its entirety, and Lan-Dale's original claim is hereby negated in its entirety.

Sincerely,

KARP, HEURLIN & WEISS, P.C.

Brian A. Laird

BAL/jrb
Enclosure
cc: Client
Lan-Dale Correspondence Watson 020506

THE LAW FIRM OF

KARP, HEURLIN & WEISS, P.C.

STEPHEN M. WEISS
BRUCE R. HEURLIN
LEONARD KARP
LAURA C. BELLEAU
GREGORY J. FOSTER
CYNDY A. VALDEZ
CHARLES R. HAMM
BRIAN A. LAIRD

3060 NORTH SWAN ROAD, SUITE 100
TUCSON, ARIZONA 85712-1225

TELEPHONE (520) 325-4200
FACSIMILE (520) 325-4224
WWW.KHAW-LAW.COM

MARY C. CLEMENTS
CERTIFIED PUBLIC ACCOUNTANT

May 6, 2002

Gary T. Watson
Contracting Officer
Purchasing and Contracting
2010 Zeilin Road
Quantico, VA 22134-5098

| | | |
|---|---|---|
| Re: | Breach of Contract: | No. M00264-99-C-0003 |
| | Dated: | January 18, 2000 |
| | Contractor: | The Lan-Dale Co. |

To the Contracting Officer:

This is Lan-Dale's REVISED CLAIM for breach of the above-referenced contract. This REVISED CLAIM and the accompanying certification are brought pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 601, *et. seq.* Lan-Dale requests that the Contracting Officer make a final determination of this REVISED CLAIM.

**INTRODUCTION**

For more than a decade Lan-Dale has been attempting to obtain performance by the government of contractual obligations. The government has failed to perform, first under its initial contract with Lan-Dale, then under the substitute Settlement Contract, pursuant to which the government sought to settle Lan-Dale's claims for the first breach. Now, the government has breached the Settlement Contract. Throughout the course of the government's dealings with Lan-Dale, agents of the government have repeatedly committed acts of nonfeasance, malfeasance, and fraud. These acts were in violation of government policies, rules, regulations, and DOD laws by which the agencies involved are bound.

**FACTUAL BASIS OF CLAIM**

Lan-Dale alleges that the Contracting Officer failed to administer the contract by not arranging for the release of items from their military locations in accordance with the terms and conditions of the contract. In support of its REVISED CLAIM for breach of contract, Lan-Dale relies on the following factual allegations:

1. On January 18, 2000, Lan-Dale was awarded Contract No. M00264-99-C-0003 (the Settlement Contract). *See* Exhibit "A", 1/18/00 Award/Contract.

2. The Settlement Contract was authorized by the government in settlement of Lan-Dale's Complaint for breach of contract and fraud related to Contract No. M00264-99-C-0003. *See* Exhibit "B", October 22, 1997 Complaint filed with the Armed Services Board of Contract Appeals.[1]

3. Lan-Dale fully performed all its obligations as of February 27, 1992.

4. The Underlying Claim arose from acts of deliberate malfeasance by Lt. Col. Carmen Dragotta and Col. A.J. Ponwitz, and was filed June 4, 1996. *See* Exhibit "C" June 4, 1996 claim to the Contracting Officer, the Underlying Claim.[2]

5. Following denial of the Underlying Claim by the Contracting Officer, Lan-Dale filed its Complaint. *See* Exhibits "B".

6. The Settlement Contract was negotiated by Thomas Hamilton, attorney for Lan-Dale, and John A. Dietrich, Senior Trial Attorney for the Department of the Navy on May 11, 1998, in Washington, D.C.

7. At the settlement conference Dietrich displayed, and subsequently furnished to Lan-Dale, color photographs of the interiors and exteriors of all the aircraft included in the Settlement Contract, confirming Lan-Dale's reasonable expectations as to what it was to receive. *See* Exhibit "D", color photocopies of photographs.

---

[1]The Settlement Contract was a substitute for Contract No. M00264-92-C-0010, dated February 13, 1992. *See* Exhibit "A", §C-1.1.3.

[2]An official U.S. Marine Corps investigation into the activities of Dragotta and Ponwitz found that Lan-Dale "may not have been dealt with fairly or equitably" and noted that "[s]hould the dispute become public through litigation, considerable embarrassment may be accrued by the Marine Corps."

8. The "as is, where is" condition of the aircraft and the release of the aircraft at no cost to Lan-Dale were memorialized in June 30, 1998 letter from Hamilton to Dietrich, a copy of which was sent to the Board. *See* Exhibit "E". Dietrich never objected to this confirming statement of the terms of the Settlement.

9. Under the Settlement Contract, the government agreed to provide Lan-Dale with the following items: (1) five aircraft engines; (2) one T-34B; and (3) six T-39s (five T-39Ds and one VT-39E) including log books for each item. The five T-39Ds at issue were identified in the Settlement Contract as follows:

| | | |
|---|---|---|
| 0001AB | T-39D BuNo | 151336 |
| 0001AC | T-39D BuNo | 150543 |
| 0001AD | T-39D BuNo | 150547 |
| 0001AE | T-39D BuNo | 150969 |
| 0001AF | T-39D BuNo | 150548 |

*See* Exhibit "A" at § B.

10. Under the Settlement Contract, the above-listed items were to be "delivered to Lan-Dale Co. 'AS IS, WHERE IS.'"

11. Under Section F-3 of the Settlement Contract, title to the above-listed items was to transfer to Lan-Dale upon execution of a Bill of Sale by the government.

12. The government provided Lan-Dale with Bills of Sale for the five T-39Ds dated February 7, 2000, pursuant to section F-3 of the Settlement Contract. *See* Exhibit "A" at 15-19 (attachments B through F).

13. Title to the T-39Ds passed to Lan-Dale upon receipt of the Bills of Sale.

14. Lan-Dale attempted to take possession of its property and subsequently remove its property from the military locations no later than March 15, 2000.

15. Upon presentation, the removal of the T-34B and VT-39E from Cherry Point was accomplished in accordance with the Settlement Contract "as is, where is" and at no cost to Lan-Dale, with the exception that the government refused to tender log books for these aircraft.

16. The government has refused to provide Lan-Dale with the five T-39Ds identified as follows:

| | | |
|---|---|---|
| 0001AB | T-39D BuNo | 151336 |
| 0001AC | T-39D BuNo | 150543 |
| 0001AD | T-39D BuNo | 150547 |
| 0001AE | T-39D BuNo | 150969 |
| 0001AF | T-39D BuNo | 150548 |

*See* Exhibit "A" at § B.

17. The Contracting Officer's failure to administer the Settlement Contract and arrange for the government's release of the T-39Ds as promised was breach of the Settlement Contract.

**SUM CERTAIN**

As compensation for Lan-Dale's damages for breach of the Settlement Contract described above, Lan-Dale demands the government pay the following sum certain:

| | |
|---|---|
| Five T-39Ds: | 275,000.00[3] |
| Lost profits: | 7,687,670.00[4] |
| Attorneys fees: | 44,268.17 |
| | $8,006,938.17 |

Dated May 6, 2002

KARP, HEURLIN & WEISS

Bruce R. Heurlin
Brian A. Laird

Dated MAY 6, 2002

Anthony J. D'Alessandris

[3]The values established by the government are $50,000 each for T-39Ds BuNo 151336, 150543, 150969, $55,000 for BuNo 150547, and $70,000 for BuNo 150548.

[4]$776,867.00 per year, per airplane, for two years.

# CERTIFICATION OF CLAIM

This certification is in reference to Lan-Dale Co.'s REVISED CLAIM to the Contracting Officer, dated May 6, 2002. I, Anthony J. D'Alessandris, am President of the Lan-Dale Co. Pursuant to 41 U.S.C. §§601-613, and FAR clause 52.233-1, "I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor."

Dated May 6, 2002,

Anthony J. D'Alessandris

# EXHIBIT JJ

UNITED STATES MARINE CORPS
MARINE CORPS BASE
QUANTICO, VIRGINIA 22134-5001

IN REPLY REFER TO:
4200
B40
23 May 02

JUN 2002
RECEIVED
S.S.G.H. & R.

Slutes, Sakrison, Grant, Hill & Rubin, P.C.
33 North Stone, Suite 1100
Tucson, Arizona 85701-1489

Attention: Mr. James M. Sakrison

Ref: Contract M00264-99-C-0003 (Lan-Dale Co.)

Dear Mr. Sakrison,

I am in receipt of Lan-Dale's letter dated 9 May 2002 identifying you as the attorney of record for a revised claim against the Government filed on 6 May 2002. I received the revised claim on 8 May 2002.

In order to become better informed of the facts of this case, I spoke to your assistant on 20 May 2002 about my need for additional information. The questions are as follows:

1. When was the payment for the de-militarization of the aircraft tendered to the Air Force Aerospace Maintenance and Regeneration Center (AMARC)?
2. Who was the Government agent at AMARC that Lan-Dale tendered payment to? (Please furnish the agent's name and telephone number)
3. What reason, if any, did the Government agent give refusing the payment?—
4. In order to substantiate your claim for lost profits, please provide proof of the existence of the business agreement for which potential profits were allegedly lost.

Please furnish me with answers to the foregoing questions by 5 June 2002 so I can make a timely decision.

For additional information please contact me at (703) 784-1921.

Gary E. Watson
Contracting Officer

# EXHIBIT KK

UNITED STATES MARINE CORPS
MARINE CORPS BASE
QUANTICO, VIRGINIA 22134-5001

IN REPLY REFER TO:
4200
B40
17

JUL 2002
RECEIVED
S.S.G.H. & R.

Slutes, Sakrison, Grant, Hill & Rubin, P.C.
33 North Stone, Suite 1100
Tucson, Arizona 85701-1489

Attention: Mr. James M. Sakrison

Ref: Contract M00264-99-C-0003 (Lan-Dale Co.)

Dear Mr. Sakrison,

On 3 July 2002 I received a response to my letter of 23 May 2002 requesting additional information. The response was provided by Mr. Tom Hamilton of LaFont, Tunnell, Formby, LaFont & Hamilton, L.L.P. Mr. D'Alessandris of Lan-Dale Co. previously identified your office as the attorney of record and directed that I submit all correspondence relative to the claim to you. I am confused at the present time why I received the response from Mr. Hamilton and not your firm.

Currently, I am awaiting additional information from the Air Force and anticipate a decision to your claim NLT 16 August 2002.

Gary E. Watson
Contracting Officer

# EXHIBIT LL

UNITED STATES MARINE CORPS
MARINE CORPS BASE
QUANTICO, VIRGINIA 22134-5001

IN REPLY REFER TO:
4200
16 Aug 02

AUG 2002
RECEIVED
S.S.G.H. & R.

Slutes, Sakrison, Grant, Hill & Rubin, P.C.
33 North Stone, Suite [illegible]
Tucson, Arizona 85701-148[illegible]

Attention: Mr. James M. Sakrison

Ref: Contract M00264-99-C-0003 (Lan-Dale Co.)

Dear Mr. Sakrison,

I drafted a response to your claim submitted under the referenced contract and have forwarded to my legal department for review and comment

I should have a final decision to you NLT 23 August 2002.

Gary E. Watson
Contracting Officer

# EXHIBIT MM

UNITED STATES MARINE CORPS
MARINE CORPS BASE
QUANTICO, VIRGINIA 22134-5001

IN REPLY REFER TO:
4200
B40
22 Aug 02

SEP 2002
RECEIVED
S.S.G.H. & R.

Shutes, Sakrison, Grant, Hill & Rubin, P.C.
33 North Stone, Suite 1100
Tucson, Arizona 85701-1489

Attention: Mr. James M. Sakrison

Ref: Contract M00264-99-C-0003 (Lan-Dale Co.)

Dear Mr. Sakrison,

I have reviewed Lan-Dale's revised claim, dated 6 May 2002, and all accompanying certifications, for alleged breach of contract. The claim represents a request for compensation for alleged breach of the settlement contract, M00264-99-C-0003. The total amount of the claim is for $8,006,938.17 and includes: cost of the aircraft ($275,000.00), lost profits in the amount of ($7,687,670.00) and attorney fees ($44,268.17).

The basic allegation is that the Contracting Officer failed to administer the settlement contract properly. Specifically, you allege that the Contracting Officer failed to arrange for the release of the aircraft as promised in an "as is, where is" condition. The claim further states that the Government failed to perform and that the Government has repeatedly committed acts of nonfeasance, malfeasance, and fraud.

In order to reach my decision, I have reviewed and considered the following:

1. The case file and all correspondence received to date,
2. Lan-Dale's submissions with attachments;
3. Discussions with Air Force and Navy personnel at the Aerospace Maintenance and Regeneration Center (AMARC), Davis-Monthan Air Force Base, AZ; and
4. Your response to my letter dated 23 May 2002.

As a result of my review I must deny your claim in its entirety.

My denial of your claim is based on the following:

1. Inconsistent statements. The original claim with attachments and existing documentation in the case file state that you attempted to tender $21,999 to AMARC but was refused. (Reasons and circumstances not provided) The letter of 3 July 2002, from Mr. Tom Hamilton representing the firm LaFont, Tunnell, Formby, La Font & Hamilton, L.L.P., stated that besides being irrelevant to the claim, the tender of payment to AMARC for demilitarization never **occurred**. Based on this information I am now forced to question the credibility of other

assertions of facts made in your behalf in previous correspondence regarding your claim and must also consider the possibility of your company having submitted a false claim.

2. Failure on your part to mitigate damages. According to AMARC personnel and your own admission, you have not attempted to tender payment for the demilitarization of your aircraft. AMARC personnel do not recall speaking with you or any representatives of your company since your engines were picked up. They indicate that you were informed of the required demilitarization of the aircraft as well as your payment obligations. Furthermore, agreement in principle to share the cost of demilitarization of the aircraft was reached in early 2001. Since you have not attempted to tender payment, I must conclude that the delay in taking possession of the aircraft is directly attributable to your failure to provide timely payment for the demilitarization to AMARC, and not to any misfeasance or malfeasance on the part of the Navy or AMARC.

3. Failure to comply with demilitarization procedures. Over the past several years your business has had various contracts with the Government for similar trades and purchase of surplus military equipment. Since you are in the business for doing this type of work, you either are or should be aware of the Government's requirements regarding the Defense Demilitarization Manual, DoD 4161.21-M-1 and the use of DLA Form 1488. Although you have asserted that the form is inappropriate for use after contract award, you have made no attempt to pursue alternatives to the DLA Form 1488 or provide the information that the form requires. From your many years of experience with Government surplus equipment, you are aware that equipment must often be removed from military aircraft before it is released to a civilian purchaser. I agree that the settlement contract included the phrase "As is, where is, with no warranties implied or operational condition guaranteed". That phrase, as used in the ordinary course of business, is intended to protect sellers from later claims from buyers that the property was unfit for its intended use. It should not be interpreted to imply that you were relieved of government regulations that apply to demilitarization. On the contrary paragraph C-3.2 stated that all costs for transportation, presentation, insurance, and incidentals related to the movement of the property shall be at the contractor's expense. If you feel that this language was ambiguous, as a joint drafter of the agreement, you should have brought this to our attention at the time of settlement. See paragraph C-5 of the settlement contract.

4. Lack of support for lost profits. There is insufficient evidence to support your claim of lost profits. You included no documentation that proves any contractual commitment between you and any other company to provide the aircraft leasing services in Mexico which form the basis for your claim of lost profits. There is nothing, aside from a bare assertion that you could have had such a contract and that how much you would have profited from such a contract that could support payment of $7,687,670.00.

Again, as stated above, you took no action for nearly two years to take possession of the aircraft. If such a lucrative business arrangement were in jeopardy, reasonable businessmen would have taken more aggressive measures to remove obstacles to the deal. Additionally, as noted above, the aircraft were sold in an "as is, where is" condition. Although AMARC makes every effort to store the aircraft under conditions which maximize their potential for future use, it is far from certain how many of the planes could have flown again. Therefore, your calculations, which are based on all five aircraft being placed in service and ignore the restoration costs for each aircraft, are illusory.

90 days from date of receipt is 12/16/0

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the Armed Services Board of Contract Appeals (ASBCA) and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the ASBCA, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Gary Watson
Contracting Officer

# EXHIBIT NN

FEDERAL ACQUISITION REGULATION

33.101 Definitions.

As used in this subpart-

"Day" means a calendar day, unless otherwise specified. In the computation of any period-

(1) The day of the act, event, or default from which the designated period of time begins to run is not included; and

(2) The last day after the act, event, or default is included unless-

(i) The last day is a Saturday, Sunday, or Federal holiday; or

(ii) In the case of a filing of a paper at any appropriate administrative forum, the last day is a day on which weather or other conditions cause the closing of the forum for all or part of the day, in which event the next day on which the appropriate administrative forum is open is included.

"Filed" means the complete receipt of any document by an agency before its close of business. Documents received after close of business are considered filed as of the next day. Unless otherwise stated, the agency close of business is presumed to be 4:30 p.m., local time.

"Interested party for the purpose of filing a protest" means an actual or prospective offeror whose direct economic interest would be affected by the award of a contract or by the failure to award a contract.

33.201 "Claim" means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract. A claim arising under a contract, unlike a claim relating to that contract, is a claim that can be resolved under a contract clause that provides for the relief sought by the claimant. However, a written demand or written assertion by the contractor seeking the payment of money exceeding $100,000 is not a claim under the Contract Disputes Act of 1978 until certified as required by the Act and 33.207.

"Misrepresentation of fact" means a false statement of substantive fact, or any conduct which leads to the belief of a substantive fact material to proper understanding of the matter in hand, made with intent to deceive or mislead.

33.204 Policy.

The Government's policy is to try to resolve all contractual issues in controversy by mutual agreement at the contracting officer's level. Reasonable efforts should be made to resolve controversies prior to the submission of a claim.

33.206 Initiation of a claim.

(a) Contractor claims shall be submitted, in writing, to the contracting officer for a decision within 6 years after accrual of a claim, unless the contracting parties agreed to a shorter time period. This 6-year time period does not apply to contracts awarded prior to October 1, 1995. The contracting officer shall document the contract file with evidence of the date of receipt of any submission from the contractor deemed to be a claim by the contracting officer.

(b) The contracting officer shall issue a written decision on any Government claim initiated against a contractor within 6 years after accrual of the claim, unless the contracting parties agreed to a shorter time period. The 6-year period shall not apply to contracts awarded prior to October 1, 1995, or to a Government claim based on a contractor claim involving fraud.

33.211 Contracting officer's decision.

(a) When a claim by or against a contractor cannot be satisfied or settled by mutual agreement and a decision on the claim is necessary, the contracting officer shall-

(1) Review the facts pertinent to the claim;

(2) Secure assistance from legal and other advisors;

(3) Coordinate with the contract administration office or contracting office, as appropriate; and

(4) Prepare a written decision that shall include a-

(i) Description of the claim or dispute;

(ii) Reference to the pertinent contract terms;

(iii) Statement of the factual areas of agreement and disagreement;

(iv) Statement of the contracting officer's decision, with supporting rationale;

(v) Paragraph substantially as follows:

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you

receive this decision; and

(vi) Demand for payment prepared in accordance with 32.610(b) in all cases where the decision results in a finding that the contractor is indebted to the Government.

(b) The contracting officer shall furnish a copy of the decision to the contractor by certified mail, return receipt requested, or by any other method that provides evidence of receipt. This requirement shall apply to decisions on claims initiated by or against the contractor.

(c) The contracting officer shall issue the decision within the following statutory time limitations:

(1) For claims of $100,000 or less, 60 days after receiving a written request from the contractor that a decision be rendered within that period, or within a reasonable time after receipt of the claim if the contractor does not make such a request.

(2) For claims over $100,000, 60 days after receiving a certified claim; provided, however, that if a decision will not be issued within 60 days, the contracting officer shall notify the contractor, within that period, of the time within which a decision will be issued.

(d) The contracting officer shall issue a decision within a reasonable time, taking into account-

(1) The size and complexity of the claim;

(2) The adequacy of the contractor's supporting data; and

(3) Any other relevant factors.

(e) The contracting officer shall have no obligation to render a final decision on any claim exceeding $100,000 which contains a defective certification, if within 60 days after receipt of the claim, the contracting officer notifies the contractor, in writing, of the reasons why any attempted certification was found to be defective.

(f) In the event of undue delay by the contracting officer in rendering a decision on a claim, the contractor may request the tribunal concerned to direct the contracting officer to issue a decision in a specified time period determined by the tribunal.

(g) Any failure of the contracting officer to issue a decision within the required time periods will be deemed a decision by the contracting officer denying the claim and will authorize the contractor to file an appeal or suit on the claim.

(h) The amount determined payable under the decision, less any portion already paid, should be paid, if otherwise proper, without awaiting contractor action concerning appeal. Such payment shall be without prejudice to the rights of either party.

33.214 Alternative dispute resolution (ADR).

(a) The objective of using ADR procedures is to increase the opportunity for relatively inexpensive and expeditious resolution of issues in controversy. Essential elements of ADR include-

(1) Existence of an issue in controversy;

(2) A voluntary election by both parties to participate in the ADR process;

(3) An agreement on alternative procedures and terms to be used in lieu of formal litigation; and

(4) Participation in the process by officials of both parties who have the authority to resolve the issue in controversy.

(b) If the contracting officer rejects a contractor's request for ADR proceedings, the contracting officer shall provide the contractor a written explanation citing one or more of the conditions in 5 U.S.C. 572(b) or such other specific reasons that ADR procedures are inappropriate for the resolution of the dispute. In any case where a contractor rejects a request of an agency for ADR proceedings, the contractor shall inform the agency in writing of the contractor's specific reasons for rejecting the request.

(c) ADR procedures may be used at any time that the contracting officer has authority to resolve the issue in controversy. If a claim has been submitted, ADR procedures may be applied to all or a portion of the claim. When ADR procedures are used subsequent to the issuance of a contracting officer's final decision, their use does not alter any of the time limitations or procedural requirements for filing an appeal of the contracting officer's final decision and does not constitute a reconsideration of the final decision.

(d) When appropriate, a neutral person may be used to facilitate resolution of the issue in controversy using the procedures chosen by the parties.

(e) The confidentiality of ADR proceedings shall be protected consistent with 5 U.S.C. 574.

(f)(1) A solicitation shall not require arbitration as a condition of award, unless arbitration is otherwise required by law. Contracting officers should have flexibility to select the appropriate ADR procedure to resolve the issues in controversy as they arise.

(2) An agreement to use arbitration shall be in writing and shall specify a maximum award that may be issued by the arbitrator, as well as any other conditions limiting the range of possible outcomes.

(g) Binding arbitration, as an ADR procedure, may be agreed to only as specified in agency guidelines. Such guidelines shall provide advice on the appropriate use of binding arbitration and when an agency has authority to settle an issue in controversy through binding arbitration.

# EXHIBIT OO

15 FEB 1998

AIRFREIGHT OPERATION - MEXICO
SABRELINER/T-39 (NA 265)

OPERATING COST ANALYSIS

FIXED COSTS: (based on 1,300 hours per year per aircraft).

| | | Per Hour |
|---|---|---|
| Salaries: | | |
| Pilot: | $2,500 per month; $30,000 per year | $23.07 |
| Copilot: | $1,000 per month; $12,000 per year | 9.23 |
| Insurance: | Approximately $15,000 per year | 11.53 |
| Administrative expense: | | 76.92 |
| | TOTAL FIXED COSTS PER HOUR | $120.75 |

DIRECT COSTS:

| | |
|---|---|
| Fuel, 600 gallons per hour | $180.00 |
| Engine reserves | 75.00 |
| Hot section - 2 engines, $40,000 @ 1,500 hours | 26.66 |
| Mechanic - labor | 75.00 |
| Parts | 175.00 |
| TOTAL DIRECT COSTS PER HOUR | $531.66 |

TOTAL FIXED COSTS & DIRECT COSTS PER HOUR $652.41